**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CONSOLIDATION COAL COMPANY,     )
           )
         Plaintiff,    )
           )
     v.     )
           )
UNITED STATES DEPARTMENT OF THE   )
INTERIOR, NATIONAL PARK SERVICE, et al.   )
           )   CIVIL ACTION No. 00-2120
         Defendants.   )
_____  )
           )
ROY BRENDEL and DIANE BRENDEL,   )
           )
         Third-Party Plaintiffs,   )
           )
     v.     )
           )
UNITED STATES DEPARTMENT OF   )
INTERIOR, OFFICE OF SURFACE MINING   )
RECLAMATION AND ENFORCEMENT,  et al.   )
           )
         Third-Party Defendants.   )

# EXHIBITS

**FOR BRENDELS' MOTION TO DISMISS COMPLAINT OF CONSOLIDATION COAL
COMPANY**

**EXHIBITS FOR BRENDELS' MOTION TO DISMISS**

# UNITED STATES CODE

*Congressional and Administrative News*

## 96th Congress—Second Session

### 1980

Convened January 3, 1980
Adjourned December 16, 1980

## Volume 5

LEGISLATIVE HISTORY
[Public Laws 96–472 to 96–522]

ST. PAUL, MINN.
WEST PUBLISHING CO.

LEGISLATIVE HISTORY
P.L. 96-515

# NATIONAL HISTORIC PRESERVATION ACT AMENDMENTS OF 1980

*P.L. 96-515, see page 94 Stat. 2987*

House Report (Interior and Insular Affairs Committee) No. 96-1457, Oct. 10, 1980 (To accompany H.R. 5496)

Senate Report (Energy and Natural Resources Committee) No. 96-943, Sept. 16, 1980 (To accompany S. 3116)

Cong. Record Vol. 126 (1980)

## DATES OF CONSIDERATION AND PASSAGE

House November 17, 1980
Senate November 19, 1980

The House bill was passed in lieu of the Senate bill. The House Report is set out.

## HOUSE REPORT NO. 96-1457

[page 1]

The Committee on Interior and Insular Affairs, to whom was referred the bill (H.R. 5496) to amend the National Historic Preservation Act of 1966, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

* * * * * * * * *

[page 15]

### INTRODUCTION

As reported by the Committee on Interior and Insular Affairs, H.R. 5496 amends the Act of October 15, 1966 ('The National Historic Preservation Act) and contains a number of other provisions that will further the preservation of historic properties.

[page 16]

H.R. 5496 was introduced by Representative John F. Seiberling and cosponsored by:

Mr. Udall
Mr. P. Burton
Mr. Sebelius
Mr. Edwards (Alabama)
Mr. Dellums

Mr. Howard
Mr. Wolff
Mr. Richmond
Mr. Bingham
Mr. Ottinger

6378

---

NATIONAL HISTORIC PRESERVATION
P.L. 96-515

Mr. McCloskey
Mr. Bauleman
Mr. Stark
Mr. Lagomarsino
Mr. Brown (California)
Mr. Kogovsek
Mr. Bennett
Mr. Black
Mr. Pepper
Mr. Won Pat
Mr. Simon
Mr. Derwinski
Mr. Winn
Mr. Mazzoli
Mr. Edward (California)
Mrs. Boggs (Louisiana)
Mrs. Byron
Mr. Barnes
Mr. Long (Maryland)
Mr. Studds
Mr. Baldus
Ms. Mikulski
Mrs. Spellman
Mr. Bauman
Mr. Moakley
Mr. Sabo
Mr. Vento
Mr. Gephardt
Mr. Williams (Montana)
Mr. Florio
Mr. Rodino
Mr. Fenwick
Mrs. Hughes
Mr. Evans
Mr. Thompson

Mr. Lundine
Mr. Weiss
Mr. Peyser
Mr. Downey
Mr. Stratton
Mr. Gudger
Mr. Mottl
Mr. Howard
Mr. Mineta
Mr. Vanik
Mr. Weaver
Mr. McDade
Mr. Murphy (Pennsylvania)
Mr. Kostmayer
Mr. Gray
Mr. Ritter
Mr. Beard
Mr. Derrotte
Mr. Duncan
Mr. Eckhardt
Mr. Pickle
Mr. Frost
Mr. de la Garza
Mr. Wyatt
Mr. Jeffords
Mr. Whitehurst
Mr. Pritchard
Mr. Lowry
Mr. Rahall
Mr. Kastenmeier
Mr. Baldus
Mr. Aspin
Mr. Corrada
Mr. Evans
Mr. Gore

As reported by the Committee, H.R. 5496 also incorporates a number of provisions relating to historic preservation contained in H.R. 6604, introduced by Representative Phillip Burton and cosponsored by Mr. Seiberling, Mr. Sebelius, Mr. Vento, Mr. Bingham and Mr. Kostmayer; H.R. 6804, introduced by Mr. Seiberling; H.R. 6808, introduced by Mr. Phillip Burton and cosponsored by Mr. Sebelius, Mr. Vento, Mr. Bingham, and Mr. Kostmayer; and H.R. 2498, introduced by Mr. Bingham.

[page 17]

### OVERVIEW AND PERSPECTIVE

H.R. 5496 represents the first major change in the National Historic Preservation Act since 1966. Like the 1966 Act, it is a landmark measure for American historic preservation. It denotes the maturation of

6379

## LEGISLATIVE HISTORY
### P.L. 96-515

over a century of Federal, State, local and private efforts to preserve significant remnants of our nation's historic cultural heritage.

The National Historic Preservation Act of 1966 expanded the role of the Federal government in historic preservation. Under the Historic Sites Act of 1935, the Federal role was limited to preserving historic sites and buildings of national significance. In 1966 Congress responded to the devastating effects of various Federal programs—such as urban renewal and freeway systems—on historic properties throughout the country and enacted the National Historic Preservation Act.

The 1966 Act established, for the first time, a partnership between the Federal government and the States and the private sector to protect our nation's historic resources. It broadened the National Historic Landmark program to establish the National Register of Historic Places, a list of significant historic properties at the national, State and local levels. The Act also provided grants to States to conduct historic surveys and plans and to acquire and develop historic properties; grants were also provided for the National Trust for Historic Preservation. It created the Advisory Council on Historic Preservation and established a program for reviewing the effects of Federal undertakings on historic properties.

H.R. 5496 builds on over 14 years of experience in developing a broad national historic preservation program. It recognizes the management needs of a program for identification and protection of over 15,000 years of American life in prehistoric hunting camps, frontier homesteads and towns, early 20th Century working-class neighborhoods, as well as major public buildings and monuments.

Indeed, the historic preservation movement itself has grown tremendously in the past decades. What started as a small movement in the 19th Century to save a few historic treasures such as Casa Grande Ruins in Arizona and Mount Vernon in Virginia now encompasses a wide range of historic properties in every State and nearly every city and town in America including the Canal-era village of Peninsula, Ohio, Chinatown in San Francisco, California, the prehistoric Pueblo Bonito in Chaco Canyon, New Mexico, a Russian Orthodox church in Sitka, Alaska, and a 16th Century fort in San Juan, Puerto Rico.

[page 18]

### HISTORY OF HISTORIC PRESERVATION

Historic preservation in the United States began through the efforts of private organizations and individuals. Federal support and leadership follow. Even today, its role is mainly to provide the stimulus and leadership for what is primarily a State, local and private sector activity.

Over 100 years ago, George Washington's home was offered to the Commonwealth of Virginia and to the Federal government. Both refused. Ann Pamela Cunningham, recognizing the importance of that

## NATIONAL HISTORIC PRESERVATION
### P.L. 96-515

site and the need to preserve it for future generations, formed the Mount Vernon Ladies' Association to save it. They did, and today millions of Americans continue to visit the home, still owned and operated by "The Ladies."

The first Federal preservation project was in the late 19th century, initiated by a citizen drive to protect from pot hunters the prehistoric Casa Grande ruins in Arizona. Vandalism of this and other archeological sites led to enactment of the Antiquities Act of 1906. That Act provided penalties for destroying or damaging any historic or prehistoric ruin on public lands and authorized the President to set aside historic places, landmarks and structures as well as other lands of significant scientific, natural, and scenic value. Thus, for example, Mesa Verde National Park was established as a monument on June 29, 1906 to protect some of the best preserved prehistoric cliff dwellings in the United States. At the same time, the Archeological Institute of America was Federally chartered to support archeological scholarship and excavation, and to disseminate information about archeology and antiquities to the general public. In 1916, the National Park Service was created to protect and manage many historic and prehistoric sites.

In the 1930's, the Works Progress Administration (WPA), in its "make-work" programs, hired archeological supervisors and hundreds of laborers to excavate some of the great prehistoric mounds of the Mississippi, Ohio and Tennessee River valleys. Concurrently, American historians and architects, concerned about our Euro-American built environment in the midst of a developing public works program pushed for passage of the Historic Sites Act of 1935.

The Historic Sites Act of 1935, declared for the first time a national policy of historic preservation and authorized the Secretary of the Interior to initiate a number of preservation programs. Under the auspices of the National Park Service, the National Survey of Historic Sites and Buildings began in 1937 with the goal of identifying and evaluating nationally significant properties. Under the 1935 Act, the Historic American Buildings Survey and the Historic American Engineering Record have been created to document historic structures through photography and measured drawings.

When World War II interrupted the efforts of historians, architects, archeologists, and engineers have been part cruelly dismayed by the accelerated loss of the prehistoric built environment, especially in urban areas, and of the prehistoric archeological record. To strengthen the private sector's role in historic preservation the National Trust for Historic Preservation was chartered in 1949 as a private, non-profit organization whose chief purpose was to facilitate public participation in the preservation of historic properties and antiquities. In compliment, in the post-war years, Federal involvement in historic preservation continued to expand into all aspects of programs that affect American heritage resources.

The late 1940's and subsequent surges in Federal reservoir construction had major adverse impacts on thousands of prehistoric riverside sites and historic homesteads and towns. As a result, the Smithsonian Institution established the River Basin Surveys as a salvage program to recover at least some of the impacted artifacts and information be-

[page 19]

## LEGISLATIVE HISTORY P.L. 96-515

fore they were destroyed or inundated. In 1960, the Reservoir Salvage Act codified requirements for such programs on Federal projects.

In the meantime, development of the Interstate Highway System had other major adverse effects on historic properties. Recognition of this resulted in directives in the Federal-Aid Highway Acts of the mid-1960's to save any antiquities impacted by Federally funded road construction. This led to the establishment of Highway Archeological Salvage Programs in most of the states by the late 1960's. Subsequently, to forestall the wholesale demolition of historic properties and neighborhoods, the Federal Highway Administration in 1966 was required to apply a "prudent and feasible alternative" standard for planning, and implementing specific projects that would adversely impact identified historic resources.

The 1960's saw a furthering of public concern about urban historic preservation.

In November 1964, the report of a Task Force on the Preservation of Natural Beauty was submitted to the President. It recommended, among other things, that: the National Park Service should be required to prepare a comprehensive list of the Nation's historic sites and areas; existing Federal loans and matching grants should be used by State and local governments for historic preservation; machinery should be set up so that Federally financed building projects do not conflict with historic preservation; and the National Trust for Historic Preservation should be given a "fresh legislative lease on life."

In May 1965, the White House Conference on Natural Beauty was convened; the Conference reinforced the recommendations of the Task Force and made recommendations for a program to certify historic landmark structures or areas; to create historic districts, wherever appropriate, including the whole of some historic towns; to expand public programs of ownership of historic structures and areas; to develop a coordinated public-private program of preservation, with the Federal government taking a leadership role; and to overhaul Federal, State and local tax policies to encourage preservation of approved historic and landmark structures.

In late 1965, the U.S. Conference of Mayors sponsored a "Special Committee on Historic Preservation," to study the problems facing historic preservation in the United States and to recommend necessary changes. Members of the committee included officials in various posts at all levels of government and representatives of national preservation organizations and institutions, including the National Trust. Their recommendations, published in February 1966 in a report entitled "With Heritage So Rich," led to enactment of the National Historic Preservation Act on October 15, 1966.

The 1966 Act was a major step forward in preservation law. For the first time, it recognized the importance of preserving properties of State and local, as well as national, significance. The House Report (No. 1916) from the Committee on Interior and Insular Affairs stressed the significance of the legislation:

> Notwithstanding the progress which has been made with regard to historic preservation, most existing Federal pro-

[page 20]

grams and criteria for preservation are limited to natural and historical properties determined to be "nationally significant."

6382

## NATIONAL HISTORIC PRESERVATION P.L. 96-515

Only a limited number of properties meet this standard. Many others which are worthy of protection because of their historical, architectural, or cultural significance at the community, State or regional level have little protection given to them against the force of the wrecking ball. Some of them are too expensive to acquire and preserve. It is important that if they are to be brought to light and the focused on their significance whenever proposals are made, in that may, be brought in. for instance, u e urban renewal field or the public roads program or for the construction of Federal projects or of projects under Federa license that may lead to their destruction. Only thus can a me ningful balance be affected between preservation of these i portant elements of our heritage and new construction to m et the needs of our ever-growing communities and cities.

The 1966 Act di ected the Secretary of the Interior to maintain an expanded listing . buildings, sites, districts, structures and objects significant in Ameri an history, architecture, archeology and culture—the National Regis er of Historic Places. It also, for the first time, offered Federal fu ding assistance to the States and to the National Trust for Historic Preservation activities and created the Advisory Council on Historic Preservation to comment on Federal undertakings that would affect historic properties.

In 1971, to provide further guidance for Federal agencies concerning their responsibilities for historic preservation, President Nixon signed an Executive Order 11593 on "Preservation and Enhancement of the Cultural Environment." The Executive Order directed Federal agencies to adopt measures for identifying and protecting properties in their ownership or control which might be eligible for National Register listing. The order also directed agencies to maintain National Register properties at professionally determined standards, to develop internal procedures for preservation, and to give early consideration in project planning to properties which might be eligible for the National Register.

The 1970's saw a number of other historic preservation measures enacted by the Congress. In 1974, the Archeological and Historical Preservation Act expanded the effect of the 1960 Reservoir Salvage Act by extending the notification and salvage requirements to all Federal, Federally assisted and Federally licensed projects that might cause the loss of significant historical or archeological data. Up to one percent of the total Federal project cost was authorized for recovery of data in such cases.

In 1976, the historic preservation grant program was expanded through establishment of the Historic Preservation Fund, authorizing up to $150 million a year through 1981. Preservation Fund, successfully established after the 1976 Act, the Historic Preservation Fund receives its moneys from revenues derived from offshore oil leasing, re

During the 96th Congress, the Archeological Resources Protection Act of 1979 was enacted. The Act requires permits for archeological excavations or collections on the public lands, and provides penalties for theft or destruction of archeological resources on those lands.

6383

# LEGISLATIVE HISTORY
## P.L. 96-515
[page 21]

## HISTORIC PRESERVATION TODAY

Historic preservation, as it is practiced today, incorporates many important national priorities—the need to conserve energy resources, to fight inflation, to revitalize our cities and to provide more opportunities for local employment. Recent studies have shown that historic preservation contributes to greater housing supply, increased tax revenues, new business starts, growth in retail sales, expanded tourism and convention activity, and increased public and private investments.

Throughout the country, adaptive use of historic structures and rehabilitation of historic districts have proved to be not just a source of local pride, but a means of helping local economies and saving energy. An example is Quaker Square in Akron, Ohio, where a 19th Century mill was transformed into an award-winning shopping complex and several of the original Quaker Oats silos have been renovated and are now a major hotel. Preservation activities in the historic district of Alexandria, Va. increased sales of restaurants at a rate of 142 percent or 24 percent annually. The Central Arcade, an adaptive reuse of a landmark in a two block area in Seattle's Pioneer Square Historic District, required less than one-fifth as much energy for rehabilitation materials and construction activities than would have been needed to produce the materials and build comparable new facilities—a net energy investment advantage over an equivalent new structure for the next two centuries.

First and foremost, however, the goal of historic preservation is to provide the citizens of our nation with an understanding and appreciation of our culture and heritage. It is to foster a long-range perspective of our communities and politics, of our technologies and development. It is directed toward protection and enhancement of modern remnants of our architectural and engineering traditions—for our immediate appreciation and use—and of the heritage information that is inherent in our prehistoric and historic resources—which serve to tie us to the lessons and achievements of the past.

Historic preservation does not inhibit development. It is, rather, a partner, one that has proven its effectiveness. The time is now to build on its successes, to learn from its experience.

## BACKGROUND OF LEGISLATION

H.R. 5496 is the culmination of nearly five years of study and work on issues affecting historic preservation.

In 1975, the Advisory Council on Historic Preservation, prepared an analysis of historic preservation in the United States. Issued in a report, "The status of historic preservation in the United States," and printed in January 1976,¹ reviewed the strengths and weaknesses of existing programs and discussed current problems and alternative approaches to solving these problems. The Council pointed to the need for increased Federal guidance and coordination, and the need for more action concerning historic properties throughout the nation.

¹ "The National Historic Preservation Program Today," Prepared by the Advisory Council on Historic Preservation, at the Request of Henry M. Jackson, Chairman, Committee on Interior and Insular Affairs, United States Senate, 94th Congress, 2d Session, January 1976.

# NATIONAL HISTORIC PRESERVATION
## P.L. 96-515
[page 22]

Legislation was introduced in the 95th Congress, similar to H.R. 5496, to strengthen and improve the national historic preservation program.² Although not formally considered by the Committee, the legislation prompted discussion among organizations and individuals concerned about the future of historic preservation.

In 1978, the historic preservation programs of the National Park Service—that is, those related to the Service's land management responsibilities—were transferred to the Heritage Conservation Recreation Service, created by Secretarial Order.

Over the past five years, historic preservation has been extensively studied by Congress. In 1977 at the request of the Chairmen of the Committee, the General Accounting Office prepared a massive survey of the national historic preservation program. During the 95th Congress, the Committee staff conducted its own oversight review of that program, the results of which were reported in Indications of the Historic Preservation and Recreation Surveys and Investigations staff report of the Federal historic preservation program. Finally, at the request of the Interior Committee Chairman, the GAO in 1980 completed a study of implementation of archeological salvage laws at the New Melones Dam project in California and is currently reviewing the entire Federal archeological program.

The Federal agencies involved in historic preservation have themselves examined the program in detail. Notable among these efforts was the Heritage Task Force assembled by the Secretary of the Interior as a result of a directive in President Carter's 1977 Environmental Message. For a task force to study and make recommendations concerning the preservation of the nation's heritage resources which led to the Administration's proposal for the National Heritage Policy Act.

H.R. 6801. In addition, HCRS began long-range policy reviews and studies of historic preservation programs in 1979. Also in 1979, the Advisory Council on Historic Preservation's Annual Report to the Congress and the President contained a major review of the nation-wide preservation agenda for the private sector; its recommendations are included in a report entitled "Preservation: Toward an Ethic in the 1980's."

H.R. 5496 draws heavily from these studies, the problems they identified and the solution to they proposed.

## PURPOSE AND NEED

H.R. 5496 amends the National Historic Preservation Act of 1966 to provide better definition and guidance for the national historic preservation program at the Federal, State and local levels. The bill reauthorizes the Historic Preservation Fund through 1987 at its current $150 million annual level. It provides a role for local governments in the program throughout certification at the State and Federal level, and specifies Federal agency responsibilities with regard to historic preservation programs. It would revise the structure of the Advisory Council on Historic Preservation.

² H.R. 9062, "A bill to establish a national policy for the preservation of historic, architectural, archeological and cultural resources, to establish a coordinated national historic preservation program, and for other purposes," introduced by Rep. John F. Seiberling, February 10, 1977.

Other sections of the bill are also intended to further historic preservation include provisions to ensure proper maintenance of archaeological resources, procedures for implementing the World Heritage Convention (approved by the Senate on October 26, 1973), a loan insurance program, and establishment of the national museum of the building arts. The bill does not contain the natural areas provisions contained in related bills considered in this Congress by the Committee.

Following are some of the issues addressed by H.R. 5496:

*State programs.*—Since enactment of the National Historic Preservation Act of 1966, the State programs have greatly matured, yet their authorities under the Act have remained minimal. In 1966, there were few preservation plans in any State and no territories; today, there are plans in every State and six territories.

The State programs are key to implementation of the 1966 Act. The State Historic Preservation Officer (SHPO), designated by the Governor, is responsible for statewide historic preservation surveys, inventories and plans, for nominations to the National Register and for administration of the grants program within the State. The SHPO also provides many professions of Federal undertakings for compliance with Section 106 of the National Historic Preservation Act. Each State with an approved program and a State SHPO has the assistance of full-time professional staff and a State historic preservation review board.

Despite the increased responsibilities placed on them, and despite the growth in their professional capabilities and experience, the States have not been treated as the full partner envisioned by the Congress in the 1966 Act. Lacking a statutory base for their programs, and subject to changing Administration priorities, the States were and individually could not remedy this. H.R. 5496 would remedy this by establishing the basic requirements for an approved State program and by providing more authority to the States for administration of the national program. Matching grants could be provided on a programmatic basis, and notification of allocations would be expedited. The intent of the Committee is to be promulgated by the Secretary of the Interior are clarified, and would be subject to review and possible disapproval by the Congress.

*Local programs.*—The 1966 Act, while recognizing the need to protect historic properties at the local as well as Federal and State levels, did not provide a specific role for local governments in the national program. In 1966 there were few local ordinances enacted to protect historic properties; today there are over 650. Local governments have grown tremendously yet they remain outside the formal participation mechanism for H.R. 5496 retains the Federal-State partnership established by the 1966 Act, including responsibility for the State to administer within the State, the Federal program pursuant to this Act, H.R. 5496 also establishes a process by which local governments could become certified by the State if they meet certain minimum standards. Once certified, the local governments will be included in the process of reviewing applications for nominations to the National Register and will share at least ten percent of the State's allocation from the Historic Preserva-

tion Fund. All local governments, regardless of certification, would have the opportunity to participate in actions taken by the Advisory Council on Historic Preservation with respect to Federal undertakings that affect those local governments.

*Federal programs.*—Although Executive Order 11593 was intended to provide guidance and direction to Federal agencies in implementing the National Historic Preservation Act of 1966, not all agencies have fully implemented the order, and certain provisions have had little effect. For example, the 1973 deadline for the completion of Federal surveys given in Section 2(a) of the Executive Order has led to some confusion among Federal agencies concerning their continuing responsibility to survey, inventory and nominate historic properties to the National Register after that date. Also unclear are Federal agency responsibilities for eligible, ineligible, owned or controlled historic properties; standards for documenting, mitigation and curation; relationships with the... among the State Historic Preservation Officers, Secretary of the Interior and the Advisory Council on Historic Preservation; and authorities for the use of funds to preserve historic resources.

H.R. 5496 provide clear direction to Federal agencies for the basic requirements that must be met under the National Historic Preservation Act. It provides only the minimal modification in the agency responsibilities as required by other laws, Executive Orders, or regulations, and does not limit the President's authority to specify additional responsibilities.

*Private sector.*—The success of historic preservation has always depended on the initiative and drive of the private sector. This was noted in the findings of the 1966 Act that "the major burdens of historic preservation have been borne and major efforts initiated by private agencies and individuals."

Since 1966, there has been a... provision of preservation organizations in towns and cities of all sizes. The nation's Bicentennial celebration in 1976 focused increased attention on the need to preserve our cultural heritage for future generations. The National Trust for Historic Preservation has seen its membership grow to 170,000 members; current estimates are that over 2 million Americans are supporting preservation interests through organizational memberships.

An increasing number of citizens have invested both dollars and "sweat equity" in preservation and rehabilitation of deteriorated properties in areas of town that were once characterized as "blighted and undesirable." Some have successfully funded such projects through the packaging of Federal programs. Many have the private investment in community development. Many have hampered by the severe limitation of available grants programs, the denial of tax benefits for residential rehabilitation, and the inability to obtain loans for both acquisition and improvement of historic properties.

H.R. 5496 recognizes the importance of the non-governmental role in the preservation program within many provisions of the legislation. The... uniformity of Federal and State relationships and responsibilities will assure increased involvement throughout the nation. The provisions permitting increased involvement of local government in the program offers new opportunities for preservation at the local level. These provisions and others requiring

greater public participation, will create new responsibilities for local nonprofit organizations to offer their assistance and expertise in the implementation of State and local programs.

The bill also offers a number of other provisions that will encourage preservation activities in the private sector. An insured loan program will be established specifically to stimulate private investment in the preservation of properties included on the National Register.

Programmatic grants will make it easier for private organizations and individuals to obtain grants. Information and training programs will be available for private organizations and individuals, as well as to Federal, State and local government agencies. Studies will be done to consider ways to further assist historic preservation including studies to develop means of identifying and conserving America's heritage; to examine the effects of the tax laws on the Historic Preservation Fund; to review conservation districts; and to examine the correlation, if any, between Federal and State laws and arson or fire "by suspicious origin" in historic properties.

*Other concerns.*—H.R. 5496 addresses a number of other concerns with the national historic preservation program, particularly related to the National Register of Historic Places and to the Historic Preservation Fund. While leaving the basic existing program intact, the bill provides further changes and direction of the program in response to identified problems and needs. These are explained in more detail in the Section-by-Section Analysis.

SECTION-BY-SECTION ANALYSIS

Section 1 states that the bill may be cited as the "National Historic Preservation Act Amendments of 1980."

TITLE I—FINDINGS AND POLICY

Title I provides a short title for the Act of October 15, 1966, the "National Historic Preservation Act," and adds a number of new findings and a statement of policy to that Act. Thus, it reaffirms that historic preservation is an important and continuing responsibility of the Federal Government, involves all levels of preservation, the States, local governments, Indian tribes and Native groups, and private organizations and individuals.

TITLE II

Title II provides reauthorization and direction for the Federal, State and local historic preservation programs.

Subsection 101(a)(1) reauthorizes the Secretary of the Interior's responsibility to expand and maintain the National Register of Historic Places which, as under the 1966 Act, is intended to include properties of States and local, as well as national, historic significance. All historic properties included on the National Register on the date of

enactment of the Act will remain on the Register unless subsequently removed. All historic properties listed as National Historic Landmarks in the February 9, 1979 Federal Register and those listed before enactment of this Act would also retain their designation. In the cases of National Historic Landmark districts for which new boundaries have been established, boundaries must first be published in the Federal Register and submitted to the authorizing committees of Congress.

The purpose of this subsection is to assure the continued validity of all historic properties included on the National Register and historic properties designated as National Historic Landmarks, whether they are individual monuments or districts and whether they were designated under the Historic Sites Act of 1935. By grandfathering in the properties presently included on the National Register or designated as National Historic Landmarks, the Committee recognizes that some properties may have lost the historic qualities for which they were included or designated. Therefore, to preserve the integrity of the National Register and National Historic Landmark program, the Committee provides for the regulations in this Section, that the Secretary may remove properties from the National Register or may remove the National Historic Landmark designation.

Subsection 101(a)(2) directs the Secretary to establish the criteria for properties to be included in the National Register and also criteria for National Historic Landmarks. The Committee does not intend by these provisions that the Secretary should necessarily expand the existing criteria, but rather that the criteria should be reviewed and revised when that is necessary. The present criteria appear adequate. However, criteria are used about the application of the criteria, and whether the criteria are being applied too narrowly or too broadly. Clearly, professional judgments are involved, and there may vary among professionals themselves; however, the Committee expects the Secretary to provide sufficient guidance under the regulatory procedures required by this Act, to assure the uniform application of professional evaluation standards at the Federal level.

Paragraph (2) further directs the Secretary to promulgate or revise regulations as may be necessary for procedures for nominations to, and removals from, the National Register; for obtaining the consent of property owners; for designating properties as National Historic Landmarks and for removing such designation; for considering appeals; for nominating historic properties to the World Heritage list; and for making determinations of eligibility for the National Register; and for publishing, in the general public.

The Committee recognizes that the new requirement for regulations for owner notification and concurrence before properties may be in-

* Criteria. National Register, as specified in 36 CFR 12.6: "The quality of significance in American history, architecture, archeology, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association and
a. that are associated with events that have made a significant contribution to the broad patterns of our history; or
b. that are associated with the lives of persons significant in our past; or
c. that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
d. that have yielded, or may be likely to yield, information important in prehistory or history."

Case 2:00-cv-02120-DSC    Document 100    Filed 02/10/2006    Page 9 of 98

cluded on the National Register or designated as National Historic Landmarks may present administrative difficulties, particularly for the State Historic Preservation Officers. There are, for example, problems with multiple ownerships of individual buildings, the volume of ownerships in historic districts, multiple ownerships where surface and mineral rights are owned separately, and absentee owners. By providing for regulations to implement the requirements of paragraph (6), there should be adequate flexibility to address the various situations that might arise. In drafting the regulations, the Secretary should consult with the Committee to assure that the intent of this provision is carried out.

Paragraph (3) provides that properties nominated by Federal agencies and by States with approved State programs will be included on the National Register 45 days after the Secretary receives the nomination and the necessary documentation unless the Secretary disapproves such nomination or unless there are no unnecessary delays in the nominations. If the 45-day procedure is too short, the nominations have been properly followed and the documentation is sufficient, the Secretary should be able to approve the nomination without a substantive review. The Secretary should, however, review particular nominations on a spot-check basis, or as otherwise necessary, to insure the integrity of the program.

Paragraph (4) provides for nominations to the National Register by any person or local government to appeal a nomination or designation as a National Historic Landmark, or the failure or refusal of a nominating authority to make a nomination or designation. The Secretary is authorized to allow due consideration of appeals where the appeal itself might cause an undue delay, in approval or otherwise where present a hardship.

Paragraph (6) prohibits the Secretary from including any non-Federal property on the National Register unless the nomination is accompanied by a statement in writing from the nominating authority that the owner concurs to the inclusion. In the case of designations of National Historic Landmarks, the owner's consent itself must be in writing. In the case of historic districts, only majority concurrence is required.

The Committee recognizes that listing on the National Register does not, under the Act or under the 1966 Act, restrict in any way what a private property owner may do with his or her property. The Committee also recognizes, however, that other State and local laws for the protection of historic properties could be triggered as a result of listing on the National Register. The Committee does not intend, by adopting the so-called "owner consent" provisions, to affect State or local laws nor to encourage such owner consent provisions at the State or local level. Indeed, it is at the State and local levels of government, which have the police powers of zoning and other related regulatory tools, where more protective controls can be imposed. The National Register is not intended in and of itself to be simply an "honor roll." Rather, it is a planning tool that helps identify those properties which should be considered in Federal planning decisions, and it is a mechanism for identifying those properties which may receive certain Federal assistance.

The Committee notes that owner consent is not required for determinations of Register eligibility for the review of Federal undertakings by the Advisory Council on Historic Preservation. These determinations of eligibility are based solely on the professional evaluations of eligibility, to insure that historic resources are given proper consideration in Federal decision-making. In this regard, the State and local inventories, and not just the National Register, comprise the basic data base of historic resources throughout the nation. They are the basic source of information for evaluations of significant historic properties for Federal planning and management at the Federal as well as the State and local levels. The Committee did not require owner consent, prior to professional consideration of this provided evaluation of a property's historic significance. Nor is the owner's consent required for the State or local inventories under this Act.

Furthermore, the Committee, as noted earlier, intends for the regulations required under this section to provide sufficient flexibility to assure that the intent of paragraph (6) is met while not placing undue administrative burdens on the National Register process.

Lastly, the Committee notes that the provisions for owner notification and consent do not apply to properties included on the National Register, or designated as National Historic Landmarks, on or before the date of enactment of this Act. (There are presently over 21,000 National Register properties, and 1,535 National Historic Landmarks.) In addition, H.R. 5496 provides many incentives for properties to be listed on the National Register. For example, the grant and insured loans available under this Act would be available only for the preservation of National Register properties.

It is doubtful that in the future many owners who object to having their properties listed will be denied the opportunity to participate in the benefits of this Act. Properties; these owners, however, should be given the opportunity at the time of nomination.

Section 101(a)(1)(A) and (B) direct the Secretary to promulgate regulations to ensure that significant prehistoric and historic and associated records resulting from various Federal activities are deposited in institutions with adequate long-term curatorial capacities. Regulations are also required to assure establishment of a uniform process and standards for documenting historic properties to be incorporated into or to complement the national historical and architectural and engineering record.

Paragraph (7) directs the Secretary to ensure that historic resource artifacts and associated records (including geological and biotic samples from archaeological sites, as well as historical architectural and engineering records) collected pursuant to Federal recovery requirements be appropriately curated. Such curation is to be adequate to preserve the collected data and objects for future research and for the development of public interpretive programs. The relevant Federal requirements are set forth in Section 110(b) of this Act and in the Archeological and Historic Preservation Act of June 27, 1980, both of which state that Federal agencies must recover historic and archeological data (records) and specimens that are to be destroyed

Secretary is required to submit a report of the study and recommendations to the President and the Congress within two years of enactment of this Act.

Cultural park is defined in the National Historic Preservation Act to mean a definable urban area which is distinguished by historic resources and land related to such resources and which is an interpretive, educational, and recreational resource for the public at large. Historic conservation district is defined to mean an urban area of one or more neighborhoods which contains historic properties, building having similar or related architectural characteristics, cultural cohesiveness or any combination of the foregoing.

The primary difference between a cultural park and an historic conservation district is the requirement that a cultural park must include resources for public uses—interpretive, educational and informational. A cultural park may, in fact, contain an historic district but historic conservation districts, so long as appropriate forms of public uses are provided.

In considering the study, and formulating the recommendations, the Secretary should consider settings in which a distinctive environment or atmosphere prevails which reflects a particular social and historical heritage of intrinsic significance to an area. He should also explore opportunities for using cultural resources as part of educational programs where both students and visitors can assimilate and understand the various relationships and historic settings. Urban waterfronts and other natural land areas with historical associations which offer active and passive recreational opportunities should be considered.

In addition, the Secretary should study and make recommendations concerning opportunities for development and revitalization of urban areas in conjunction with the management of urban recreational, cultural and historical resources; existing Federal activities affecting the identification, conservation, and management of various resources; and procedures for developing and coordinating the activities in cultural parks and historic conservation districts through Federal, State and local programs and through private efforts.

Section 507 directs the Secretary of the Interior to submit a report to the President and the Congress on the historic properties, including a review of Federal laws to determine any relationship between these laws and use of historic properties, and for amendments to such laws, where appropriate, to provide a comprehensive Federal role to exist. The study should also address the feasibility and necessity of protective measures at the Federal, State or local level for the prevention, detection, and control of arson or fire by suspicious origin, and recommendations concerning the proper Federal role in assisting States and local governments. The report is due within 18 months after enactment of this Act.

In conducting the study and in making recommendations, the Secretary is directed to cooperate with the Secretary of the Treasury, the Administrator of the United States Fire Administration and the Administrator of the Federal Insurance Administration. In addition, the Committee expects that the Secretary will consult with other appropriate Federal agencies—including the U.S. Forest Service—and appropriate State and local agencies.

6414

## OVERSIGHT STATEMENT

The Committee on Interior and Insular Affairs has conducted a number of oversight reviews of the national historic preservation programs relating to the provisions of H.R. 5496. Studies have been conducted by the Committee staff and by the General Accounting Office (GAO) at the request of the Chairman. Many of the findings and recommendations of these studies have been incorporated into H.R. 5496. In addition, H.R. 5496 requires a number of additional specific studies and reports to the Congress on matters relating to historic preservation, in order to ensure continued review and oversight. None of the matters contained in the legislation have been the subject of any reports or recommendations from the Committee on Government Operations under Rule X, clause 2(b)(2) of the Rules of the House of Representatives.

## INFLATIONARY IMPACT STATEMENT

The Committee estimates that enactment of H.R. 5496 will have little or no significant inflationary impact on the nation's economy. The bill primarily amends existing historic preservation programs. Furthermore, the renovation and reuse of historic properties, encouraged under the legislation, help to reduce inflation by conserving both energy resources and raw materials.

## LEGISLATIVE HISTORY

H.R. 5496 was introduced on September 28, 1979. On March 17 and 18, 1980, the Subcommittee on National Parks and Insular Affairs held hearings on the bill and several related measures: H.R. 6504, H.R. 6803, and H.R. 2494. The Subcommittee met on September 22 to consider a staff draft containing revisions in the original bill; an amended version was then recommended to the full Committee.

## COST AND BUDGET ACT COMPLIANCE

As already noted, the legislation extends the current annual authorization level for the Historic Preservation Fund at $150 million for fiscal years 1982 thru 1987. In addition it authorizes a loan guarantee program to be funded from the nonappropriated balance of the Historic Preservation Fund in effect at this time (approximately $965 million). The analysis of the Congressional Budget Office follows:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
Washington, D.C., October 1, 1980.

Hon. MORRIS K. UDALL,
Chairman, Committee on Interior and Insular Affairs, U.S. House of Representatives, Longworth House Office Building, Washington, D.C.

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed H.R. 5496, the National Historic Preservation Act Amendments of 1980, as ordered reported by the House Committee on Interior and Insular Affairs, September 30, 1980.

6415

## LEGISLATIVE HISTORY
### P.L. 96-515
[page 53]

This bill amends the National Historic Preservation Act of 1966 and directs the Secretary of the Interior to develop or revise regulations regarding certification of state historical preservation programs. Section 204 of the bill establishes a new loan guarantee program, which directs the Secretary of the Interior to establish and maintain a program for insuring loans made to finance any project for the preservation of a historic property. The loan program guarantee ceiling is set at the appropriated level which defaults would be covered by funds provided in effect on the date of enactment of this Act, or approximately $365 million (assuming early fiscal year 1981 enactment). There would not be any direct budget impact for the guarantee part of the loan program. However, such guarantees represent a contingent liability to the federal government, and a default on an insured loan would result in federal outlays. Such defaults would be covered by funds provided by appropriations action for just such a purpose. However, it is not possible to estimate the likely default rate and budget impact of the program.

The bill also directs that the head of each federal agency designate an official to be the agency's "Preservation Officer" and that each agency shall also designate qualified officials at the field or regional level to assist with discussion with the Historic Preservation Conservation and Recreation Service, it is assumed that such appointments may be made with existing agency personnel. Agencies would not have to designate or entitle a new position to carry out preservation activities, since such functions may be carried out by existing personnel who handle environmental issues. Thus, no new costs are estimated for this provision.

In addition, Section 205 of the bill extends current law and directs that $150 million of Outer Continental Shelf Lands Act receipts from fiscal years 1982 through 1987 be available for appropriation for the Historic Preservation Fund. This is the same amount covered into the existing Historic Preservation Fund for fiscal years 1980 and 1981, although appropriations in recent years have been far below that level ($90 million in fiscal year 1979 and $25 million in 1980).

Title V of the bill provides a legislative veto of regulations proposed by the Secretary of the Interior under the National Historic Preservation Act, and mandates a number of studies. The studies cover such subjects as conserving intangible elements of cultural heritage, federal tax laws regarding historic preservation, operation of the Historic Preservation Trust Fund, plans of the Pennsylvania Avenue Development Corporation, coordination of cultural parks and districts and fire protection of historic properties. The costs of the legislative review or proposed regulations promulgated under this Act will not be significant. Studies are highly dependent on the number and type of studies undertaken and the extensiveness of such reviews; however, the costs associated with this provision and with the required studies are not expected to be significant.

Should the Committee so desire, we would be pleased to provide further details on this estimate.

Sincerely,

Alice M. Rivlin,
*Director.*

---

## NATIONAL HISTORIC PRESERVATION
### P.L. 96-515
[page 54]

### COMMITTEE AMENDMENTS AND RECOMMENDATIONS

The Committee on Interior and Insular Affairs approved a revised substitute text of H.R. 5496 on September 30, 1980, meeting in open session. H.R. 5496, as amended, favorably reported by voice vote. The Committee recommends enactment of the bill by the House.

### DEPARTMENTAL REPORTS

The following correspondence (September 10, 1979, two of March 14, 1980, and September 29, 1980) have been received from the Department of the Interior on matters that were incorporated into the amended text of H.R. 7496.

U.S. DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D.C., September 10, 1979.*

Hon. THOMAS P. O'NEILL,
*Speaker, U.S. House of Representatives,*
*Washington, D.C.*

DEAR MR. SPEAKER: Enclosed is the "National Heritage Policy Act of 1979," a bill to implement the National Heritage Program called for in President Carter's 1977 Environmental Message. The bill is the result of a study initiated in mid-1977 by a National Heritage Task Force and program decisions made thereafter by this Department and the President. The Task Force was composed of numerous representatives of Federal and State agencies, private organizations, and individuals. Its recommendations have been widely circulated to interested individuals, groups, and government officials throughout the country.

We recommend that the enclosed bill be referred to the appropriate committee for consideration, and that it be enacted.

The purpose of the bill is to establish a national policy and provide the basis for protecting, restoring, and maintaining significant aspects of our national heritage. Our national heritage consists of that collection of resources important to Americans because they are significant aspects of our history and culture and significant elements of our natural environment. Natural areas include lands and waters of ecologic and geologic significance to the Nation's natural environment at the national, State, and local level. Historic places include districts, sites, buildings, structures, objects, networks, cultural landscapes, and neighborhoods significant in American history, architecture, archeology and culture at national, State and local level. By identifying these areas and places, we will be helping to preserve our American heritage.

The National Heritage Program is a Federal initiative to work with the States and others to coordinate and strengthen existing public and private efforts to identify and protect significant natural areas and historic places. It will also provide a basis for developing and refining a consistent Federal policy and program for heritage resources. The National Heritage Policy Act will not supplant any existing Federal program which identifies or protects natural areas or historic places. It will assist those programs by assuring that information on such resources is available to those programs in a timely manner and in a useful form. As such, it will facilitate rather than obstruct Federal planning and

Federal actions. In addition, the bill provides for the judicious application of exemptions from the program and agencies may issue counterpart regulations to ensure that program compliance is consistent with their missions, mandates, and time requirements.

Since a national program for historic preservation has been in place since the 1906 National Historic Preservation Act, the nation can draw upon a similar level of sophistication developed in the Federal program. The national program component of the proposed National Heritage Program will be brought up to a similar level of sophistication and use as a foundation, the accomplishments of Federal land management and use as a foundation, the accomplishments of existing programs for the conservation and protection of heritage resources. Thus, this bill does not substantially change, but seeks to build similar efficient and effective identification and protection of heritage resources, planning for significant natural areas. In similar responsibilities for the conservation inherent in Federal programs, order to avoid the additional significant natural areas, to develop a uniform and this proposal is not and will come, but rather an effort consistent system of Federal lands and the identification and inventory of significant natural areas and historic places—the foundation of a nationwide effort to protect heritage resources through informed planning and policy making.

The key components of the proposed National Heritage Program are as follows:

1. *The identification of potential heritage areas and places.*—Identification of our natural and heritage resources is a major step in the preservation of our natural heritage. Identification of heritage resources will be undertaken by the States through State Natural Heritage Programs which they may voluntarily participate in, as established by section 201(f) and the State Historic Preservation Programs available from 201(g). Financial support for these programs is not and will come from the Land and Water Conservation Fund and the Historic Preservation Fund, respectively. Federal historic resources are directed to locate and nominate to the National Register which appear on lands which they own or administer to the head of any such agency to be eligible for the Historic Register, and similarly to cooperate with the Secretary and the States in identifying and nominating areas for the National Register.

2. *The Registers.*—Once identified, the States, Federal agencies, Indian tribes, individuals, or public or private agencies, as appropriate, may recommend areas and places which appear to be eligible for listing in either the National Register of Natural Areas, established by section 201(b) of this Act, or the National Register of Historic Places. The Secretary already administers the National Register of Historic

Places under authority of the National Historic Preservation Act of 1966, as amended, 16 U.S.C. § 470 et seq. These recommendations will be forwarded to the Secretary as nominations to the Registers by the State Natural Heritage Officer or the State Historic Preservation Officer, who will review and recommend them for either Register. The owner will be notified when the recommended for either Register. The criteria for a natural area or historic place of national, State, or local significance will be established under the Secretary's direction within one year of the effective date of the Act. These criteria will be developed in consultation with appropriate Federal agencies and participating States. The Registers will contain a comprehensive listing of areas and places significant to this nation's natural and heritage, planning and management processes.

The criteria to be prepared for the designation of significant areas will be capable of excluding as well as including areas that will be of high enough standards to limit those properties selected for national significance to a relatively small proportion of all properties eligible to be placed on the National Registers. Natural areas determined to be of national significance which are on the Register will be designated at National Natural Landmarks; nationally significant historic places which are on the Register will be designated as National Historic Landmarks.

3. *Protection.*—Once listed on either Register, or determined to be eligible for listing, significantly natural areas and historic places will receive a variety of protections:

a. The heads of Federal agencies responsible for Federal or federally assisted actions which may affect listed or eligible areas and places will be required to take such efforts into consideration for the purpose of avoiding or mitigating adverse impacts. This consideration will include consultation with the Council on Heritage Conservation, an independent Federal agency established by Title II of the bill. This procedure is currently required for places listed in or eligible for listing on the National Register of Historic Places, pursuant to section 106 of the National Historic Preservation Act of 1966, as amended. Section 204 of the bill extends the section 106 requirements to natural areas. The Advisory Council on Historic Preservation is renamed the Council on Heritage Conservation and has been expanded to include certain responsibilities for natural areas. The requirements of section 106 of the National Historic Preservation Act of 1966, as amended, and section 204 of this Act will now prohibit Federal or federally assisted actions which may adversely affect eligible or listed areas and places, but will help assure that efforts to avoid unnecessary adverse impacts are undertaken.

b. Section 205 of the bill requires that any Natural or Historic Landmarks not be adversely affected by any Federal undertaking unless there is no prudent and feasible alternative exists, and then only when planning and action are undertaken to minimize harm. This requirement, while not prohibiting adverse impacts on listed areas and places, will assure that efforts to avoid unnecessary adverse impacts are undertaken.

c. Although no new or additional planning acquisition, or development funds are called for in this bill, States may use Federal financial

## LEGISLATIVE HISTORY
## P.L. 96-515
[page 57]

assistance for planning, acquisition, and appropriate development of significant natural areas and historic places. This element of the program is currently in effect for historic places under the Historic Preservation Fund established by the National Historic Preservation Act of 1966, as amended. Section 2(f) of this bill will make available similar funding for natural areas by amending section 6 of the Land and Water Conservation Fund Act, as amended. 16 U.S.C. § 460l-8, to authorize Federal assistance to States that wish to use this funding source for planning, acquisition, and development of eligible natural areas even though, in some instances, the recreational use of such areas and places may have to be limited in order to protect fragile resources.

d. In addition to the specific protection measures mentioned above, section 4(b) gives general authority to the Secretary to (1) further the identification and protection of significant natural areas and historic places through technical assistance, consultation and cooperation with other Federal agencies; (2) extend honorific recognition of exceptional efforts by local governments and the private sector in the identification and protection of heritage resources; and (3) study, in cooperation with other agencies and organizations, other appropriate protection measures and actions.

As an administrative complement to the legislative proposal, the Secretary has established, by Secretarial Order #3017 of January 25, 1978, a Heritage Conservation and Recreation Service within the Department of the Interior. This Service administers most of the programs formerly administered by the Bureau of Outdoor Recreation. In addition, the Secretarial Order transferred from the National Park Service to the Heritage Conservation and Recreation Service the National Natural Landmarks Program and the Office of Archeology and Historic Preservation, which administers the Historic Preservation Fund, the National Register of Historic Places and the National Historic Landmarks Program. The consolidation of the planning and grant administration activities relating to outdoor recreation and the conservation of natural areas and historic places will serve to strengthen the efficiency and effectiveness of these programs and achieve necessary coordination between them which was lacking in the past.

The Office of Management and Budget has advised that this legislative proposal is in accord with the program of the President.

Sincerely,

Ronarr Hernsrr, *Secretary.*

Enclosure.

*     *     *     *     *

## NATIONAL HISTORIC PRESERVATION
## P.L. 96-515
[page 66]

U.S. Department of the Interior,
Office of the Secretary,
Washington, D.C., March 14, 1980.

Hon. Morris K. Udall,
Chairman, Committee on Interior and Insular Affairs, U.S. House of Representatives, Washington, D.C.

Dear Mr. Chairman: This responds to your request for the views of this Department on H.R. 5496, a bill "To amend the National Historic Preservation Act of 1966 and for other purposes."

Although we support several of the provisions of H.R. 5496, we recommend against its enactment. Instead, we recommend the enactment of H.R. 6504, the proposed National Heritage Policy Act of 1979, which is identical to the Administration's proposal. Many of the provisions contained in H.R. 5496 are also in H.R. 6504. Those that we support in H.R. 5496 but not in H.R. 6504 are discussed herein and are recommended for inclusion in H.R. 6504.

The principal effects of H.R. 5496 would be as follows:

1. To restructure the National Register of Historic Places and incorporate both State and local inventories into officially recognized lists.

2. To create an independent historic preservation agency incorporating the current historic preservation functions of the Heritage Conservation and Recreation Service and the Advisory Council on Historic Preservation.

3. To authorize a comprehensive program of Federal loans and loan guarantees.

4. To restructure the Historic Preservation Fund (HPF) program to provide HPF money directly to qualifying communities primarily

[page 67]

through the State Historic Preservation Officers (SHPO) by directing program money to certified programs and mandating pass-through of funds to local bodies that have been approved by the SHPO.

5. To define comprehensively and expand Federal agency responsibilities for historic properties and offer tools to Federal agencies to assist them in that function.

6. To spell out in detail Departmental responsibilities and forms of participation in the World Heritage Program.

7. To mandate education and training programs for a wide range of audiences.

8. To reauthorize the HPF for $150,000,000 through 1989.

9. To include a series of miscellaneous provisions on preservation awards, Center for the Building Arts, various reports, and a study of the Pennsylvania Avenue Development Corporation.

Several of the provisions of H.R. 5496 are included in H.R. 6504. These include: reauthorization of the Historic Preservation Fund for $100 million through 1983; codification of the basic Federal responsibilities stated in Executive Order 11593; general direction for Departmental participation in the World Heritage program; creation of new categories of properties for listing in the National Register; and establishment of a "prudent and feasible alternative" standard for Federal review of actions affecting National Historic Landmarks.

## LEGISLATIVE HISTORY
### P.L. 96-515

We believe that H.R. 6904 is a straightforward proposal, simple in design, which allows involvement at all levels of government, invites voluntarism, and encourages interplay in a purposeful manner to accomplish protection of our irreplaceable heritage resources. By contrast, H.R. 5496 is an extremely complex proposal that would be difficult to administer. H.R. 5496 would require this Department to maintain three separate lists of architectural properties and to accord logically significant properties, triggering a different level of protection and assistance to each. We are opposed to this proliferation of lists as it would create confusion in both the public and private sectors. In addition, this would necessitate a significant increase in administrative workload.

This Department also strongly opposes the creation of a new preservation agency. Creation of such an agency would be detrimental to the proper functioning of the preservation program. Under existing law, the functions of this preservation are carried out by an agency that also conducts environmental review is of particular concern. There is a strong linkage between natural and cultural heritage resources and we believe this linkage should be encouraged by responsibilities administered by the same agency. This concept is the premise of H.R. 6904.

H.R. 5496 also authorizes the establishment of historic preservation loan and loan guarantee programs. Although loans and loan guarantees may be useful tools to accomplish the objectives, we have serious reservations. Regarding a cost-benefit ratio for Federal loan participation in historic preservation, we believe, however, that such programs because of their high, administrative costs. Administration of such programs at the State level—closer to the resources—is more appropriate.

H.R. 5496 would create a highly structured grant program that includes legislated formulas and criteria.

[page 68]

authorizations that provide greater flexibility to respond to changing needs and effectively focus limited resources. We also oppose the concept of mandated program grants to all States since many State programs are not of sufficient size to effectively manage a programmatic grant. In addition, while we support the concept of encouraging local participation and responsibility for historic preservation, we do not feel that the H.R. 5496 approach would accomplish this goal in all regions of the country and could result in spreading our resources too thinly. The President's fiscal year 1981 budget proposes that the States' Historic Preservation Fund allocations should be directed to the extent possible to building up local preservation programs.

We support codification of E.O. 11593, which defines Federal agency responsibilities for cultural resources. Although H.R. 5496 very generally addresses these responsibilities for cultural resources, it goes beyond E.O. 11593 by requiring specific property management plans and by imposing new penalties for failure to comply with Section 106 and E.O. 11593 requirements we are opposed to both these additional requirements as unduly onerous.

The proposed National Heritage Policy Act identifies the Department's basic World Heritage responsibilities. H.R. 5496 is considerably more detailed, but not incompatible with the Department's current operation of the program. While we recognize the importance of

## NATIONAL HISTORIC PRESERVATION
### P.L. 96-515

training and education programs, we currently have the authority to conduct such programs. In this instance, as elsewhere, we prefer general authorities which permit maximum administrative flexibility as opposed to specific mandates.

We also oppose provisions that limit assistance to public buildings. We use ... governments for ... purposes, establish a per year grant limit, ... for specific ... restrict the use of contributed goods and services as match for HTF money, and allow the head of the proposed new agency to impose a 60 day delay when a National Register property is scheduled for demolition.

We support the inclusion in H.R. 6904 of a provision that would permit the Secretary to provide program grants to States with comprehensive programs so that they can take a thorough approach to preservation while retaining full responsibility, grant authority, for other States that, ... the full responsibility. This would not mandate ... flexibility in the matching ratio they establish and recommend match ... funding of up to 100 percent for nationally significant properties. We believe, however, that States receiving such grants should match all Federal monies that are used for administrative expenses.

We support the provisions of H.R. 5496 that would provide specific authority for the use of HTF funds in projects that use other Federal funds. We believe, however, except as otherwise authorized by law, no other Federal funds should be used to match HTF money. With respect to the provisions of H.R. 5496 that would waive current 1 percent limitation on use of project funds for archeological salvage, we ask the Congress to defer consideration of this issue until we establish an Administration position as to whether current authority already allows such waiver.

[page 69]

The Office of Management and Budget has advised that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

ROBERT HERBST,
Secretary.

—

U.S. DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
Washington, D.C., March 14, 1980.

Hon. MORRIS K. UDALL,
Chairman, Committee on Interior and Insular Affairs, U.S. House of Representatives, Washington, D.C.

DEAR MR. CHAIRMAN: This responds to your request for the views of this Department on H.R. 2484, the proposed "National Cultural Park Act of 1979".

We recommend the enactment of H.R. 6904 in lieu of H.R. 2484. The present ... of H.R. 2484 is to improve the quality and increase the level of conservation and revitalization of natural and cultural resources in the Nation's urban and settled areas by:

1. establishing a 25-member Cultural Park Advisory Commission to study and submit within three years recommendations to the President

## LEGISLATIVE HISTORY
### P.L. 96-515

and the Congress concerning the creation of a National System of Cultural Parks; and

2. authorizing the Secretary of the Interior to award a maximum of two grants to any State which demonstrates that it will develop an adequate management program for cultural parks or that it will otherwise assist the Commission.

H.R. 2484 contains several provisions that overlap with the Administration's proposed National Heritage Policy Act. For example, the definition of a "National Cultural Park" in section 3(a) of H.R. 2484 approximates the "cultural landscape" category which section 208 of H.R. 6504 proposes to add to the existing National Register of Historic Places.

H.R. 2484 also embraces an administrative philosophy for "National Cultural Parks" which is similar to that proposed in H.R. 6504 by providing for federal technical assistance to States which implement "appropriate cultural park management programs".

We also have other reservations about H.R. 2484. They are as follows:

1. The Cultural Park Advisory Commission proposed in sections 4, 5, and 6 of the bill would, to a large extent, duplicate the functions of the existing Advisory Board on National Parks, Historic Sites, Buildings and Monuments, certain Boards required by the Historic Sites Act of 1935, as amended, (16 U.S.C. 463).

2. The bill contains no provision to insure that the Federal investment in the resources will be protected after the grants are made.

3. The bill contains in section 9 an open-ended authorization of appropriations which would not provide any budgetary control.

[page 70]

4. The study required by the bill would be duplicative of part B of Volume 1 of the National Urban Recreation Study already done by this Department.

We believe the overall objectives of H.R. 2484 can best be accomplished by strengthening existing programs through the Administration's proposed National Heritage Policy Act, and therefore recommend the enactment of H.R. 6504 in lieu of this bill.

The Office of Management and Budget has advised that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

ROBERT HERBST,
Assistant Secretary.

U.S. DEPARTMENT OF THE INTERIOR,
Washington, D.C., September 23, 1980.

Hon. JOHN F. SEIBERLING,
House of Representatives,
Washington, D.C.

DEAR MR. SEIBERLING: Thank you for the opportunity to comment on the committee print of H.R. 5496, particularly Section 101(a) requiring owner concurrence for listing properties on the National Register of Historic Places. While we do not support the concept of owner concurrence for the evaluation and recognition of historic re-

## NATIONAL HISTORIC PRESERVATION
### P.L. 96-515

sources and believe it is important to emphasize that listing on the National Register does not in any way restrict what a private property owner can do with his property, we will direct our comments to the technical aspects of the way section 101(a) is presently drafted in that it would create some problems with the written consent of the owner.

One of the present requirements of the National Register program is that owners, as well as local units of government and others, be notified that a property is being considered for nomination to the National Register and is given an opportunity to comment. Under the current regulations comments are to be focused on the historic or architectural significance of the property—the basis of the National Register listing decision. Naturally, some additional form of owner inquiry is required in this process. However, we are anxious to minimize this notification and request for comments, particularly on the State, or such a request for owner approval. For this reason, we would recommend that whatever language is adopted allow adequate administrative flexibility to address such situations as multiple ownership of properties, absentee owners and district nominations. Our experience indicates that a substantial majority of owners support having their properties listed on the National Register.

If we are permitted to print does and affect the terminations of eligibility for the review of Federal undertakings by the Advisory Council on Historic Preservation. Historic preservation is an important national interest and this advisory process, which in-

[page 71]

sures our historic resources consideration in the Federal decisionmaking process, is an essential element in responsible public decisions.

We are also pleased to note that grants and insured loans would only be available to properties actually listed on the National Register, welcome these affirmative incentives to preservation and to National Register listing.

In general, we view those properties that comprise our Nation's historic heritage as part of the wealth of this country and as a nonrenewable resource. We believe, therefore, that the identification, recognition and protection of these historic resources should be based principally on an evaluation of their historic significance. We view the National Register of Historic Places as more than an honor roll; it is a planning tool that identifies those properties which should be considered in planning decisions. We have never assumed, or in fact advocated, that all of the properties on the National Register either would or should be preserved. There are many competing interests and factors in both public and private use decisions and we support consideration of historic preservation as one of the factors in those decisions.

Again, thank you for the opportunity to comment.

Sincerely,

CHRIS THERRAL DELAPORTE,
Director.

## LEGISLATIVE HISTORY
P.L. 96-515

[page 94]

### ADDITIONAL VIEWS

We are very supportive of the provisions of this bill and we highly endorse its adoption by the House. There is one particular provision of the bill, however, which leaves us with much concern.

The Committee approved an amendment to this bill which requires that properties may not be listed on the National Register of Historic Places unless owners of such properties consent to such listing. Owner consent has heretofore never been required. We feel that this change is a most unwise decision. It constitutes a serious threat to the current professional integrity of the National Register, and will result in a significant diminishment of the usefulness which the Register has served for so long, as a professional tool to identify and to assist in the preservation of historic properties nationwide.

A fundamental principle of the national historic preservation program has always been that decisions regarding the historic significance of a property, and consequently its eligibility for entry on the National Register, are to be made exclusively by the objective professional application of criteria relating solely to historic significance. Congress established this principle as early as the Antiquities Act of 1906, and it has consistently reaffirmed the principle in such later laws as the Historic Sites Act of 1935, the National Historic Preservation Act of 1966, and the Archeological and Historic Preservation Act of 1974.

The National Register has always been a professional document representing those properties considered worthy of listing based upon their professional historic merit. The listing of a property on the Register provides no legal protection whatever for that property. It principally elevates the importance of that property by virtue of its visibility from being so listed. The Register represents a professional yardstick of the historic importance of our nation's historic properties and objects.

We concur that the provision for owner consent should be incorporated into any situation where an owner's private property rights are in any way infringed upon or abridged. However, the listing of a property on the National Register does not take away or infringe upon the private property rights of the owner, and it is for that principal reason that we see no logic in requiring that owners must first consent before an item can be listed on the Register.

For properties listed on the Register, the Congress has provided in law certain review processes for threatened properties, has provided the ability to obtain financial benefit through grants and tax treatment, and has also provided some tax disincentives for the destruction of historic properties.

The insertion of owner consent into the criteria for listing constitutes a political element, whereby unquestionably legitimate historic properties can be precluded from the Register for any number of reasons.

[page 95]

These provisions do not infringe upon private property rights of owners; they merely constitute an expression of the Federal government's favorable concern for historic preservation.

Many state and local governments have based provisions of their laws dealing with historic preservation on the existence of the profes-

## NATIONAL SCIENCE FOUNDATION
P.L. 96-516

sionally assembled National Register. The change in the constitution of the National Register brought forth by the amendment to this bill represents a change in ground rules which will likely present serious adverse ramifications for numerous state and local laws.

The National Register under existing law has been working very well. We feel that the addition of an owner consent provision is totally non-meritorious, will be damaging to the professional integrity of the Register, and will overall needlessly reverse the cause of historic preservation across the nation.

KEITH G. SEBELIUS.
DOUG BEREUTER.
BRUCE F. VENTO.
PETER H. KOSTMAYER.
EDWARD J. MARKEY.

### NATIONAL SCIENCE FOUNDATION AUTHORIZATION AND SCIENCE AND TECHNOLOGY EQUAL OPPORTUNITIES ACT

P.L. 96-516; see page 94 Stat. 3007

Senate Report (Labor and Human Resources Committee) No. 96-713, May 15, 1980 [To accompany S. 568]

House Report (Science and Technology Committee) No. 96-999, May 6, 1980 [To accompany H.R. 7115]

Senate Conference Report No. 96-1028, Nov. 21, 1980

House Conference Report No. 96-1474, Nov. 21, 1980 [To accompany S. 568]

[Cong. Record Vol. 126 (1980)]

### DATES OF CONSIDERATION AND PASSAGE
Senate June 23, November 21, 1980
House September 4, December 2, 1980

The Senate bill was passed in lieu of the House bill. The Senate Report (this page) and the House Conference Report (page 6445) are set out.

### SENATE REPORT NO. 96-713
[page 1]

The Committee on Labor and Human Resources, to which was referred the bill (S. 568 to authorize appropriations for the program of women in science, and for other purposes having considered the same, reports favorably thereon with an amendment to the title and an amendment to the title and recommends that the bill as amended do pass.

"(b) Each Federal agency shall initiate measures to assure that where, as a result of Federal action or assistance carried out by such agency, an historic property is to be substantially altered or demolished, timely steps are taken to make or have made appropriate records, and that such records then be deposited, in accordance with section 101(a), in the Library of Congress or with such other appropriate agency as may be designated by the Secretary, for future use and reference.

"(c) The head of each Federal agency shall, unless exempted under section 214, designate a qualified official to be known as the agency's 'preservation officer' who shall be responsible for coordinating that agency's activities under this Act. Each Preservation Officer may, in order to be considered qualified, satisfactorily complete an appropriate training program established by the Secretary under section 101(g).

"(d) Consistent with the agency's missions and mandates, all Federal agencies shall carry out agency programs and projects (including those under which any Federal assistance is provided or any Federal license, permit, or other approval is required) in accordance with the purposes of this Act and, give consideration to programs and projects which will further the purposes of this Act.

"(e) The Secretary shall review and approve the plans of transferees of surplus federally owned historic properties not later than 90 days after his receipt of such plans to ensure that the prehistorical, historical, architectural, or culturally significant values will be preserved or enhanced.

"(f) Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

"(g) Each Federal agency may include the costs of preservation activities of such agency under this Act as eligible project costs in all undertakings of such agency or assisted by such agency. The eligible project costs may also include amounts paid by a Federal agency to any State to be used in carrying out such preservation responsibilities of the Federal agency under this Act, and reasonable costs may be charged to Federal licensees and permittees as a condition to the issuance of such license or permit.

"(h) The Secretary shall establish an annual preservation awards program under which he may make monetary awards in amounts of not to exceed $1,000 and provide citations for special achievement to officers and employees of Federal, State, and certified local governments in recognition of their outstanding contributions to the preservation of historic resources. Such program may include the issuance of annual awards by the President of the United States to any citizen of the United States recommended for such award by the Secretary.

"(i) Nothing in this Act shall be construed to require the preparation of an environmental impact statement where such a statement would not otherwise be required under the National Environmental Policy Act of 1969, and nothing in this Act shall be construed to provide any exemption from any requirement respecting the preparation of such a statement under such Act.

"(j) The Secretary shall promulgate regulations under which the requirements of this section may be waived in whole or in part in the event of a major natural disaster or an imminent threat to the national security.".

SEC. 207. Title I of the National Historic Preservation Act is amended by adding the following at the end thereof:

"SEC. 111. (a) Notwithstanding any other provision of law, any Federal agency may, after consultation with the Advisory Council on Historic Preservation, lease an historic property owned by the agency to any person or organization, or exchange any property owned by the agency with comparable historic property, if the agency head determines that the lease or exchange will adequately insure the preservation of the historic property.

"(b) The proceeds of any lease under subsection (a) may, notwithstanding any other provision of law, be retained by the agency entering into such lease and used to defray the costs of administration, maintenance, repair, and related expenses incurred by the agency with respect to such property or other properties which are on the National Register which are owned by, or are under the jurisdiction or control of, such agency. Any surplus proceeds from such leases shall be deposited into the Treasury of the United States at the end of the second fiscal year following the fiscal year in which such proceeds were received.

"(c) The head of any Federal agency having responsibility for the management of any historic property may, after consultation with the Advisory Council on Historic Preservation, enter into contracts for the management of such property. Any such contract shall contain such terms and conditions as the head of such agency deems necessary or appropriate to protect the interests of the United States and insure adequate preservation of the historic property.".

SEC. 208. Notwithstanding section 7(a) of the Act of June 27, 1960 (16 U.S.C. 469c), or any other provision of law to the contrary—

(1) identification, surveys, and evaluation carried out with respect to historic properties within project areas may be treated for purposes of any law or rule of law as planning costs of the project and not as costs of mitigation;

(2) reasonable costs for identification, surveys, evaluation, and data recovery carried out with respect to historic properties within project areas may be charged to Federal licensees and permittees as a condition to the issuance of such license or permit; and

(3) Federal agencies, with the concurrence of the Secretary and after notification of the Committee on Interior and Insular Affairs of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate, are authorized to waive, in appropriate cases, the 1 per centum limitation contained in section 7(a) of such Act.

## TITLE III—AMENDMENTS TO TITLE II OF NATIONAL HISTORIC PRESERVATION ACT

SEC. 301. (a) Section 201(a) of the National Historic Preservation Act is amended by striking out "twenty-nine" and all that follows and substituting: "the following members:

"(1) a Chairman appointed by the President selected from the general public;

"(2) the Secretary of the Interior;

"(3) the Architect of the Capitol;

"(4) the Secretary of Agriculture and the heads of four other agencies of the United States (other than the Department of the Interior) the activities of which affect historic preservation, appointed by the President;

"(5) one Governor appointed by the President;

"(6) one mayor appointed by the President;

"(7) the President of the National Conference of State Historic Preservation Officers;

"(8) the Chairman of the National Trust for Historic Preservation;

"(9) four experts in the field of historic preservation appointed by the President from the disciplines of architecture, history, archeology, and other appropriate disciplines; and

"(10) three at-large members from the general public, appointed by the President.".

"(b) Section 201(b) of such Act is amended by deleting (1) through (17) and substituting (2) through (8) (other than (5) and (6))" and by inserting the following before the period ", except that, in the case of paragraphs (2) and (4), no such officer other than an Assistant Secretary or an officer having major department-wide or agency-wide responsibilities may be so designated".

"(c) Section 201(c) of such Act is amended to read as follows:

"(c) Each member of the Council appointed under paragraph (1), and under paragraphs (9) and (10) of subsection (a) shall serve for a term of four years from the expiration of his predecessor's term; except that the members first appointed under that paragraph shall serve for terms of one to four years, as designated by the President at the time of appointment, in such manner as to insure that the terms of not more than two of them will expire in any one year. The members appointed under paragraphs (5) and (6) shall serve for the term of their elected office but not in excess of four years. An appointed member may not serve more than two terms. An appointed member whose term has expired shall serve until that member's successor has been appointed.".

"(d) Section 201(d) of such Act is amended to read as follows:

"(d) A vacancy in the Council shall not affect its powers, but shall be filled, not later than sixty days after such vacancy commences, in the same manner as the original appointment (and for the balance of any unexpired terms). The members of the Advisory Council on Historic Preservation appointed by the President under this Act as in effect on the day before the enactment of the National Historic Preservation Act Amendments of 1980 shall remain in office until all members of the Council, as specified in this section, have been appointed. The members first appointed under this section shall be appointed not later than one hundred and eighty days after the enactment of the National Historic Preservation Act Amendments of 1980.".

"(e) Section 201(e) of such Act is amended to read as follows:

"(e) The President shall designate a Vice Chairman, from the members appointed under paragraph (5), (6), (9), or (10). The Vice Chairman may act in place of the Chairman during the absence or disability of the Chairman or when the office is vacant.".

"(f) Section 201(f) of such Act is amended by deleting the word "Fifteen" and substituting in lieu thereof the word "Nine".

"(g)(1) Section 202(a) of such Act is amended by striking out "and" after the semicolon in paragraph (4), by striking out the period at the end of paragraph (5) and inserting in lieu thereof a semicolon, and by adding at the end thereof the following new paragraphs:

"(6) review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under this Act; and

"(7) inform and educate Federal agencies, State and local governments, Indian tribes, other nations and international organiza-

BEST DOCUMENT AVAILABLE

Case 2:00-cv-02120-DSC    Document 100    Filed 08/10/2006    Page 19 of 98

to make recommendations respecting amendments to such laws should a correlation be found to exist. Such report shall include the feasibility and necessity of establishing or devloping protective measures at the Federal, State, or local level for the prevention, detection, and control of arson or fire by "suspicious origin" in historic properties. Such report shall also include recommendations regarding the Federal role in assisting the States and local governments with protecting historic properties from damage by fire. Such report shall be submitted within eighteen months after the date of enactment of this Act.

The SPEAKER pro tempore. Is a second demanded?

Mr. SEBELIUS. Mr. Speaker, I demand a second.

The SPEAKER pro tempore. Without objection, a second will be considered as ordered.

There was no objection.

The SPEAKER pro tempore. The gentleman from Ohio (Mr. SEIBERLING) will be recognized for 20 minutes, and the gentleman from Kansas (Mr. SEBELIUS) will be recognized for 20 minutes.

The Chair recognizes the gentleman from Ohio (Mr. SEIBERLING).

Mr. SEIBERLING. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, as author of the original version of H.R. 5496, I am pleased to speak today on its behalf and on behalf of all those who support our Nation's historic preservation programs. I am doubly pleased because, as my friend and colleague Mr. PHILLIP BURTON pointed out, the bill before us is not the product of my efforts alone. It reflects a tremendous amount of work by Members on both sides of the aisle. This kind of bipartisan interest is indeed significant on such an important piece of legislation.

No list of commendations on this bill would be complete, however, without special mention of one of the guiding forces behind it—Mr. BURTON himself. His continuing spirit of coordination and compromise has been an inspiration to all of us.

Special thanks are due also to the distinguished chairman of the Committee on Interior and Insular Affairs, the gentleman from Arizona (Mr. UDALL), and to our ranking member, the gentleman from California (Mr. CLAUSEN). They have worked together to make this bill a truly bipartisan effort.

Another member who deserves great credit for helping to draft the final compromise version of this bill is the gentleman from Wyoming (Mr. CHENEY). He has been willing to listen to all points of view and to modify his own approach to the bill in response to identified needs and problems. The final version of the bill has been greatly improved because of his efforts.

Other significant contributions have been made by the ranking members of the Subcommittee on National Parks and Insular Affairs and the Subcommittee on Public Lands—the gentleman from Kansas (Mr. SEBELIUS), and the gentleman from Colorado (Mr. JOHNSON). Their knowledge and experience in historic preservation matters has been of great help to all of us.

In addition, several other members have contributed substantially to this legislation. I would particularly like to commend Mr. BINGHAM from New York, Mr. SANTINI from Nevada, Mr. KOSTMAYER from Pennsylvania, Mr. VENTO from Minnesota, Mr. KOGOVSEK from Colorado, Mr. LUJAN from New Mexico, Mr. LAGOMARSINO, Mr. PASHAYAN from California, and Mr. BEREUTER from Nebraska.

As you can see, support for this bill comes not only from both sides of the aisle but from nearly every region of the country.

I would also like to mention the outstanding work of this bill accomplished by the staff of the committee and of several of the members. In particular, I would like to thank Gary Ellsworth and Clay Peters on the committee's minority staff, and Lee McElvain, Cleve Pinnex, and Loretta Neumann on the majority staff. Others who have worked hard on this legislation include Patty Howe on Mr. CHENEY's staff and Mike Rosenberg on Mr. BINGHAM's staff, and Pope Barrow of the Office of the Legislative Counsel.

Several officials within the administration were particularly helpful. Indeed, President Carter himself was one of the major proponents of legislation such as this, when he made enactment of a National Heritage Policy Act one of his priorities. Although this bill differs in a number of ways from his original proposal, it was the President's impetus and leadership that made this version possible.

Several officials within the administration deserve special thanks, including Mr. Robert Herbst, Assistant Secretary of the Interior for Fish, Wildlife and Parks, and his deputy, David Hales; Chris Delaporte, Director, Heritage Conservation and Recreation Service; Robert Garvey, Executive Director, Advisory Council on Historic Preservation; and Ross Holland, Assistant Director for Cultural Resources, National Park Service.

I would also like to point out that nearly 200 organizations have supported this legislation, including representatives of historic preservation, labor, industry and related professions and interests. At the end of my remarks I would like to insert in the RECORD a list of these organizations.

Several representatives of these organizations deserve special mention for the invaluable assistance they have provided on this bill. Among these are Nellie Longsworth of Preservation Action; Larry Tise, Rodney Little, and Peter King of the National Conference of State Historic Preservation Officers; Michael Ainslie and Aubra Anthony of the National Trust for Historic Preservation; Ruthann Knudsen of the Society for American Archeology; Cynthia Field of the Building Museum; Len Simon of the U.S. Conference of Mayors; and Kevin McCarty of the National League of Cities.

### BACKGROUND AND SUMMARY OF BILL

Mr. Speaker, Federal programs for historic preservation have been in place for over 100 years. H.R. 5496 builds on this foundation of experience to provide affirmative direction for historic preservation programs in the years ahead.

H.R. 5496 would amend the National Historic Preservation Act of 1966. That act was landmark legislation which established, for the first time, a partnership between the Federal Government and the States, and private sector. It broadened the national landmark program, established by the Congress in 1935, to create the National Register of Historic Places listing historic properties of the national, State, and local significance. The act also provided grants to States and the National Trust for Historic Preservation, and it created the Advisory Council on Historic Preservation to review the effects of Federal undertakings on historic properties.

H.R. 5496 would provide further definition and guidance for these programs to meet identified needs. It would establish criteria to qualify State historic preservation programs for increased authorities and reauthorize the Historic Preservation Fund through 1987 at its currently authorized level of $150 million a year.

In addition the bill would, for the first time, provide for certification of local government programs and offer local governments an opportunity to participate in Federal financial assistance, in reviews of nominations to the National Register and in the reviews of Federal undertakings on historic properties within their jurisdictions.

The bill would also define Federal agency responsibilities and revise the structure of the Advisory Council on Historic Preservation. Other sections of the bill would provide for proper maintenance of archeological resources, procedures for implementing the World Heritage Convention, a loan insurance program, recognition of the National Museum of the Building Arts, and studies to provide information on historic preservation matters.

### CHANGES IN THE BILL: "OWNER CONSENT"

The only major controversy over the bill centered on the so-called "owner consent" provision, adopted by the committee at the suggestion of Mr. CHENEY. The amendment required an owner's consent for the majority of owners, in the case of an historic district) before a property could be included on the National Register or designated a national historic landmark.

We felt that the amendment would meet the concerns of property owners while maintaining the existing process for protecting historic properties. The committee version did not, for example, require an owner's consent for determinations of whether a property were eligible for inclusion or designation; if eligible, it would still receive the same protection in the event of a Federal undertaking that might adversely affect it.

Since adoption of that amendment, however, a number of issues and concerns related to the provision have been brought to our attention. As a result, Mr. CHENEY and I recommended a compromise provision, which is now incorporated into the bill.

Following is a brief outline of the changes that were made by this compromise:

Regulations would be required to give all owners notification and an oppor-

BEST DOCUMENT AVAILABLE

*November 17, 1980*  CONGRESSIONAL RECORD — HOUSE

tunity to concur in or object to inclusion of a property on the National Register or designation as a national historic landmark.

Absent such objection, a property would be so included or designated.

If a private owner (or majority of private owners in an historic district) object, the property would not be included or designated. However, the Secretary of the Interior would then make a determination of eligibility on historic grounds and provide the information to the appropriate officials and the owner or owners.

The determination of eligibility would have no automatic side-effect on the actions of private owners, except for the usual review procedures in the event of a Federal undertaking.

An eligible property could subsequently be included or designated upon withdrawal of the objection.

Regulations would be required to deal with situations relating to multiple ownership of a single property.

I want to commend Mr. CHENEY for his thoughtfulness on this matter and his willingness to amend his original provision to meet many of the concerns that were addressed. Mr. CHENEY clearly has demonstrated a genuine concern for historic preservation and he has been sincerely interested in listening to all points of view on this issue.

I believe that the new version is a reasonable and workable compromise which adequately takes into account the concerns of private owners without seriously eroding the usefulness of the National Register as a planning tool and comprehensive historical record.

Key to this is the requirement that the Secretary make a determination of eligibility for those properties which are subject to an objection and therefore not included on the National Register. The objective information about the property's historical values would then be available for planning purposes on State and local inventories and for use by the Advisory Council in the event of a Federal undertaking that would adversely affect it.

Moreover, the new provision should be viewed in the context of the total bill. H.R. 5496 offers many incentives for properties to be included on the National Register. It is also one that offers many improvements in the national historic preservation program as a whole.

OTHER CHANGES

There are several changes in the bill at the desk which, although noncontroversial, are significant.

Others are merely technical or conforming changes.

Following is an explanation of the significant ones:

Section 101(a)(5) was amended to assure that the provision allowing appeals of National Register nominations would be directed to the Secretary of the Interior.

This change is not intended in any way to limit the rights of persons or local government to appeal to the courts for other remedies that are available. The purpose here, however, is to give any person or local government an opportunity to appeal directly to the Secretary if a nominating authority has nominated a property which does not appear to meet the criteria of the National Register; it also allows them to appeal to the Secretary the failure or refusal of a nominating authority to nominate a property that does meet such criteria. The Secretary of the Interior has the authority to determine whether any property should be included on the National Register.

Section 110(e) was amended to place a 90-day time limit on the Secretary's review of the plans of transferees of surplus federally-owned historic properties prior to such transfer.

Under Executive Order 11593, the Secretary of the Interior reviews such plans to assure that properties are not damaged or destroyed. The new language assures that the Secretary makes these reviews in a timely manner.

Section 110(f) was amended to state that Federal agencies would to the maximum extent practicable (rather than possible) undertake such planning and actions as necessary to minimize harm to a national historic landmark which might be directly and adversely affected by a Federal undertaking.

Although the words generally carry the same interpretation, there was some concern that the word "possible" had too broad a connotation and might lead to unnecessary litigation.

Section 110(g) was amended to provide discretionary, rather than mandatory, authority to Federal agencies to use funds available for specific projects for related preservation activities.

This authority is in addition to that provided under the so-called Economy Act (general appropriations legislation) to spend funds in the pursuit of national policies without specific appropriations authorizations. This section is not meant to limit the authority of agencies to expend funds for environmental compliance related to their activities as, for example, is provided in section 302 of this bill.

Section 301 was amended to clarify the definition of "agency" to assure that all or part of an agency's programs, if they have minimal effect on historic properties, may be exempted from the provisions of this act.

The intent of this change is to clarify that exemptions may be made under sections 214; it is not, however, to permit the exemption of an individual undertaking from the requirements of section 106 merely because an agency desires to follow a more expedient route.

Section 302 was amended to express the intent that preservation activities conducted by Federal agencies will be funded from budgetary activities related to the preservation concern, and recognizes the constraints that might be added by appropriations legislation.

As with section 302, the purpose of this section is to assure that preservation activities are integrated into other appropriate agency activities. Thus, for example, the use of Forest Service timber cutting funds for preservation work related to the timber cutting is appropriate. On the other hand, the use of food

stamp funds, which is not related to preservation, would be precluded. The language is not meant to bar agencies from spending their operating funds, which are commonly used for environmental compliance activities, for these expenditures.

In addition, I would also like to offer clarification on the grants provided in section 101(d)(3)(A)(iv) on page 17 of the bill. Concern was raised as to whether or not these grants could be used to provide rent subsidies to residents or small businesses within historic districts. That is not the intent of this provision. Rather, it is meant to provide special grants in cases where existing residents and small businesses cannot obtain sufficient assistance from other programs, including the loan insurance program established by this bill. While the needs may be greater than this program can meet, I do feel that we should make some effort to give special assistance to residents and small businesses who may be adversely affected by renovation activities carried out in historic districts.

PRESERVE THE PAST, SAVE THE FUTURE

Lastly, I would like to add to comments that have been frequently made that historic preservation is part of our Nation's future.

One thing that has struck me in working on this legislation is that the term "historic preservation" encompasses so much that is important to all of us, regardless of our political persuasion or philosophy. It includes our everyday world, the places where we live and work, as well as remote archeological sites that hold the remains of previous generations. We share the need to preserve those tangible bonds that preserve our history as a people and a Nation.

What makes historic preservation different from other environmental concerns is that it is often so immediate and personal. We recognize that we cannot save everything. Indeed, as one historian pointed out, the problem with historic preservation is that structures start to deteriorate from the moment they are built. Yet once these historical places are gone, they are gone forever.

The best we can do is to preserve as much as we can for as long as we can. We are fortunate that those who came before us left us these treasures to enjoy. We must do the same for those who come after us.

The list follows:

ORGANIZATIONS SUPPORTING H.R. 5496

The National Trust for Historic Preservation
Preservation Action
The Coordinating Council of National Archaeological Societies
The National Conference of State Historic Preservation Officers
The National Center for Preservation Law
The Museum for the Building Arts
The U.S. Conference of Mayors
The League of Cities
American Horticultural Society
San Antonio Conservation Society
Society for Historical Archaeology
Society for American Archaeology
Society of Profession 1 Archaeologists
Cleveland Landmarks Commission
Friends of Ohio Landmarks

BEST DOCUMENT AVAILABLE

Historic Faubourge-St. Mary Corporation.
Marshall Historical Society, MI.
Landmarks Association of St. Louis, Inc.
Society of Architectural Historians.
Municipal Arts Society, NY.
Connecticut Trust for Historic Preservation.

American Institute of Architects.

### AMERICAN HERITAGE ALLIANCE

Adirondack Council.
The Alabama Trust for Historic Preservation.
America the Beautiful Fund.
American Planning Association.
American Society of Interior Designers.
Audobon Naturalist Society of the Central Atlantic States, Inc.
Center for Environmental Intern Programs.
Center for the Hudson River Valley.
Connecticut Association of Historic District Commissioners.
The Conservation Foundation.
Florida Trust for Historic Preservation.
Friends of Pickering Creeks Conservation Trust, Inc.
Friends of Cast Iron Architecture.
Friends of the Earth.
Great Lake Camp and Trail Association.
Hampton Heritage Foundation, Inc.
Hawaii Geographic Society.
Heritage Hill Association.
Historic Augusta.
Historic Broward County Preservation Board.
Historic Denver, Inc.
Historic Fredericksburg Foundation Inc.
Historic Gettysburg-Adams County, Inc.
Historic House Association of America.
Historic Kansas City Foundation.
Historic Nashville, Inc.
Historic Preservation Trust of Lancaster, Pa.
Historic St. Augustine Preservation Board.
Izaak Walton League of America.
Jacksonville Historic Landmarks Commission.
Knoxville Heritage, Inc.
Lehigh Valley Conservancy, Inc.
Leonia Environmental Commission.
Litchfield Historic District Commission.
Maryland Association of Historic District Commissions.
Morris County Trust for Historic Preservation.
National Audubon Society.
National Council for Preservation Education.
National Parks and Conservation Association.
National Wildlife Refuge Association.
Natural Land Institute.
Natural Resources Defense Council.
Natural Science for Youth Foundation.
The Nature Conservancy.
The New Mexico Natural History Institute.
New York Landmarks Conservancy.
Partners for Livable Places.
Piedmont Environmental Council.
Public Lands Institute.
The Sanibel-Captiva Conservation Foundation, Inc.
Save the Dunes Council.
Scenic Hudson Preservation Conference.
Sierra Club.
Society for Commercial Archaeology.
Society for Industrial Archaeology.
The Southern New Jersey Chapter of the Archaeological Society of New Jersey.
Thorne Ecological Institute.
The Trust for Public Land.
The Victorian Society in America.
The Wilderness Society.
Historic Columbus Foundation.
Wilderness Watch.
The Preservation Resource Center of New Orleans.
The Colonial Williamsburg Foundation.
The Alabama Conservancy.
Birmingham Historical Society, Al.

Early Settlers Association of the Western Reserve, Ohio.
Cleveland Restoration Society.
Quapaw Quarter Association, Ar.
Macon Heritage Foundation, Ga.
American Society for Conservation Archaeology.
Archaeological Institute of America.
Association for Field Archaeology.
National Association of State Archaeologists.
American Association of State and Local History.
Historic Columbus Foundation, Inc., Ga.
Townscape Institute, Inc., Ma.

---

### ORGANIZATIONS ENDORSING THE NATIONAL BUILDING MUSEUM—H.R. 5496

#### AMERICAN ASSOCIATION OF ENGINEERING SOCIETIES

American Society of Civil Engineers.
Western Society of Engineers.
American Institute of Mining, Metallurgical and Petroleum Engineers, Inc.
American Society of Mechanical Engineers.
Cleveland Engineering Society.
Institute of Electrical and Electronics Engineers.
American Society for Engineering Education.
Society of Naval Architects and Marine Engineers.
American Society of Heating, Refrigeration and Air-Conditioning Engineers, Inc.
Engineering Society of Detroit.
Louisiana Engineering Society.
Society of Automotive Engineers, Inc.
Washington Society of Engineers.
Illuminating Engineering Society of North America.
Air Pollution Control Association.
American Society of Agricultural Engineers.
American Institute of Chemical Engineers.
American Society of Safety Engineers.
American Society for Metals.
Society of Motion Picture and Television Engineers, Inc.
National Council of Engineering Examiners.
Society of American Military Engineers.
Engineering Societies of New England, Inc.
Institute of Transportation Engineers.
American Institute of Aeronautics and Astronautics, Inc.
Engineers' Council for Professional Development.
Society of Manufacturing Engineers.
National Society of Professional Engineers.
National Institute of Ceramic Engineers.
Society of Allied Weight Engineers, Inc.
American Congress on Surveying and Mapping.
Society of Plastics Engineers, Inc.
Society of Experimental Stress Analysis.
Instrument Society of America.
National Association of Corrosion Engineers.
Society of Packaging and Handling Engineers.
American Society for Quality Control.
Standards Engineers Society.
American Institute of Industrial Engineers.
International Material Management Society.
International Material Management Society, New Jersey Chapter, Inc.
Society of Fire Protection Engineers.
Society of Women Engineers.
American Institute of Plant Engineers.
American Nuclear Society.
American Society of Gas Engineers.
American Academy of Environmental Engineers.
American Association of Cost Engineers.
Danville Engineers Club.
American Consulting Engineers Council.
Federation of Materials Societies.

Association for Cooperation in Engineering.
American Institute of Architects.
American Institute of Constructors.
American Institute of Real Estate Appraisers.
American Planning Association.
American Society of Interior Designers.
American Society of Landscape Architects.
Associated General Contractors of America.
Association of Collegiate Schools of Architecture.
Association for Preservation Technology.
Brick Institute of America.

#### BUILDING AND CONSTRUCTION TRADES DEPARTMENT, AFL-CIO

International Association of Heat and Frost Insulators and Asbestos Workers.
International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers.
International Union of Bricklayers and Allied Craftsmen.
United Brotherhood of Carpenters and Joiners of America.
International Brotherhood of Electrical Workers.
International Union of Elevator Constructors.
International Union of Operating Engineers.
The Granite Cutters' International Association of America.
International Association of Bridge, Structural and Ornamental Iron Workers.
Laborers' International Union of North America.
Tile, Marble, Terrazzo, Finishers and Shopmen International Union.
International Brotherhood of Painters and Allied Trades.
Operative Plasterers' and Cement Masons' International Association of the United States and Canada.
United Union of Roofers, Waterproofers and Allied Workers.
Sheet Metal Workers' International Association.
United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada.

#### COUNCIL OF AMERICAN BUILDING OFFICIALS

Building Officials and Code Administrators International, Inc.
Southern Building Code Congress International, Inc.
International Conference of Building Officials.
Cultural Alliance of Greater Washington.
District of Columbia Office of Planning and Development.
Greater Washington Board of Trade.
Greater Washington Central Labor Council, AFL-CIO.
National Association of Housing and Redevelopment Officials.
National Construction Industry Council.
National Institute of Building Sciences.
National Trust for Historic Preservation.
Neighborhood Development Collaborative.
Sheet Metal and Air Conditioning Contractors National Association.
Society of Architectural Historians.
Society of Industrial Archeology.
The Victorian Society in America.
Washington Building Congress.
Society for American Archeology.

☐ 1320

Mr. GRADISON. Mr. Speaker, will the gentleman yield?

Mr. SEIBERLING. I am glad to yield to gentleman from Ohio.

Mr. GRADISON. Mr. Speaker, I thank the gentleman from Ohio for yielding.

I want to thank the gentleman also for explaining the new provision with regard to owner consent.

As a member of the Committee on

Case 2:00-cv-02120-DSC    Document 100    Filed 02/10/2006    Page 22 of 98

Ways and Means, I would like to indicate that we have held a series of hearings on the question of the future of the existing tax provisions. While the testimony was not unanimous, there were very serious questions raised in each of the hearings about the wisdom of continuing the disincentives.

Now, I understand that this bill will remove the owner consent.

Mr. SEIBERLING. Mr. Speaker, if the gentlemen will yield on that point, the bill does not eliminate owner consent.

Mr. GRADISON. Excuse me. I thank the gentleman for correcting me. This bill will require owner consent.

Mr. SEIBERLING. Correct.

Mr. GRADISON. In contrast with what we have had in the past.

Now, one of the arguments that has been used in the past has been that this is basically a listing that is set up for planning purposes. Therefore, that the consent of the owner should in no way be required; that would be perfectly reasonable if there were no disincentives provided such as we have today.

I think there is a reasonable possibility that within the next year the Committee on Ways and Means will have an opportunity to review the disincentives. Indeed, they may ultimately be eliminated. If they were, then I think it would be possible to go back and take a whole new look at this question of owner consent and perhaps move back toward the basic concept of the listing being a planning tool, rather than a step which carries with it disadvantages for property owners.

Mr. SEIBERLING. Well, I agree with the gentleman that it should be reviewed. I personally believe, based on what I know now—I could change that if additional facts came to my attention that warranted it—this tax disincentive to owners of properties that are on the National Register of Historic Places should be removed from the law, because that is a disincentive to protection. In fact, we want to encourage people to put their historic properties on the National Register because then they are more likely to be preserved, even if there are no tax disincentives. I hope that the committee does review that.

Let me say that I was discussing the original form of the Cheney amendment. The form that is incorporated in the bill that is before us recasts the owner consent provision somewhat. The bill requires the Secretary to issue regulations directing that all owners be given notice and an opportunity to concur in or object to the inclusion of their property on the National Register or designation as a national historic landmark. The bill further provides that if an owner objects, then the property cannot be included on the Register. If the owner did not object, then the property could be put on the Register. However, the bill also provides that even if the owner objects the Secretary of Interior would still make a determination as to whether that property was eligible on historic grounds and would provide information to the appropriate officials and the owner, so that if the owner later withdrew his or her objection, the

property could then be included or designated at that time for inclusion on the National Register.

It is most gratifying that the gentleman from Wyoming (Mr. CHENEY) worked with us and with the historic preservation groups, including, in particular, the National Trust for Historic Preservation, to refine that provision to the point where it does not frustrate the process of identifying and protecting historic properties, yet it still preserves the principle of owner consent.

So I again want to commend the gentleman from Wyoming for both his concept and for his willingness to work out a refined version of it.

There are several other changes of significance, as well as some technical changes. I do not think I will go into them now, unless somebody wishes to.

I would simply again emphasize that this bill is a consensus bill. It does strengthen the national historic preservation program and at the same time provides us with the means of making it more flexible and protecting the interests of local governments and private property owners. While it is not a panacea, it certainly helps set an agenda for the future and one that will make preservation a partner and not a competitor in our Nation's future growth and development.

GENERAL LEAVE

Mr. SEIBERLING. Mr. Speaker, I ask unanimous consent that all Members may revise and extend their remarks on the bill under consideration.

The SPEAKER pro tempore (Mr. DUNCAN of Oregon). Is there objection to the request of the gentleman from Ohio?

There was no objection.

Mr. SEIBERLING. Mr. Speaker, I yield 2 minutes to the gentleman from Puerto Rico (Mr. CORRADA).

Mr. CORRADA. Mr. Speaker, I rise in support of H.R. 5496, the National Historic Preservation Act Amendments of 1980 and urge my colleagues to vote in favor of this legislation.

This legislation is the product of long and substantial hearings that have resulted in a comprehensive and equitable bill that has the approval of representatives from major historic preservation organizations as well as business and industry groups. This bill is needed to enable the historic preservation fund to continue with the excellent work it has been performing since its establishment in 1966.

The spirt of cooperation established by the National Historic Preservation Act of 1966 between the Federal, State, and private sectors must be maintained and enhanced. This bill achieves this goal by providing, for the first time, for the participation of qualified local government and elected officials in the nomination of properties to the National Register of Historic Places. The bill also establishes an insured loan program for properties on the National Register and provides greater uniformity of the program at the State level.

Every area of the country will benefit from this legislation through the preservation of sites of historic value and significance to all our citizens.

Again, I urge my colleagues to cast their votes in favor of the enactment of the National Historic Preservation Act Amendments of 1980.

Mr. SEBELIUS. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I would like to associate myself with the remarks of the gentleman from Ohio who did such fine work on this bill and congratulate the gentleman from California (Mr. PHILLIP BURTON), the chairman of the subcommittee, and the gentleman from Arizona (Mr. UDALL) the chairman of the full committee.

Mr. Speaker, I support the adoption by the House of the bill now under consideration (H.R. 5496). This bill amends existing historic preservation law and brings forth certain other new provisions so as to update the statutory framework for accomplishing historic preservation.

Accomplishments in the field of historic preservation in this country have been exceptional over the period of the last couple of decades. Much of this success can be attributed to the existence and perfection of Federal historic preservation law through that period, coupled with the tremendous activism and commitment of private individuals, citizen historic preservation organizations, and State and local governments.

This bill brings forth many needed and appropriate adjustments and additions to historic preservation law. The only element of the bill which I strongly oppose is the provision of owner consent for the listing of historic items on the National Register of Historic Places. Since I have registered the essence of my thoughts in the additional views of the committee report (Rept. No. 96-1457), I shall not belabor the issue again here, since the bill cannot be amended at this point and I do intend to vote for the bill, nevertheless.

I should point out before leaving this matter, however, that in the event that an owner does object to his eligible property being placed on the register, the Secretary is thereupon required to notify specified entities of the professional eligibility of the property. This action should be taken in writing, and a separate listing should be maintained of such properties possessing such professional eligibility but not incorporating owner consent for direct register listing. This listing will then be publicly available for whatever consultation value it may have in indicating the professional historic qualities of a property, despite owner objection to listing on the national register itself.

Mr. Speaker, there is one remaining point I would like to comment on with regard to this bill. In the review of the historic preservation program at the Federal level, it has become quite clear to me, as I am certain that it has to others, that the Federal bureaucracy dealing with this program has proliferated beyond logical need. The great bulk of the Federal historic preservation program is centered within the Department of the Interior. Other major parts of the

BEST DOCUMENT AVAILABLE

program are operated by the Advisory Council on Historic Preservation.

Another role is played by the federally chartered national trust for historic preservation. Many other departments and agencies of the Federal Government are also involved in historic preservation activities, usually as related to their own operations.

There are some very good reasons why all historic preservation programs cannot and should not be consolidated into one central operation. But I do believe there is also good reason to closely scrutinize this matter to see if some economies and efficiencies of operation could not be accomplished by some form of consolidation, with the principal aim of accomplishing greater achievements for historic preservation, and the secondary aim of accomplishing greater economies of operating efficiency and dollar expenditures. Time did not permit this bill to address this issue, but this matter should be reviewed and acted upon promptly by the next Congress.

● Mr. DERWINSKI. Mr. Speaker, as a cosponsor of this legislation and a student of American history with a desire to see our Nation's historic resources protected, I urge the House to approve H.R. 5496.

This measure, which authorizes the historic Preservation Fund through fiscal year 1987 at its current level of $150 million per year, will provide better guidance and coordination at Federal, State, and local levels for the national historic preservation program. It permits local governments to nominate sites for listing on the National Register of Historic Places and specifies Federal agency responsibilities with regard to historic preservation programs. It also prohibits non-Federal property from being listed on the Register without the consent of its owner, who, under current law, may thereby subject himself to restrictions and financial disadvantages.

H.R. 5496 also recognizes the importance of the nongovernmental role and clarifies Federal and State relationships and responsibilities to assure greater uniformity of programs of historic preservation.●

● Mr. MOAKLEY. Mr. Speaker, I rise today in staunch support for the Historic Preservation Act Amendments of 1980. I wish to congratulate the Interior Committee; particularly Mr. SEIBERLING and Mr. BURTON, who have labored to develop this important legislation which will dramatically improve the historic preservation program in this country.

As a citizen of Boston, I believe that I have a special appreciation for the need to preserve our historic communities and for the sense of belonging which historic architecture can contribute to a community. While I was growing up in Boston, I had a special feeling for men like Samuel Adams and James Otis, who founded the American Revolution and who walked the same streets as I did only 200 years earlier.

Each Boston community offers a unique history, which not only reflects the community as it was during the time of its construction, but also can transcend that time period. One can walk the street of any historic district and find more than beauty in its architecture, but also a feeling of belonging, a feeling that we are somehow a product of the walls which surround us.

In Boston we have literally thousands of buildings awaiting inclusion into the National Register of Historic Places. This legislation will assist in preserving these buildings and in continuing a program of historic preservation which we so desperately need. I believe that the continuation of the Historic Preservation Fund through 1987; the new provisions to assist Federal, State, and local preservation efforts; and the studies which are mandated under this bill are of crucial importance to the development and continuation of a strong historic preservation program both in Massachusetts and in the Nation as a whole.

I wish to especially thank the committee for including a direction to the Secretary of the Interior to submit a report to the Congress on arson in historic buildings. Boston, like many other communities across the country, has been subjected to a seemingly dramatic increase in the number of historic buildings being destroyed by arson. This report, I believe, will focus attention to this problem and assist in developing both Federal and local programs to assist communities which are presently being victimized by this senseless criminal action.

Mr. Speaker, I urge my colleagues to join in true nonpartisan support for this legislation which is deserving of support by this Congress.●

● Mr. KOSTMAYER Mr. Speaker, I rise in strong support of this legislation which will extend and strengthen the national historic preservation program established by the landmark National Historic Preservation Act of 1966.

The legislation is important as a reaffirmation of the Federal Government's roll in coordinating and encouraging historic preservation activities among our State and local governments, as well as private organizations and individuals.

The legislation extends and expands the National Register of Historic Places which is the official list of our Nation's historical, architectural, and cultural resources worthy of preservation. At the current time there are more than 20,000 entries on the National Register and it represents the most comprehensive listing of our country's cultural resources.

Pennsylvania is one of our most historic States and has many important structures on the register. In my congressional district in southeastern Pennsylvania we have 50 sites on the register. These include the Delaware Canal which runs along the Delaware River the full length of Bucks County and northward into Northampton County, Andalusia in Bensalem Township, a classic example of Greek revival architecture and the historic home of the Biddle family, the Pearl S. Buck home in Perkasie, Hilltown Township, and Summerseat in Morrisville, the home of two signers of the Declaration of Independence.

One of the finest qualities about the National Register is that it encourages private—rather than solely governmental—efforts at preservation. Listing on the National Register does not insure the preservation of an historic property or prohibit its demolition. However with the passage of the Tax Reform Act in 1976 Congress encouraged private owners to protect historic properties by providing tax incentives for rehabilitation of historic commercial buildings, as well as certain tax disincentive provisions intended to discourage the demolition of historic buildings and their replacement.

H.R. 5496 carries forward this principle of encouraging preservation activities in the private sector. The bill establishes an insured loan program to stimulate private investment in properties included on the National Register. The bill also makes important strides in encouraging State administration of our national historic preservation activities and specifies responsibilities of State historic preservation officers.

I might note Mr. Speaker that the Commonwealth of Pennsylvania's Historic Preservation Office supports this legislation, particularly those provisions extending and strengthening cooperation among Federal, State, and local preservation efforts.

Finally, Mr. Speaker, I would like to mention the fine leadership of my colleague on the Interior Committee, the gentleman from Ohio (Mr. SEIBERLING) and his staff for their leadership roll in advancing this legislation. It is important that as our Nation grows, and our economy expands, as cities and neighborhoods are revitalized, as rural America is changed by slow and steady population growth, we try and preserve for future generations a sense of the history and the overall quality of life which form such a solid foundation of our Nation's cultural heritage. This legislation recognizes this fact, and I urge my colleagues to support it.●

● Mr. MINETA. Mr. Speaker, I wish to express my support of H.R. 5496, the National Historic Preservation Act Amendments of 1980, which the House is considering today. This legislation reaffirms the need to preserve and enhance for the benefit of present and future generations of Americans existing evidence of our Nation's diverse cultural heritage. Passage of this bill will insure the continuity and improvement of the provisions of the 1966 National Historic Preservation Act, which laid the groundwork for a working Federal, State, and local partnership committed to protecting our country's valuable historic and cultural resources.

The variety of cultural strands which comprise our Nation's unique historical fabric is shown in my own district in Santa Clara County by such landmarks as the Kotani-En Garden in Los Gatos, Calif., an early 20th century example of the classical Japanese tradition in landscape design. Just as the architect Tarashima translated his cultural inheritance in the ponds and symbolic rock gardens of Kotani-En, so do the Spanish features of the Hayes Mansion in San Jose, with its tiled roof and stuccoed facade, attest

to a different, but equally vital, legacy in our cultural tradition. Without the protection guaranteed by the inclusion of these and other historic properties in the National Register, such significant contributions to the broad pattern of our history would go unrecognized.

The concern of historic preservation is not, however, only for our Nation's past, but for its future as well. Incorporating many important national priorities, such as energy and natural resource conservation, fighting inflation, revitalizing our urban areas, and providing greater opportunity for local employment, the historic preservation movement is a creative step forward in meeting the needs of the 20th century. While historic preservation legislation will not inhibit appropriate development in this energy-conscious age newness is not always a viable directive. The encouragement on both Federal and local levels of a sympathetic attitude toward conservation, renovation, and reuse of existing buildings and materials should become an increasingly important priority.

Further, the provisions in H.R. 5496 for increased involvement of local governments in the administration and implementation of the Federal historic preservation program will offer new and much needed opportunities for preservation at the community level. With an estimated 2 million Americans currently supporting preservation interests through a variety of organizational memberships across the country, the active involvement of local governments is long overdue. Passage of H.R. 5496 will also authorize grants to nonprofit organizations representing ethnic and minority groups, and assist Americans of immigrant backgrounds in continuing their inherited customs and ties within their communities.

Building upon the Preservation Act of 1966, H.R. 5496 seeks to develop a broad national historic preservation program which recognizes the need to identify, manage and preserve over 15,000 years of American life. As we face the encroaching extinction of our irreplaceable natural, cultural, and historic resources, one hopes that the 21st century will be heralded by a new consciousness—one which includes, and perhaps is guided by, a profound recognition of the value of preservation in planning for the future. With this in mind, I encourage my colleagues to join me in supporting the National Historic Preservation Act Amendments of 1980. ●

● Mr. UDALL. Mr. Speaker, I too, would like to commend all those who have worked so long and so hard in the development of this fine bill.

My dear friend and colleague, Mr. SEIBERLING, first introduced similar legislation on this issue nearly 4 years ago. I and nearly 50 other Members of the House cosponsored that legislation. Although not enacted during the 95th Congress, the bill prompted much discussion among the historic preservation community, the administration, and the Congress on the needs and opportunities facing historic preservation in the coming decades.

The product of all this effort is H.R. 5496. It will assure a balanced and improved historic preservation program. It favorably supports the preservation partnership that has shown proven results throughout the Nation, in remote countrysides, and in towns and cities of all sizes.

Every Member's district has examples of historic preservation that are significant to local, State, and national events. In my own State of Arizona, we take particular pride in the historic preservation of properties such as Casa Grande National Monument—the first federally preserved historic property. We are also proud to retain the 11,000-year-old Lehner Mammoth Kill site, the 18th century colonial Spanish mission of San Xavier del Bac, and the infamous OK Corral in the Tombstone Historic District.

We westerners are extremely aware of the historic contributions that our ancestors, both native and immigrant, have made to the settlement of our great Nation. We are as supportive as any New Englander of legislation that will assure preservation of our cultural heritage for generations to come.

The national historic preservation fund needs reauthorization now, to assure the continuity of the program begun with the passage of the National Historic Preservation Act of 1966. In addition to the reauthorization, I am pleased to support a bill that offers so many positive program improvements, as I was a year ago when we considered and passed the Archeological Resources Protection Act of 1979.

H.R. 5496 is an excellent bill. It deserves the support of each and every one of us. ●

Mr. SEIBERLING. Mr. Speaker, I have no further requests for time. I yield back the balance of my time.

The SPEAKER pro tempore. The question is on the motion offered by the gentleman from Ohio (Mr. SEIBERLING) that the House suspend the rules and pass the bill (H.R. 5496), as amended.

The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the bill, as amended, was passed.

A motion to reconsider was laid on the table.

## NET OPERATING LOSS CARRY-OVERS OF REAL ESTATE INVESTMENT TRUSTS

Mr. ROSTENKOWSKI. Mr. Speaker, I move to suspend the rules and pass the bill (H.R. 4968) to amend the Internal Revenue Code of 1954 to provide that in certain cases the net operating loss carryover period for a taxpayer who ceases to be real estate investment trust shall be the same as the net operating loss carryover period for a taxpayer who continues to be real estate investment trust, as amended.

The Clerk read as follows:

> **H.R. 4968**
>
> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) subparagraph (E) of section 172(b)(1) of

the Internal Revenue Code of 1954 (relating to net operating loss deduction) is amended to read as follows:

"(E)(i) A net operating loss for a REIT year—

"(I) shall not be a net operating loss carryback to any taxable year preceding the taxable year of such loss, and

"(II) shall be a net operating loss carryover to each of the 8 taxable years following the taxable year of such loss.

"(ii) In the case of any net operating loss for a taxable year which is not a REIT year—

"(I) such loss shall not be carried back to any taxable year which is a REIT year, and

"(II) the number of taxable years to which such loss may be a net operating loss carryover under subparagraph (B) shall be increased (to a number not greater than 8) by the number of taxable years to which such loss may not be a net operating loss carry back by reason of subclause (I).

"(iii) For purposes of this subparagraph, the term 'REIT year' means any taxable year for which the provisions of part II of subchapter M (relating to real estate investment trusts) apply to the taxpayer."

(b) The amendment made by subsection (a) shall apply to the determination of the net operating loss deduction for taxable years ending after October 4, 1976. For purposes of applying the preceding sentence to any net operating loss for a taxable year which is not a REIT year and which ends on or before October 4, 1976, subclause (II) of section 172(b)(1)(E)(ii) of the Internal Revenue Code of 1954 shall be applied by substituting "the number of REIT years to which such loss was a net operating loss carryback" for "the number of taxable years to which such loss may not be a net operating loss carryback by reason of subclause (I)". In the case of a net operating loss for a taxable year described in the preceding sentence, subclause (II) of section 172(b)(1)(E)(ii) of such Code shall not apply to any taxpayer which acted so as to cause it to cease to qualify as a "real estate investment trust" within the meaning of section 856 of such Code if the principal purpose of such action was to secure the benefit of the allowance of a net operating loss carryover under section 172(b)(1)(B) of such Code.

The SPEAKER pro tempore. Is a second demanded?

Mr. DUNCAN of Tennessee. Mr. Speaker, I demand a second.

The SPEAKER pro tempore. Without objection, a second will be considered as ordered.

There was no objection.

The SPEAKER pro tempore. The gentleman from Illinois (Mr. ROSTENKOWSKI) will be recognized for 20 minutes, and the gentleman from Tennessee (Mr. DUNCAN) will be recognized for 20 minutes.

The Chair recognizes the gentleman from Illinois (Mr. ROSTENKOWSKI).

GENERAL LEAVE

Mr. ROSTENKOWSKI. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days in which to revise and extend their remarks on the bill, H.R. 4968, under consideration.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Illinois?

There was no objection.

□ 1330

Mr. ROSTENKOWSKI. Mr. Speaker, I yield myself such time as I may consume.

Case 2:00-cv-02120-DSC    Document 100    Filed 02/10/2006    Page 24 of 98

BEST DOCUMENT AVAILABLE

ate, 62 of our colleagues cosponsored S. 43, but I would like to specifically mention Senators THURMOND, CANNON, and HEINZ who participated in our hearing and to Senator KENNEDY who graciously chaired the hearing and provided needed support all along the way.

In the House, I would like to say thanks to Representative JACK KEMP who sponsored the House companion bill, H.R. 2279. It was a pleasure for me to work with him and his staff assistant, Mr. Michael Castine. The measure could not have proceeded but for the understanding and interest of the chairman of the Administrative Law Subcommittee, Representative GEORGE DANIELSON and the ranking minority member of both the subcommittee and full committee, Representative ROBERT MCCLORY.

Their staffs assisted a great deal in laying the groundwork in the House for hearings and subcommittee and full committee markups and for keeping me well informed of House progress on the bill. Mr. Jim Lauer and Mr. Alan Coffey deserve our appreciation in this regard. There are many others who have had a hand in the passage of this bill and to everyone who believed in the efficacy of this legislation and helped to bring it to this point, on behalf of the National Ski Patrol System, I say thank you.●

● Mr. ROBERT C. BYRD. Mr. President, on behalf of Mr. KENNEDY I move that the Senate concur in the amendment of the House.

The motion was agreed to.

---

## NATIONAL HISTORIC PRESERVATION ACT AMENDMENTS OF 1980

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Senate proceed to the consideration of Calendar Order No. 1150, H.R. 5496.

The PRESIDING OFFICER. The bill will be stated by title.

The assistant legislative clerk read as follows:

A bill (H.R. 5496) to amend the National Historic Preservation Act of 1966, and for other purposes.

The Senate proceeded to the consideration of the bill.

● Mr. BUMPERS. Mr. President, this measure, which has been cleared on both sides, would reauthorize the existing national historic preservation program and make a number of improvements and innovations in the historic preservation program. I now ask unanimous consent that a summary of the bill's major provisions appear in the RECORD at this point.

H.R. 5496 would provide for:

Continuation of the National Register with national, State, and local significance, while properties deemed of national significance will be designated as "National Historic Landmarks";

Development and revision of regulations for the nomination of properties to the National Register that include notification, appeals, and local government participation;

Uniform documentation and curatorial procedures for properties, sites, artifacts, and records;

Revision of regulations to govern the State historic preservation programs requiring appointment of a State historic preservation officer to administer the following program components:

Comprehensive survey and inventory;

Nomination of eligible properties to the National Register;

Comprehensive statewide historic preservation plan;

Public information, education, and training concerning the Federal and State programs;

Designation of a State review board;

Cooperation with local governments, Federal and State agencies, and citizens;

Certification of qualified local governments for increased participation;

Matching grants-in-aid for projects and programs in the States and the National Trust for Historic Preservation;

Education and training programs for public officials at all levels of government;

Grants made under this act will not be taxable as income;

A sum of 70 percent Federal funding match for survey and planning at State and local levels;

A sum of 10 percent of State apportionment to be earmarked for local governments that are certified or working toward certification;

When the appropriation exceeds $65 million for a single year, half of the excess will be earmarked for certified local governments; and

The sum of $150 million authorization through 1987, the current level of authorization.

Federal agency responsibility to include:

Designation of a historic preservation officer in each agency;

Recording of data in event building listed or eligible must be altered or destroyed;

A higher standard will apply when a Federal undertaking will affect a National Historic Landmark;

Data recovery requirements with reasonable costs potentially being passed onto licensees, permittees, or grantees;

Lease provision with use of proceeds to defray preservation costs of other properties within the agency's jurisdiction; and

Preservation activity reasonable costs may be assumed by the agency or passed on to licensees or permittees.

The Department of the Interior may accept donations and bequests of money and personal property for the purposes of the program as well as easements.

Exemption from the Freedom of Information Act;

Reimbursement of private attorneys' fees in civil action brought in any U.S. district court as the court deems reasonable;

A loan insurance program for National Register properties;

Recognition of the National Museum of the Building Arts;

Report on intangible cultural resources within 2 years in cooperation with the American Folklife Center;

The council, in cooperation with Treasury, shall submit a report on Federal tax laws and a loan guarantee program within 1 year of enactment.

There were many people and organizations who have helped make this bill possible. Rather than recite them all at this point, I would like to refer to the CONGRESSIONAL RECORD of November 17, 1980 on pages 29826–29828, and add the deep gratitude of the Senate for their help.

Mr. President, I move the passage of H.R. 5496.●

The PRESIDING OFFICER. The bill is before the Senate and open to amendment. If there be no amendment to be offered, the question is on the third reading and passage of the bill.

The bill (H.R. 5496) was ordered to a third reading, was read the third time, and passed.

Mr. ROBERT C. BYRD. Mr. President, I move to reconsider the vote by which the bill was passed.

Mr. STEVENS. Mr. President, I move to lay that motion on the table.

The motion to lay on the table was agreed to.

---

## GASOHOL COMPETITION ACT OF 1980

Mr. ROBERT C. BYRD. Mr. President, I ask the Chair lay before the Senate a message from the House of Representatives on S. 2251.

The PRESIDING OFFICER laid before the Senate the following message from the House of Representatives:

Resolved, That the bill from the Senate (S. 2251) entitled "An Act to amend the Clayton Act to prohibit restrictions on the use of credit instruments in the purchase of gasohol", do pass with the following amendment:

Strike out all after the enacting clause, and insert: That this Act may be cited as the "Gasohol Competition Act of 1980".

SEC. 2. The Clayton Act is amended by redesignating section 26 as section 27 and by inserting after section 25 the following new section:

"SEC. 26. (a) Except as provided in subsection (b), it shall be unlawful for any person engaged in commerce in the course of such commerce, directly or indirectly to impose any condition, restriction, agreement, or understanding that—

"(1) limits the use of credit instruments in any transaction concerning the sale, resale, or transfer of gasohol or other synthetic motor fuel of equivalent usability in any case in which there is no similar limitation on transactions concerning such person's conventional motor fuel; or

"(2) otherwise unreasonably discriminates against or unreasonably limits the sale, resale, or transfer of gasohol or other synthetic motor fuel of equivalent usability in any case in which such synthetic or conventional motor fuel is sold for use, consumption, or resale within the United States.

"(b)(1) Nothing in this section or in any other provision of law in effect on the date of the enactment of this Act which is specifically applicable to the sale of petroleum products shall preclude any person referred to in subsection (a) from imposing a reasonable fee for credit on the sale, resale, or transfer of the gasohol or other synthetic motor fuel referred to in subsection (a) if such fee equals no more than the actual costs to such person of extending that credit.

"(2) The prohibitions in this section shall not apply to any person who makes available sufficient supplies of gasohol and other syn-

the indicia of ownership pursuant to paragraph (a)(2)(ii)(A) of this section.

(C) Maintained by a bank described in paragraph (a)(2)(ii)(A)(1), in the custody of an entity that is a foreign securities depository or foreign bank that is supervised or regulated by a government agency or regulatory authority in the foreign jurisdiction having authority over such depositories or banks: *Provided*, That:

(1) The foreign entity holds the indicia of ownership as agent for the bank;

(2) The bank is liable to the plan to the same extent it would be if it retained the physical possession of the indicia of ownership within the United States;

(3) The indicia of ownership are not subject to any right, charge, security interest, lien or claim of any kind in favor of the foreign entity except for their safe custody or administration;

(4) Beneficial ownership of the assets represented by the indicia of ownership is freely transferable without the payment of money or value other than for safe custody or administration; and

(5) The bank identifies to the plan, at such time that the bank ordinarily furnishes the plan with a statement of plan assets held by the bank, the name, address and principal place of business of any foreign entities having custody of indicia of ownership of plan assets, and the name and address of the governmental agency or other regulatory authority that supervises or regulates those foreign entities.

*   *   *   *   *

(c) For purposes of this regulation:

(1) The term "management and control" means the power to direct the acquisition or disposition through purchase, sale, pledging, or other means; and

(2) The term "depository" means any company, or agency or instrumentality of government, that acts as a custodian of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates.

Signed at Washington, D.C. this 28th day of July 1980.

Ian D. Lanoff,

*Administrator, Pension and Welfare Benefit Programs, Labor-Management Services Administration, Department of Labor.*

[FR Doc. 80-23397 Filed 7-30-80; 9:28 am]

BILLING CODE 4510-29-M

## DEPARTMENT OF THE INTERIOR

**Heritage Conservation and Recreation Service**

**36 CFR Part 1202**

**National Register of Historic Places**

**AGENCY:** Heritage Conservation and Recreation Service, Interior.

**ACTION:** Proposed amendments.

**SUMMARY:** These amendments update and revise in minor respects the procedures for nominations to the National Register of Historic Places by State and Federal agencies. The amendments (1) specifically define the responsibility of the State Historic Preservation Officer to establish priorities for nomination of all eligible properties to the National Register, (2) make clear that when a State review board reviews and approves a nomination, if it is procedurally correct, the State Historic Preservation Officer shall submit the nomination to the Heritage Conservation and Recreation Service unless the State Historic Preservation Officer considers the property does not meet National Register criteria, (3) establish a more open process which allows that State Historic Preservation Officer or State review board to request the Keeper to make a final decision on a nomination upon which they disagree, (4) amend the procedures by which nominations to the National Register by States and Federal agencies are reviewed by the Heritage Conservation and Recreation Service, and (5) adopt a new appeals process for the listing and removal of properties in the National Register. Minor revisions of requirements for making changes and revisions to properties listed in the National Register are also included.

**DATE:** Comments must be received on or before October 6, 1980.

**ADDRESS:** Written comments should be addressed to the Acting Keeper of the National Register of Historic Places, Heritage Conservation and Recreation Service, Department of the Interior, Washington, D.C. 20243.

**FOR FURTHER INFORMATION CONTACT:** Ms. Carol Shull, Acting Keeper of the National Register, United States Department of the Interior, Heritage Conservation and Recreation Service, Washington, D.C. 20243 (202/343-6401).

**SUPPLEMENTARY INFORMATION:** The National Register is designed to be a comprehensive list of the Nation's significant cultural resources to be used as a planning tool by Federal, State and local governments, private groups and citizens. The State Historic Preservation

Officer is responsible for establishing systematic priorities for nominating all eligible properties in the State to the National Register. The decision to nominate a property to the National Register is a professional decision concerning whether or not the property meets the National Register criteria for evaluation. Amendments to § 1202.11(c) and 1202.15(a)(1) and (a)(4) clarify the State Historic Preservation Officer's role in the nomination process and his/her responsibility to submit procedurally correct nominations approved by the State board unless the State Historic Preservation Officer determines that a property does not meet National Register criteria for evaluation.

The proposed amendments to 1202.15(a)(5) allow the State Historic Preservation Officer to submit a nomination to the Keeper for a final decision if the State Historic Preservation Officer and State review board disagree whether a property meets the National Register criteria for evaluation.

The amendments also strengthen the legislated function of the National Register as a comprehensive list of the Nation's significant cultural resources by explicitly stating that decisions of both the State Historic Preservation Officer and Federal agencies to nominate properties should be based solely on whether the property meets National Register criteria for evaluation and not on other considerations.

The nomination process in these regulations was designed to ensure high professional standards and evaluations to maintain the integrity of the National Register as the list of the Nation's significant cultural resources. The system was purposely created to assure use of multiple levels of expert professional opinion at the State level and by Federal agencies prior to the review of a nomination by the Heritage Conservation and Recreation Service.

States and Federal agencies first apply the National Register criteria for evaluation within each State or region. The National Register criteria are the standard for identifying historic properties to establish a comprehensive resource management and planning system. The identification of all cultural resources within a State is one aspect of this system. The State Historic Preservation Officer is responsible for establishing a systematic method for identifying cultural resources within a State and for the nomination of all eligible properties to the National Register. The Federal agencies are required to inventory and nominate all eligible properties under their jurisdiction or control. The National

Register criteria are worded so that they can apply to cultural resources in all States. The States and Federal agencies establish the context for evaluation of resources within State, regional and local preservation planning systems and apply the criteria to the specific types of resources in any given area.

For State nominations the State Historic Preservation Officer has the responsibility of making the first determination of which properties meet the criteria for evaluation. To ensure high professional standards the Heritage Conservation and Recreation Service requires that each State develop expertise in the disciplines of architectural history, history, archeology, and historical architecture on the State staff and State review board. All nominations are prepared under the supervision of the State Historic Preservation Officer and his or her professional staff in accordance with an approved State historic preservation plan (a comprehensive resource management and planning system). The State Historic Preservation Officer submits nominations to the State review board in accordance with the statewide priorities for preparation and submittal of nominations for all properties meeting National Register criteria. The nomination is then reviewed and a recommendation on it is made by a State review board approved by the Heritage Conservation and Recreation Service with professional expertise in the disciplines described above. The State Historic Preservation Officer again reviews the nomination after its consideration by the review board, signs it and forwards it to the Heritage Conservation and Recreation Service for further professional review at the Federal level.

Federal agencies submitting nominations to the National Register are required to have a Federal Representative for historic preservation, and are strongly encouraged to have personnel which meet the requirements of professionalism established for the States either by having professional staffs or obtaining the services of professionals to prepare nominations. Federal nominations are also sent to the State Historic Preservation Officer for review and substantive comment regarding the significance of the property and its eligibility for the National Register.

Under the current procedures all nominations undergo another indepth technical and professional review by the Heritage Conservation and Recreation Service to determine if the nomination form is technically and professionally

correct and sufficient and that the nomination is in conformance with National Register criteria. The introduction to these regulations as published on September 21, 1977, described in detail the steps in this review. In recognition of the increased professional capacity of State historic preservation offices and Federal agencies submitting nominations, the Heritage Conservation and Recreation Service will no longer undertake as comprehensive a review of the technical and professional aspects of each nomination as it previously had done. Section 1202.15 (a)(4), and (b)(3) of these regulations are revised to state specifically that a State Historic Preservation Officer or Federal Representative signing a nomination is affirming that all appropriate procedures have been followed and that the nomination is technically and professionally correct and sufficient and in conformance with National Register criteria.

Section 1202.16(b) (2) and (3), concerning changes and revisions to properties listed in the National Register, is revised slightly to specify what information must be submitted to the Heritage Conservation and Recreation Service after a property has been physically moved for properties which have remained on the National Register during the move.

Section 1202.17, concerning removal of properties from the National Register, is revised to set forth a formal appeals process whereby the State Historic Preservation Officer, Federal Representative, head of the local political subdivision in which the property is located or owner of record may petition for the removal of a property from the National Register and revises slightly the grounds for removal.

A new nomination appeals process, section 1202.18 is also added to the regulations. The revisions in general are intended to make the nomination and listing procedure a more open and comprehensive process. To assure better understanding by the public about the basis for decisions on the listing of properties in the National Register, the Heritage Conservation and Recreation Service is instituting a new policy. When the Keeper determines that a nomination presents questions about application of the National Register criteria or procedures that cannot be resolved on the basis of precedent or experience, he or she will resolve the question in a written opinion. Notice of the written opinions of the Keeper will be published in the **Federal Register** and will be available in a consistent format

to the public. The purpose of the opinions of the Keeper will be to resolve the question at hand and to serve as guidance for subsequent applications of the National Register criteria and procedures.

In addition, the references to the Office of Archeology and Historic Preservation and National Park Service are changed to the Heritage Conservation and Recreation Service throughout the regulations.

These amendments are developed under the authority of the National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470 et seq., and Executive Order 11593. Because the amendments have to do with procedural aspects of the National Register program and have no impact upon the environment, an environmental impact statement is not required. The Department of the Interior has determined that this document is not a significant rule and does not require a regulatory analysis under Executive Order 12044 and 43 CFR Part 14.

The originator of these procedures is Carol Shull of the Division of the National Register of Historic Places (202/343–6401).

Dated: July 28, 1980.

**Chris T. Delaporte,**

*Director, Heritage Conservation and Recreation Service.*

(National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470 Pub. L. 89–665, 80 Stat. 1915–1919, Executive Order 11593)

Accordingly, §§ 1202.11(c), 1202.15 (a)(1), (a)(4)  and (a)(5) and (b)(3), § 1202.16(b) (2) and (3) and § 1202.17 are amended and § 1202.18 is added as follows. In addition to the above amendments, the references to the Office of Archeology and Historic Preservation and the National Park Service are changed to the Heritage Conservation and Recreation Service throughout the regulations.

1. Section 1202.11(c) is amended to read as follows:

§ 1202.11  Concurrent State and Federal nominations.

* * * * *

(c) If the State Historic Preservation Officer and the State review board agree that the nomination meets the National Register criteria for evaluation, the nomination is signed by the State Historic Preservation Officer and returned to the Federal agency initiating the nomination. If the State Historic Preservation Officer and the State review board disagree, the nomination shall be returned to the Federal agency with the comments of the State Historic Preservation Officer and the State

review board concerning the adequacy of the nomination and the eligibility of the property. The State Historic Preservation Officer's signed comments shall confirm to the Federal agency that the State nomination procedures have been fulfilled including notification requirements. Any comments received by the State concerning the significance of the property shall be included with the letter.

2. Section 1202.15 (a)(1) (a)(4) and (a)(5) and (b)(3) are amended to read as follows:

§ 1202.15  Processing of nominations.

(a)(1) Nomination forms (10–300) are prepared under the supervision of the State Historic Preservation Officer. The State Historic Preservation Officer establishes statewide priorities for preparation and submission of nominations for all properties meeting National Register criteria for evaluation within the State. All nominations from the State shall be submitted in accord with the State priorities, which shall be consistent with an approved State historic preservation plan.

(a)(4) Nomination forms approved by the State review board are then reviewed by the State Historic Preservation Officer and if he or she finds them to be technically, professionally, and procedurally correct and sufficient and in conformance with National Register criteria for evaluation, they are signed by him or her with that certification and submitted to the Keeper of the National Register of Historic Places, Heritage Conservation and Recreation Service, Washington, D.C. 20243.

(a)(5) If the State Historic Preservation Officer and the State review board disagree on whether a property meets the National Register criteria for evaluation, the State Historic Preservation Officer may submit the nomination with his or her comments and those of the State review board to the Keeper of the National Register for a final decision if he or she chooses. The State Historic Preservation Officer shall submit such nominations if so requested by the review board but need not otherwise do so. The State Historic Preservation Officer shall also submit to the Keeper nominations if so requested under the appeals process in § 1202.18. Comments received by a State concerning a property's significance are submitted with the nomination.

(b)(3) After receiving the comments of the State Historic Preservation Officer, or if there has been no response within 45 days, the Federal Representative may approve the nomination and forward it to the Keeper of the National Register of

Historic Places, Heritage Conservation and Recreation Service, Washington, D.C. 20243. The Federal Representative shall sign the nomination form with the certification that all appropriate procedures have been followed and that the nomination is technically and professionally correct and sufficient and in conformance with National Register criteria for evaluation. The comments of the State Historic Preservation Officer shall be appended to the nomination, or, if there are no comments, an explanation shall be attached. Concurrent nominations cannot be submitted, however, until the nomination has been approved by the State in accord with § 1202.11, supra. Comments received by the State concerning concurrent nominations must be submitted with the nomination.

3. Section 1202.16(b)(2) and (b)(3) are amended to read as follows:

§ 1202.16  Changes and revisions to properties listed in the National Register.

(b)(2)(i) If it is proposed that a property listed in the National Register be moved and the State Historic Preservation Officer or Federal agency for a property under Federal jurisdiction or control wishes the property to remain in the National Register during and after the move, the State Historic Preservation Officer or Federal representative having jurisdiction or control shall submit documentation prior to the move which shall discuss: (i) the reasons for the move; (ii) the effect on the property's historical integrity; (iii) the new setting and general environment of the proposed site, including evidence that the proposed site does not possess historical significance that would be adversely affected by the intrusion of the property; and (iv) photographs showing the proposed location.

(3) Any such proposal with respect to the new location submitted by a State shall follow the required notification procedures, shall be aproved by the State review board and shall continue to follow normal review procedures. The Keeper shall respond to a properly documented request within 45 days of receipt from the State Historic Preservation Officer or Federal Representative concerning whether or not the move is approved. Once the property is moved, the State Historic Preservation Officer or Federal Representative shall submit to the Keeper for review (i) a letter notifying him or her of the date the property was moved; (ii) photographs of the property on its new site; and (iii) a revised map, acreage, and verbal boundary description.

(b)(4) If the Keeper approves the move, the property will remain on the National Register during and after the move unless the integrity of the property is, in some unforeseen manner, destroyed. If the Keeper does not approve the move, the property will be automatically deleted from the National Register when moved. In cases of properties removed from the National Register, if the State or Federal agency has evidence that previously unrecognized significance exists, or has accrued, the State or Federal agency may resubmit a nomination for the property.

4. Section 1202.17 is amended to read as follows:

§ 1202.17  Removing properties from the National Register.

(a) Grounds for removing properties from the National Register are as follows:

(1) The property has ceased to meet the criteria for the National Register because the qualities which caused it to be originally listed have been lost or destroyed; (2) error in professional judgment as to whether the property meets the criteria of the National Register; or (3) prejudicial and substantial procedural error in the nomination and listing process. Properties removed from the National Register for procedural error shall be reconsidered for listing by the Keeper after correction of the error or errors by the State Historic Preservation Officer or Federal agency which originally nominated the property, or by the Keeper, as appropriate. The Keeper shall follow the procedures set forth in section 1202.15(a)(6–8) or section 1202.15(b)(4–6) hereof, as appropriate, in such reconsiderations.

(b) The appropriate State Historic Preservation Officer, Federal Representative, head of the local political subdivision in which a property is located, or owner of record may petition for removal of the property from the National Register on the grounds established in subsection (a). Petitions for removal are submitted to the Keeper through the State Historic Preservation Officer for State nominations and the Federal Representative for Federal nominations.

(c) The State Historic Preservation Officer or Federal Representative shall respond in writing to the petition within 45 days of receipt advising the petitioner of his or her view on the petition. Thereafter, if the petitioner so requests the State Historic Preservation Officer or Federal Representative shall forward the petition to the Keeper within 10 days with his or her comments.

(d) The Keeper shall respond to the petition within 45 days of receipt. The Keeper shall make the final administrative determination. No person shall be considered to have exhausted administrative remedies with respect to delisting of a property on the National Register until he or she has complied with the procedures set forth in this section.

5. A new § 1202.16 is added and reads as follows:

**§ 1201.16  Appeals for Nominations.**

(a) The State Historic Preservation Officer shall respond as appropriate in writing within 45 days to any person or organization submitting a National Register nomination which meets the documentation requirements of the State and the Heritage Conservation and Recreation Service. Such response shall set forth and evaluation of the property against the National Register criteria for evaluation and the State nomination priorities.

(b) After receiving the comments of the State Historic Preservation Officer an appellant may request in writing that the State Historic Preservation Officer submit the nomination to the State review board provided the appellant has submitted an adequately documented nomination. Unless the nomination has been previously scheduled for consideration by the State review board, the State Historic Preservation Officer shall follow the notification procedures of § 1202.12 hereof and submit the nomination to the State review board pursuant to the procedures set forth in § 1202.15(a) hereof within six months of the receipt of an adequately documented request. The State Historic Preservation Officer may provide comments on the nomination for the consideration of the State review board.

(c) After consideration by the State review board, and upon notification by the State Historic Preservation Officer that either the State review board or the State Historic Preservation Officer, or both, do not approve the nomination, the appellant may nonetheless request that the State Historic Preservation Officer submit the nomination to the Keeper. In this instance the State Historic Preservation Officer shall forward the nomination to the Keeper within 45 days of such a request together with the written comments of the State Historic Preservation Officer and the State review board which may be in the minutes of the State review board meeting.

(d) If the appellant substantially revises a nomination as the result of comments by the State Historic Preservation Officer or the review board, the nomination shall be reprocessed by the State prior to consideration by the Keeper if the State Historic Preservation Officer determines such reprocessing to be necessary.

(e) The Keeper will advise the State Historic Preservation Officer and the appellant within 30 days if the appeal will be considered or denied. The Keeper will consider appeals if he or she finds that the nomination appears likely to meet the criteria of the National Register.

(f) Appeals considered by the Keeper will follow the procedures for nominations in § 1202.15(a)(6)–(8).

[FR Doc. 80-23507 Filed 8-4-80; 8:45 am]

BILLING CODE 4310-00-M

**POSTAL SERVICE**

**39 CFR Part 111**

**Address Cards Arranged in Sequence of Carrier Delivery**

**AGENCY:** Postal Service.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule would amend and clarify the requirements for submission of address cards to the Postal Service for sequencing and correction. A uniform format for such cards is proposed and standardized control forms are included in the proposal. The proposed rule explains the different address card correction and sequencing services performed by the Postal Service and the requirements a customer must meet in order to obtain each of those services. The need for timely return of the customer's cards is expressed. The definition of a delivery in a multiple delivery building has been modified for the purpose of determining if a customer's submitted address cards meet the requirement that the cards represent at least 90% of all possible deliveries in a 5-digit ZIP Code delivery area, before complete and updated correction/sequencing can be provided.

**DATE:** Comments must be received on or before September 4, 1980.

**ADDRESS:** Written comments should be addressed to the Director, Office of Mail Classification, Rates & Classification Department, U.S. Postal Service. Washington, D.C. 20260. Copies of written comments received will be available for public inspection and photocopying between 9 a.m. and 4 p.m., Monday through Friday, in Room 1640, 475 L'Enfant Plaza West, S.W., Washington, D.C. 20260.

**FOR FURTHER INFORMATION CONTACT:** Don Mumma, (202) 245-4353.

**SUPPLEMENTARY INFORMATION:** The Postal Service currently performs address card correction and sequencing services for its customers as specified in Domestic Mail Manual § 945.3. Due to complaints about the timeliness and accuracy of the information provided under those services and confusion over what services are available, the Postal Service has undertaken a comprehensive revision of section 945.3 to clarify and streamline its address card sequencing services. This proposed rule explains the conditions under which address cards may be submitted to the Postal Service (945.32) and provides for three different levels of sequencing service:

(1) "Sequencing of Address Cards." (945.33)

This service includes the arrangement of unsequenced address cards in carrier route delivery sequence. (Cards with incorrect or undeliverable addresses will be removed from the list, bundled separately, and returned to the customer.)

(2) "Sequencing of Address Cards with Total Possible Deliveries Shown." (945.34)

This service includes the arrangement of unsequenced address cards in carrier route delivery sequence with the insertion of a blank card for an incorrect or missing address or series of addresses. (Cards with incorrect or undeliverable addresses will be removed from the list, bundled separately, and returned to the customer.)

(3) "Sequencing, Updating and Complete Correction of Carrier Route Address Cards." (945.35)

This service includes:

(a) The arrangement of unsequenced address cards in carrier route delivery sequence;

(b) The correction of incorrect address cards;

(c) The inclusion of omitted addresses from the customer's list including rural address conversions to city delivery;

(d) The removal of non-existent addresses which are undeliverable by any carrier.

The proposed rule emphasizes the Postal Service's responsibility to provide timely and accurate sequencing service and provides for customer use of standardized address cards and forms to facilitate that effort. The proposed rule modifies the definition of a delivery in multiple delivery buildings—section 945.352 provides that each apartment unit or office in a building will be treated as a separate address. Therefore, the determination of whether a submitted mailing list contains 90 percent of all addresses within the 5-

Regulated Navigation Area in violation of these regulations.

(2) Applicability. The regulations apply to barges with a freeboard of greater than ten feet and any vessel towing or pushing these barges on outbound transits of the Tomlinson Bridge.

(3) Regulated barges may not transit the bridge—

(i) Except during the period of three hours before and after high water slack,

(ii) When the wind speed at the bridge is greater than twenty knots, and

(iii) With the barge being towed on a hawser, stern first.

(4) Regulated barges with a beam greater than fifty feet must be pushed ahead through the bridge.

(5) If the tug operator does not have a clear view over the barge when pushing ahead, the operator shall post a lookout on the barge with a means of communication with the operator.

(6) Regulated barges departing the Mill River may transit the bridge only between sunrise and sunset. Barges must be pushed ahead of the tug, bow first, with a second tug standing by to assist at the bow.

(7) Nothing in this section is intended to relieve any person from complying with—

(i) Applicable Navigation and Pilot Rules for Inland Waters;

(ii) Any other laws or regulations;

(iii) Any order or direction of the Captain of the Port.

(8) The Captain of the Port, New Haven, may issue an authorization to deviate from any rule in this Section if the COTP finds that an alternate operation can be done safely.

(Sec. 12 Pub. L. 95–474, 96 Stat. 1477 (33 U.S.C. 1223, 1231) 49 CFR 1.46(n)(4))

Dated: October 8, 1981.

W. E. Caldwell,

*Rear Admiral, U.S. Coast Guard, Chief, Office of Marine Environment and Systems.*

[FR Doc. 81–32768 Filed 11–13–81; 8:45 am]

BILLING CODE 4910–14–M

## 33 CFR Part 165

[CCGD17–81–04]

### Gastineau Channel, Juneau, Alaska; Establishment of a Safety Zone

**AGENCY:** Coast Guard, DOT.

**ACTION:** Final rule.

**SUMMARY:** The Coast Guard intends to establish a Safety Zone in the vicinity of the old Juneau-Douglas bridge, which is presently being torn down, from 8:00 a.m. PST to 6:00 p.m. PST on November

18, 1981. This Safety Zone is required to minimize the danger to the maritime community during the demolition of the center section (lift span) of the old bridge. This Safety Zone has been requested by Underwater Construction, Inc., the demolition contractor. No marine traffic will be allowed within the Safety Zone during the time it is in effect. Coast Guard and Underwater Construction, Inc. vessels will be patrolling the area during demolition operations.

**EFFECTIVE DATE:** This amendment becomes effective on November 18, 1981.

**FOR FURTHER INFORMATION CONTACT:** Lt. Joseph M. Hunt, c/o Commanding Officer, U.S. Coast Guard Marine Safety Office, 612 Willoughby Avenue, Juneau, Alaska 99801, telephone: (907) 586–7279.

**SUPPLEMENTARY INFORMATION:** This emergency Safety Zone regulation is published without notice and public comment because good cause exists which makes notice and public procedures impractical and contrary to the public interest. This demolition plan was scheduled and notification was given to the Coast Guard without sufficient time to comply with notice and publication requirements. The limited duration of the Safety Zone and the limited effect that this Safety Zone will have on marine commerce constitutes good cause to establish this Safety Zone without prior publication. Because of the immediate nature of this regulation it is exempt from the procedures of Executive Order 12291.

**DRAFTING INFORMATION:** The principle person involved in drafting this rule is Lt. Joseph M. Hunt, Project Officer, Marine Safety Office, Juneau, Alaska.

**FINAL REGULATION:** In consideration of the foregoing, Part 165 of Title 33, Code of Federal Regulations is amended by adding § 165.1705 to read as follows:

### § 165.1705 Gastineau Channel, Juneau, Alaska.

(a) The waters within the following boundaries are a Safety Zone: The area 100 yards South and 100 yards North of the centerline of the old Juneau-Douglas bridge, presently being dismantled, from 8:00 a.m. PST to 6:00 p.m. PST on November 18, 1981.

(b) The general regulations governing Safety Zones as contained in 33 CFR 165.20 apply.

(92 Stat. 2475 (33 U.S.C. 1225); 49 CFR 1.46 (n)(4))

Dated: October 30, 1981.

H. D. Jacoby,

*Commander, U.S. Coast Guard, Captain of the Port, Southeast Alaska.*

[FR Doc. 81–32912 Filed 11–13–81; 8:45 am]

BILLING CODE 4910–14–M

## DEPARTMENT OF THE INTERIOR

## National Park Service

## 36 CFR Part 60

## National Register of Historic Places

**AGENCY:** National Park Service, Interior.

**ACTION:** Interim rules with request for comments.

**SUMMARY:** These interim rules incorporate revisions required by the National Historic Preservation Act Amendments of 1980, Pub. L. 96–515, ("Amendments") and update and revise in minor respects the procedures for nominations to the National Register of Historic Places by States and Federal agencies as set forth in 36 CFR Part 60. 36 CFR Part 1202 has been redesignated and transferred to 36 CFR Part 60 consistent with the transfer of the National Register of Historic Places to the National Park Service in accordance with Secretarial Order 3060 abolishing the Heritage Conservation and Recreation Service.

**DATE:** Interim rule effective November 16, 1981; comments must be received on or before January 15, 1982.

**ADDRESS:** Send comments to: Keeper of the National Register, National Park Service, United States Department of the Interior, Washington, D.C. 20240 (202/272–3504).

**FOR FURTHER INFORMATION CONTACT:** Carol D. Shull, Acting Keeper of the National Register (202–272–3504).

**SUPPLEMENTARY INFORMATION:** Amended §§ 60.1, 2, 3, 4, 5, 6 (except subsections (i) and (m)), 9, 10, 13, 14, and 15 of 36 CFR Part 60 are published herein as interim rules effective immediately. Amended §§ 60.6(m), 8, 11 and 12 of 36 CFR Part 60 are published elsewhere in this same issue of the Federal Register as proposed rules. Except for the amended sections published as interim rules for immediate effect, 36 CFR Part 60 is revoked.

The National Park Service ("NPS") will be receiving comments on the interim rules and those proposed rules at the same time. They will be consolidated in final rules to be published after consideration of comments. The sections of 36 CFR Part 60 which are published as proposed

rules are shown as reserved in this publication. As a matter of usual practice, the Department publishes all agency rules for comment prior to making them effective. These rules are on an interim basis with a request for comment because the National Register listing program was required to be suspended as of December 13, 1980, due to the passage of the National Historic Preservation Act Amendments of 1980, Public Law 96–515 ("Amendments"). The essential feature of the Amendments which caused a suspension of the National Register listing program is the requirement that owners of private properties proposed to be listed in the National Register be given a reasonable opportunity to concur in or object to the listing. If the owner objects (or a majority of owners in the event of a district), the property is not to be listed in the National Register. These regulations incorporate this reasonable opportunity to concur or object requirement.

The suspension of the National Register listing program has had the following detrimental results:

1. Property owners are not able to get their properties listed and thus qualify for Federal income tax benefits under Section 2124 of the Tax Reform Act of 1976. This has caused delays in rehabilitation activities with consequent cost increases and the possibility that some historic properties may have to be demolished rather than rehabilitated;

2. State and local governments are unable in some instances to make decisions under State and local laws and requirements concerning applications to demolish or renovate historic properties, thereby delaying developing plans;

3. Property owners are not able to qualify their historic properties for receipt of historic preservation grant funds from the Department's Historic Preservation Fund.

These disruptions of ongoing activities at the State and local level which give rise to the level of emergency with respect to preservation of certain historic properties, coupled with the fact that these regulations grant property owners the right to not have their property listed in the National Register, warrant the publication of these regulations on an interim basis effective immediately.

The National Register nomination and listing procedures are amended by these rules to do the following:

(1) Add "engineering significance" to the National Register criteria for evaluation, as required by the Amendments;

(2) Revise the notification procedures for nominations to provide an opportunity for owners to concur in or object to National Register listing, as required by the Amendments;

(3) Strengthen and clarify the responsibilities of the State Historic Preservation Officer to establish priorities for nominating all eligible properties to the National Register, as intended by the Amendments;

(4) Make clear that when a State Review Board reviews and approves a nomination, if it is procedurally correct, the State Historic Preservation Officer shall submit the nomination to NPS unless the State Historic Preservation Officer believes the property does not meet National Register criteria, as required by the Amendments;

(5) Establish a process which allows the State Historic Preservation Officer or State Review Board to request the Keeper of the National Register ("Keeper") to make a final decision on a nomination upon which they disagree;

(6) Strengthen and clarify the responsibilities of Federal agencies and the Federal Preservation Officer in the nomination process, as intended by the Amendments; and delete the provision allowing the State Historic Preservation Officer to nominate properties under Federal ownership or control;

(7) Include a process with appropriate notification by which the Keeper will review and make determinations of eligibility on nominations where the private owners or a majority of such owners for historic districts object to listing in the National Register, as required by the Amendments;

(8) Amend the procedures by which nominations are reviewed and approved by the NPS, define when substantive reviews of nominations will occur, and establish time frames for the review process, as required by the Amendments;

(9) Include technical modifications of requirements for making changes and revisions to nominations for properties listed in the National Register;

(10) Adopt a new appeals process for removal of properties from the National Register, as required by the Amendments;

(11) Delete all references to the Office of Archeology and Historic Preservation, and replace them with National Park Service where appropriate.

A proposed rulemaking which included amendments to 36 CFR § 60.11(c), 60.15 (a)(1), (a)(4) and (a)5 and b(3), 60.16(b)(2) and (3) and 60.17 and the addition of § 60.18, was published in the Federal Register for comment on August 5, 1980. On December 12, 1980, the National Historic Preservation Act Amendments of 1980 became law necessitating additional

major revisions in the nomination and listing process.

These interim regulations incorporate the revisions required by the Amendments as well as many of the changes published in the Federal Register for comment on August 5. These regulations have been written in consultation with State Historic Preservation Officers, Federal agencies, the National Trust for Historic Preservation, Congressional Committee staff and others with concerns about the program. The National Park Service will consult with these and other parties upon request during the comment period. The Amendments require or authorize the Secretary to promulgate or revise regulations relating to the nomination and listing process for the following:

(a) Establishing or revising criteria for properties to be included in the National Register in consultation with national historical and archeological associations;

(b) Nominating properties for inclusion in, and removal from, the National Register and considering the recommendations of properties by certified local governments;

(c) Considering appeals from such recommendations, nominations, removals, and designations (or any failure or refusal by a nominating authority to nominate or designate);

(d) Making determinations of eligibility of properties for inclusion in the National Register;

(e) Notifying the owner of a property, any appropriate local governments, and the general public, when the property is being considered for inclusion in the National Register;

(f) Including a State or Federal nomination in the National Register forty-five days after receipt by the Secretary of the nomination and necessary documentation, unless the Secretary disapproves such nomination within such forty-five day period or unless an appeal is filed;

(g) Accepting a nomination directly from any person or local government for inclusion of a property in the National Register only if such property is located in a State where there is no approved State program and including that property in the National Register or making a determination of its eligibility within 90 days of the nomination unless the nomination is appealed;

(h) Providing a method whereby any person or local government may appeal to the Secretary a nomination of any historic property for inclusion in the National Register and may appeal to the Secretary the failure or refusal of a

Federal Register / Vol. 46, No. 220 / Monday, November 16, 1981 / Rules and Regulations     56185

nominating authority to nominate a property;

(i) Requiring that before any private property or district including private property may be included in the National Register, the owner or owners of such property, or a majority of the owners of the properties within the district in the case of an historic district, shall be given the opportunity (including a reasonable period of time) to concur in, or object to, the nomination of the property or district for such inclusion;

(j) Reviewing a nomination where the private owner or a majority of such owners object to listing to determine whether or not a property or district is eligible for inclusion in the National Register and informing the Advisory Council on Historic Preservation, the appropriate State Historic Preservation Officer, the appropriate chief elected local official and the owner or owners of such property, of such determination;

(k) Modifying the review process to allow the Keeper to approve a nomination without substantive review if the procedures have been properly followed, and documentation is adequate.

Implementation of the other provisions is in the proposed regulations published in this Federal Register, with the exception of the provisions regarding certification of local governments. Proposed rules for participation in the National Register program by certified local governments will be published separately after the requirements for certifying local governments are developed. 36 CFR 60.6(i) and 60.7 have been reserved for this purpose. The interim rules also include minor revisions published in the Federal Register on August 5 for comment as revised based on the Amendments and comments received from the States, Federal agencies, local governments, the National Trust for Historic Preservation, private companies and individuals.

Commentary:

The National Register is designed to be a comprehensive list of the Nation's significant cultural resources to be used as a planning tool by Federal, State and local governments, private groups and citizens. The nomination process in these regulations was designed to ensure high professional standards for evaluation to maintain the integrity of the National Register as the list of the Nation's significant cultural resources. The system was purposely created to assure use of multiple levels of expert professional opinion at the State level and by Federal agencies prior to the submittal of a nomination to the NPS.

States and Federal agencies first apply the National Register criteria for evaluation within each State or region. The National Register criteria are the standard for identifying historic properties to establish a comprehensive resource management and planning system. The identification of all cultural resources within a State is one aspect of this system. The State Historic Preservation Officer is responsible for establishing a systematic method for identifying cultural resources within a State and prioritize for the nomination of all eligible properties to the National Register. Federal agencies are required to inventory and nominate all eligible properties under their ownership or control. The National Register criteria are worded so that they can apply to the wide variety of historic and cultural properties. The States and Federal agencies establish the context for evaluation of resources within State, regional and local preservation planning systems and apply the criteria to the specific types of resources in any given area.

For State nominations the State Historic Preservation Officer has the responsibility of making the first determination of which properties meet the criteria for evaluation. To ensure high professional standards the NPS requires that each State develop expertise in the disciplines of history, architectural history, archeology, and historical architecture on the State staff and State Review Board. Nominations are prepared under the supervision of the State Historic Preservation Officer and his or her professional staff in accordance with an approved State historic preservation plan, which is intended to be a comprehensive resource management and planning system. The State Historic Preservation Officer submits nominations to the State Review Board in accordance with established Statewide priorities for preparation and submittal of nominations for all properties meeting National Register criteria. The nomination is then reviewed and a recommendation concerning whether or not the property meets the National Register criteria for evaluation in made by a State Review Board with professional expertise in the disciplines described above. The State Historic Preservation Officer again reviews the nomination after its consideration by the Review Board, signs it and forwards it to NPS.

Federal agencies submitting nominations to the National Register are required to have a Federal Preservation Officer. Federal agencies obtain qualified personnel either by having

professional staffs or obtaining the services of professionals to prepare nominations. Federal nominations are sent to the State Historic Preservation Officer for review and comment regarding the adequacy of the nomination, the significance of the property and its eligibility for the National Register.

Generally, NPS relies on States and Federal agencies to identify historic properties for National Register listing. Because of the experience and ability of the States and Federal agencies in identifying and evaluating historic and cultural properties which Congress recognized in the Amendments, NPS will, in most instances, list nominations by Federal agencies and by States with approved State programs without substantive review, provided the Federal agency or State certifies that the procedures for making nominations have been properly followed, the documentation is sufficient, and the nomination meets the National Register criteria for evaluation. However, the Keeper or his or her designee will review particular nominations as part of a systematic process of monitoring State and Federal historic preservation programs, and as otherwise necessary, to insure the integrity of the program. This change in the review process places important additional responsibilities on State Historic Preservation Officers and Federal Preservation Officers to assure that nominations are sufficiently documented, technically and procedurally correct and in accord with National Register criteria for evaluation.

The Amendments codify the responsibilities of State Historic Preservation Officers and establish a process whereby the Secretary approves State programs. Any State Historic Preservation Program in effect under prior authority of law will be treated as an approved program until the date on which the Secretary approves a program submitted by the State or until three years after the date of the enactment of the Amendments unless the Secretary chooses to rescind such approval because of program deficiencies.

The revisions to 36 CFR Part 60 are intended to make the nomination and listing procedures a more open and comprehensible process. To assure better understanding by the public about the basis for decisions on listing of properties in the National Register, NPS is instituting a new policy. When the Keeper determines that a nomination presents questions that cannot be resolved on the basis of precedent or experience, he or she will resolve the

**56166**  Federal Register / Vol. 46, No. 220 / Monday, November 16, 1981 / Rules and Regulations

question in a written opinion. The written opinions of the Keeper will be published and will be available to the public in a consistent format. The purpose of the opinions of the Keeper will be to resolve the question at hand and to serve as guidance for subsequent applications of the National Register criteria and procedures.

The Department has given careful consideration to establishing the most reasonable and legally defensible method for carrying out the requirement that before any privately owned property or district including private property may be included in the National Register, the owner or owners of such property, or a majority of the owners of the properties within the district in the case of a historic district, shall be given the opportunity (including a reasonable period of time) to concur in, or object to, the nomination of the property or district. The statute refers only to owners. The language in the committee report acknowledges that there should be adequate flexibility to address the various situations which might arise. State Historic Preservation Officers are required to obtain the list of owners from the most current list of owners in either the tax or land recordation records, whichever is more appropriate. Only the names of those which appear on the list consulted will be notified. Each owner has a vote in determining whether a majority of owners in a historic district or single property with multiple owners object to listing. To protect the rights of property owners and to assure that the record is defensible, the regulations provide that an owner who wishes to object shall submit to the State Historic Preservation Officer a notarized statement certifying that the party is the sole or partial owner of the private property, as appropriate, and objects to the listing.

After consideration it was concluded that since Federal agencies are legally responsible for nominating historic properties under their ownership or control, the nomination of Federal properties by the State Historic Preservation Officer is duplicative and unnecessary. Therefore the regulations have been revised to delete the provisions (§§ 60.11(d) and 60.15(a)(2) in the current regulations) allowing the State Historic Preservation Officer to nominate properties under Federal ownership or control to the National Register. Section 60.6(y) of these regulations does provide that the State Historic Preservation Officer may submit completed nomination forms for such properties to the appropriate Federal Preservation Officer who may

approve the nomination and forward it to the National Park Service. As required by the 1980 Amendments the failure of a Federal agency to nominate an eligible property is subject to appeal. Provisions for appealing nominations are published for comment in this same issue of the **Federal Register**.

Comments and response to comments upon the August 5, 1980 proposed amendments:

The following summarizes the comments received and actions taken in these interim rules on the August 5 proposed amendments.

One comment recommended that the regulations should make clear that comments on National Register nominations should address only the property's historic significance. The most useful comments are those which address the historic significance of a property and therefore assist in its evaluation. However, the public may comment on any aspect of the matter, including procedural aspects. The regulations have been revised to be more consistent when they refer to comments.

One comment recommended that Federal agencies submitting nominations be required to meet the same professional qualification standards as States. While NPS has no authority to impose such a requirement, the Amendments do require that the head of each Federal agency shall, unless exempted, designate a qualified official to be known as the agency's "preservation officer" who shall be responsible for coordinating that agency's activities under this Act.

A recommendation was received that the regulations should be revised to allow for clear consent before processing a National Register nomination and expressing disagreement with the intent of the proposed revisions. The interim regulations now reflect the Amendments which state that if the owner or owners of any privately owned property, or a majority of the owners of such properties within the district in the case of an historic district, object to inclusion, such property shall not be included in the National Register until such objection is withdrawn.

*Section 60.15  Processing nominations (§§ 60.6 and 9 in these regulations).*

One comment addressed the requirement that nominations be submitted in accord with State priorities. That comment recommended that there be provision for regularly revised State priorities and for review and approval of the priorities by the NPS in accordance with national

priorities established by the Secretary. Another comment said that the regulations should make clear that the States should have some method in effect for determining priorities for nominations.

One comment recommended that the proposed amendments be dropped and suggested that factors other than significance could influence whether a property is nominated and listed in the National Register. Consistent with Federal law, except where private owners object, only the significance of a property should be the basis for the decision to list a property. These revisions reinforce that basis.

The National Conference of State Historic Preservation Officers recommended that the head of the local political subdivision be able to request that the State Historic Preservation Officer submit nominations on which the State Historic Preservation Officer and the State Review Board disagree. This provision has been added.

One comment recommended that all nominations be submitted to the National Register when the State Historic Preservation Officer and State Review Board disagree on the eligibility of a property. Comments also recommended that the State Historic Preservation Officer be given discretionary authority in the nomination process. The regulations give the State Historic Preservation Officer, as the authority responsible for nominations in the State, discretion not to submit nominations which the State Historic Preservation Officer does not believe meet the National Register criteria unless requested by the State Review Board, the head of the local political subdivision, or on appeal.

One comment questioned whether Federal nominations should be submitted to the NPS without State Historic Preservation Officer approval. The NPS considers that Federal agencies should retain authority to submit nominations to the National Register for properties under Federal ownership or control after consultation with the State.

Removing Properties from the National Register (published as § 60.7 on August 5, now § 60.15).

One comment suggested that another ground for removal be added to the regulations which would provide for removal of a property if additional information shows that the property does not possess sufficient significance to meet the National Register criteria for evaluation. Properties have previously been removed from the National Register for this reason but this ground

for removal has been made explicit in these regulations.

The National Conference of State Historic Preservation Officers' comments recommended that a 45-day time period be placed on petitioners for removal who with to pursue the request further. They also recommended that the State be given 15 rather than 10 days to forward such petitions to the Keeper. These revisions have been added to the regulations.

The National Trust for Historic Preservation recommended that "prejudicial and substantial" procedural errors be further defined. The term "substantial" has been deleted.

Comments also recommended requiring the petitioner to provide some evidence on the established grounds to support the petition for removal. This requirement has been added. Concern was also expressed that this section might be abused. Others urged that notice be given and an opportunity to comment and that the State Review Board be allowed to reconsider proposals for removal, where appropriate, before a property is removed from the National Register. These recommendations are also incorporated into the regulations. They should assist in assuring that the removal process is a responsible one with adequate public participation.

(National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470 *et seq.*, and Executive Order 11593)

The Department of the Interior has determined that this document is not a major rule under Executive Order 12291 and does not have a significant economic effect on a substantial number of small entities in accordance with the Regulatory Flexibility Act of 1980 (Pub. L. 96–354). These revisions are procedural not substantive. They tell the public how to nominate properties to the National Register and since they are procedural only they have no significant economic effect on small entities.

This regulation does not significantly impact the environment. Because the amendments have to do with procedural aspects of the National Register program and have no impact upon the environment, an environmental impact statement is not required.

The originator of these procedures is Carol Shull of the Division of the National Register of Historic Places (202/272–3504).

Dated: November 18, 1981.

Ira J. Hutchison.

*Acting Director, National Park Service.*

The following sections of 36 CFR Part 60 are published herein for comment and immediate interim effect. The reserved sections with the exception of § 60.6(i) and § 60.7 are published separately for comment in this same issue of the **Federal Register**. Except for the following amended sections, 36 CFR Part 60 is suspended.

Accordingly, 36 CFR Part 60 is revised to read as follows:

## PART 60—NATIONAL REGISTER OF HISTORIC PLACES

Sec.
60.1   Authorization and expansion of the National Register.
60.2   Effects of listing under Federal law.
60.3   Definitions.
60.4   Criteria for evaluation.
60.5   Nomination forms and information collection.
60.6   Nominations by the State historic preservation officer under approved State historic preservation programs.
60.7   [Reserved]
60.8   [Reserved]
60.9   Nominations by Federal agencies.
60.10  Concurrent State and Federal nominations.
60.11  [Reserved]
60.12  [Reserved]
60.13  Publication in the Federal Register and other National Park Service notification.
60.14  Changes and revisions to properties listed in the National Register.
60.15  Removing properties from the National Register.

Authority: National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470 *et seq.*, and EO 11593.

### § 60.1   Authorization and expansion of the National Register.

(a) The National Historic Preservation Act of 1966, 80 Stat. 915, 16 U.S.C. 470 *et seq.*, as amended, authorizes the Secretary of the Interior to expand and maintain a National Register of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering and culture. The regulations herein set forth the procedural requirements for listing properties on the National Register.

(b) Properties are added to the National Register through the following processes.

(1) Those Acts of Congress and Executive orders which create historic areas of the National Park System administered by the National Park Service, all or portions of which may be determined to be of historic significance consistent with the intent of Congress;

(2) Properties declared by the Secretary of the Interior to be of national significance and designated as National Historic Landmarks;

(3) Nominations prepared under approved State Historic Preservation Programs, submitted by the State Historic Preservation Officer and approved by the NPS;

(4) Nominations from any person or local government (only if such property is located in a State with no approved State Historic Preservation Program) approved by the NPS and;

(5) Nominations of Federal properties prepared by Federal agencies, submitted by the Federal Preservation Officer and approved by NPS.

### § 60.2   Effects of listing under Federal law.

The National Register is an authoritative guide to be used by Federal, State, and local governments, private groups and citizens to identify the Nation's cultural resources and to indicate what properties should be considered for protection from destruction or impairment. Listing of private property on the National Register does not prohibit under Federal law or regulation any actions which may otherwise be taken by the property owner with respect to the property.

(a) The National Register was designed to be and is administered as a planning tool. Federal agencies undertaking a project having an effect on a listed or eligible property must provide the Advisory Council on Historic Preservation a reasonable opportunity to comment pursuant to section 106 of the National Historic Preservation Act of 1966, as amended. The Council has adopted procedures concerning, *inter alia,* their commenting responsibility in 36 CFR Part 800. Having complied with this procedural requirement the Federal agency may adopt any course of action it believes is appropriate. While the Advisory Council comments must be taken into account and integrated into the decisionmaking process, program decisions rest with the agency implementing the undertaking.

(b) Listing in the National Register also makes property owners eligible to be considered for Federal grants-in-aid for historic preservation.

(c) If a property is listed in the National Register, certain provisions of the Tax Reform Act of 1976 as amended by the Revenue Act of 1978 and the Tax Treatment Extension Act of 1980 may apply. These provisions encourage the preservation of depreciable historic structures by allowing favorable tax treatments for rehabilitation, and discourage destruction of historic buildings by eliminating certain otherwise available Federal tax provisions both for demolition of historic structures and for new construction on the site of demolished historic buildings. Owners of historic

buildings may benefit from the investment tax credit provisions of the Revenue Act of 1978. The Economic Recovery Tax Act of 1981 generally replaces the rehabilitation tax incentives under these laws beginning January 1, 1982 with a 25% investment tax credit for rehabilitations of historic commercial, industrial and residential buildings. This can be combined with a 15-year cost recovery period for the adjusted basis of the historic building. Historic buildings with certified rehabilitations receive additional tax savings by their exemption from any requirement to reduce the basis of the building by the amount of the credit. The denial of accelerated depreciation for a building built on the site of a demolished historic building is repealed effective January 1, 1982. The Tax Treatment Extension Act of 1980 includes provisions regarding charitable contributions for conservation purposes of partial interests in historically important land areas or structures.

(d) If a property contains surface coal resources and is listed in the National Register, certain provisions of the Surface Mining and Control Act of 1977 require consideration of a property's historic values in the determination on issuance of a surface coal mining permit.

## § 60.3  Definitions.

(a) *Building.* A building is a structure created to shelter any form of human activity, such as a house, barn, church, hotel, or similar structure. Building may refer to a historically related complex such as a courthouse and jail or a house and barn.

*Examples*

Molly Brown House (Denver, CO)
Meek Mansion and Carriage House (Hayward, CA)
Huron County Courthouse and Jail (Norwalk, OH)
Fairntosh Plantation (Durham vicinity, NC)

(b) *Chief elected local official.* Chief elected local official means the mayor, county judge, county executive or otherwise titled chief elected administrative official who is the elected head of the local political jurisdiction in which the property is located.

(c) *Determination of eligibility.* A determination of eligibility is a decision by the Department of the Interior that a district, site, building, structure or object meets the National Register criteria for evaluation although the property is not formally listed in the National Register. A determination of eligibility does not make the property eligible for such benefits as grants, loans, or tax

incentives that have listing on the National Register as a prerequisite.

(d) *District.* A district is a geographically definable area, urban or rural, possessing a significant concentration, linkage, or continuity of sites, buildings, structures, or objects united by past events or aesthetically by plan or physical development. A district may also comprise individual elements separated geographically but linked by association or history.

*Examples*

Georgetown Historic District (Washington, DC)
Martin Luther King Historic District (Atlanta, GA)
Durango-Silverton Narrow-Gauge Railroad (right-of-way between Durango and Silverton, CO)

(e) *Federal Preservation Officer.* The Federal Preservation Officer is the official designated by the head of each Federal agency responsible for coordinating that agency's activities under the National Historic Preservation Act of 1966, as amended, and Executive Order 11593 including nominating properties under that agency's ownership or control to the National Register.

(f) *Keeper of the National Register of Historic Places.* The Keeper is the individual who has been delegated the authority by NPS to list properties and determine their eligibility for the National Register. The Keeper may further delegate this authority as he or she deems appropriate.

(g) *Multiple Resource Format submission.* A Multiple Resource Format submission for nominating properties to the National Register is one which includes all or a defined portion of the cultural resources identified in a specified geographical area.

(h) *National Park Service (NPS).* The National Park Service is the bureau of the Department of Interior to which the Secretary of Interior has delegated the authority and responsibility for administering the National Register program.

(i) *National Register Nomination Form.* National Register Nomination Form means (1) National Register Nomination Form NPS 10-900, with accompanying continuation sheets (where necessary) Form NPS 10-900a, maps and photographs or (2) for Federal nominations, Form No. 10-306, with continuation sheets (where necessary) Form No. 10-300A, maps and photographs. Such nomination forms must be "adequately documented" and "technically and professionally correct and sufficient." To meet these requirements the forms and

accompanying maps and photographs must be completed in accord with requirements and guidance in the NPS publication, "How to Complete National Register Forms" and other NPS technical publications on this subject. Descriptions and statements of significance must be prepared in accord with standards generally accepted by academic historians, architectural historians and archeologists. The nomination form is a legal document and reference for historical, architectural, and archeological data upon which the protections for listed and eligible properties are founded. The nominating authority certifies that the nomination is adequately documented and technically and professionally correct and sufficient upon nomination.

(j) *Object.* An object is a material thing of functional, aesthetic, cultural, historical or scientific value that may be, by nature or design, movable yet related to a specific setting or environment.

*Examples*

Delta Queen Steamboat (Cincinnati, OH)
Adams Memorial (Rock Creek Cemetery, Washington, DC)
Sumpter Valley Gold Dredge (Sumpter, OR)

(k) *Owner or owners.* The term owner or owners means those individuals, partnerships, corporations or public agencies holding fee simple title to property. Owner or owners does not include individuals, partnerships, corporations or public agencies holding easements or less than fee interests (including leaseholds) of any nature.

(l) *Site.* A site is the location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined, or vanished, where the location itself maintains historical or archeological value regardless of the value of any existing structure.

*Examples*

Cabin Creek Battlefield (Pensacola vicinity, OK)
Mound Cemetery Mound (Chester vicinity, OH)
Mud Springs Pony Express Station Site (Dalton vicinity, NE)

(m) *State Historic Preservation Officer.* The State Historic Preservation Officer is the person who has been designated by the Governor or chief executive or by State statute in each State to administer the State Historic Preservation Program, including identifying and nominating eligible properties to the National Register and otherwise administering applications for listing historic properties in the National Register.

(n) *State Historic Preservation Program.* The State Historic Preservation Program is the program established by each State and approved by the Secretary of Interior for the purpose of carrying out the provisions of the National Historic Preservation Act of 1966, as amended, and related laws and regulations. Such program shall be approved by the Secretary before the State may nominate properties to the National Register. Any State Historic Preservation Program in effect under prior authority of law before December 12, 1980, shall be treated as an approved program until the Secretary approves a program submitted by the State for purposes of the Amendments of December 12, 1983, unless the Secretary chooses to rescind such approval because of program deficiencies.

(o) *State Review Board.* The State Review Board is a body whose members represent the professional fields of American history, architectural history, historic architecture, prehistoric and historic archeology, and other professional disciplines and may include citizen members. In States with approved State historic preservation programs the State Review Board reviews and approves National Register nominations concerning whether or not they meet the criteria for evaluation prior to their submittal to the NPS.

(p) *Structure.* A structure is a work made up of interdependent and interrelated parts in a definite pattern of organization. Constructed by man, it is often an engineering project large in scale.

*Examples*

Swanton Covered Railroad Bridge (Swanton vicinity, VT)
Old Point Loma Lighthouse (San Diego, CA)
North Point Water Tower (Milwaukee, WI)
Reber Radio Telescope (Green Bay vicinity, WI)

(q) *Thematic Group Format submission.* A Thematic Group Format submission for nominating properties to the National Register is one which includes a finite group of resources related to one another in a clearly distinguishable way. They may be related to a single historic person, event, or developmental force; of one building type or use; or designed by a single architect; of a single archeological site form; or related to a particular set of archeological research problems.

(r) *To nominate.* To nominate is to propose that a district, site, building, structure, or object be listed in the National Register of Historic Places by preparing a nomination form, with accompanying maps and photographs which adequately document the property and are technically and professionally correct and sufficient.

§ 60.4  Criteria for evaluation.

The criteria applied to evaluate properties (other than areas of the National Park System and National Historic Landmarks) for the National Register are listed below. These criteria are worded in a manner to provide for a wide diversity of resources. The following criteria shall be used in evaluating properties for nomination to the National Register, by NPS in reviewing nominations, and for evaluating National Register eligibility of properties. Guidance in applying the criteria is further discussed in the "How To" publications, Standards & Guidelines sheets and Keeper's opinions of the National Register. Such materials as available upon request.

*National Register criteria for evaluation.* The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association and

(a) that are associated with events that have made a significant contribution to the broad patterns of our history; or

(b) that are associated with the lives of persons significant in our past; or

(c) that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

(d) that have yielded, or may be likely to yield, information important in prehistory or history.

*Criteria considerations.* Ordinarily cemeteries, birthplaces, or graves of historical figures, properties owned by religious institutions or used for religious purposes, structures that have been moved from their original locations, reconstructed historic buildings, properties primarily commemorative in nature, and properties that have achieved significance within the past 50 years shall not be considered eligible for the National Register. However, such properties will qualify if they are integral parts of districts that do meet the criteria or if they fall within the following categories:

(a) A religious property deriving primary significance from architectural or artistic distinction or historical importance; or

(b) A building or structure removed from its original location but which is significant primarily for architectural value, or which is the surviving structure most importantly associated with a historic person or event; or

(c) A birthplace or grave of a historical figure of outstanding importance if there is no appropriate site or building directly associated with his productive life.

(d) A cemetery which derives its primary significance from graves of persons of transcendent importance, from age, from distinctive design features, or from association with historic events; or

(e) A reconstructed building when accurately executed in a suitable environment and presented in a dignified manner as part of a restoration master plan, and when no other building or structure with the same association has survived; or

(f) A property primarily commemorative in intent if design, age, tradition, or symbolic value has invested it with its own exceptional significance; or

(g) A property achieving significance within the past 50 years if it is of exceptional importance.

This exception is described further in NPS "How To" #2, entitled "How to Evaluate and Nominate Potential National Register Properties That Have Achieved Significance Within the Last 50 Years" which is available from the National Register of Historic Places Division, National Park Service, United States Department of the Interior, Washington, D.C. 20240.

§ 60.5  Nomination forms and information collection.

(a) All nominations to the National Register are to be made on standard National Register forms. These forms are provided upon request to the State Historic Preservation Officer, participating Federal agencies and others by the NPS. For archival reasons, no other forms, photocopied or otherwise, will be accepted.

(b) The information collection requirements contained in this part have been approved by the Office of Management and Budget under 44 U.S.C. 3507 and assigned clearance number 1024–0018. The information is being collected as part of the nomination of properties to the National Register. This information will be used to evaluate the eligibility of properties for inclusion in the National Register under established criteria. The obligation to respond is required to obtain a benefit.

§ 60.6  Nominations by the State Historic Preservation Officer under approved State Historic Preservation programs.

(a) The State Historic Preservation Officer is responsible for identifying and nominating eligible properties to the National Register. Nomination forms are prepared under the supervision of the State Historic Preservation Officer. The State Historic Preservation Officer establishes statewide priorities for preparation and submittal of nominations for all properties meeting National Register criteria for evaluation within the State. All nominations from the State shall be submitted in accord with the State priorities, which shall be consistent with an approved State historic preservation plan.

(b) The State shall consult with local authorities in the nomination process.

**56190**    Federal Register / Vol. 46, No. 220 / Monday, November 16, 1981 / Rules and Regulations

The State provides notice of the intent to nominate a property and solicits written comments especially on the significance of the property and whether or not it meets the National Register criteria for evaluation. The State notice also gives owners of private property an opportunity to concur in or object to listing. The notice is carried out as specified in the subsections below.

(c) As part of the nomination process, each State is required to notify in writing the property owner(s), except as specified in paragraph (d) of this section, of the State's intent to bring the nomination before the State Review Board. The list of owners shall be obtained from either official land recordation records or tax records, whichever is more appropriate, within 90 days prior to the notification of intent to nominate. If in any State the land recordation or tax records is not the most appropriate list from which to obtain owners that State shall notify the Keeper in writing and request approval that an alternative source of owners may be used.

The State is responsible for notifying only those owners whose names appear on the list consulted. Where there is more than one owner on the list, each separate owner shall be notified. The State shall send the written notification at least 30 but not more than 75 days before the State Review Board meeting. Required notices may vary in some details of wording as the States prefer, but the content of notices must be approved by the National Register. The notice shall give the owner(s) at least 30 but not more than 75 days to submit written comments and concur in or object in writing to the nomination of such property. At least 30 but not more than 75 days before the State Review Board meeting, the States are also required to notify by the above mentioned National Register approved notice the applicable chief elected official of the county (or equivalent governmental unit) and municipal political jurisdiction in which the property is located. The National Register nomination shall be on file with the State Historic Preservation Program during the comment period and a copy made available by mail when requested by the public, or made available at a location of reasonable access to all affected property owners, such as a local library courthouse, or other public place, prior to the State Review Board meeting so that written comments regarding the nomination can be prepared.

(d) For a nomination with more than 50 property owners, each State is required to notify in writing at least 30 but not more than 75 days in advance of the State Review Board meeting the chief elected local officials of the county (or equivalent governmental unit) and municipal political jurisdiction in which the property or district is located. The State shall provide general notice to property owners concerning the State's intent to nominate. The general notice shall be published at least 30 days but not more than 75 days before the State Review Board meeting and provide an opportunity for the submission of written comments and provide the owners of private property or a majority of such owners for districts an opportunity to concur in or object in writing to the nomination. Such general notice must be published in one or more local newspapers of general circulation in the area of the nomination. The content of the notices shall be approved by the National Register. If such general notice is used to notify the property owners for a nomination containing more than 50 owners, it is suggested that a public information meeting be held in the immediate area prior to the State Review Board meeting. If the State wishes to individually notify all property owners, it may do so, pursuant to procedures specified in Subsection 60.6(c), in which case, the State need not publish a general notice.

(e) For Multiple Resource and Thematic Group Format submission, each district, site, building, structure and object included in the submission is treated as a separate nomination for the purpose of notification and to provide owners of private property the opportunity to concur in or object in writing to the nomination in accord with this section.

(f) The commenting period following notifications can be waived only when all property owners and the chief elected local official have advised the State in writing that they agree to the waiver.

(g) Upon notification, any owner or owners of a private property who wish to object shall submit to the State Historic Preservation Officer a notarized statement certifying that the party is the sole or partial owner of the private property, as appropriate, and objects to the listing. In nominations with multiple ownership of a single private property or of districts, the property will not be listed if a majority of the owners object to listing. Upon receipt of notarized objections respecting a district or single private property with multiple owners, it is the responsibility of the State Historic Preservation Officer to ascertain whether a majority of owners of private property have objected. If an owner whose name did not appear on the list certifies in a written notarized statement that the party is the sole or partial owner of a nominated private property such owner shall be counted by the State Historic Preservation Officer in determining whether a majority of owners has objected. Each owner of private property in a district has one vote regardless of how many properties or what part of one property that party owns and regardless of whether the property contributes to the significance of the district.

(h) If a property has been submitted to and approved by the State Review Board for inclusion in the National Register prior to the effective date of this section, the State Historic Preservation Officer need not resubmit the property to the State Review Board; but before submitting the nomination to the NPS shall afford owners of private property the opportunity to concur in or object to the property's inclusion in the Register pursuant to applicable notification procedures described above.

(i) [Reserved]

(j) Completed nomination forms or the documentation proposed for submission on the nomination forms and comments concerning the significance of a property and its eligibility for the National Register are submitted to the State Review Board. The State Review Board shall review the nomination forms or documentation proposed for submission on the nomination forms and any comments concerning the property's significance and eligibility for the National Register. The State Review Board shall determine whether or not the property meets the National Register criteria for evaluation and make a recommendation to the State Historic Preservation Officer to approve or disapprove the nomination.

(k) Nominations approved by the State Review Board and comments received are then reviewed by the State Historic Preservation Officer and if he or she finds the nominations to be adequately documented and technically, professionally, and procedurally correct and sufficient and in conformance with National Register criteria for evaluation, the nominations are submitted to the Keeper of the National Register of Historic Places, National Park Service, United States Department of the Interior, Washington, D.C. 20240. All comments received by a State and notarized statements of objection to listing are submitted with a nomination.

(l) If the State Historic Preservation Officer and the State Review Board disagree on whether a property meets

the National Register criteria for evaluation, the State Historic Preservation Officer, if he or she chooses, may submit the nomination with his or her opinion concerning whether or not the property meets the criteria for evaluation and the opinion of the State Review Board to the Keeper of the National Register for a final decision on the listing of the property. The opinion of the State Review Board may be the minutes of the Review Board meeting. The State Historic Preservation Officer shall submit such disputed nominations if so requested within 45 days of the State Review Board meeting by the State Review Board or the chief elected local official of the local, county or municipal political subdivision in which the property is located but need not otherwise do so. Such nominations will be substantively reviewed by the Keeper.

(m) [Reserved]

(n) If the owner of a private property or the majority of such owners for a district or single property with multiple owners have objected to the nomination prior to the submittal of a nomination, the State Historic Preservation Officer shall submit the nomination to the Keeper only for a determination of eligibility pursuant to subsection (s) of this section.

(o) The State Historic Preservation Officer signs block 12 of the nomination form if in his or her opinion the property meets the National Register criteria for evaluation. The State Historic Preservation Officer's signature in block 12 certifies that:

(1) All procedural requirements have been met;

(2) The nomination form is adequately documented;

(3) The nomination form is technically and professionally correct and sufficient;

(4) In the opinion of the State Historic Preservation Officer, the property meets the National Register criteria for evaluation.

(p) When a State Historic Preservation Officer submits a nomination form for a property that he or she does not believe meets the National Register criteria for evaluation, the State Historic Preservation Officer signs a continuation sheet Form NPS 10-900a explaining his/her opinions on the eligibility of the property and certifying that:

(1) All procedural requirements have been met;

(2) The nomination form is adequately documented;

(3) The nomination form is technically and professionally correct and sufficient.

(q) Notice will be provided in the Federal Register that the nominated property is being considered for listing in the National Register of Historic Places as specified in § 60.13.

(r) Nominations will be included in the National Register within 45 days of receipt by the Keeper or designee unless the Keeper disapproves a nomination, an appeal is filed, or the owner of private property (or the majority of such owners for a district or single property with multiple owners) objects by notarized statements received by the Keeper prior to listing. Nominations which are technically or professionally inadequate will be returned for correction and resubmission. When a property does not appear to meet the National Register criteria for evaluation, the nomination will be returned with an explanation as to why the property does not meet the National Register criteria for evaluation.

(s) If the owner of private property (or the majority of such owners for a district or single property with multiple owners) has objected to the nomination by notarized statement prior to listing, the Keeper shall review the nomination and make a determination of eligibility within 45 days of receipt, unless an appeal is filed. The Keeper shall list such properties determined eligible in the National Register upon receipt of notarized statements from the owner(s) of private property that the owner(s) no longer object to listing.

(t) Any person or organization which supports or opposes the nomination of a property by a State Historic Preservation Officer may petition the Keeper during the nomination process either to accept or reject a nomination. The petitioner must state the grounds of the petition and request in writing that the Keeper substantively review the nomination. Such petitions received by the Keeper prior to the listing of a property in the National Register or a determination of its eligibility where the private owners object to listing will be considered by the Keeper and the nomination will be substantively reviewed.

(u) State Historic Preservation Officers are required to inform the property owners and the chief elected local official when properties are listed in the National Register. In the case of a nomination where there are more than 50 property owners, they may be notified of the entry in the National Register by the same general notice stated in § 60.6(d). States which notify all property owners individually of entries in the National Register need not publish a general notice.

(v) In the case of nominations where the owner of private property (or the majority of such owners for a district or single property with multiple owners) has objected and the Keeper has determined the nomination eligible for the National Register, the State Historic Preservation Officer shall notify the appropriate chief elected local official and the owner(s) of such property of this determination. The general notice may be used for properties with more than 50 owners as described in § 60.6(d) or the State Historic Preservation Officer may notify the owners individually.

(w) If subsequent to nomination a State makes major revisions to a nomination or renominates a property rejected by the Keeper, the State Historic Preservation Officer shall notify the affected property owner(s) and the chief elected local official of the revisions or renomination in the same manner as the original notification for the nomination, but need not resubmit the nomination to the State Review Board. Comments received and notarized statements of objection must be forwarded to the Keeper along with the revisions or renomination. The State Historic Preservation Officer also certifies by the resubmittal that the affected property owner(s) and the chief elected local official have been renotified. "Major revisions" as used herein means revisions of boundaries or important substantive revisions to the nomination which could be expected to change the ultimate outcome as to whether or not the property is listed in the National Register by the Keeper.

(x) Notwithstanding any provision hereof to the contrary, the State Historic Preservation Officer in the nomination notification process or otherwise need not make available to any person or entity (except a Federal agency planning a project, the property owner, the chief elected local official of the political jurisdiction in which the property is located, and the local historic preservation commission for certified local governments) specific information relating to the location of properties proposed to be nominated to, or listed in, the National Register if he or she determines that the disclosure of specific information would create a risk of destruction or harm to such properties.

(y) With regard to property under Federal ownership or control, completed nomination forms shall be submitted to the Federal Preservation Officer for review and comment. The Federal Preservation Officer, may approve the nomination and forward it to the Keeper of the National Register of Historic

Places, National Park Service, United States Department of the Interior, Washington, D.C. 20240.

§§ 60.7 and 60.8    Reserved

§ 60.9    Nominations by Federal agencies.

(a) The National Historic Preservation Act of 1966, as amended, requires that, with the advice of the Secretary and in cooperation with the State Historic Preservation Officer of the State involved, each Federal agency shall establish a program to locate, inventory and nominate to the Secretary all properties under the agency's ownership or control that appear to qualify for inclusion on the National Register. Section 2(a) of Executive Order 11593 provides that Federal agencies shall locate, inventory, and nominate to the Secretary of the Interior all sites, buildings, districts, and objects under their jurisdiction or control that appear to qualify for listing on the National Register of Historic Places. Additional responsibilities of Federal agencies are detailed in the National Historic Preservation Act of 1966, as amended, Executive Order 11593, the National Environmental Policy Act of 1969, the Archeological and Historic Preservation Act of 1974, and procedures developed pursuant to these authorities, and other related legislation.

(b) Nomination forms are prepared under the supervision of the Federal Preservation Officer designated by the head of a Federal agency to fulfill agency responsibilities under the National Historic Preservation Act of 1966, as amended.

(c) Completed nominations are submitted to the appropriate State Historic Preservation Officer for review and comment regarding the adequacy of the nomination, the significance of the property and its eligibility for the National Register. The chief elected local officials of the county (or equivalent governmental unit) and municipal political jurisdiction in which the property is located are notified and given 45 days in which to comment. The State Historic Preservation Officer signs block 12 of the nomination form with his/her recommendation.

(d) After receiving the comments of the State Historic Preservation Officer, and chief elected local official, or if there has been no response within 45 days, the Federal Preservation Officer may approve the nomination and forward it to the Keeper of the National Register of Historic Places, National Park Service, United States Department of the Interior, Washington, D.C. 20240. The Federal Preservation Officer signs block 12 of the nomination form if in his

or her opinion the property meets the National Register criteria for evaluation. The Federal Preservation Officer's signature in block 12 certifies that

(1) All procedural requirements have been met;

(2) The nomination form is adequately documented;

(3) The nomination form is technically and professionally correct and sufficient;

(4) In the opinion of the Federal Preservation Officer, the property meets the National Register criteria for evaluation.

(e) When a Federal Preservation Officer submits a nomination form for a property that he or she does not believe meets the National Register criteria for evaluation, the Federal Preservation Officer signs a continuation sheet Form NPS 10–900a explaining his/her opinions on the eligibility of the property and certifying that:

(1) All procedural requirements have been met;

(2) The nomination form is adequately documented;

(3) The nomination form is technically and professionally correct and sufficient.

(f) The comments of the State Historic Preservation Officer and chief local official are appended to the nomination, or, if there are no comments from the State Historic Preservation Officer an explanation is attached. Concurrent nominations (see § 60.10) cannot be submitted, however, until the nomination has been considered by the State in accord with Sec. 60.6, supra. Comments received by the State concerning concurrent nominations and notarized statements of objection must be submitted with the nomination.

(g) Notice will be provided in the Federal Register that the nominated property is being considered for listing in the National Register of Historic Places in accord with § 60.13.

(h) Nominations will be included in the National Register within 45 days of receipt by the Keeper or designee unless the Keeper disapproves such nomination or an appeal is filed. Nominations which are technically or professionally inadequate will be returned for correction and resubmission. When a property does not appear to meet the National Register criteria for evaluation, the nomination will be returned with an explanation as to why the property does not meet the National Register criteria for evaluation.

(i) Any person or organization which supports or opposes the nomination of a property by a Federal Preservation Officer may petition the Keeper during the nomination process either to accept

or reject a nomination. The petitioner must state the grounds of the petition and request in writing that the Keeper substantively review the nomination. Such petition received by the Keeper prior to the listing of a property in the National Register or a determination of its eligibility where the private owner(s) object to listing will be considered by the Keeper and the nomination will be substantively reviewed.

§ 60.10    Concurrent State and Federal nominations.

(a) State Historic Preservation Officers and Federal Preservation Officers are encouraged to cooperate in locating, inventorying, evaluating, and nominating all properties possessing historical, architectural, archeological, or cultural value. Federal agencies may nominate properties where a portion of the property is not under Federal ownership or control.

(b) When a portion of the area included in a Federal nomination is not located on land under the ownership or control of the Federal agency, but is an integral part of the cultural resource, the completed nomination form shall be sent to the State Historic Preservation Officer for notification to property owners, to give owners of private property an opportunity to concur in or object to the nomination, to solicit written comments and for submission to the State Review Board pursuant to the procedures in § 60.6.

(c) If the State Historic Preservation Officer and the State Review Board agree that the nomination meets the National Register criteria for evaluation, the nomination is signed by the State Historic Preservation Officer and returned to the Federal agency initiating the nomination. If the State Historic Preservation Officer and the State Review Board disagree, the nomination shall be returned to the Federal agency with the opinions of the State Historic Preservation Officer and the State Review Board concerning the adequacy of the nomination and whether or not the property meets the criteria for evaluation. The opinion of the State Review Board may be the minutes of the State Review Board meeting. The State Historic Preservation Officer's signed opinion and comments shall confirm to the Federal agency that the State nomination procedures have been fulfilled including notification requirements. Any comments received by the State shall be included with the letter as shall any notarized statements objecting to the listing of private property.

(d) If the owner of any privately owned property, (or a majority of the owners of such properties within a district or single property with multiple owners) objects to such inclusion by notarized statement(s) the Federal Historic Preservation Officer shall submit the nomination to the Keeper for review and a determination of eligibility. Comments, opinions, and notarized statements of objection shall be submitted with the nomination.

(e) The State Historic Preservation Officer shall notify the nonfederal owners when a concurrent nomination is listed or determined eligible for the National Register as required in § 60.6.

§§ 60.11 and 60.12  [Reserved]

§ 60.13  Publication in the "Federal Register" and other NPS notification.

(a) When a nomination is received, NPS will publish notice in the Federal Register that the property is being considered for listing in the National Register. A 15-day commenting period from date of publication will be provided. When necessary to assist in the preservation of historic properties this 15-day period may be shortened or waived.

(b) NPS shall notify the appropriate State Historic Preservation Officer, Federal Preservation Officer, person or local government when there is no approved State program of the listing of the property in the National Register and will publish notice of the listing in the Federal Register.

(c) In nominations where the owner of any privately owned property (or a majority of the owners of such properties within a district or single property with multiple owners) has objected and the Keeper has determined the nomination eligible for the National Register, NPS shall notify the State Historic Preservation Officer, the Federal Preservation Officer (for Federal or concurrent nominations), the person or local government where there is no approved State Historic Preservation Program and the Advisory Council on Historic Preservation. NPS will publish notice of the determination of eligibility in the Federal Register.

(d) [Reserved]

§ 60.14  Changes and revisions to properties listed in the National Register.

(a) Boundary changes. (1) A boundary alteration shall be considered as a new property nomination. All forms, criteria and procedures used in nominating a property to the National Register must be used. In the case of boundary enlargements only those owners in the newly nominated as yet unlisted area need be notified and will be counted in determining whether a majority of private owners object to listing. In the case of a diminution of a boundary, owners shall be notified as specified in § 60.15 concerning removing properties from the National Register. A professionally justified recommendation by the State Historic Preservation Officer, Federal Preservation Officer, or person or local government where there is no approved State Historic Preservation Program shall be presented to NPS. During this process, the property is not taken off the National Register. If the Keeper or his or her designee finds the recommendation in accordance with the National Register criteria for evaluation, the change will be accepted. If the boundary change is not accepted, the old boundaries will remain. Boundary revisions may be appealed as provided for in Sections 60.12 and 60.15.

(2) Four justifications exist for altering a boundary: Professional error in the initial nomination, loss of historic integrity, recognition of additional significance, additional research documenting that a larger or smaller area should be listed. No enlargement of a boundary should be recommended unless the additional area possesses previously unrecognized significance in American history, architecture, archeology, engineering or culture. No diminution of a boundary should be recommended unless the properties being removed do not meet the National Register criteria for evaluation. Any proposal to alter a boundary has to be documented in detail including photographing the historic resources falling between the existing boundary and the other proposed boundary.

(b) Relocating properties listed in the National Register. (1) Properties listed in the National Register should be moved only when there is no feasible alternative for preservation. When a property is moved, every effort should be made to reestablish its historic orientation, immediate setting, and general environment.

(2) If it is proposed that a property listed in the National Register be moved and the State Historic Preservation Officer, Federal agency for a property under Federal ownership or control, or person or local government where there is no approved State Historic Preservation Program, wishes the property to remain in the National Register during and after the move, the State Historic Preservation Officer or Federal Preservation Officer having ownership or control or person or local government where there is no approved State Historic Preservation Program, shall submit documentation to NPS prior to the move. The documentation shall discuss: (i) the reasons for the move; (ii) the effect on the property's historical integrity; (iii) the new setting and general environment of the proposed site, including evidence that the proposed site does not possess historical or archeological significance that would be adversely affected by the intrusion of the property; and (iv) photographs showing the proposed location.

(3) Any such proposal with respect to the new location shall follow the required notification procedures, shall be approved by the State Review Board if it is a State nomination and shall continue to follow normal review procedures. The Keeper shall also follow the required notification procedures for nominations. The Keeper shall respond to a properly documented request within 45 days of receipt from the State Historic Preservation Officer or Federal Preservation Officer, or within 90 days of receipt from a person or local government where there is no approved State Historic Preservation Program, concerning whether or not the move is approved. Once the property is moved, the State Historic Preservation Officer, Federal Preservation Officer, or person or local government where there is no approved State Historic Preservation Program shall submit to the Keeper for review (i) a letter notifying him or her of the date the property was moved; (ii) photographs of the property on its new site; and (iii) revised maps, including a U.S.G.S. map, (iv) acreage, and (v) verbal boundary description. The Keeper shall respond to a properly documented submittal within 45 days of receipt with the final decision on whether the property will remain in the National Register. If the Keeper approves the move, the property will remain in the National Register during and after the move unless the integrity of the property is in some unforeseen manner destroyed. If the Keeper does not approve the move, the property will be automatically deleted from the National Register when moved. In cases of properties removed from the National Register, if the State, Federal agency, or person or local government where there is no approved State Historic Preservation Program has neglected to obtain prior approval for the move or has evidence that previously unrecognized significance exists, or has accrued, the State, Federal agency, person or local government may resubmit a nomination for the property.

(4) In the event that a property is moved, deletion from the National Register will be automatic unless the above procedures are followed prior to the move. If the property has already

56194   Federal Register / Vol. 46, No. 220 / Monday, November 16, 1981 / Rules and Regulations

been moved, it is the responsibility of the State, Federal agency or person or local government which nominated the property to notify the National Park Service. Assuming that the State, Federal agency or person or local government wishes to have the structure reentered in the National Register, it must be nominated again on new forms, which should discuss: (i) the reasons for the move; (ii) the effect on the property's historical integrity, and (iii) the new setting and general environment, including evidence that the new site does not possess historical or archeological significance that would be adversely affected by intrusion of the property. In addition, new photographs, acreage, verbal boundary description and a U.S.G.S. map showing the structure at its new location must be sent along with the revised nomination. Any such nomination submitted by a State must be approved by the State Review Board.

(5) Properties moved in a manner consistent with the comments of the Advisory Council on Historic Preservation, in accord with its procedures (36 CFR Part 800), are granted as exception to § 60.12(b). Moving of properties in accord with the Advisory Council's procedures should be dealt with individually in each memorandum of agreement. In such cases, the State Historic Preservation Officer or the Federal Preservation Officer, for properties under Federal ownership or control, shall notify the Keeper of the new location after the move including new documentation as described above.

§ 60.15  Removing properties from the National Register.

(a) Grounds for removing properties from the National Register are as follows: (1) the property has ceased to meet the criteria for listing in the National Register because the qualities which caused it to be originally listed have been lost or destroyed, or such qualities were lost subsequent to nomination and prior to listing. (2) additional information shows that the property does not meet the National Register criteria for evaluation; (3) error in professional judgement as to whether the property meets the criteria for evaluation; or (4) prejudicial procedural error in the nomination or listing process. Properties removed from the National Register for procedural error shall be reconsidered for listing by the Keeper after correction of the error or errors by the State Historic Preservation Officer, Federal Preservation Officer, person or local government which originally nominated the property, or by

the Keeper, as appropriate. The procedures set forth for nominations shall be followed in such reconsiderations. Any property or district removed from the National Register for procedural deficiencies in the nomination and/or listing process shall automatically be considered eligible for inclusion in the National Register without further action and will be published as such in the Federal Register.

(b) Properties listed in the National Register prior to December 13, 1980, may only be removed from the National Register on the grounds established in subsection (a)(1) of this section.

(c) Any person or organization may petition in writing for removal of a property from the National Register by setting forth the reasons the property should be removed on the grounds established in paragraph (a) of this section. With respect to nominations determined eligible for the National Register because the owners of private property object to listing, anyone may petition for reconsideration of whether or not the property meets the criteria for evaluation using these procedures. Petitions for removal are submitted to the Keeper by the State Historic Preservation Officer for State nominations, the Federal Preservation Officer for Federal nominations, and directly to the Keeper from persons or local governments where there is no approved State Historic Preservation Program.

(d) Petitons submitted by persons or local governments where there is no approved State Historic Preservation Program shall include a list of the owner(s). In such cases the Keeper shall notify the affected owner(s) and the chief elected local official and give them an opportunity to comment. For approved State programs, the State Historic Preservation Officer shall notify the affected owner(s) and chief elected local official and give them an opportunity to comment prior to submitting a petition for removal. The Federal Preservation Officer shall notify and obtain the comments of the appropriate State Historic Preservation Officer prior to forwarding an appeal to NPS. All comments and opinions shall be submitted with the petition.

(e) The State Historic Preservation Officer or Federal Preservation Officer shall respond in writing within 45 days of receipt to petitions for removal of property from the National Register. The response shall advise the petitioner of the State Historic Preservation Officer's or Federal Preservation Officer's views on the petition.

(f) A petitioner desiring to pursue his removal request must notify the State Historic Preservation Officer or the Federal Preservation Officer in writing within 45 days of receipt of the written views on the petition.

(g) The State Historic Preservation Officer may elect to have a property considered for removal according to the State's nomination procedures unless the petition is on procedural grounds and shall schedule it for consideration by the State Review Board as quickly as all notification requirements can be completed following procedures outlined in § 60.6, or the State Historic Preservation Officer may elect to forward the petition for removal to the Keeper with his or her comments without State Review Board consideration.

(h) Within 15 days after receipt of the petitioner's notification of intent to pursue his removal request, the State Historic Preservation Officer shall notify the petitioner in writing either that the State Review Board will consider the petition on a specified date or that the petition will be forwarded to the Keeper after notification requirements have been completed. The State Historic Preservation Officer shall forward the petitions to the Keeper for review within 15 days after notification requirements or Review Board consideration, if applicable, have been completed.

(i) Within 15 days after receipt of the petitioner notification of intent to pursue his petition, the Federal Preservation Officer shall forward the petition with his or her comments and those of the State Historic Preservation Officer to the Keeper.

(j) The Keeper shall respond to a petition for removal within 45 days of receipt, except where the Keeper must notify the owners and the chief elected local official. In such cases the Keeper shall respond within 90 days of receipt. The Keeper shall notify the petitioner and the applicable State Historic Preservation Officer, Federal Preservation Officer, or person or local government where there is no approved State Historic Preservation Program, of his decision. The State Historic Preservation Officer or Federal Preservation Officer transmitting the petition shall notify the petitioner, the owner(s), and the chief elected local official in writing of the decision. The Keeper will provide such notice for petitions from persons or local governments where there is no approved State Historic Preservation Program. The general notice may be used for properties with more than 50 owners. If the general notice is used it shall be

published in one or more newspapers with general circulation in the area of the nomination.

(k) The Keeper may remove a property from the National Register on his own motion on the grounds established in paragraph (a) of this section, except for those properties listed in the National Register prior to December 13, 1980, which may only be removed from the National Register on the grounds established in paragraph (a)(1) of this section. In such cases, the Keeper will notify the nominating authority, the affected owner(s) and the applicable chief elected local official and provide them an opportunity to comment. Upon removal, the Keeper will notify the nominating authority of the basis for the removal. The state Historic Preservation Officer, Federal Preservation Officer, or person or local government which nominated the property shall notify the owner(s) and the chief elected local official of the removal.

(l) No person shall be considered to have exhausted administrative remedies with respect to removal of a property from the National Register until the Keeper has denied a petition for removal pursuant to this section.

[FR Doc. 81-32973 Filed 11-13-81; 8:45 am]

BILLING CODE 4310-70-M

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[A-3-FRL 1955-5]

### Approval of Revision of the Maryland State Implementation Plan

**AGENCY:** Environmental Protection Agency.

**ACTION:** Final rule.

**SUMMARY:** This notice announces the Administrator's approval of a revision of the Maryland State Implementation Plan. The revision is a Secretarial Order excepting the Maryland Cup Corporation's Reisterstown Road plant from the State's "no visible emissions" regulations. The variance allows visible emissions not to exceed 25 percent opacity from the company's four new wax coaters with their related cooling and exhaust systems. The variance expires on September 11, 1982.

**EFFECTIVE DATE:** December 16, 1981.

**ADDRESSES:** Copies of the revision and associated support material are available for inspection during normal business hours at the following offices:

U.S. Environmental Protection Agency, Region III, Curtis Building, 10th Floor, 6th & Walnut Street, Philadelphia, Pennsylvania 19106, ATTN: Patricia Sheridan.

State of Maryland, Air Management Administration, Department of Health and Mental Hygiene, 201 West Preston Street, Baltimore, Maryland 21201, ATTN: Mr. George Ferreri.

Public Information Reference Unit, Room 2922—EPA Library, U.S. Environmental Protection Agency, 401 M Street, SW., (Waterside Mall), Washington, D.C. 20460.

The Office of the Federal Register, 1100 L St., NW., Room 804, Washington, D.C. 20408.

**FOR FURTHER INFORMATION CONTACT:** Edward A. Vollberg (3AH12), U.S. Environmental Protection Agency, Region III, 6th & Walnut Streets, Philadelphia, PA 19106, telephone (215) 597–8990.

**SUPPLEMENTARY INFORMATION:**

**Background**

The State of Maryland submitted a Secretarial Order for the Maryland Cup Corporation as a revision to the Maryland State Implementation Plan. The revision grants an exception to COMAR 10.18.06.02B which requires no visible emissions. It applies to four new wax coaters and their related cooling and exhaust systems at the Corporation's Reisterstown Road plant located in Baltimore County. The exception allows visible emissions not to exceed 25 percent opacity and expires September 11, 1982. The State demonstrated that the revision would not impact attainment of National Ambient Air Quality Standards.

The company has been unable to find an effective means to control the visible emissions. During the variance period, the company will continue to research new control technology applicable to its operation.

The revision was proposed for approval in the Federal Register on July 29, 1981 (46 FR 38730). For further information regarding the revision, please consult the notice of proposed rulemaking.

**Public Comments**

No public comments were received during the 30-day comment period.

**EPA Action**

By this notice, the Administrator hereby approves the exception to COMAR 10.18.06.02B for the Maryland Cup Corporation as a revision to the Maryland State Implementation Plan.

Under Executive Order 12291, EPA must judge whether a regulation is "Major" and therefore subject to the requirement of a Regulatory Impact Analysis. This regulation is not major because this action only approves States actions and imposes no new requirements.

This regulation was submitted to the Office of Management and Budget for review as required by Executive Order 12291.

Pursuant to the provisions of 5 U.S.C. Section 605(b) I certify that the SIP approvals under Sections 110 and 172 of the Clean Air Act will not have a significant economic impact on a substantial number of small entities. This action only approves State actions. It imposes no new requirements.

Under Section 307(b)(1) of the Clean Air Act, judicial review of this action is available only by the filing of a petition for review in the United States Court of Appeals for the appropriate circuit within 60 days of today. Under Section 307(b)(2) of the Clean Air Act, the requirements which are the subject of today's notice may not be challenged later in civil or criminal proceedings brought by EPA to enforce these requirements.

(42 U.S.C. 7401–642)

Dated: November 6, 1981.

Anne M. Gorsuch,

*Administrator.*

**Note.**—Incorporation by reference of the State Implementation Plan for the State of Maryland was approved by the Director of the Federal Register on July 1, 1981.

### PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

Part 52 of Title 40, Code of Federal Regulations is amended as follows:

### Subpart V—Maryland

Section 52.1070 is amended by adding paragraph (c)(54) to read as follows:

### § 52.1070   Identification of plans.

\*    \*    \*    \*    \*

(c) \* \* \*

(54) A revision submitted by the State of Maryland on October 17, 1980, consisting of an exception to COMAR 10.18.06.02B for the Maryland Cup Corporation.

[FR Doc. 81-32963 Filed 11-13-81; 8:45 am]

BILLING CODE 6560-38-M

submitted to OSM: Ohio Administrative Code Sections 1501:13-1-02, 13-4-04, 13-4-05, 13-4-13, 13-4-14, 13-9-04, 13-12-03, and 13-12-04.

(Pub. L. 95-87, 30 U.S.C. 1201 *et seq.*)

[FR Doc. 83-27658 Filed 10-11-83; 8 45 am]

BILLING CODE 4310-05-M

---

## National Park Service

## 36 CFR Part 60

## National Register of Historic Places

**AGENCY:** National Park Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** The National Park Service (NPS) publishes herein certain sections of the final regulations for processing nominations to the National Register of Historic Places. The National Register regulations have been revised in this rulemaking to incorporate changes required by the National Historic Preservation Act Amendments of 1980, and to update and revise in other minor respects the procedures for processing National Register nominations and listings. The sections being made final here are being published now in order to make effective the procedures for appeals of, and requests for, nominations proposed as published in the **Federal Register** on November 16, 1981. The sections of this final rule give the public more opportunity to participate in the National Register programs.

**EFFECTIVE DATES:** November 14, 1983.

**FOR FURTHER INFORMATION CONTACT:** Carol D. Shull, Chief of Registration, National Register of Historic Places, Interagency Resources Division, National Park Service, United States Department of the Interior, Washington, D.C. 20240. Telephone No. (202) 343-9539.

**SUPPLEMENTARY INFORMATION:** The purpose of the National Register of Historic Places is to identify districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering and culture. The Secretary of the Interior maintains this list under the authority of Section 101(a)1(A) of the National Historic Preservation Act of 1966, as amended.

On December 12, 1980, the National Historic Preservation Act was amended, to direct the Secretary to promulgate or revise regulations relating to the nomination and listing process for the following:

a. Nominating properties for inclusion in, and removal from, the National Register and considering the

recommendations of properties by certified local governments;

b. Considering appeals from such recommendations, nominations, removals, and designations (or any failure or refusal by a nominating authority to nominate or designate).

On November 16, 1981, interim regulations for amended Sections 60.1, 2, 3, 4, 5, 6 (except subsections (i) and (m)), 9, 10, 13, 14, 15 were published in the **Federal Register**, effective as of that date. Also on November 16, 1981, proposed regulations for amended Sections 60.6(m), 8, 11 and 12 of 36 CFR 60 were published elsewhere in the **Federal Register**. The NPS requested comments on the interim and proposed rules. These comments have been considered in the preparation of the final rulemaking. These regulations have been written in consultation with State Historic Preservation Offices (SHPOs), Federal Preservation Officers (FPOs), the National Trust for Historic Preservation, Committee staff of the United States Congress, and others with concerns about the program. Although these procedures provide for the consideration of appeals of any nominating authority's refusal to nominate properties to the National Register, the NPS is particularly concerned that appeals not be encouraged in cases where there is a general consensus of opinion among involved State and/or Federal officials that a property is not eligible.

**Comments and Response to Comments on November 16, 1981 Publication of Proposed Rules**

*General comments or comments that did not address specific language in the proposed rules.* Numerous technical and editorial revisions were recommended, and all have been carefully considered. The rules have been revised where deemed appropriate by the NPS. Revised language, particularly in 60.12(a), reflects the concern on the part of the NPS that this appeals process not become an administrative burden.

*Requests for Nominations (§ 60.11)*

One comment recommended deleting the section concerning requests for nominations and instead requiring that the provision for public participation in the nomination process be required as a prerequisite for approval of State historic preservation programs. The NPS has retained this section because of the need to ensure that States respond to all requests for nominations and that the appeals process in Section 60.12 is applied equitably in all cases.

Section 60.11(a) allows the SHPO 60 days to respond to an applicant

submitting a completed National Register nomination form. One comment stated that it is not clear if failure to respond within the time allowed is justification for appeal under subsection 60.12(a). The final regulations have been amended to make failure of the SHPO to comply with any of the requirements in Section 60.11 adequate basis for an appeal.

*Section 60.11(c):* One comment urged that the NPS clarify that the SHPO is required to comply with the notification requirements outlined in Section 60.6 prior to scheduling the property for presentation to the State Review Board. The language has been revised to clarify this requirement.

*Section 60.11(e):* One SHPO suggested that the requirement that the SHPO shall submit a nomination to the NPS no later than 75 days after the State Review Board meeting is partially redundant and contradictory to the provision in 60.12(c)(1) whereby the Keeper will consider the eligibility of a property under appeal. In 60.12(c)(1), the SHPO or FPO is requested to submit the applicable nomination form to the Keeper within 15 days, or within 15 days after completion of *all* requirements in Section 60.8 or 60.9. These two provisions are not contradictory because the 15 day time period applies only to formally appealed nominations.

*Section 60.11(f):* One comment cited the concern that the SHPO is given discretion not to submit substantially revised nominations to the State Review Board. Subsection (f) merely assumes that a substantially revised nomination will be treated as a new request for nomination and processed again in accord with this section.

*Section 60.11(g):* One comment urged changing the time periods in (g) to provide more time for the FPO to get the SHPO's comments. This has been done.

*Nomination Appeals (§ 60.12)*

Several comments proposed that appellants be allowed to appeal nominations as they go through the nomination process as well as being able to appeal the failure of a nominating authority to nominate. The regulations already provide owners and the public the opportunity to comment on a nomination and to petition for substantive review during the nomination process in §§ 60.6(t) and 60.9(i).

One commenter urged that a new ground for appeal be added to provide that the Keeper will consider an appeal where there is disagreement with the judgment of the SHPO or FPO that the nomination does not appear to be

adequately documeted. This is permitted under § 60.12. However, the NPS has determined that it is appropriate that the decision concerning whether a nomination has been adequately documented should rest principally with the nominating authority after applying relevant standards and guidelines issued by the Secretary of the Interior.

One SHPO asked if appellants were required to have "standing". Because the National Historic Preservation Act states that any person or local government may appeal to the Secretary a nomination of any historic property for inclusion in the National Register and may appeal to the Secretary the failure or refusal of a nominating authority to nominate a property, standing is not required.

One comment suggested there was redundancy between the formal appeals process in § 60.12 and the provision in § 60.6 concerning disputed nominations. Section 60.6(l) is limited to nominations where the SHPO and the State Review Board disagree.

One comment suggested that this rule specify whether the SHPO or FPO should sign a nomination as described in §§ 60.6(o) or (p) or 60.9 (d) or (e) prior to submitting it to the NPS. In § 60.12(c)(1), the SHPO and FPO are requested to comply with *all* of the requirements in §§ 60.6 or 60.9, whichever is appropriate.

One association was concerned that the proposed regulations do not establish a clear time period during which the SHPO would be required to submit appealed nominations to the State Review Board and urged that there be a maximum time period of six months for this to occur. The NPS regulations, 36 CFR Part 61, require that State Review Boards meet at least 3 times a year. With this requirement and the requirements in § 60.11(c) that the SHPO shall "schedule the property for presentation at the earliest possible State Review Board meeting" and that "scheduling shall be consistent with the State's established priorities for processing nominations," the NPS does not see any need to establish a specific time frame in the final regulations.

**Revisions**

After consideration of comments and careful review, the NPS has made the following revisions to 60.5 (m), 11, and 12 of 36 CFR 60. Numerous editorial changes have also been made and the order and codification of specific subsections has been adjusted.

*Section 60.11(a):* The first phrase

"adequately documented" has been replaced in the first sentence with "completed" and the second phrase deleted.

*Section 60.11(a):* The phrase "adequately documented" has been added in the second sentence.

*Section 60.11(c):* The phrase "comply with the notification requirements in § 60.6" has been added.

*Section 60.11(d):* The words "on the prority list" have been replaced with "in accord with the State's priorities for processing nominations."

*Section 60.11(d):* The phrase "as well as complying with the notification requirements in § 60.6" has been added to the end of the second sentence.

*Section 60.11(e):* The time period within which the State Historic Preservation Officer shall submit a nomination to the National Park Service has been extended from 75 to 90 days after State Review Board consideration.

*Section 60.11(f):* This subsection has been revised to include references to the Federal Preservation Officer.

*Section 60.11(g):* The 60 day time period for notification to an applicant after receipt of an adequately documented nomination form has been changed to 90 days.

*Section 60.11(g):* A sentence has been added. "The Federal Preservation Officer shall submit an adequately documented nomination to the National Park Service unless in his or her opinion the property is not eligible for the National Register."

*Section 60.12:* This section has been renamed "Nomination appeals."

*Section 60.12(a):* Two sentences have been added: "This action differs from the procedure for appeals during the review of a nomination by the National Park Service where an individual or organization may "petition the Keeper during the nomination process," as specified in §§ 60.6 (t) and 60.9 (i). Upon receipt of such petition, the normal 45 day review period will be extended for 30 days beyond the date of the petition to allow the petitioner to provide additional documentation for review."

*Section 60.12(a):* The categories of appeal have been reduced to two: One, for cases where the appellant disagrees with the State Historic Preservation Officer and/or the State Review Board or Federal Preservation Officer on the question of eligibility for the National Register; and, two, where the State or Federal official has not complied with the requirements in Section 60.11. Although there are fewer categories of appeal, the grounds for appeal remain

basically the same.

*Section 60.12(c):* The final regulations provide that the Keeper will respond to applicants in 45 days rather than the 30 days provided for in the proposed regulations.

*Section 60.12(c):* This subsection has been revised to specify that the Keeper will either support or deny an appeal and the specific actions that the Keeper will take in either case.

*Section 60.12(d):* This subsection (formerly (c)) has been revised to specify that the Secretary reserves the right to list properties in the National Register or determine properties eligible for listing and describes procedures for such actions.

*Section 60.12(e):* A sentence has been added to this subsection. "With respect to the appeals outlined in this section, the decision of the Keeper is the final administrative decision."

Authority: This rulemaking is developed under the authority of the National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470 *et seq.*

*Classification:* In accordance with Executive Order 12291, the Department of the Interior has determined that these rules are not a "major". In accordance with the Regulatory Flexibility Act, the Department of the Interior has determined that these rules do not have a significant economic effect on a substantial number of small entities. These revisions are procedural not substantive. They tell the public how to appeal nominations of, or the failure to nominate, properties to the National Register. The information collection requirements contained in this part have been approved by the Office of Mangement and Budget under 44 U.S.C. 3501 *et seq.* and assigned clearance number 1024–0018.

*Environmental Impact Statement:* This regulation does not significantly impact the environment. Because these rules have to do with procedural aspects of the Naticnal Register program and have no impact upon the environment, an environmental impact statement is not required.

List of Subjects in 36 CFR Part 60

Historic preservation.

The originators of these procedures are Carol D. Shull and Steve Sheffield of the Interagency Resources Division of the National Park Service (202/343–9505).

Dated: August 16, 1983.
G. Ray Arnett,
*Assistant Secretary, Fish and Wildlife and Parks.*

[National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470 *et. seq.*].

## PART 60—NATIONAL REGISTER OF HISTORIC PLACES

Accordingly, 36 CFR Part 60 is amended as follows:

1. Section 60.6 is amended by adding paragraph (m) as follows:

### § 60.6 Nominations by the State Historic Preservation Officer under approved State Historic Preservation Programs.

*     *     *     *     *

(m) The State Historic Preservation Officer shall also submit to the Keeper nominations if so requested under the appeals process in Section 60.12.

*     *     *     *     *

2. Sections 60.11 and 60.12 are added as follows:

### § 60.11  Requests for nominations.

(a) The State Historic Preservation Officer or Federal Preservation Officer as appropriate shall respond in writing within 60 days to any person or organization submitting a completed National Register nomination form or requesting consideration for any previously prepared nomination form on record with the State or Federal agency. The response shall provide a technical opinion concerning whether or not the property is adequately documented and appears to meet the National Register criteria for evaluation in § 60.4. If the nomination form is determined to be inadequately documented, the nominating authority shall provide the applicant with an explanation of the reasons for that determination.

(b) If the nomination form does not appear to be adequately documented, upon receiving notification, it shall be the responsibility of the applicant to provide necessary additional documentation.

(c) If the nomination form appears to be adequately documented and if the property appears to meet the National Register criteria for evaluation, the State Historic Preservation Officer shall comply with the notification requirements in Section 60.6 and schedule the property for presentation at the earliest possible State Review Board meeting. Scheduling shall be consistent with the State's established priorities for processing nominations. If the nomination form is adequately documented, but the property does not appear to meet National Register criteria for evaluation, the State Historic

Preservation Officer need not process the nomination, unless so requested by the Keeper pursuant to § 60.12.

(d) The State Historic Preservation Officer's response shall advise the applicant of the property's position in accord with the State's priorities for processing nominations and of the approximate date the applicant can expect its consideration by the State Review Board. The State Historic Preservation Officer shall also provide notice to the applicant of the time and place of the Review Board meeting at least 30 but not more than 75 days before the meeting, as well as complying with the notification requirements in § 60.6.

(e) Upon action on a nomination by the State Review Board, the State Historic Preservation Officer shall, within 90 days, submit the nomination to the National Park Service, or, if the State Historic Preservation Officer does not consider the property eligible for the National Register, so advise the applicant within 45 days.

(f) If the applicant substantially revises a nomination form as a result of comments by the State or Federal agency, it may be treated by the State Historic Preservation Officer or Federal Preservation Officer as a new submittal and reprocessed in accord with the requirements in this section.

(g) The Federal Preservation Officer shall request the comments of the State Historic Preservation Officer and notify the applicant in writing within 90 days of receipt of an adequately documented nomination form as to whether the Federal agency will nominate the property. The Federal Preservation Officer shall submit an adequately documented nomination to the National Park Service unless in his or her opinion the property is not eligible for the National Register.

### § 60.12  Nomination appeals.

(a) Any person or local government may appeal to the Keeper the failure or refusal of a nominating authority to nominate a property that the person or local government considers to meet the National Register criteria for evaluation upon decision of a nominating authority to not nominate a property for any reason when requested pursuant to § 60.11, or upon failure of a State Historic Preservation Officer to nominate a property recommended by the State Review Board. (This action differs from the procedure for appeals during the review of a nomination by the National Park Service where an individual or organization may "petition the Keeper during the nomination

process," as specified in §§ 60.6(t) and 60.9(i). Upon receipt of such petition the normal 45-day review period will be extended for 30 days beyond the date of the petition to allow the petitioner to provide additional documentation for review.)

(b) Such appeal shall include a copy of the nomination form and documentation previously submitted to the State Historic Preservation Officer or Federal Preservation Officer, an explanation of why the appplicant is submitting the appeal in accord with this section and shall include pertinent correspondence from the State Historic Preservation Officer or Federal Preservation Officer.

(c) The Keeper will respond to the appellant and the State Historic Preservation Officer or Federal Preservation Officer with a written explanation either denying or sustaining the appeal within 45 days of receipt. If the appeal is sustained, the Keeper will:

(1) request the State Historic Preservation Officer or Federal Preservation Officer to submit the nomination to the Keeper within 15 days if the nomination has completed the procedural requirements in Section 60.6 or 60.9 except that concurrence of the State Review Board, State Historic Preservation Officer or Federal Preservation Officer is not required; or

(2) if the nomination has not completed these procedural requirements, request the State Historic Preservation Officer or Federal Preservation Officer to promptly process the nomination pursuant to Section 60.6 or 60.9 and submit the nomination to the Keeper without delay.

(d) State Historic Preservation Officers and Federal Preservation Officers shall process and submit such nominations if so requested by the Keeper pursuant to this section. The Secretary reserves the right to list properties in the National Register or determine properties eligible for such listing on his own motion when necessary to assist in the preservation of historic resources and after notifying the owner and appropriate parties and allowing for a 30-day comment period.

(e) No person shall be considered to have exhausted administrative remedies with respect to failure to nominate a property to the National Register until he or she has complied with procedures set forth in this section. The decision of the Keeper is the final administrative action on such appeals.

[FR Doc. 83–27535 Filed 10–11–83; 8:45 am]

**BILLING CODE 4310-70-M**

Property Location: ON PA T R 218    MAP ID: 25/ 06/ 121/ A/    Bldg #: 1    Card  1   of   1

Vision ID: 29688    Other ID: 26685    Print Date: 02/10/2006 15:24

| CURRENT OWNER | | TOPO. | UTILITIES | STRT./ROAD | LOCATION | CURRENT ASSESSMENT | | | |
|---|---|---|---|---|---|---|---|---|---|
| BRENDEL ROY J ET UX | | 6 Low | | 1 Paved | | Description | Code | Appraised Value | Assessed Value |
| | | | | | | RES VAC | 1600 | 4,304 | 4,300 |
| 124 FORNEY HOLLOW RD | | | | | | | | | |
| SPRAGGS, PA 15362 | | | | | | | | | |

**8003**
**GREENE COUNTY, PA**

# VISION

### SUPPLEMENTAL DATA

| | | | |
|---|---|---|---|
| Account # | 25-000040 | BANK_CODE | |
| STEB DIST | 405 | HOMESTEAD N | |
| SCHOOL DISTI | 30140 | TAX_DISTRIC | |
| CLEAN & GREE | N | 911 ADDRESS | |
| PARCEL COUNT | 0 | TAX STATUS 5 | |
| PROP_TYPE | RESIDENTIAL | | |
| GIS ID: | | | |

| | | | |
|---|---|---|---|
| | Total | 4,304 | 4,300 |

| RECORD OF OWNERSHIP | BK-VOL/PAGE | SALE DATE | q/u | v/i | SALE PRICE | V.C. |
|---|---|---|---|---|---|---|
| BRENDEL ROY J ET UX | | | U | | 0 | |

### PREVIOUS ASSESSMENTS (HISTORY)

| Yr. | Code | Assessed Value | Yr. | Code | Assessed Value | Yr. | Code | Assessed Value |
|---|---|---|---|---|---|---|---|---|
| 2006 | 1600 | 4,300 | 2006 | 1600 | 4,300 | 2005 | 1600 | 4,300 |
| | Total: | 4,300 | | Total: | 4,300 | | Total: | 4,300 |

| EXEMPTIONS | | | | OTHER ASSESSMENTS | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Type/Description | Amount | Code | Description | Number | Amount | Comm. Int. | |
| | | | | | | | | |
| | | Total: | | | | | | |

*This signature acknowledges a visit by a Data Collector or Assessor*

### APPRAISED VALUE SUMMARY

| | |
|---|---|
| Appraised Bldg. Value (Card) | 0 |
| Appraised XF (B) Value (Bldg) | 0 |
| Appraised OB (L) Value (Bldg) | 0 |
| Appraised Land Value (Bldg) | 4,304 |
| Special Land Value | |
| Total Appraised Card Value | 4,304 |
| Total Appraised Parcel Value | 4,304 |
| Valuation Method: | Cost/Market Valuation |
| Net Total Appraised Parcel Value | 4,304 |

### NOTES

ON PA T R 218

H. John Frazier
Certified PA Evaluator
Certification #AV-000841-L

| | BUILDING PERMIT RECORD | | | | | | | | VISIT/CHANGE HISTORY | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permit ID | Issue Date | Type | Description | Amount | Insp. Date | % Comp. | Date Comp. | Comments | Date | ID | Cd. | Purpose/Result |
| | | | | | | | | | | | | |

### LAND LINE VALUATION SECTION

| B# | Use Code | Description | Zone | D | Frontage | Depth | Units | | Unit Price | I. Factor | S.I. | C. Factor | Nbhd. | Adj. | Notes- Adj/Special Pricing | Adj. Unit Price | Land Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | RE6 | RES. VAC | | 25 | 153 | | 1.00 | AC | 11,000.00 | 1.00 | 6 | 0.90 | 25 | 0.80 | SPCL(TLW,PGS,218,SLF,FM) | | 4,304 |
| | | Total Card Land Units | | | 1.00 | AC | | Parcel Total Land Area: | | 1.00 AC | | | | | | Total Land Value | | 4,304 |

| CONSTRUCTION DETAIL | | | |
|---|---|---|---|
| Element | Cd. | Ch. | Description |
| Style/ Type | 99 | | Vacant Land |
| Model | 00 | | Vacant |
| Grade | | | |
| Stories | | | |
| Occupancy | | | |
| Exterior Wall 1 | | | |
| 2 | | | |
| Roof Structure | | | |
| Roof Cover | | | |
| Interior Wall 1 | | | |
| 2 | | | |
| Interior Floor 1 | | | |
| 2 | | | |
| Heating Fuel | | | |
| Heating Type | | | |
| AC Type | | | |
| Bedrooms | | | |
| Bathrooms | | | |
| Total Rooms | | | |
| Bath Type | | | |
| Kitchen Style | | | |

| Commercial Data Elements | | | |
|---|---|---|---|
| Element | Cd. | Ch. | Description |
| Heat & AC | | | |
| Frame Type | | | |
| Baths/Plumbing | | | |
| Ceiling/Wall | | | |
| Rooms/Prtns | | | |
| % Common Wall | | | |
| Wall Height | | | |

| CONDO/MOBILE HOME DATA | | | |
|---|---|---|---|
| Element | Code | Description | Factor |
| Complex | | | |
| Floor Adj | | | |
| Unit Location | | | |
| Number of Units | | | |
| Number of Levels | | | |
| % Ownership | | | |

| COST/MARKET VALUATION | |
|---|---|
| Unadj. Base Rate | 0.00 |
| Size Adj. Factor | 0.00000 |
| Grade (Q) Index | 0.00 |
| Adj. Base Rate | 0.00 |
| Bldg. Value New | 0 |
| Year Built | 0 |
| Eff. Year Built | |
| Nrml Physcl Dep | 0 |
| Funcnl Obslnc | 0 |
| Econ Obslnc | 0 |
| Specl. Cond. Code | |
| Specl Cond % | 0 |
| Overall % Cond. | |
| Deprec. Bldg Value | 0 |

| MIXED USE | | |
|---|---|---|
| Code | Description | Percentage |
| RE6 | RES. VAC | 100 |

| OB-OUTBUILDING & YARD ITEMS(L) / XF-BUILDING EXTRA FEATURES(B) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code | Description | L/B | Units | Unit Price | Yr. | Dp Rt | %Cnd | Apr. Value |
| | | | | | | | | |

| BUILDING SUB-AREA SUMMARY SECTION | | | | | | |
|---|---|---|---|---|---|---|
| Code | Description | Living Area | Gross Area | Eff. Area | Unit Cost | Undeprec. Value |
| | | | | | | |

| Ttl. Gross Liv/Lease Area | | | 0 | Bldg Val: | |

SKETCH

| CURRENT OWNER | TOPO. | UTILITIES | STRT./ROAD | LOCATION | CURRENT ASSESSMENT | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Description | Code | Appraised Value | Assessed Value |
| BRENDEL ROY J ET UX | | | | | | | 0 | 0 |
| RD 1 BOX 135 | | | | | | | | |
| SPRAGGS, PA 15362 | | | | | | | | |

8003
*GREENE COUNTY, PA*

# VISION

### SUPPLEMENTAL DATA

| | | | |
|---|---|---|---|
| Account # | 25-071497 | BANK_CODE | |
| STEB DIST | 405 | HOMESTEAD N | |
| SCHOOL DISTI | 30140 | TAX_DISTRIC | |
| CLEAN & GREE | N | 911 ADDRESS | |
| PARCEL COUNT | 0 | TAX STATUS | 5 |
| PROP_TYPE | RESIDENTIAL | | |

GIS ID:

| | Total | 0 | 0 |
|---|---|---|---|

| RECORD OF OWNERSHIP | BK-VOL/PAGE | SALE DATE | q/u | w/i | SALE PRICE | V.C. |
|---|---|---|---|---|---|---|
| BRENDEL ROY J ET UX | 0602/0033 | | U | | 0 | |

### PREVIOUS ASSESSMENTS (HISTORY)

| Yr. | Code | Assessed Value | Yr. | Code | Assessed Value | Yr. | Code | Assessed Value |
|---|---|---|---|---|---|---|---|---|
| 2006 | | 0 | 2006 | | 0 | 2005 | | 0 |
| Total: | | 0 | Total: | | 0 | Total: | | 0 |

| EXEMPTIONS | | | OTHER ASSESSMENTS | | | | |
|---|---|---|---|---|---|---|---|
| Year | Type/Description | Amount | Code | Description | Number | Amount | Comm. Int. |
| | | | | | | | |
| | Total: | | | | | | |

*This signature acknowledges a visit by a Data Collector or Assessor*

### APPRAISED VALUE SUMMARY

| | |
|---|---|
| Appraised Bldg. Value (Card) | 0 |
| Appraised XF (B) Value (Bldg) | 0 |
| Appraised OB (L) Value (Bldg) | 0 |
| Appraised Land Value (Bldg) | 0 |
| Special Land Value | |
| Total Appraised Card Value | 0 |
| Total Appraised Parcel Value | 0 |

### NOTES

ADJ J MOORE R KIGER W
DULANEY I PHILLIPS

H. John Frazier
Certified PA Evaluator
Certification # AV-000841-L

## CONSTRUCTION DETAIL

| Element | Cd. | Ch. | Description |
|---|---|---|---|
| Style/ Type | NV | | No Value |
| Model | 00 | | Vacant |
| Grade | | | |
| Stories | | | |
| Occupancy | | | |
| Exterior Wall 1 | | | |
| 2 | | | |
| Roof Structure | | | |
| Roof Cover | | | |
| Interior Wall 1 | | | |
| 2 | | | |
| Interior Floor 1 | | | |
| 2 | | | |
| Heating Fuel | | | |
| Heating Type | | | |
| AC Type | | | |
| Bedrooms | | | |
| Bathrooms | | | |
| Total Rooms | | | |
| Bath Type | | | |
| Kitchen Style | | | |

### Commercial Data Elements

| Element | Cd. | Ch. | Description |
|---|---|---|---|
| Heat & AC | | | |
| Frame Type | | | |
| Baths/Plumbing | | | |
| Ceiling/Wall | | | |
| Rooms/Prtns | | | |
| % Common Wall | | | |
| Wall Height | | | |

### CONDO/MOBILE HOME DATA

| Element | Code | Description | Factor |
|---|---|---|---|
| Complex | | | |
| Floor Adj | | | |
| Unit Location | | | |
| Number of Units | | | |
| Number of Levels | | | |
| % Ownership | | | |

### COST/MARKET VALUATION

| | |
|---|---|
| Unadj. Base Rate | 0.00 |
| Size Adj. Factor | 0.00000 |
| Grade (Q) Index | 0.00 |
| Adj. Base Rate | 0.00 |
| Bldg. Value New | 0 |
| Year Built | 0 |
| Eff. Year Built | |
| Nrml Physcl Dep | 0 |
| Funcnl Obslnc | 0 |
| Econ Obslnc | 0 |
| Specl. Cond. Code | |
| Specl Cond % | |
| Overall % Cond. | 0 |
| Deprec. Bldg Value | 0 |

### MIXED USE

| Code | Description | Percentage |
|---|---|---|
| | | 100 |

## OB-OUTBUILDING & YARD ITEMS(L) /XF-BUILDING EXTRA FEATURES(B)

| Code | Description | L/B | Units | Unit Price | Yr. | Dp Rt | %Cnd | Apr. Value |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

## BUILDING SUB-AREA SUMMARY SECTION

| Code | Description | Living Area | Gross Area | Eff. Area | Unit Cost | Undeprec. Value |
|---|---|---|---|---|---|---|
| | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Ttl. Gross Liv/Lease Area** | | | 0 | **Bldg Val:** | |

**SKETCH**

Property Location: ON T 522    MAP ID: 25/ 06/ 123/ /

Vision ID: 29691   Case 2:00-cv-02120-DSC   Document 40-00: 267ac Filed 02/10/2006   Page 50 of 98   Card 1 of 1    Print Date: 02/10/2006 15:25

| CURRENT OWNER | TOPO. | UTILITIES | STRT./ROAD | LOCATION | CURRENT ASSESSMENT | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Description | Code | Appraised Value | Assessed Value |
| BRENDEL ROY J ET UX | 4 Rolling | | | | AGRICUL | 5000 | 9,390 | 9,390 |
| | 6 Low | | | | | | | |
| 124 FORNEY HOLLOW RD | 8 High | | | | | | | **8003** |
| SPRAGGS, PA 15362 | | | | | | | | **GREENE COUNTY, PA** |

**SUPPLEMENTAL DATA**

| | | | |
|---|---|---|---|
| Account # | 25-000041 | BANK_CODE | |
| STEB DIST | 405 | HOMESTEAD N | |
| SCHOOL DISTI | 30140 | TAX_DISTRIC | |
| CLEAN & GREE | N | 911 ADDRESS | |
| PARCEL COUNT | 0 | TAX STATUS 5 | |
| PROP_TYPE | AGRICULTURE | | |

GIS ID:

Total   9,390   9,390

**VISION**

| RECORD OF OWNERSHIP | BK-VOL/PAGE | SALE DATE | q/u | v/i | SALE PRICE | V.C. |
|---|---|---|---|---|---|---|
| BRENDEL ROY J ET UX | | | U | | 0 | |

**PREVIOUS ASSESSMENTS (HISTORY)**

| Yr. | Code | Assessed Value | Yr. | Code | Assessed Value | Yr. | Code | Assessed Value |
|---|---|---|---|---|---|---|---|---|
| 2006 | 5000 | 9,390 | 2006 | 5000 | 9,390 | 2005 | 5000 | 9,390 |
| Total: | | 9,390 | Total: | | 9,390 | Total: | | 9,390 |

**EXEMPTIONS**

| Year | Type/Description | Amount |
|---|---|---|
| | | |

Total:

**OTHER ASSESSMENTS**

| Code | Description | Number | Amount | Comm. Int. |
|---|---|---|---|---|
| | | | | |

This signature acknowledges a visit by a Data Collector or Assessor

**APPRAISED VALUE SUMMARY**

| | |
|---|---|
| Appraised Bldg. Value (Card) | 0 |
| Appraised XF (B) Value (Bldg) | 0 |
| Appraised OB (L) Value (Bldg) | 0 |
| Appraised Land Value (Bldg) | 9,390 |
| Special Land Value | |
| Total Appraised Card Value | 9,390 |
| Total Appraised Parcel Value | 9,390 |
| Valuation Method: | Cost/Market Valuation |
| Net Total Appraised Parcel Value | 9,390 |

**NOTES**

ON T 522

H. John Frazier
Certified PA Evaluator
Certification # AV-000841-L

| BUILDING PERMIT RECORD | | | | | | | | VISIT/CHANGE HISTORY | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Permit ID | Issue Date | Type | Description | Amount | Insp. Date | % Comp. | Date Comp. | Comments | Date | ID | Cd. | Purpose/Result |
| | | | | | | | | | | | |

**LAND LINE VALUATION SECTION**

| B# | Use Code | Description | Zone | D | Frontage | Depth | Units | | Unit Price | I. Factor | S.I. | C. Factor | Nbhd. | Adj. | Notes- Adj/Special Pricing | Adj. Unit Price | Land Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | AG6 | AG VAC | | 25 | | | 1.00 | AC | 9,000.00 | 1.00 | 6 | 0.90 | 25 | 0.80 | SPCL(PGS,218,SLF,SS)Notes: | | 3,154 |
| 1 | AG6 | AG VAC | | 25 | | | 17.60 | AC | 650.00 | 1.00 | 0 | 1.00 | 25 | 0.80 | SPCL(PGS,218,SLF,SS)Notes: | | 6,236 |

Total Card Land Units 18.60 AC   Parcel Total Land Area: 18.60 AC   Total Land Value 9,390

## CONSTRUCTION DETAIL

| Element | Cd. | Ch. | Description |
|---|---|---|---|
| Style/ Type | 99 | | Vacant Land |
| Model | 00 | | Vacant |
| Grade | | | |
| | | | |
| Stories | | | |
| Occupancy | | | |
| | | | |
| Exterior Wall 1 | | | |
| 2 | | | |
| Roof Structure | | | |
| Roof Cover | | | |
| | | | |
| Interior Wall 1 | | | |
| 2 | | | |
| Interior Floor 1 | | | |
| 2 | | | |
| | | | |
| Heating Fuel | | | |
| Heating Type | | | |
| AC Type | | | |
| | | | |
| Bedrooms | | | |
| Bathrooms | | | |
| | | | |
| Total Rooms | | | |
| | | | |
| Bath Type | | | |
| Kitchen Style | | | |

### Commercial Data Elements

| Element | Cd. | Ch. | Description |
|---|---|---|---|
| Heat & AC | | | |
| Frame Type | | | |
| Baths/Plumbing | | | |
| | | | |
| Ceiling/Wall | | | |
| Rooms/Prtns | | | |
| % Common Wall | | | |
| Wall Height | | | |

### CONDO/MOBILE HOME DATA

| Element | Code | Description | Factor |
|---|---|---|---|
| Complex | | | |
| Floor Adj | | | |
| Unit Location | | | |
| | | | |
| Number of Units | | | |
| Number of Levels | | | |
| % Ownership | | | |

### COST/MARKET VALUATION

| | |
|---|---|
| Unadj. Base Rate | 0.00 |
| Size Adj. Factor | 0.00000 |
| Grade (Q) Index | 0.00 |
| Adj. Base Rate | 0.00 |
| Bldg. Value New | 0 |
| Year Built | 0 |
| Eff. Year Built | |
| Nrml Physcl Dep | 0 |
| Funcnl Obslnc | 0 |
| Econ Obslnc | 0 |
| Specl. Cond. Code | |
| Specl Cond % | |
| Overall % Cond. | 0 |
| Deprec. Bldg Value | 0 |

## MIXED USE

| Code | Descrition | Percentage |
|---|---|---|
| AG6 | AG VAC | 100 |

## OB-OUTBUILDING & YARD ITEMS(L) / XF-BUILDING EXTRA FEATURES(B)

| Code | Description | L/B | Units | Unit Price | Yr. | Dp Rt | %Cnd | Apr. Value |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

## BUILDING SUB-AREA SUMMARY SECTION

| Code | Description | Living Area | Gross Area | Eff. Area | Unit Cost | Undeprec. Value |
|---|---|---|---|---|---|---|
| | | | | | | |

| | | | | |
|---|---|---|---|---|
| Ttl. Gross Liv/Lease Area | | 0 | Bldg Val: | |

### SKETCH

| CURRENT OWNER | TOPO. | UTILITIES | STRT./ROAD | LOCATION | | CURRENT ASSESSMENT | | | |
|---|---|---|---|---|---|---|---|---|---|
| BRENDEL ROY J ET UX | 1 Level | | 1 Paved | | Description | Code | Appraised Value | Assessed Value | |
| | 4 Rolling | | | | AGRICUL | 5000 | 37,967 | 37,970 | 8003 |
| 124 FORNEY HOLLOW RD | 6 Low | | | | MAIN | 5000 | 34,760 | 34,760 | |
| SPRAGGS, PA 15362 | | | | | OUT BLDG | 5000 | 9,370 | 9,370 | GREENE COUNTY, PA |

**SUPPLEMENTAL DATA**

| | | | |
|---|---|---|---|
| Account # | 25-000039 | BANK_CODE | |
| STEB DIST | 405 | HOMESTEAD Y | |
| SCHOOL DISTI | 30140 | TAX_DISTRIC | |
| CLEAN & GREE | N | 911 ADDRESS | |
| PARCEL COUNT | 0 | TAX STATUS 5 | |
| PROP_TYPE | AGRICULTURE | | |
| GIS ID: | | | |

| | | | |
|---|---|---|---|
| | Total | 82,097 | 82,100 |

**VISION**

| RECORD OF OWNERSHIP | BK-VOL/PAGE | SALE DATE | q/u | v/i | SALE PRICE | V.C. | PREVIOUS ASSESSMENTS (HISTORY) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRENDEL ROY J ET UX | | | U | | | 0 | Yr. | Code | Assessed Value | Yr. | Code | Assessed Value | Yr. | Code | Assessed Value |
| | | | | | | | 2006 | 5000 | 37,970 | 2006 | 5000 | 37,970 | 2005 | 5000 | 37,970 |
| | | | | | | | 2006 | 5000 | 34,760 | 2006 | 5000 | 34,760 | 2005 | 5000 | 34,760 |
| | | | | | | | 2006 | 5000 | 9,370 | 2006 | 5000 | 9,370 | 2005 | 5000 | 9,370 |
| | | | | | | | | Total: | 82,100 | | Total: | 82,100 | | Total: | 82,100 |

| EXEMPTIONS | | | OTHER ASSESSMENTS | | | | | *This signature acknowledges a visit by a Data Collector or Assessor* |
|---|---|---|---|---|---|---|---|---|
| Year | Type/Description | Amount | Code | Description | Number | Amount | Comm. Int. | |

**APPRAISED VALUE SUMMARY**

| | |
|---|---|
| Appraised Bldg. Value (Card) | 31,050 |
| Appraised XF (B) Value (Bldg) | 3,710 |
| Appraised OB (L) Value (Bldg) | 9,370 |
| Appraised Land Value (Bldg) | 37,967 |
| Special Land Value | |
| Total Appraised Card Value | 82,097 |
| Total Appraised Parcel Value | 82,097 |
| Valuation Method: | Cost/Market Valuation |
| Net Total Appraised Parcel Value | 82,097 |

| Total: | |

**NOTES**

POOL

ON PA T R 218

H. John Frazier
Certified PA Evaluator
Certification # AOOO841

| BUILDING PERMIT RECORD | | | | | | | | | VISIT/CHANGE HISTORY | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Permit ID | Issue Date | Type | Description | Amount | Insp. Date | % Comp. | Date Comp. | Comments | Date | ID | Cd. | Purpose/Result |

**LAND LINE VALUATION SECTION**

| B# | Use Code | Description | Zone | D | Frontage | Depth | Units | | Unit Price | I. Factor | S.I. | C. Factor | Nbhd. | Adj. | Notes- Adj/Special Pricing | Adj. Unit Price | Land Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | AG3 | AG LND & B | | 25 | 670 | | 1.00 | AC | 9,000.00 | 1.00 | 6 | 1.00 | 25 | 0.80 | SPCL(TLW,PGS,218,SLF,FM | | 4,138 |
| 1 | AG3 | AG LND & B | | 25 | 670 | | 113.20 | AC | 650.00 | 1.00 | 0 | 1.00 | 25 | 0.80 | SPCL(TLW,PGS,218,SLF,FM | | 33,829 |
| | | | | | Total Card Land Units | | 114.20 | AC | Parcel Total Land Area: | | | 114.20 | AC | | | Total Land Value | 37,967 |

Property Location: ON PA T B 218
Vision ID: 29687
Case 2:00-cv-02120-DSC Document 100 Filed 02/10/2006 Page 53 of 98
MAP ID: 25/ 06/ 121/ /
Other ID: 26684
Bldg #: 1   Card   1   of   1
Print Date: 02/10/2006 15

## CONSTRUCTION DETAIL

| Element | Cd. | Ch. | Description |
|---|---|---|---|
| Style/ Type | 06 | | Conventional |
| Model | 01 | | Residential |
| Grade | 23 | | A |
| Stories | 2 | | 2 Stories |
| Occupancy | | | |
| Exterior Wall 1 | 08 | | Wd/Vy/Al Sidin |
| 2 | 21 | | Stone/Masonry |
| Roof Structure | 03 | | Gable/Hip |
| Roof Cover | 08 | | Clay Tile |
| Interior Wall 1 | 03 | | Plstr/Drywall |
| 2 | 06 | | Cust Wd Panel |
| Interior Floor 1 | 13 | | Parquet/hardwo |
| 2 | 11 | | Ceram Clay Til |
| Heating Fuel | 02 | | Oil/Gas |
| Heating Type | 05 | | Ht Water |
| AC Type | 01 | | None |
| Bedrooms | 03 | | 3 Bedrooms |
| Bathrooms | 2 | | 2 Bathrooms |
| Total Rooms | | | |
| Bath Type | 03 | | Above Avg |
| Kitchen Style | 03 | | Above Avg |

### Commercial Data Elements

| Element | Cd. | Ch. | Description |
|---|---|---|---|
| Heat & AC | | | |
| Frame Type | | | |
| Baths/Plumbing | | | |
| Ceiling/Wall | | | |
| Rooms/Prtns | | | |
| % Common Wall | | | |
| Wall Height | | | |

### CONDO/MOBILE HOME DATA

| Element | Code | Description | Factor |
|---|---|---|---|
| Complex | | | |
| Floor Adj | | | |
| Unit Location | | | |
| Number of Units | | | |
| Number of Levels | | | |
| % Ownership | | | |

### COST/MARKET VALUATION

| | |
|---|---|
| Unadj. Base Rate | 36.00 |
| Size Adj. Factor | 0.93496 |
| Grade (Q) Index | 1.70 |
| Adj. Base Rate | 57.22 |
| Bldg. Value New | 182,646 |
| Year Built | 1938 |
| Eff. Year Built | (E) |
| Nrml Physcl Dep | 18 |
| Funcnl Obslnc | |
| Econ Obslnc | |
| Specl. Cond. Code | SU |
| Specl Cond % | 65 |
| Overall % Cond. | 17 |
| Deprec. Bldg Value | 31,050 |

### MIXED USE

| Code | Description | Percentage |
|---|---|---|
| AG3 | AG LND & B | 100 |

## OB-OUTBUILDING & YARD ITEMS(L) / XF-BUILDING EXTRA FEATURES(B)

| Code | Description | L/B | Units | Unit Price | Yr. | Dp Rt | %Cnd | Apr. Value |
|---|---|---|---|---|---|---|---|---|
| FGR1 | GARAGE-AVE | L | 384 | 10.50 | 1940 | 0 | 30 | 1,210 |
| STB1 | STABLE | L | 920 | 11.00 | 1930 | 0 | 30 | 3,040 |
| SPL1 | POOL INGROUND | L | 576 | 10.00 | 1987 | 0 | 80 | 4,610 |
| SHD1 | SHED UTILITY | L | 100 | 5.00 | 1940 | 0 | 30 | 150 |
| SHD1 | SHED UTILITY | L | 120 | 5.00 | 1950 | 0 | 60 | 360 |
| FPL1 | FIREPLACE | B | 3 | 1,500.00 | 1984 | 1 | 75 | 2,570 |
| BGR | BSMT GARAGE | B | 2 | 1,000.00 | 1984 | 1 | 0 | 0 |
| XFTR | XTRA PLUMB FIX | B | 4 | 500.00 | 1984 | 1 | 75 | 1,140 |

## BUILDING SUB-AREA SUMMARY SECTION

| Code | Description | Living Area | Gross Area | Eff. Area | Unit Cost | Undeprec. Value |
|---|---|---|---|---|---|---|
| BAS | First Floor | 1,582 | 1,582 | | 57.22 | 90,522 |
| FOP | Porch, Open | 0 | 136 | | 11.36 | 1,545 |
| FUS | Upper Story, Finished | 1,402 | 1,402 | | 57.22 | 80,222 |
| OVH | Overhang | 60 | 60 | | 57.22 | 3,433 |
| PTO | Patio | 0 | 646 | | 5.76 | 3,719 |
| STP | Stoop | 0 | 200 | | 5.72 | 1,144 |
| UBM | Basement, Unfinished | 0 | 180 | | 11.44 | 2,060 |
| Ttl. Gross Liv./Lease Area | | 4,206 | | Bldg Val: | | 182,646 |

## SKETCH

| CURRENT OWNER | TOPO. | UTILITIES | STRT./ROAD | LOCATION | CURRENT ASSESSMENT | | | |
|---|---|---|---|---|---|---|---|---|
| BRENDEL ROY J ET UX | 4 Rolling | 5 Well | 1 Paved | | Description | Code | Appraised Value | Assessed Value |
| | 8 High | 6 Septic | | | RES L B | 1300 | 4,690 | 4,690 |
| 124 FORNEY HOLLOW RD | | | | | MAIN | 1300 | 8,440 | 8,440 |
| SPRAGGS, PA 15362 | | | | | | | | |

**8003**
**GREENE COUNTY, PA**

# VISION

| SUPPLEMENTAL DATA | |
|---|---|
| Account # | 25-000280 |
| STEB DIST | 405 |
| SCHOOL DISTI | 30140 |
| CLEAN & GREE | N |
| PARCEL COUNT | 1 |
| PROP_TYPE | RESIDENTIAL |
| BANK_CODE | |
| HOMESTEAD | N |
| TAX_DISTRIC | |
| 911 ADDRESS | |
| TAX STATUS | 5 |
| GIS ID: | |

| | Total | 13,130 | 13,130 |
|---|---|---|---|

| RECORD OF OWNERSHIP | BK-VOL/PAGE | SALE DATE | q/u | v/i | SALE PRICE | V.C. |
|---|---|---|---|---|---|---|
| BRENDEL ROY J ET UX | 0114/0064 | 05/01/1993 | Q | | 23,000 | |

**PREVIOUS ASSESSMENTS (HISTORY)**

| Yr. | Code | Assessed Value | Yr. | Code | Assessed Value | Yr. | Code | Assessed Value |
|---|---|---|---|---|---|---|---|---|
| 2006 | 1300 | 4,690 | 2006 | 1300 | 4,690 | 2005 | 1300 | 4,690 |
| 2006 | 1300 | 8,440 | 2006 | 1300 | 8,440 | 2005 | 1300 | 8,440 |
| | Total: | 13,130 | | Total: | 13,130 | | Total: | 13,130 |

| EXEMPTIONS | | | OTHER ASSESSMENTS | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Type/Description | Amount | Code | Description | Number | Amount | Comm. Int. | |
| | | | | | | | | |
| | Total: | | | | | | | |

*This signature acknowledges a visit by a Data Collector or Assessor*

### APPRAISED VALUE SUMMARY

| | |
|---|---|
| Appraised Bldg. Value (Card) | 8,040 |
| Appraised XF (B) Value (Bldg) | 400 |
| Appraised OB (L) Value (Bldg) | 0 |
| Appraised Land Value (Bldg) | 4,690 |
| Special Land Value | |
| Total Appraised Card Value | 13,130 |
| Total Appraised Parcel Value | 13,130 |
| Valuation Method: | |
| | Cost/Market Valuation |
| Net Total Appraised Parcel Value | 13,130 |

**NOTES**

W/S OF U S T R 218
H. John Frazier
Certified PA Evaluator
Certification # AV-000841-L

| BUILDING PERMIT RECORD | | | | | | | | VISIT/CHANGE HISTORY | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Permit ID | Issue Date | Type | Description | Amount | Insp. Date | % Comp. | Date Comp. | Comments | Date | ID | Cd. | Purpose/Result |
| | | | | | | | | | | | |

| LAND LINE VALUATION SECTION | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B# | Use Code | Description | Zone | D | Frontage | Depth | Units | Unit Price | I. Factor | S.I. | C. Factor | Nbhd. | Adj. | Notes-Adj/Special Pricing | Adj. Unit Price | Land Value |
| 1 | RE3 | RES. LB | | 25 | 674 | | 0.60 AC | 11,000.00 | 1.55 | 6 | 1.00 | 25 | 0.80 | SPCL(TLW,PGS,218,SLF,FM) | | 4,690 |
| | | | | | Total Card Land Units | 26,136.00 | SF | Parcel Total Land Area: | | 26,136 SF | | | Total Land Value | | | 4,690 |

Property Location: W/S OF U S T R 218
Vision ID: 29689
MAP ID: 25/.06/.121/.B/
Other ID: 26686
Case 2:00-cv-02120-DSC   Document 100   Filed 02/10/2006   Page 55 of 98
Bldg #: 1
Card 1 of 1
Print Date: 02/10/2006 15

## CONSTRUCTION DETAIL

| Element | Cd. | Ch. | Description |
|---|---|---|---|
| Style/ Type | 06 | | Conventional |
| Model | 01 | | Residential |
| Grade | 12 | | C-05 |
| Stories | 1 | | 1 Story |
| Occupancy | | | |
| Exterior Wall 1 | 08 | | Wd/Vy/Al Sidin |
| 2 | | | |
| Roof Structure | 02 | | Med Pitch |
| Roof Cover | 01 | | Metal/Tin |
| Interior Wall 1 | 03 | | Plstr/Drywall |
| 2 | 04 | | Panel |
| Interior Floor 1 | 12 | | Plywood/Part. |
| 2 | | | |
| Heating Fuel | 02 | | Oil/Gas |
| Heating Type | 09 | | Space |
| AC Type | 01 | | None |
| Bedrooms | 03 | | 3 Bedrooms |
| Bathrooms | 1 | | 1 Bathroom |
| Total Rooms | | | |
| Bath Type | 02 | | Average |
| Kitchen Style | 02 | | Average |

### Commercial Data Elements

| Element | Cd. | Ch. | Description |
|---|---|---|---|
| Heat & AC | | | |
| Frame Type | | | |
| Baths/Plumbing | | | |
| Ceiling/Wall | | | |
| Rooms/Prtns | | | |
| % Common Wall | | | |
| Wall Height | | | |

### CONDO/MOBILE HOME DATA

| Element | Code | Description | Factor |
|---|---|---|---|
| Complex | | | |
| Floor Adj | | | |
| Unit Location | | | |
| Number of Units | | | |
| Number of Levels | | | |
| % Ownership | | | |

### COST/MARKET VALUATION

| | |
|---|---|
| Unadj. Base Rate | 36.00 |
| Size Adj. Factor | 1.18232 |
| Grade (Q) Index | 0.81 |
| Adj. Base Rate | 34.48 |
| Bldg. Value New | 53,616 |
| Year Built | 1953 |
| Eff. Year Built | (F) |
| Nrml Physcl Dep | 35 |
| Funcnl Obslnc | |
| Econ Obslnc | |
| Specl. Cond. Code | SU |
| Specl Cond % | 50 |
| Overall % Cond. | 15 |
| Deprec. Bldg Value | 8,040 |

## MIXED USE

| Code | Description | Percentage |
|---|---|---|
| RE3 | RES. LB | 100 |

## OB-OUTBUILDING & YARD ITEMS(L) / XF-BUILDING EXTRA FEATURES(B)

| Code | Description | L/B | Units | Unit Price | Yr. | Dp Rt | %Cnd | Apr. Value |
|---|---|---|---|---|---|---|---|---|
| XFTR | XTRA PLUMB FIX | B | 2 | 500.00 | 1967 | 1 | 75 | 400 |

## BUILDING SUB-AREA SUMMARY SECTION

| Code | Description | Living Area | Gross Area | Eff. Area | Unit Cost | Undeprec. Value |
|---|---|---|---|---|---|---|
| BAS | First Floor | 1,296 | 1,296 | | 34.48 | 44,686 |
| UBM | Basement, Unfinished | 0 | 1,296 | | 6.89 | 8,930 |
| Ttl. Gross Liv/Lease Area | | | 2,592 | | Bldg Val: | 53,616 |

## SKETCH



BAS
UBM

1296#

36

36



PA. DEED—WARRANTY.—10

PHILO LAW BLANKS
SOLD BY
THE PLANDENHODE CO.
WILLIAMSPORT, PA. 17701
ALL RIGHTS RESERVED

# This Indenture,

571    1036

*Made the* 15th *day of* September
*Nineteen hundred and* seventy-one (1971).

**Between** DARRELL J. LEWIS and DOROTHY T. LEWIS, his wife,

of R. D. #1, Spraggs, Greene County, Pennsylvania, parties of the

first part,

A

N

D

ROY J. BRENDEL and DIANE F. BRENDEL, his wife, of 263 Fifth

Avenue, Waynesburg, GreeneCounty, Pennsylvania, parties

*of the second part,* **Witnesseth** *that the said part* **ies** *of the first part, for and in considera-*
*tion of the sum of* One and no/100 ($1.00) Dollar ..........................
............... *lawful money of the United States of America, unto* them *well and*
*truly paid by the said part* ies *of the second part, at or before the sealing and delivery of these*
*presents, the receipt whereof is hereby acknowledged,* have *granted, bargained, sold,*
*aliened, enfeoffed, released, conveyed and confirmed, and by these presents* do *grant, bargain,*
*sell, alien, enfeoff, release, convey and confirm, unto the said part* ies *of the second part* , their
*heirs and assigns forever,*

ALL those four certain tracts of land situate in Wayne Town-
ship, Greene County, Pennsylvania, bounded and described as fol-
lows, to-wit:

TRACT NO. I:  BEGINNING at a white walnut by the side of
the Waynesburg Road; thence with line of Sarah Yeager, North 57
1/2° West crossing run 28 perches to a bunch of small lin; thence
South 70° West 3.4 perches to a sugar; corner to Peter Rinehart;
thence North 43° West 27.1 perches to a crabapple, dead; thence
South 88° West 44 perches to a stone pile; thence South 70 1/2°
West 91.6 perches to a stone corner to Shultz and Rinehart; thence
South 53 1/2° East 117.3 perches to a stone corner to Isaac Yeager;
thence South 88° East 123 perches to a butternut near church;
thence North 6 1/4° East 23 perches to a stone quarry; thence
South 88 1/2° East 7 perches to a stone pile to heirs of John
Phillips; thence North 2 1/4° East 34 perches to a lin bush; thence
North 82 1/4° East 13.4 perches to a stone corner to Sarah Yeager;
thence North 32 1/2° West 14.8 perches to a sycamore by the road;
thence North 65-4/ perches East 17.1 perches to a sycamore on
side of road; thence North 88 1/4° West 19.8 perches to a stake
corner with Robert Zimmerman; thence North 2 1/4° East 41 perches
to a dogwood corner, dead, to Peter Rinehart; thence South 72°
West 69 perches to a stake in County Road; thence with road
South 19° East 7 perches to a stone; thence South 11° East 14.7
perches to the place of BEGINNING.

CONTAINING 114 acres, 3 roods, and 8 perches, more or less.

STATE OF PENNSYLVANIA, COUNTY OF GREENE
I, Thomas M. Headlee, Recorder of Deeds of the County
of and State aforesaid do hereby certify that the foregoing is a
true copy as appears on file in my office in Deed
Book 571 Page 1036 Given under my hand and seal
this 10th day of February 2006
Thomas M. Headlee    Recorder

571     1037

A.  Excepting and reserving the Pittsburgh, Nine-foot or
river vein or seam of coal as conveyed by Richard H. Thralls, et
ux to George L. Hibbs by deed dated August 27, 1901, and recorded in
Deed Book Vol. 128, Page 442.

B.  Excepting and reserving 1/32nd of all oil and 1/4th of
all oil royalties and rentals as conveyed by Richard Thralls, et ux
to L. L. Thomas, et al by deed dated November 18, 1899 and recorded
in Deed Book Vol. 132, Page 154.

C.  Subject to the rights acquired by the Waynesburg and Blacks-
ville Railway Company to construct a railroad within two years, from
Richard H. Thralls, et ux by deed dated February 26, 1910, and re-
corded in Deed Book Vol. 213, Page 14, wherein a right of way was
granted for the construction of a railroad over a parcel of land con-
taining 2.182 acres, and all coal, minerals, oil and gas being re-
served.

D.  Lot containing 0.6 acre together with the house and right
of way from L. R. 218 as conveyed by Ernest W. Thralls, et ux to
Charles W. Hawkins and Helen F. Hawkins, his wife, by deed dated
September 19, 1955, and recorded in Deed Book Vol. 485, Page 612.

E.  Excepting and reserving the Mapletown or Sewickley vein
or seam of coal as conveyed by Darrell J. Lewis, et ux to Consoli-
dation Coal Company by deed dated November 28, 1969, and recorded in
Deed Book Vol. 558, Page 86.

TRACT NO. II:  BEGINNING at a point in the Waynesburg and
Blacksville Road, corner to land now or formerly of John T. Rinehart;
thence by land now or formerly of Richard H. Thralls, South 22° East
6.94 perches to a point in the road; thence by the same, South 14°
East 14.54 perches to a butternut; thence by the same, North 61° 30'
West 27.93 perches to a linden; thence by land nowor formerly of
John T. Rinehart, North 69° 45' East 19.79 perches to a point in the
road, the place of BEGINNING.

CONTAINING 1.327 Acres.

A.  Subject to the rights acquired by the Waynesburg and
Blacksville Railway Company from William Kughn, et ux by deed dated
February 26, 1910, and recorded in Deed Book Vol. 213, Page 17, where-
in a right of way was granted for the construction of a railroad over
a parcel of land containing .336 acres, and all coal, minerals, oil
and gas being reserved.

B.  Excepting and reserving the Pittsburgh, Nine-foot or River
vein or seam of coal as conveyed by Darrell J. Lewis, et ux to Con-
solidation Coal Company by deed dated November 28, 1969, and recorded
in Deed Book Vol. 558, Page 84.

C.  Excepting and reserving the Mapletown or Sewickley vein or
seam of coal as conveyed by Darrell J. Lewis, et ux to Consolidation
Coal Company by deed dated November 28, 1969, and recorded in Deed
Book Vol. 558, Page 86.

TRACT NO. III:  BEGINNING at a hickory corner to lands formerly
of Henry Zimmerman; thence with said lands, South 80 3/4° West 61.6
perches to a stone on old line; thence by lands of Richard Thrall's
Heirs, South 26.78 perches to a stone; thence with lands of Fred
Curfman, East 77.68 perches to a stone; thence with lands now or for-
merly of William Lantz Heirs, North 49° East 24.03 perches to a stone;
thence by lands of said Henry Zimmerman, North 58° West 42.7 perches
to the place of BEGINNING.

CONTAINING 16 acres, 110 perches, more or less.

TRACT NO. IV:  BEGINNING at a sycamore tree above the road;
thence by lands of Richard Thrall's Heirs, South 66° 6' West 16.09
perches to a sycamore tree above the road; thence by same, South 33°
40' East 14.05 perches to a stone; thence by lands above described,
North 79° East 13.87 perches to a stone; thence by land formerly of
Henry Zimmerman, North 9° 45' West 15.97 perches to a stone; thence
by same, South 89° 30' West 4.02 perches to the place of BEGINNING.

CONTAINING 1 acre and 98.5 perches.

571   1038

Tract No. III and Tract NO. IV are subject to the following exceptions and reservations:

A.  Reserving the Pittsburgh, Nine-foot or River vein or seam of coal as conveyed by Martha A. Tukesberry, et al to George L. Hibbs by deed date d September 9, 1901, and recorded in Deed Book Vol. 126, Page 559.

B.  Reserving 1/16th of the oil and 1/2 of the oil royalty and rentals.  See Deed Book Vol. 187, Page 209.

C.  Excepting and reserving the Mapletown or Sewickley vein or seam of coal as conveyed by Darrell J. Lewis, et ux to Consolidation Coal Company by deed dated November 28, 1969, and recorded in Deed Book Vol. 558, Page 86.

FOR PRIOR TITLE see deed from Fred J. Thomas and Mary J. Thomas, his wife, to Darrell J. Lewis and Dorothy T. Lewis, his wife, dated October 23, 1968, and recorded on October 25, 1968, in Deed Book Vol. 551, Page 380.

The actual consideration for this conveyance is: $41,300.00.

THIS DOCUMENT DOES NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHT TO SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL OF SUCH COAL AND , IN THAT CONNECTION, DAMAGE MAY RESULT TO T HE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCHLAND.   THE INCLUSION OF THIS NOTICE DOES NOT ENLARGE OR RESTRICT OR MODIFY ANY LEGAL RIGHTS OR ESTATES OTHERWISE CREATED, TRANSFERRED, EXCEPTED OR RESERVED BY THIS INSTRUMENT.  (This notice is set forth in the manner provided in Section 1 of the Act of July 17, 1957, P. L. 984, as amended.)



| No 198 | No 1486 |
|---|---|
| This Stamp certifies the payment of a tax in the amount of $ 206.50 | This Stamp certifies the payment of a tax in the amount of $ 206.50 |
| Date 10-7-71 | Date 10-7-71 |
| Calculated at the rate of 1% on the transfer of titles to real estate imposed pursuant to the Act of December 31, 1965, P.L. 1257 and its amendments, by and for Wayne Township, Greene County, Pa. | Calculated at the rate of 1% on the transfer of titles to real estate imposed pursuant to the Act of December 31, 1965, P. L. 1189 and its amendments, by and for the Central Greene School District, Greene County, Pa. |
| —————— Collector | —————— Collector |

# NOTICE

Grantee (hereinafter, whether one or more, called "Grantee") hereby states that he knows that he may not be obtaining the right of protection against subsidence resulting from coal mining operations and that the purchased property may be protected from damage due to mine subsidence by a private contract with the owners of the economic interests in the coal  (THIS NOTICE IS INSERTED HEREIN TO COMPLY WITH THE BITUMINOUS MINE SUBSIDENCE AND LAND CONSERVATION ACT OF 1966.)

Roy g. Bredel

Diane F. Bredel

571   1039

**Together** with all and singular the **property,** improvements, ways, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances whatsoever thereunto belonging or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of the said part **ies** of the first part, in law, equity or otherwise, howsoever, in and to the same and every part thereof.

**To have and to hold** the said **described parcels,**

hereditaments and premises hereby granted, or mentioned, and intended so to be, with the appurtenances, unto the said part **ies** of the second part, **their** heirs and assigns, to and for the only proper use and behoof of the said part **ies** of the second part, **their** heirs and assigns **Forever**

**And** DARRELL J. LEWIS and DOROTHY T. LEWIS, his wife,

the said part **ies** of the first part, for **themselves, their** heirs, executors and administrators, **do** by these presents covenant, grant and agree to and with the said part **ies** of the second part, **their** heirs and assigns, that **they** the said part **ies** of the first part, **their** heirs all and singular the hereditaments and premises herein above described and granted, or mentioned, and intended so to be, with the appurtenances, unto the said part **ies** of the second part, **their** heirs and assigns, against **them** the said part **ies** of the first part, and **their** heirs, and against all and every other person or persons whomsoever, lawfully claiming or to claim the same or any part thereof,

**Shall and will Warrant and forever Defend**

**In Witness Whereof,** The said part **ies** of the first part **have** to these presents set **their** hands and seals. Dated the day and year first above written.

**Signed, Sealed and Delivered
In the Presence of**

_____

_____

_____

_____

| Darrell J. Lewis |
| Dorothy T. Lewis |

**Commonwealth of Pennsylvania** )
                                  ) SS.
**County of** GREENE              )

On this, the 15th day of September 19 71, before me, a notary public, the undersigned officer, personally appeared DARRELL J. LEWIS and DOROTHY T. LEWIS, his wife,

known to me (or satisfactorily proven) to be the person**s** whose name **s are** subscribed to the within instrument, and acknowledged that t**h**e**y** executed the same for the purpose therein contained. **IN WITNESS WHEREOF,** I have hereunto set my hand and **Notarial** seal.

NOTARY COMMISSION EXPIRES
July 15, 1972

Haddie Howard (Honey)

_____
Notary Public

**I Hereby Certify,** that the precise address of the grantee **s** herein is:
263 Fifth Avenue, Waynesburg, Greene County, Pennsylvania, 15370

_____

571    1040



FILED

1971 OCT -7 PM 12: 15

RECORDER'S OFFICE
GREENE COUNTY, PA.

58

DARRELL J. LEWIS and DOROTHY
T. LEWIS, his wife, parties
of the first part,
TO
ROY J. BRENDEL and DIANE F.
BRENDEL, his wife, parties
of the second part.

Dated, September 15, 19 71

HOOK & HOOK
ATTORNEYS AT LAW
WAYNESBURG, PA. 15370

Commonwealth of Pennsylvania )
                                ) SS.
County of    Greene

Recorded on this   7th   day of   October   A.D. 1971
in the Recorder's Office of said County
in DEED Book _____ Vol. 571 PAGE 1036
Given under my hand and seal of the said office
the date above written.

George D Black

RECORDER.

Author:  "Thomas C. Reed" <tcreed@rssm.com> at NP--INTERNET
Date:    4/23/99  3:03 PM
Priority: Normal
TO: Edson Beall at NP-WASO-NRHE
Subject: Ernest Thralls House, Greene County, PA
---------------------------------- Message Contents ------------------------------

Dear Edson:  The above property has been proposed for listing on the
NRHP.  Notice concerning this property appeared in the Fed.Reg. about 10
days ago..  Comments are due on or before next Wednesday.  How can an
extension of time within which to file comments be obtained?   My e-mail
is tcreed@rssm.com.  My phone number is 412-288-4288.  My fax is
412-288-3246.  Thanks.  Thomas C. Reed.



**CONSOL Inc.**
Consol Plaza
1800 Washington Road
Pittsburgh, PA 15241-1421
412-831-4000
FAX: 412-831-4916

April 27, 1999

Ms. Carol Schull
National Park Service
National Register of Historic Places
Mail Stop 2280, Suite NC 400
1849 C Street, NW
Washington, DC 20240

Re: Federal Register Notice – April 13, 1999 – Ernest Thrall House, Greene
County, Pennsylvania

Dear Ms. Schull:

CONSOL is the largest producer of bituminous coal in Pennsylvania. We have extensive
underground operations in Greene County and we have particular interest in the above
referenced Federal Register notice. This notice contains a nomination of the Ernest
Thralls house, Spraggs, PA to the National Register of Historic Places ("NRHP").
CONSOL has an interest in this nomination because it holds fee simple title to both the
mineral and support estates on this property. As the fee simple owner of two of the three
estates associated with this property, CONSOL is concerned that this process has gone
forward without prior notification to us and without our prior involvement. If the listing
of this surface property on the National Register could seriously impede our rights related
to our two property estates, we are entitled to be heard. Consequently, we ask that a
"Substantive Review" be done on this proposed listing and request that this
property not be listed on the NRHP. We ask this because there were procedural
errors in the listing process to date (namely failing to notify all persons owning fee
simple interests in the property) and because we believe there were errors in
professional judgement made by the preparer of the National Register nomination.

We also submit for your consideration, our initial comments on this proposed action. We
believe these comments support our position that this property should not be listed on the
National Register. Our reasons follow:

1. The property is not exceptionally significant nor important for any role it played in
   the local or regional history; in other words, this property has no exceptional
   importance in the history of the central Greene County community. Local citizens we
   queried were unaware of any role the property had in local history.

2. The property is not an integral part of any historic district otherwise eligible for listing.

3. The property does not have a historical perspective within the community, rather it has only transient value or interest.

4. The property's historic context has not been documented to demonstrate its relative importance as a local, regional or national resource. Rather the nomination has only purported to document the history of the original builder of the property and the reasons behind his construction of this complex. No connection to its importance to local or regional history is set forth.

5. The nomination has not identified how this property portrays the same values as other properties in the region, nor does it show how this property best illustrates the architectural values being considered within the community.

6. The nomination does not establish the property's importance within the appropriate historic context of Greene County nor show how the property is understood within the Greene County community.

7. There is no attempt in the documentation to determine the property's comparative value compared to other properties in the area.

8. The document fails to address how some owner initiated changes, that were not consistent with maintaining the architectural significance of the structure, have not impacted its eligibility for listing. (roof tiles, laundry room/bathroom , swimming pool)

9. The document fails to address why Spanish Revival style structures are not suitable for southwestern Pennsylvania given the realities of climate in the north versus climate in the southwestern United States. For example, flat pitched roofs are not recommended in heavy snowfall zones, extensive tile flooring and masonry components make heating difficult in winter months. Rather than this structure being unique, it is simply out-of-place in Greene County.

10. Even if a structure is the only example of a particular architectural style in an area, that does not equate to "being a historic place". The Thrall's house is simply one of a relatively recent origin done in a style different than its neighbors. Query: If someone constructs an adobe hacienda in Greene County tomorrow, is it entitled to be afforded the status of a "historic structure"?

Additionally, this property fails the National Register's Criteria for Evaluation as follows:

A. the property is not associated with events that have made a significant contribution to our history,

B. the property is not associated with lives of persons significant in our past,

C. the property does not embody distinctive characteristics of a type, period or method of construction nor does it represent the work of a master,

D. the property has not yielded and is unlikely to yield information important in history.

CONSOL reserves its right to make additional comments on this proposal once we have had sufficient time to fully review and evaluate both the submission to the Pennsylvania Historical and Museum Commission and the submission to the Keeper.  We also endorse the comments submitted by the Pennsylvania Coal Association on this same matter.

Sincerely,

Gary E. Slagel
Director, Regulatory
Affairs

cc: Mr. Edson Beall

Sworn and Subscribed to Before Me This

27ᵗʰ Day of April , 1999

Jonathan M. Pachter
Notary Public

Notarial Seal
Jonathan M. Pachter, Notary Public
Upper St. Clair Twp., Allegheny County
My Commission Expires Aug. 1, 2002

Member, Pennsylvania Association of Notaries

MAY-13-99 08:11A CONSOL EQC Dept                    412 831 4513          P.01

*Patrick — Thrall House PA*

## CONSOL INC
### 1800 WASHINGTON ROAD
### PITTSBURGH, PA 15241

# FAX SHEET

## ENVIRONMENTAL QUALITY CONTROL (EQC)

### FAX NUMBER: (412) 831-4513

DATE:  5/13/99

TIME:  9:20 am

TO:  Edson Beall

DEPT:

FAX NO:  202 - 343 - 1836

FROM:  Gary Slagel (412-831-4532)

COMMENTS:

Per our telecon - hard copy enroute

Number of pages including cover page:  8



**CONSOL Inc.**
Consol Plaza
1800 Washington Road
Pittsburgh, PA 15241-1421
412-831-4000
FAX 412-831-4916

May 11, 1999

Carol D. Shull
Keeper of the National Register
     of Historic Places
National Park Service
1849 L. Street N.W.
Suite NC 400
Washington D.C. 20204

Re: Federal Register Notice – April 13, 1999 – Ernest Thrall House, Greene
County, Pennsylvania

Dear Ms. Shull:

CONSOL previously submitted comments to you on the above referenced property being
nominated for listing on the National Register of Historic Places (NRHP). In these
comments we requested that a Substantive Review be done on this property and that it
not be listed on the NRHP. According to Mr. Edson Beall of your office, a Substantive
Review is underway

Attached are our additional comments on this action. These comments detail procedural
deficiencies with the nomination process and further substantiate our position that this
property should not be listed on the NRHP. We appreciate your consideration of our
comments on this matter.

Sincerely,

Gary E. Slagel,
Director, Regulatory
Affairs

MAY-13-99 08:12A CONSOL EQC Dept                    412 831 4513          P.03

## Substantive Review of the National Register Nomination
### for the
### Ernest Thralls House
### Greene County, Pennsylvania

The National Register of Historic Places Nomination Form submitted in nomination of the Ernest Thralls House in Greene County, Pennsylvania, has been substantively evaluated. Careful review suggests that there has been an "error in professional judgement as to whether the property meets the criteria for evaluation" (36 CFR 60.15(a)(3)) that should be considered in determining the significance of the property and its eligibility for listing. Because of these errors in professional judgement, the Thralls House is not eligible for listing in the National Register on several grounds:

- The nomination form itself is deficient
- The building is not a good representative of the Spanish Revival style (or any one architectural style)
- The building lacks specific elements of the Spanish Revival style
- The building lacks integrity
- The building does not meet the requirements of National Register Criterion C under which it is nominated.

### Nomination Form is Deficient

The nomination form itself is deficient in its failure to provide adequate data to permit an informed decision to be made about the significance of the property under the selected criterion. Because the property is nominated under Criterion C for its architectural significance, Section 8, *Significance*, needs to address the architectural significance of the specific property under consideration. Instead, the form provides primarily irrelevant information about the history of construction and occupancy of the structure. Of the four and one half pages of Section 8, only 2 paragraphs address the purported architectural significance of the Thralls property.

The statement of significance in Section 8 includes a larger discussion of Spanish Revival architecture and the work of architect Bertram Grosvenor Goodhue at the San Diego's Panama-California Exposition of 1915. This discussion is completely irrelevant to the nomination of the Thralls property. Even worse, it actually points out how weak the argument is regarding this property as an example of Spanish Revival architecture in the 20th century. The Thralls House simply does not contain the characteristics required of a representative example of Spanish Revival architecture.

8 'd     8689'ON                    HOOK & HOOK     Wd61:4 9002 'L 'qəℲ

The endnotes and major bibliographic references are weak. They do not include the expected academic sources to substantiate the discussion of architectural style. Instead of academic sources, the major references include a field guide written by amateurs and a newspaper article.

The nomination fails to provide an adequate boundary justification. According to the nomination, "This boundary includes the Thralls House and its historically associated outbuildings and immediate nine acres of ground which are connected to its architectural significance". The form briefly describes the nine structures, but provides no justification for the judgement that they do, indeed, contribute to the significance of the Thralls House. The house is nominated for its architectural significance as an example of Spanish Revival architecture—not as a farm property. It is difficult to understand how a "concrete block tenant house with stuccoed walls and standing seam metal clad gabled roof" or a "frame building with a gabled roof of tar paper" contribute to the significance of the main house, or why nine acres were identified in the nomination. Although the boundary description appears to encompass the farm itself, the farm was never emphasized in the discussion of significance. The outbuildings are even less representative of any architectural style than is the main house.

The nomination form mentions "Similar examples of Spanish Revival style architecture in the southwestern Pennsylvania region" (Section 8, Page 4, Paragraph 5). Yet, these properties are not described, nor are they compared to the Thralls House to substantiate its selection as an outstanding example of this style. The comparison required in a National Register nomination is absent in this document.

The State, in its evaluation of the draft nomination, raised substantive questions about the nomination. It requested additional information about the integrity of the property, and about the elements that are not representative of the Spanish Revival style. It also made suggestions about the footprint of the nomination. Failure of the revised nomination to definitively resolve the issues raised by the State demonstrate the weakness of the nomination. For example, in the State's comments, it was recommended that five acres of the property should be nominated, yet the nomination includes nine acres without explanation. The focus of this review will be on the nomination itself; additional discussion of the State review can be added at a later date upon request.

### The Building is Not a Good Representative of the Spanish Revival Style.

The Thralls House is not representative of the Spanish Revival style. Instead, it is a mixture of a variety of styles, a fact that is stressed by the author of the nomination. This underlying confusion by the author of the nomination concerning the reputed style of this house is demonstrated when he describes the features of the house that are representative elements of *other* architectural traditions. For example, he states:

- "Accenting the primarily Spanish Revival house are elements Thralls incorporated from other architectural styles including *Arts and Crafts* details,

2

Mexican tiles, and *Colonial Revival* touches such as Palladian windows, fanlights, and square-beamed ceilings" (Section 8, Page 2, Paragraph 4).

- "...the house has eclectic detailing drawn from other styles.  Common elements of the *Colonial Revival* style included in the house are vernacular Palladian windows, fanlights, and arched openings throughout the first floor. The square beam ceilings in the house are also typical of the *Colonial Revival*, as are large turned newel post and balusters of the stair and the built-in sideboard of the dining room which were taken from an older house. *Arts and crafts* detailing in the house consists of the wrought iron interior and exterior light fixtures, the use of large leaded-glass panels in the doors, the art tiling of the foyer and living room, exposed rafter ends, and open eaves of the roof.

The Thralls House is not an excellent example of the Spanish revival style or any style.  It can hardly be considered a fine example of one identified style (the basis of the nomination) when the nomination clearly identifies that it is a poorly conceived and executed hodge-podge of design elements selected from a variety of architectural traditions.

### The Thralls House Lacks the Elements of Spanish Revival Architecture

Spanish Revival architecture is characterized by several identifiable elements. Most of these elements are absent or are merely decorative additions to the Thralls property, rather than being integral components of the construction and the architectural style.  These elements include:

*Tile roofs.*  In the nomination (Section 8, Page 3, Paragraph 2), the author states that "One of the most common identifying feature (sic) of the style is the use of a tile roof, either Mission tiles shaped like half cylinders or "S" shaped Spanish tiles." Yet, the characteristic tiles on the Thralls House appear to be limited to design elements on the pent roofs.  Portions of the main roof tiles  if it was actually tiled—have been replaced, according to the nomination form, with three-dimensional shingles in the 1980s. It cannot be overemphasized that the red tile roof is the hallmark of Spanish Revival architecture. Even if this house at one point might have had architectural significance, it lacks integrity because the tile roof, which is a major feature of the style, has been changed.

*Stucco.*  The expected finish on a typical Spanish Revival house is stucco.  The addition of native stone veneer to the first story of the house is not typical, significantly reducing the value of the Thralls House as an example of Spanish Revival architecture.

*Massing.*  Spanish Revival architecture is characterized by picturesque or irregular massing.  Generally masses come together in a series of different heights.  This massing is totally absent from in the Thralls House.

3

MAY-13-99 08:13A CONSOL EQC Dept                    412 831 4513          P.06

*Floor Plan.* Spanish Revival residential floor plans are characterized by a series of connected rooms organized around a courtyard. However, the nomination author lauds the Thralls House for its open plan and large free flowing space, which is, in fact, the antithesis of the Spanish Revival style. "The first floor is surprisingly modern with an open plan living room, dining room and study" (Section 7, Page 4, Paragraph 1).

*Materials.* Spanish Revival construction depends on adobe, stucco, and tile. Glass block, which is used extensively in the Thralls House, is not a material in any way associated with Spanish Revival. Instead, glass block is typical of the industrial aesthetic of the 1930s. Beneath the stone veneer and stucco of the Thralls House is concrete block, a material that also reflects the industrial aesthetic of the 1930s. Thus, the materials used in this example are not merely irrelevant, but contradictory to the Spanish Revival style.

*Roof Rafters.* For a Spanish Revival structure, roof rafters should be rounded logs under the tile roof. Instead, in the Thralls House, they are standard rectangular roof rafters.

### Elements of the Thralls House are Inconsistent with Spanish Revival style

- Styles other than Spanish Revival are equally prominent, making it impossible to say that this building epitomizes one architectural style.

- Glass block and concrete block reflect the industrial aesthetic of the 1930s and are inconsistent with the aesthetic of the Spanish Revival style.

- The stone veneer on first floor is jarring and inappropriate.

- Many elements of the house, according to the nomination form, were "salvaged from another house by the original owner, Ernest Thralls". Such items included "elaborate turned newel posts, balusters, and handrail" (Section 7, Page 3, Paragraph 4). Additionally, "An alcove on the west end of the living room has a colorful stained glass window Ernest Thralls salvaged from another house" (Section 7, Page 4, Paragraph 2). These elements were used because they were available and inexpensive or because they appealed to Mr. Thralls; they certainly were not used because of their association with the Spanish Revival architectural style. Their use is inconsistent with the style.

- Massing and floor plan are inconsistent with the Spanish Revival style.

### Th Integrity of the Thralls House has been Significantly Compromised

The Thralls House has been significantly altered since its construction. Even had it once been an example of a single architectural style, its integrity has been compromised to the point that it is no longer significant. For example:

4

*Roof.* The characteristic most important to Spanish Revival architecture is the tile roof. According to the nomination, "Portions of the tile roof were replaced with three dimensional shingles in the 1980s" (Section 7, Page 1, Paragraph 4). It appears that the tile has been reduced to decorative elements on the pent roofs, which are very minor features of the house.

*Windows and Doors.* Even had the original windows been typical of the style, many have been significantly altered. "Two openings serve the kitchen, including a large opening originally filled with glass blocks and a central casement window. The opening was reduced, the glass blocks removed, and the casement window was replaced with a smaller operable 1960s window" (Section 7, Page 2, Paragraph 2). "The original first floor French doors were replaced in the 1960s with a picture window and imitation stone" (Section 7, Page 3, Paragraph 2).

*Massing.* It appears that the massing has been changed since it was originally built by Thralls. Specifically, the east elevation with the porch may not have been original to the structure built in the forties. The roofline is inconsistent with the line of the house, suggesting that it was added later.

*Porch.* "The first floor porch on the elevation's southern end was enclosed with glass in the 1960s" (Section 7, Page 2, Paragraph 2). "The second floor balcony was enclosed in the 1960s and the adjoining stair removed" (Section 7, Page 3, Paragraph 1). The infill of the porch and the addition of jalousie windows clearly undermine the building's integrity.

### *Conclusion*

The Ernest Thralls House was nominated to the National Register of Historic Places under Criterion C. According to National Register Bulletin 15, *How to Apply the National Register Criteria for Evaluation*, "This criterion applies to properties significant for their physical design or construction, including such elements as architecture, landscape architecture, engineering, and artwork. To be eligible under Criterion C, a property must meet at least one of the following requirements:

- Embody distinctive characteristics of a type, period or method of construction.

- Represent the work of a master.

- Possess high artistic value.

- Represent a significant and distinguishable entity whose components may lack individual distinction" (Page 17).

It is clear from the above discussion that the Thralls House does not meet these criteria.

5

- It does not *embody the distinctive characteristics* of the Spanish Revival style. The exterior lacks the typical surface material, massing, and decoration. The interior plan contradicts the plan typical of the style. Instead, the house is an assortment of motifs and elements that can be seen on styles from Colonial Revival to 1930s Industrial.

- It does not represent the *work of a master*; the architect is not even mentioned in the nomination.

- It does not possess *high artistic value*. It is merely a collection of elements that appealed to Thralls or that he could recycle from other sources or obtain inexpensively.

- It does not *represent a significant and distinguishable entity whose components may lack individual distinction*. There is no suggestion that it is part of a significant historic district or that it is significant because of its association with other similar structures.

The Thralls House clearly does not qualify for recognition as a significant historic property and does not meet the criteria for the National Register of Historic Places. It consists of a collection of dissimilar elements that could have been built any time during the 20th century. That is simply not sufficient to qualify on the list of properties that "represent the major patterns of our shared local, State and National experience" (National Register Bulletin 15, Page i).

6



## United States Department of the Interior



NATIONAL PARK SERVICE
1849 C Street, N.W.
Washington, D.C. 20240

IN REPLY REFER TO:
H32(2280)

MAY 1 4 1999

Mr. Gary E. Slagel
Director, Regulatory Affairs
CONSOL, Inc.
Consol Plaza
1800 Washington Road
Pittsburgh, Pennsylvania  15241-1421

Dear Mr. Slagel:

Thank you for your letter of April 27, 1999, on behalf of CONSOL, concerning the nomination of the Ernest Thralls House, Greene County, Pennsylvania, to the National Register of Historic Places.

Your letter raised the issue of whether CONSOL should have been notified by the Pennsylvania Historical and Museum Commission of the State's intention to nominate the house to the National Register, under National Register of Historic Places regulations 36 CFR Part 60. At issue is whether CONSOL meets the definition of an "owner," as defined by National Register regulations, for purposes of notifying owners during the nomination process.

We have considered your concerns, however, we believe that the type of property interest you describe does not fall within the definition of an owner within the meaning of our regulations and the National Historic Preservation Act of 1966. The National Register registration form establishes the architectural importance of the Ernest Thralls House, and on May 12, 1999, the Ernest Thralls House was listed in the National Register of Historic Places.

If you believe that this listing was made in error, you have an administrative remedy under National Register regulations 36 CFR 60.15 to petition to the Keeper of the National Register to remove the property from the National Register. As noted in that section of the regulations, petitions to remove properties from the National Register must be sent to the State and submitted by the State Historic Preservation Officer.

Please let me know if I may provide any further information concerning procedures for nominating properties to the National Register.

Sincerely,

*Patrick W. Andrus*

Patrick W. Andrus
Acting Keeper of the National Register of Historic Places
National Register, History and Education

cc: Pennsylvania SHPO

Mr. George L. Ellis, President
Pennsylvania Coal Association
212 North Third Street, Suite 102
Harrisburg, Pennsylvania  17101

# REED SMITH SHAW & McCLAY LLP

Writer's Direct Numbers:
Phone 412-288-3170
Fax 412-288-3063
hmingram@rssm.com

*435 Sixth Avenue*
*Pittsburgh, Pennsylvania 15219-1886*
*Phone: 412-288-3131*
*Fax:  412-288-3063*

RECEIVED

APR 2 6 1999

HISTORIC
PRESERVATION

April 22, 1999

Ms. Brenda Barrett
Director
Bureau for Historic Preservation
Historical and Museum Commission
Box 1026
Harrisburg, PA  17108-1026

Re:    Ernest Thralls Property/Greene County

Dear Ms. Barrett:

I am interested in the above property which has been proposed for listing in the National Register of Historic Places as per the attached excerpt from the Federal Register. I would like to obtain a copy of the listing petition and other related documents in the Bureau's file that can be made available to the public.

I stopped in your office today but persons to whom I was directed were tied up and, understandably, were not available to see me. They suggested I make an appointment next week. My problem is that the deadline for comments on the proposed listing is April 28th and I need to review the petition and related documents as soon as possible. Accordingly, I request a copy of these documents, at my expense, of course. If you have someone call my office (412-288-3170) when the copies are available, I will have someone in our Harrisburg office pick them up.

I apologize for the short notice but I was just made aware of the listing proposal. Thanks very much for your cooperation and assistance.

Please have someone call me if there are any questions or problems regarding this request.

Very truly yours,

*Henry Ingram*

Henry Ingram

HI:jaw

Enclosure

Case 2:00-cv-02120-DSC Document 100 Filed 02/11/2005 Page 75 of 98

Springfield, Virginia at 7:30 a.m., on May 14, 1999.

The survey was requested by the Bureau of Indians Affairs.

All inquiries or protests concerning the technical aspects of the survey must be sent to the Chief Cadastral Surveyor, Eastern States, Bureau of Land Management, 7450 Boston Boulevard, Springfield, VA 22153, prior to 7:30 a.m., May 14, 1999.

Copies of the plat will be made available upon request and prepayment of the reproduction fee of $2.75 per copy.

Dated: April 5, 1999.

**Joseph W. Beaudin,**
*Chief Cadastral Surveyor.*
[FR Doc. 99–9168 Filed 4–12–99; 8:45 am]
BILLING CODE 4310-GJ-M

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[ID–930–1920–00–4373; IDI–31741]**

### Legal Description of Juniper Butte Range Withdrawal, Correction; Idaho

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice corrects the total acreage figure and the land description of the public lands withdrawn for the Juniper Butte Range Withdrawal published in 63 FR 251, of December 31, 1998, on page 72326 and correction published in 64 FR 12, of January 20, 1999, on page 3134. In addition to those areas officially noted in the previous **Federal Register** notices the following added land description corrects the descriptions, lines and areas improperly noting a portion of the westerly boundary of the Juniper Butte Range:

**Boise Meridian**

T. 12S., R. 9E.,
    section 35, lot 5, containing 2.73 acres.
T. 13S., R. 9E.,
    section 2, lots 13 and 16, containing a total of 5.11 acres.
    section 11, lots 9 and 12, containing a total of 5.48 acres.
    section 14, lots 10 and 13 containing a total of 5.48 acres.
    section 23, lots 9 and 12 containing a total of 5.48 acres.

The acreage figure of 11,796.64 acres is corrected to 11,820.92 the correct acreage figure for the Juniper Butte Range Withdrawal in Owyhee County, Idaho.

**EFFECTIVE DATE:** April 13, 1999.

**FOR FURTHER INFORMATION CONTACT:** Jon Foster, BLM Idaho State Office, 1387 S.

Vinnell Way, Boise, Idaho 83709, 208–373–3813.

**Jimmie Buxton,**
*Branch Chief, Lands and Minerals.*
[FR Doc. 99–9093 Filed 4–12–99; 8:45 am]
BILLING CODE 4310-GG-P

## DEPARTMENT OF THE INTERIOR

### National Park Service

### Notice of Boundary Revision, Point Reyes National Seashore

**SUMMARY:** This notice announces a revision of the boundaries of Point Reyes National Seashore to include within the boundaries one unimproved parcel of land.

**FOR FURTHER INFORMATION CONTACT:** Sondra S. Humphries, Chief, Pacific Land Resources Program Center at (415) 427–1416.

**SUPPLEMENTARY INFORMATION:** Notice is hereby provided that the boundaries of Point Reyes National Seashore are revised, effective as of the date of publication of this notice to include all that certain property, situated in the County of Marin, State of California. The privately owned parcel, to be donated to the United States, is immediately adjacent to the park boundary and contains 6.47 acres, more or less. The parcel is identified as Tract P03–101 of Segment Map 03 and Drawing No. 612/03780, dated September, 1998. Detailed information is on file at the National Park Service, Pacific Land Resources Program Center, 600 Harrison Street, Suite 600, San Francisco, California 94107–1372.

Dated: April 5, 1999.

**John Reynolds,**
*Regional Director, Pacific West Region.*
[FR Doc. 99–9097 Filed 4–12–99; 8:45 am]
BILLING CODE 4310-70-M

## DEPARTMENT OF THE INTERIOR

### National Park Service

### Kaloko-Honokohau National Historical Park Advisory Commission; Notice of Meeting

Notice is given in accordance with the Federal Advisory Committee Act that a meeting of the Na Hoapili o Kaloko Honokohau, Kaloko Honokohau National Historical Park Advisory Commission will be held at 10:00 a.m. to 12:00 noon, April 17, 1999, at the Keauhou Beach Hotel, Kalakaua House, Kailua-Kona, Hawaii.

Superintendent's and Committee Reports will be presented

This meeting is open to the public will be recorded for documentation and transcribed for dissemination. Minutes of the meeting will be available to the public after approval of the full Advisory Commission. A transcript will be available after May 29, 1999. For copies of the minutes, contact the Kaloko-Honokohau National Historical Park Superintendent at (808) 329–6881

Dated: March 30, 1999.

**Gary Barbano,**
*Acting Superintendent, Pacific Islands Support Office.*
[FR Doc. 99–9098 Filed 4–12–99; 8:45 am]
BILLING CODE 4310-70-P

## DEPARTMENT OF THE INTERIOR

### National Park Service

### National Register of Historic Places; Notification of Pending Nominations

Nominations for the following properties being considered for listing in the National Register were received by the National Park Service before April 3, 1999. Pursuant to §60.13 of 36 CFR Part 60 written comments concerning the significance of these properties under the National Register criteria for evaluation may be forwarded to the National Register, National Park Service, 1849 C St. NW, NC400, Washington, DC 20240. Written comments should be submitted by April 28, 1999.

**Carol D. Shull,**
*Keeper of the National Register.*

**CALIFORNIA**

**Los Angeles County**

La Puente Valley Woman's Club, 200 N. First St., La Puente, 99000482

**COLORADO**

**Chaffee County**

Maysville School (Rural School Buildings in Colorado MPS), S of US 50, Maysville, 99000484

**Larimer County**

Plummer School (Rural School Buildings in Colorado MPS), 2524 E. Vine Dr., Fort Collins vicinity, 99000485

**Mesa County**

Pipe Line School (Rural School Buildings in Colorado MPS), 101 16.5/5 Rd., Glade Park, 99000483

**INDIANA**

**Marion County**

Crown Hill National Cemetery (Civil War Era National Cemeteries MPS), 700 W. 38th St., Indianapolis, 99000486

## IOWA

### Cedar County

Green, William, House, 1709 Madison St., Rochester vicinity, 99000488

### Keokuk County

Public Square Historic District (Sigourney, Iowa MPS), Roughly around Keokuk County Court House, Sigourney, 99000487

### Montgomery County

Chicago, Burlington Northern and Quincy Depot, 305 S. Second St., Red Oak, 99000489

### Plymouth County

Le Mars Central High School, 335 1st Ave. SW, Le Mars, 99000492

### Polk County

Teachout Building (Architectural Legacy of Proudfoot & Bird in Iowa MPS), 500–502 E. Locust St., Des Moines, 99000491

### Taylor County

Lenox Round Barn (Iowa Round Barns: The Sixty Year Experiment TR), 1001 Pollock Blvd., Bedford vicinity, 99000490

## KENTUCKY

### Jefferson County

Country Estates of River Road (Louisville and Jefferson County MPS), Roughly along River Rd. and Wolf Pen Branch Rd. from Longview Ln. to 500 ft. W of US 42, Glenview, 99000495

### Jessamine County

Canewood Farm, 8080 Harrodsburg Rd., Nicholasville vicinity, 99000494

### Nelson County

Walnut Groves Farm (Boundary Increase I), 801 Taylorsville Rd., Bloomfield vicinity, 99000521

## LOUISIANA

### Caddo Parish

South Highlands Historic District, Roughly bounded by Richmond Ave., Trabue St., Line Ave., and Southfield Rd., Shreveport, 99000496

### East Baton Rouge Parish

Fuqua Hardware Store Building, 358 Third St., Baton Rouge, 99000497

## MASSACHUSETTS

### Middlesex County

Watertown Arsenal Historic District, Arsenal St., Watertown, 99000498

## MISSISSIPPI

### Grenada County

Glenwild Plantation Manager's House, 3557 MS 51 S, Grenada, 99000499

## NEW MEXICO

### Rio Arriba County

Chimayo Trading Post and Trujillo, E.D., House, 110 Sandia Dr., Espanola, 99000500

## NEW YORK

### Cayuga County

Wall Street Methodist Episcopal Church, 69 Wall St., Auburn, 99000507

### Delaware County

Downsville Covered Bridge, Bridge St., Downsville, 99000503

Fitches Covered Bridge, Fitches Bridge Rd., East Delhi, 99000508

Hamden Covered Bridge, Basin Clove Rd., Hamden, 99000502

Lower Shavertown Covered Bridge, 682 Methol Rd., Methol, 99000504

### Franklin County

Smith's, Paul, Hotel Cottages, NY 30, Brighton, 99000501

### Montgomery County

Saint Stanislaus Roman Catholic Church Complex, 42, 46, 50 Cornell St. 73 Reid St., Amsterdam, 99000505

### Oneida County

Dorrance, W.H., House, 32 Church St., Camden, 99000506

## NORTH CAROLINA

### Wake County

Hood—Anderson Farm (Wake County MPS), Old Battle Bridge Rd., 0.4 mi. S of jct. with Old Tarboro Rd., Eagle Rock vicinity, 99000509

## OHIO

### Belmont County

Kinney, James, Farmstead, 44680 Belmont-Centerville Rd., Belmont vicinity, 99000510

### Hamilton County

Boulter, Cedric G., and Patricia Neils, House, 1 Rawson Woods Circle, Cincinnati, 99000512

Cary, Freeman Grant, Pleasant Hill Academy, 5651 Hamilton Ave., Cincinnati, 99000511

## PENNSYLVANIA

### Clearfield County

Coalport Historic District, Along Main St., roughly form Mill to Walnut STs., Coalport, 99000517

### Fayette County

Oak Hill Estate, US 40, 0.25 mi. W of US 119, North Union Township, 99000514

### Greene County

Thralls, Ernest, House, PA 218 S at TR 353 and TR 522, Spraggs, 99000513

### Lehigh County

Rodale Organic Gardening Experimental Farm, 2056 Minesite Rd., Lower Macungie township, 99000515

### Westmoreland County

Academy Hill Historic District, Roughly bounded by Baughman St., N. Maple Ave. Kenneth St., Culbertson Ave., Beacon St., and Pennsylvania Ave., Greensburg, 99000516

## WISCONSIN

### Dane County

Middleton Depot, Chicago, Milwaukee, and St. Paul Railroad, 1811 Parmenter St., Middleton, 99000520.

Rowley, Dr. Newman C., House, 7410 Hubbard Ave., Middleton, 99000518

[FR Doc. 99–9150 Filed 4–12–99; 8:45 am]

BILLING CODE 4310–70–P

## DEPARTMENT OF THE INTERIOR

## National Park Service

## Official Insignia Designation

**SUMMARY:** This notice establishes the official National Park Service insignia commemorating the Bicentennial Anniversary of the Lewis and Clark Expedition, 2003–2006.

**DATES:** This action is effective April 13, 1999.

**FOR FURTHER INFORMATION CONTACT:** Mark Engler, Interim Superintendent, Corps of Discovery II: 200 Years to the Future, Route 3, Box 47, Beatrice, Nebraska 68310, telephone 402–223–3514.

**SUPPLEMENTARY INFORMATION:** The National Park Service has designated an official insignia of the Lewis and Clark Expedition Bicentennial Anniversary, 2003–2006. You may obtain a copy of the insignia from the address listed in **FOR FURTHER INFORMATION CONTACT**. Notice is given that whoever manufactures, sells, or possesses this insignia, or any other colorable imitation thereof, or photographs, prints or in any other manner makes or executes any engraving photograph or print or impression in the likeness of this insignia, or any colorable imitation thereof, without authorization from the United States Department of the Interior is subject to the penalty provisions of Section 701, Title 18 of the United States Code.

Dated: March 22, 1999.

**David N. Given,**

*Deputy Regional Director, Midwest Region.*

[FR Doc. 99–8130 Filed 4–12–99; 8:45 am]

BILLING CODE 4310–70–P

## DEPARTMENT OF JUSTICE

## Notice of Lodging of Consent Decree Pursuant to the Clean Air Act

In accordance with Departmental policy, 28 CFR § 50.7, notice is hereby given that a proposed consent decree in *United States v. Gulatin Steel Company,* Civil Action No. 99–30 was lodged on February 25, 1999, with the United

Left margin fragments: It, and, is, ill, 1., d, l, t



Commonwealth of Pennsylvania
**Pennsylvania Historical and Museum Commission**
Bureau for Historic Preservation
Post Office Box 1026
Harrisburg, Pennsylvania 17108-1026

March 15, 1999

Carol Shull, Chief of Registration
National Register of Historic Places
U.S. Department of Interior
National Park Service
1849 C Street, NW
Suite NC 400
Washington, D.C.  20240

Re:  NR nomination form

Dear Ms. Shull:

The following National Register forms are being submitted for your review:

    Coalport Historic District, Clearfield County
    Rodale Organic Gardening Experimental Farm, Lehigh County
    Thralls, Ernest, House, Greene County
    Academy Hills Historic District, Westmoreland County
    Oak Hill Estate, Fayette County

The proposed action is listing in the National Register.

If you have any questions regarding the nominations please call us at (717) 783-8947.

Sincerely,

Dan G. Deibler, Chief
Division of Preservation Services

Enclosures
DGD/dr
DC23



Commonwealth of Pennsylvania
**Pennsylvania Historical and Museum Commission**
Bureau for Historic Preservation
Post Office Box 1026
Harrisburg, Pennsylvania 17108-1026

May 25, 199

Roy and Diane Brendel
RR #1, Box 135
Spraggs, PA 15362

Re:   Ernest Thralls House, Wayne Township, Greene County

Dear Mr. and Ms. Brendel:

I am pleased to inform you that the above referenced property was placed in the National Register of Historic Places on May 12, 1999.  A certificate attesting to this registration is enclosed.

The National Register recognizes the historical, architectural or cultural merits of properties.  Properties listed in the National Register receive consideration when state or federal projects are being planned, and may qualify for federal historic preservation tax credits or grant assistance (when available).  Also enclosed is a brochure explaining the National Register program.

Sincerely,

Brenda Barrett
Director

Enclosure
Cc:  Preparer of Nomination
BB/clb
DC24Ind

(Oct. 1990)

United States Department of the Interior
National Park Service

# National Register of Historic Places
# Registration Form

This form is for use in nominating or requesting determinations for individual properties and districts. See instructions in *How to Complete the National Register of Historic Places Registration Form* (National Register Bulletin 16A). Complete each item by marking "x" in the appropriate box or by entering the information requested. If an item does not apply to the property being documented, enter "N/A" for "not applicable." For functions, architectural classification, materials, and areas of significance, enter only categories and subcategories from the instructions. Place additional entries and narrative items on continuation sheets (NPS Form 10-900a). Use a typewriter, word processor, or computer, to complete all items.

## 1. Name of Property

historic name ___Thralls, Ernest, House___

other names/site number ___N/A___

## 2. Location

street & number __Route 218 South at TR 353 & TR 522__     N/A ☐ not for publication

city or town __Spraggs (Wayne Township)__     N/A  ☐ vicinity

state __Pennsylvania__     code __PA__  county __Greene__     code __059__  zip code __15362__

## 3. State/Federal Agency Certification

As the designated authority under the National Historic Preservation Act, as amended, I hereby certify that this ☒ nomination
☐ request for determination of eligibility meets the documentation standards for registering properties in the National Register of Historic Places and meets the procedural and professional requirements set forth in 36 CFR Part 60. In my opinion, the property ☒ meets ☐ does not meet the National Register criteria. I recommend that this property be considered significant
☐ nationally ☐ statewide ☒ locally. (☐ See continuation sheet for additional comments.)

_____  Exec. Dir.  3/9/99
Signature of certifying official/Title          Date

__PA Historical and Museum Commission__
State of Federal agency and bureau

In my opinion, the property ☐ meets ☐ does not meet the National Register criteria. (☐ See continuation sheet for additional comments.)

_____          _____
Signature of certifying official/Title          Date

_____
State or Federal agency and bureau

## 4. National Park Service Certification

I hereby certify that the property is:          Signature of the Keeper          Date of Action

☐ entered in the National Register.
  ☐ See continuation sheet.
☐ determined eligible for the
  National Register
  ☐ See continuation sheet.
☐ determined not eligible for the
  National Register.
☐ removed from the National
  Register.
☐ other, (explain:) _____

Thralls, Ernest, House
Name of Property

Greene County, PA
County and State

---

## 5. Classification

**Ownership of Property**
(Check as many boxes as apply)

- XX private
- ☐ public-local
- ☐ public-State
- ☐ public-Federal

**Category of Property**
(Check only one box)

- XX building(s)
- ☐ district
- ☐ site
- ☐ structure
- ☐ object

**Number of Resources within Property**
(Do not include previously listed resources in the count.)

| Contributing | Noncontributing | |
|---|---|---|
| 6 | 0 | buildings |
| 0 | 0 | sites |
| 3 | 1 | structures |
| 0 | 0 | objects |
| 9 | 1 | Total |

**Name of related multiple property listing**
(Enter "N/A" if property is not part of a multiple property listing.)

N/A

**Number of contributing resources previously listed in the National Register**

0

---

## 6. Function or Use

**Historic Functions**
(Enter categories from instructions)

Domestic/single dwelling

Agriculture/subsistence/animal

facility

Domestic/secondary structure

Recreation & culture/sports facility

**Current Functions**
(Enter categories from instructions)

Domestic/single dwelling

Agriculture/subsistence/animal

facility

Domestic/secondary structure

Recreation & culture/sports facility

---

## 7. Description

**Architectural Classification**
(Enter categories from instructions)

Spanish Colonial Revival

**Materials**
(Enter categories from instructions)

foundation _____ concrete

walls _____ concrete

roof _____ asphalt

other _____ terra cotta

**Narrative Description**
(Describe the historic and current condition of the property on one or more continuation sheets.)

Case 2:00-cv-02120-DSC   Document 100   Filed 02/10/2006   Page 81 of 98

## 8. Statement of Significance

### Applicable National Register Criteria
(Mark "x" in one or more boxes for the criteria qualifying the property for National Register listing.)

☐ **A** Property is associated with events that have made a significant contribution to the broad patterns of our history.

☐ **B** Property is associated with the lives of persons significant in our past.

☒ **C** Property embodies the distinctive characteristics of a type, period, or method of construction or represents the work of a master, or possesses high artistic values, or represents a significant and distinguishable entity whose components lack individual distinction.

☐ **D** Property has yielded, or is likely to yield, information important in prehistory or history.

### Criteria Considerations
(Mark "x" in all the boxes that apply.)

Property is:

☐ **A** owned by a religious institution or used for religious purposes.

☐ **B** removed from its original location.

☐ **C** a birthplace or grave.

☐ **D** a cemetery.

☐ **E** a reconstructed building, object, or structure.

☐ **F** a commemorative property.

☐ **G** less than 50 years of age or achieved significance within the past 50 years.

### Areas of Significance
(Enter categories from instructions)

Architecture

_____  _____
_____
_____
_____
_____
_____
_____

### Period of Significance
1939-1940

_____
_____

### Significant Dates
N/A

_____
_____

### Significant Person
(Complete if Criterion B is marked above)
N/A

### Cultural Affiliation
N/A

_____
_____
_____

### Architect/Builder
Thralls, Ernest

_____
_____

### Narrative Statement of Significance
(Explain the significance of the property on one or more continuation sheets.)

## 9. Major Bibliographical References

### Bibliography
(Cite the books, articles, and other sources used in preparing this form on one or more continuation sheets.)

**Previous documentation on file (NPS):**

☐ preliminary determination of individual listing (36 CFR 67) has been requested
☐ previously listed in the National Register
☐ previously determined eligible by the National Register
☐ designated a National Historic Landmark
☐ recorded by Historic American Buildings Survey # _____
☐ recorded by Historic American Engineering Record # _____

**Primary location of additional data:**

☒ State Historic Preservation Office
☐ Other State agency
☐ Federal agency
☐ Local government
☐ University
☐ Other
Name of repository:

_____

Thralls, Ernest, House                              Greene County, PA
_____                             _____
Name of Property                                    County and State

## 10. Geographical Data

**Acreage of Property** _____ approximately nine acres

**UTM References**
(Place additional UTM references on a continuation sheet.)

1 | 1,7 |  | 5,6 ,6 ,9,8 ,0 |  | 4,4 ,0,0 ,4 ,0,0 |         3 | 1,7 |  | 5,6 ,6 ,8,4 ,0 |  | 4,4 ,0,0 ,2,2 ,0 |
  Zone      Easting             Northing                    Zone      Easting             Northing

2 | 1,7 |  | 5 ,6,6 ,7 ,6,0 |  | 4,4 ,0,0 ,4 ,4,0 |        4 | 1,7 |  | 5,6 ,7 ,0,1 ,0 |  | 4,4 ,0,0 ,2,4 ,0 |
                                                            ☐ See continuation sheet

**Verbal Boundary Description**
(Describe the boundaries of the property on a continuation sheet.)

**Boundary Justification**
(Explain why the boundaries were selected on a continuation sheet.)

## 11. Form Prepared By

name/title _____ Clinton Piper

organization _____     date _____ December 1998

street & number _____ RR #4, BOX 89A     telephone _____ 724.537.2738

city or town _____ LATROBE     state _____ PA     zip code _____ 15650

## Additional Documentation
Submit the following items with the completed form:

## Continuation Sheets

## Maps

    A **USGS map** (7.5 or 15 minute series) indicating the property's location.

    A **Sketch map** for historic districts and properties having large acreage or numerous resources.

## Photographs

    Representative **black and white photographs** of the property.

## Additional items
(Check with the SHPO or FPO for any additional items)

## Property Owner
(Complete this item at the request of SHPO or FPO.)

name _____ Roy and Diane Brendel

street & number _____ RR #1, BOX 135     telephone _____ 724.435.7197

city or town _____ Spraggs     state _____ PA     zip code _____ 15362

**Paperwork Reduction Act Statement:** This information is being collected for applications to the National Register of Historic Places to nominate properties for listing or determine eligibility for listing, to list properties, and to amend existing listings. Response to this request is required to obtain a benefit in accordance with the National Historic Preservation Act, as amended (16 U.S.C. 470 *et seq.*).

**Estimated Burden Statement:** Public reporting burden for this form is estimated to average 18.1 hours per response including time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding this burden estimate or any aspect of this form to the Chief, Administrative Services Division, National Park Service, P.O. Box 37127, Washington, DG 20013-7127; and the Office of Management and Budget, Paperwork Reductions Projects (1024-0018), Washington, DC 20503.

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

Thralls, Ernest, House
Greene County, Pennsylvania

**Section Number    7        Page   1**

The Ernest Thralls House, approximately two miles south of the town of Spraggs on State Route 218 in Wayne Township, is located near the intersection of Forney Hollow Road (TR 522) and Old Church Lane (TR 353) in southern Greene County. This nomination consists of a nine-acre portion of the 133-acre Thralls property. The nine-acre portion contains the Thralls complex and its immediate setting bordered on the east and west by steep hills and intersected by Roberts Run. The complex has nine contributing buildings and structures including a circa 1939/1940 Spanish Revival house, a tenant house, three sheds, and a horse barn. Contributing structures on the property are: an open sheep shed, pig shed, and chicken coop. To the south of the Thralls House is a non-contributing 1980s pool. Small-scale landscape features within the curtilage not included in the resource count are: a simple concrete highway bridge over Roberts Run, a stone and brick exterior fireplace/grille, a split rail fence with stone piers around the semicircular entrance drive to the house, and a stone pier, the last being the remainder of a part of a simple stone footbridge over the tributary stream that was built at the same time as the house. The Thralls House, despite some minor changes, continues to retain much of its distinctive Spanish Revival detailing, setting, and outbuildings.

The property's focal point is the 2 ½ story Thralls House, a 64' wide by 51' deep concrete block house with terraces at the front and rear. *(Photo #1)* It is a Y-shaped house with a first floor plate slightly larger than the second floor plate. The first floor is clad in native stone veneer with a header brick belt course and second floor of stucco veneer.

Most of the windows in the house are original metal casements with original glass block surrounds. Typical of the Spanish Revival style, the windows have either brick lintels and sills or rough-hewn lintels with brick sills. The house has a raised basement of stone clad concrete with a watertable composed of a header row of bricks while a row of soldier bricks accentuates the basement openings.

Also common to the Spanish Revival style is the low-pitched hipped and gabled roof with straight barrel mission tile laid in regular courses. *(Photo #5)* Portions of the tile roof were replaced with three-dimensional shingles in the 1980s. The roof has exposed rafter ends and a standing exterior end chimney on the west elevation. Colorful decorative tiles or vents are typical on the roof's many gable ends. Overall, the house retains the majority of its original finishes and details.

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

Thralls, Ernest, House
Greene County, Pennsylvania

**Section Number    7          Page  2**

_____

The asymmetrical facade of the house, with seven window openings, is oriented north.  A two-story semicircular stone veneer tower serves as the formal entrance to the house.  *(Photo #11)*  Colorful Mexican tiles accent the concrete steps to the heavy wood front door.  The door has three large stylized strap hinges and two small square leaded-glass windows, one placed slightly higher than the other depicting a bird and flowers.  *(Photo #13 & #14)*  Under the door's threshold are additional Mexican tiles.  A tile-roofed hood on wood consoles extends over the top of the door.  Flanking the door are iron sconces.  *(Photo #12)*  On one side of the door is a rectangular stained-glass window, and on the other side is a small casement.   The tower's second floor has a tall narrow glass block window with smaller casement windows to either side. The glass block window has iron grillework at the bottom and a single Mexican tile above.  The front facing gable west of the tower has a first floor casement window with glass block sidelights and fanlight.  On the second floor is a less elaborate casement window.  East of the tower is a bay extending beyond the second floor plate with a tiled roof and casement window.

The facade's eastern portion has four openings on each floor.  The floor plate of the second floor is slightly larger than the first floor creating an overhang supported with metal posts on the first floor.  The openings on the first floor include a kitchen window, kitchen entrance, breakfast room window, and stair window.  *(Photos #9 & #10)*  Two openings serve the kitchen: including a large opening originally filled with glass blocks and a central casement window.  The opening was reduced, the glass blocks removed, and the casement window was replaced with a smaller operable 1960s window.  The second opening to the kitchen is a simple door fronting onto north terrace adjoining the driveway.  Near the door is an original metal sconce.  The third opening is an original casement surrounded by glass blocks to the breakfast room.  Further west is a small casement illuminating the back stairs.  Across the second floor are two large metal casement windows to the north bedroom and two smaller windows to the west light the second floor hall and back stairs.

The east elevation is three openings wide.  *(Photo #8)*  At the basement level are two garage doors and an adjoining man door.  The first floor porch on the elevation's southern end was enclosed with glass in the 1960s.  The central opening on first and second floors is a large glass block window with an original metal casement window in the center.  Similar to the facade, the original first floor kitchen window opening had a central casement window with glass blocks surrounding it.  The glass blocks were removed and partially in filled in the 1960s when a smaller operable

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

**Section Number    7         Page  3**

---

window  was installed.

Between the two cross gables of the south elevation is a terrace edged in metal railings.  In the center of the terrace is a stone and brick well head with a tile roof.  *(Photos #6 & #7)*  The first floor of the central portion of the south elevation has three openings: a center opening with double French doors and a fanlight.  Casement windows with glass block surrounds flank the doors.  The second floor balcony was enclosed in the 1960s and the adjoining exterior stair removed.

The eastern cross gable on the south elevation has casement windows at the basement, first and second floors.  The cross gable to the west of the terrace has a balcony on the first floor and a porch and balcony on the second floor.  The original first floor French doors were replaced in the 1960s with a picture window and imitation stone.  An arched porch extends from the second floor gable end with a central French door opening to a large balcony.  A portion of the stone clad basement is exposed on this elevation with a wood paneled door and a casement window to the west.

The house's west elevation has three openings and a tall standing end chimney.  *(Photo #2)*  The chimney has stone veneer on the first floor, stucco accented with three Mexican tiles on the second floor, and on the top is a tiled-roof chimney cap.  The south end of the elevation has stone steps to a secondary living room entrance.  *(Photo #3)*  The wood panel door is similar in detail to the front door with leaded windows depicting birds and flowers.  It also has a tile roof supported by consoles overhead.  South of the door is a glass block window, and to the north is a one story alcove that extends beyond the floor plate of the second floor with a hipped roof and large stained glass window.  The second floor has a single casement window and two glass block windows flanking the end chimney.

The plan of the first floor radiates from the stone tower containing a half bathroom, storage closet, and foyer.  The tile foyer has an integral colorful Mexican-inspired rug pattern original to the house.  *(Photo #13)*  The walls of the foyer are paneled in dark wood with a decorative grille work panel on the east wall.  The main stair, composed of a single run, landing, and second shorter flight, is adjacent to the foyer.  The bottom three steps of the otherwise closed stair project beyond the wall.  They are fitted with elaborate turned newel posts, balusters, and handrail salvaged from another house by the original owner, Ernest Thralls.  Similar balusters and handrails are used from

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior
National Park Service**

**National Register of Historic Places
Continuation Sheet**

Thralls, Ernest, House
Greene County, Pennsylvania

**Section Number   7          Page  4**

---

the landing to the second floor where an original wrought iron fixture illuminates the space.

The first floor is surprisingly modern with an open plan living room, dining room, and study. All the original details are intact unless otherwise noted. *(Photo #16)* Each room is finished with hardwood floors, beamed ceilings, simple wood baseboards, cornices, window surrounds, single recessed panel doors with glass knobs, and wall sconces. Portions of the living room and dining room have paneled walls. Many of the windows in these rooms have deep sills lined with Mexican tiles.

An alcove on the west end of the living room has a colorful stained glass window Ernest Thralls salvaged from another house. *(Photo #17)* Along the west wall is a fireplace with a raised stone hearth clad in Mexican tiles. *(Photo #19)* The portion of the fireplace below the mantel shelf is built of large stone slabs with a central panel of Mexican tiles depicting a man in a pastoral landscape. The large wrought andirons on the hearth are original to the house. The stonework above the wood mantel shelf consists of thinner slabs laid in regular courses. The southern end of the living room has a tile floor similar to the foyer with a second integral rug pattern.

The dining room contains wood wainscoting, an elaborate built-in sideboard, and a large mirror with a carved frame flanked with sconces. *(Photo #21)* South of the sideboard is a door with three vertical glass panels opening to a service hall while north of the sideboard is a door to the terrace at the front of the house. *(Photo #24)* On the north end of the room is a small study raised above the dining room and separated by a grille work gate and adjoining grille work screen. The study has beamed ceilings and casement windows. *(Photo #22)* French doors on the southern end of the dining room open onto the south terrace. An original glass/crystal chandelier hangs from the ceiling above the center of the dining room.

The service hall off the dining room contains a storage closet, access to the basement steps, a stair to the second floor hall, and a casement window. An arched opening at the eastern end of the service hall opens to a square breakfast room with wood paneled walls and a circa 1970 ceramic tile floor. *(Photo #25)* The northern end of the room has a large casement window surrounded by glass blocks with a second smaller window on the west wall. To the east is the kitchen with 1970s cabinets and a door to the north terrace. On the southern end of the breakfast room is a door to the present family room that was a bedroom during the Thralls ownership.[1] The south and west

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

**Section Number    7        Page  5**

---

walls of the room have casement windows while to the east is a full bathroom, closet, and small
sun porch. The bathroom has two glass block windows, original fixtures, and tile walls. The
present owners removed and replaced the bathtub with a washer and dryer.

The second floor of the house has many of the same original finishes as the first including
hardwood floors, cornices, simple baseboards, and inlaid doors. The second floor hall extends
from east to west. A small room used as a sewing room during the Thralls ownership is north of
the hall.[2] The current owners use it for storage. *(Photo #26)* The master bedroom and adjoining
bathroom are at the west end of the hall. At the east end of the hall are two bedrooms that share a
bathroom with large glass block windows, tile floors and walls, and original fixtures.

The master bedroom has a stone fireplace similar to the living room accented with Mexican tiles at
the base, the hearth, and under the mantel shelf. *(Photo #27)* Above the mantel shelf is a stone
slab depicting a street scene. Flanking the fireplace are glass block windows. The southern end of
the room has a set of French doors opening to an arched porch and adjoining balcony. On the
east wall of the master bedroom is a door to the bathroom. The present owners installed a large
soaking tub in the 1980s, enclosing a portion of the hall to accommodate it. The other two
bedrooms each have closets and details similar to the master bedroom. In the hallway near the
bedrooms are several storage closets and a door to the back stairs. Over the stairs is a hatch to the
attic crawl space above. The second floor porch, also accessible from the main hall, was enclosed
with windows in the 1960s.

The full basement has three spaces finished with concrete floors and walls. The eastern portion
contains a two-car garage and a small adjoining kitchen for canning garden vegetables. The
basement's central portion has an original half bathroom in the northwest corner. The western
portion has an original stone fireplace and exterior door on the southern wall.

Across Route 218, roughly five hundred forty feet west of the Thralls House, is a contributing
circa 1940 concrete block tenant house with stuccoed walls and standing seam metal clad gabled
roof. *(Photos #28 & #29)* It is presently used as a rental property. This house is detailed in a
manner similar to the Thralls House, albeit much simpler. This one-story rectangular building
(roughly 35' by 40') also has metal casement windows with wood lintels and brick sills and some
decorative tiles in the gable ends. The northwest elevation has a one-car garage at the basement
level.

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

United States Department of the Interior
National Park Service

National Register of Historic Places
Continuation Sheet

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

Section Number    7        Page  6

Closer to the Thralls House is a group of circa 1940 outbuildings.  Southeast of the house is a contributing 8' by 10' log shed used for potting plants.  It has a gabled roof of straight barrel mission tile.  *(Photo #8)* Thralls likely recycled the logs for the building from another building on the property.  South of the log shed are two contributing frame buildings raised above the ground on concrete blocks.  *(Photos #32 & #33)* The 10' by 20' building has a shed roof of standing seam metal, and it is used for storage.  A second 20' by 30' building has a gabled roof of tar paper.  It is used as an additional garage.  Approximately 500 feet southwest of the Thralls house is another contributing building, a horse barn with a low pitched gable roof measuring 25' by 40.'  It is used for storage.  *(Photo #34)*

Three structures also contribute to the complex.  Southwest of the Thralls House three hundred twenty feet, on the west side of Roberts Run, are two frame structures: a 16' by 20' pig shed and a 15' by 20' chicken coop.  *(Photo #35)* Both structures are raised above the ground with concrete blocks and have standing seam metal shed roofs with exposed rafter ends.  They are used for storage.  Sixty feet north of the house, across Forney Hollow Road, is a 15' by 20' open sheep shed.  It is constructed of wood posts supporting a flat metal roof.  Directly south of the Thralls house is a non-contributing 18' by 20' pool dating to the 1980s that replaced an original pond Ernest Thralls built.[3]

The Thralls House is an excellent and intact example of the nationally popular Spanish Revival style.  Despite its northeastern location, the house has preserved details characteristic of the style that was popular in the American southwest, Florida, and California.  Changes to the house, outbuildings and setting have been minor and have not significantly altered the integrity of the property as a whole. The Thralls House, its outbuildings, and unspoiled setting serve as a singular example of the Spanish Revival style in rural Greene County.

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

United States Department of the Interior
National Park Service

National Register of Historic Places
Continuation Sheet

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

Section Number    8        Page   1

---

The Ernest Thralls House is locally significant under criterion "C" of the National Register as a singular example of Spanish Revival architecture that was popular across the country from 1920 through 1940. The style recreated the appearance of Spanish Colonial houses of the American southwest. The Thralls House is a culmination of the ideals and aspirations of its builder, Ernest Thralls, who traveled extensively, especially to the American southwest. Thralls' exposure to this architecture strongly influenced the style and materials he chose for his retirement home. The period of significance begins circa 1939 with construction of the main house and continues through 1940 at which time the property achieved its present appearance.

### Family History and Development

George Washington Ernest Thralls (known simply as Ernest Thralls) was born in Spraggs, Wayne Township, Greene County in March of 1885, son of Richard H. and Charlotte Temple Thralls. Richard, originally from nearby Blacksburg, West Virginia, was a builder and local school director.[4] Richard and Charlotte purchased the farm of William and Rebecca Phillips in April of 1885.[5] They lived in a small frame house on the property where they raised seven children. Ernest resided with his family on the property until circa 1902 when he moved to the southwestern portion of the United States for two years. In 1904, he enrolled at Valparaiso University in Indiana, graduating in 1908 with degrees in Pharmacy and Chemistry. Thralls worked for several years as manager of retail drug stores in West Virginia, New Mexico, Colorado, and Indiana. His first marriage to Fannie Galloway of Kentucky lasted from 1910, to her death in 1916. His second marriage, in 1918, was to Terre Watkins of Hattiesburg, Mississippi, a sister of a college friend. Neither marriage produced children.[6]

Thralls was commissioned as an officer in the Indiana National Guard serving along the Mexican border in 1916 and subsequently serving abroad in World War I. He appears to have served full-time until achieving the status of Major, Cavalry Reserve in 1929. During a practice session Thralls' pistol accidentally exploded, causing serious nerve damage and eventual deafness in both his ears. It was a condition that ultimately caused his retirement from the service. After his service career Thralls worked with his brother Francis, also a Valparaiso graduate, as a regional insurance manager for the Massachusetts Protective Insurance Company at Central Savings Bank Building in Baltimore, Maryland.[7]

Richard Thralls died in 1917 and Charlotte in 1927; Ernest subsequently inherited the 133-acre Greene County farm. His primary residence continued to be in Baltimore, although his personal

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

**Section Number   8          Page   2**

correspondence indicates he was overseeing the farm's operation from Maryland.  He relates to a friend in a 1937 letter that he was building the largest apple orchard in the county having successfully reforested portions of the property with 20,000 walnut and locust trees.[8]  His sister Lucy and her husband resided in nearby Spraggs, and they apparently oversaw the property on a daily basis.  The combination of Ernest's and his brother's declining health resulted in the subsequent closing of their insurance office in late 1937.

Thralls studied what he had seen in domestic architecture of Mexico and the American southwest and applied his knowledge into the concrete block house he designed and constructed between 1939 and 1940.  He built the house on the site of the dilapidated Thralls farmhouse.  The neighboring tenant house and the present outbuildings also date to this period.  Original drawings indicate that his plan for the farm included gardens, a pond, outdoor grille, a stone bridge over Roberts Run, and the planting of various trees.  Much of the original planting remains intact although the orchard is overgrown.[9]

Ernest and Terre resided on the property until Ernest's death in 1954.  He was subsequently buried in Arlington National Cemetery.  In 1960, Terre Thralls sold the 133-acre property to Fred and Mary Thomas.[10]  They owned the property until 1968, when it was sold to Darrell and Dorothy Lewis.  They sold it to the present owners, Roy and Diane Brendel in 1971.[11]  The house and its setting have not significantly changed since its construction except for the replacement of some windows, repair of the roof, and the enclosure of two porches.

### Architectural Significance

The Ernest Thralls House derives its architectural significance from its Spanish Revival details characterizing the vernacular territorial style common in central and northern New Mexico during the time Thralls was in the region.  Accenting the primarily Spanish Revival house are elements Thralls incorporated from other architectural styles including Arts and Crafts details, Mexican tiles, and Colonial Revival touches such as Palladian windows, fanlights, and square-beamed ceilings.  Mexico and the southwest had a lasting influence on Thralls that resulted in the design and construction of his retirement house.  The Thralls House and its supporting outbuildings are an important local interpretation of a national architectural style.

San Diego's Panama-California Exposition of 1915 coincided with the opening of the Panama

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

**Section Number   8         Page   3**

_____

Canal and spawned elaborate imitations of Spanish Revival style buildings.  Architect Bertram
Grosvenor Goodhue (1869-1924) created a Spanish-Colonial influenced building for the
exposition's California pavilion after completing a thorough study of the style.  Prior to this period,
most Spanish Colonial examples followed the influence of the less elaborately detailed mission
buildings with shaped parapets and quatrefoil windows.  The Spanish examples Goodhue studied
were more richly decorated.[12]

The exposition influenced other period architects to return to Spanish Colonial architecture.  The
style reached its pinnacle in the late 1920s, and it continued to be popular through the 1940s.  The
style was prolific in California, Arizona, Texas, New Mexico, and Florida where Spanish Colonial
building traditions existed.  Good examples of the style were not common outside of these areas,
but various vernacular examples emerged in suburban plans across the country including
Pittsburgh.  One of the most common identifying feature of the style is the use of a tile roof, either
Mission tiles shaped like half cylinders or "S" shaped Spanish tiles.[13]

Thralls began to consider construction of the present house with a personal letter to a friend in
1937.[14]  He refers to a house in Mexico that he found particularly inspirational, but was expensive
to duplicate in Pennsylvania.  Regardless, traditional domestic architecture of Mexico and the
American southwest influenced his design choices.  The evolution of Thralls' ideas are clear in a
series of design iterations the current owners discovered in a box of personal papers in the rafters
of the house.[15]

The Thralls House has characteristics of the Spanish Colonial Revival style including an
asymmetrical form with shallow roof pitches accented in Mission tiles, a romantic semicircular
entrance tower, a stuccoed exterior and a plan of interconnected rooms opening onto a central
patio with a Mission tile-roofed well head.  Thralls made extensive use of casement windows,
doors, and terraces, that suggest an open-air atmosphere common to areas where Spanish Colonial
architecture originally developed.  The use of heavy wood paneled doors at the front and west
elevations of the house with wrought iron strap hinges, Talavera tiles on the exterior of the house,
at the fireplaces, and around the windows are characteristic of Spanish Colonial architecture, as is
the extensive use of ornate iron detailing.

In addition to the influences of the American southwest and Mexico, the house has eclectic

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

United States Department of the Interior
National Park Service

National Register of Historic Places
Continuation Sheet

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

Section Number  8        Page  4

---

detailing drawn from other styles.  Common elements of the Colonial Revival style included in the house are vernacular Palladian windows, fanlights, and arched openings throughout the first floor. The square beam ceilings in the house are also typical of the Colonial Revival, as are large turned newel post and balusters of the stair and the built-in sideboard of the dining room, which were taken from an older house.  Arts and crafts detailing in the house consists of the wrought iron interior and exterior light fixtures, the use of large leaded-glass panels in the doors, the art tiling of the foyer and living room, exposed rafter ends, and open eaves of the roof.

Thralls was aware of current building trends and materials.  His personal papers reveal that he referred to various contemporary plan books such as *Designed for Concrete,* a 1936 publication by the Portland Cement Association which included fifty five selected designs from a competition for the design of fire safe concrete homes.[16]  Other sources from Thralls personal files include catalogs from the Owens-Illinois Glass Company insulux products division, promotional materials from the Ludowici-Celadon Company, producers of roof tiles, and catalogs for building details such as doors, bath fixtures, and window blinds.[17]

The house has a large open plan living and dining room with an adjoining study.  The free flowing space and interior detailing was particularly innovative for Thralls.  His use of recycled details such as the newel posts, stained-glass windows, and built-in sideboard from other older houses perhaps similar to the simple one story gable roofed dwelling which served as his boyhood home also indicates his practicality.

The nearby rental house was erected as a residence for a military friend of Thralls after the completion of the main house.  The rental house, like the main house, exhibits a southwestern influence with stuccoed walls, accent tiles, and Spanish Revival fenestration patterns highlighted with casement windows.

Similar examples of Spanish Revival style architecture in the southwestern Pennsylvania region include an enclave of houses on Spanish Villa Drive in Hempfield Township, Westmoreland County.  Built in the middle 1920s by insurance salesman Morris Kelley in a wooded locale, these houses use many of the same details as the Thralls House.  They are generally, brightly-painted with parapets, arched windows, decorative tiles, flat roofs, towers, and tile roofed chimneys. Kelley, like Thralls, was well-traveled.  He visited Florida in the early 1920s during the state's land boom and was influenced by the Spanish Revival architecture emerging there.  Kelley apparently

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

**Section Number   8          Page   5**

designed the houses himself.[18]

Several 1930s and 1940s Spanish Revival style houses exist in the Point Breeze section of
Pittsburgh. A large two story L-shaped example with stuccoed walls and arcaded porches is
located at 414 South Dallas Avenue, but much of the original tile roof has been replaced. Another
example is a two story brick house at 6635 Reynolds Avenue with a tile roof and entrance tower
reminiscent of the Thralls House. A first floor modern addition slightly alters the house's
appearance. A final example stands at 5488 Northumberland Street which is a stuccoed two story
house has a low pitched tile roof and large arcaded facade. The primary difference between these
houses and the Thralls House is the execution of the design; the Pittsburgh houses likely had
architects evident in their more refined detailing.

The Ernest Thralls House represents a nationally-popular architectural style adapted by a Greene
County, Pennsylvania native as a retirement retreat. The house is a locally important singular
example of the style.

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

**Section Number    Notes      Page   1**

---

## ENDNOTES

1.      Ernest Thralls. *Circa 1939 Plans, elevations, and site plans for the Thralls House,* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.  The Brendels retain a box of personal material consisting of  photographs, plans, elevations,  and site plans relating the present house as well as other miscellaneous correspondence.  This original material served as the basis for the nomination.

2.      Ibid.

3.      Ernest Thralls. *Circa 1939 Plans, elevations, and site plans for the Thralls House,* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

4.      Ernest Thralls. *Circa 1930 Draft of a Biographical Sketch prepared for "Masonic Who's Who in the United States and Canada."* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

5.      William Phillips and Rebecca Phillips to Richard H. Thralls, deed dated 18 April 1885, Greene Count Courthouse, Waynesburg, PA.

6.      Ernest Thralls. *Circa 1939 Draft of a Biographical Sketch prepared for "Masonic Who's Who in the United States and Canada."*

7.      Ibid.

8.      Ernest Thralls to Mrs. Stella M. Baker, Weatherford, Oklahoma, 24 April 1937. Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

9.      Ernest Thralls. *Circa 1939 Plans, elevations, and site plans for the Thralls House.* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

10.     Terre Watkins Thralls to Fred J. Thomas and Mary J. Thomas, deed dated 10 February 1960, Greene County Courthouse, Waynesburg, PA.

11.    Fred J. Thomas and Mary J. Thomas to Darrell J. Lewis and Dorothy T. Lewis, deed dated 23 October 1968, Greene County Courthouse, Waynesburg, PA.

12.    Darrell J. Lewis and Dorothy T. Lewis to Roy Brendel and Diane Brendel, deed dated 15 September 1971, Greene County Courthouse, Waynesburg, PA.

13.    Virginia and Lee McAlester, *A Field Guide to American Houses* (Mount Vernon, New York: Consumers Union of the United States, 1987), 418.

14.    Ernest Thralls to Mrs. Stella M. Baker.

15.    Ernest Thralls. *Circa 1939 Plans, elevations, and site plans for the Thralls House.* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

16.    Portland Cement Company, *Designed for Concrete* (Chicago, Illinois: Portland Cement Company, 1936). Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

17.    Ernest Thralls, *Various circa 1939 Advertisement for Building Material and Products,* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

18.    James D. Van Trump, *"Spanish Villas: A Charming Legacy from the 20s."* <u>Tribune-Review</u> 13 March 1983.

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior**
**National Park Service**

**National Register of Historic Places**
**Continuation Sheet**

*Thralls, Ernest, House*
*Greene County, Pennsylvania*

**Section Number   9        Page   1**

---

## MAJOR BIBLIOGRAPHICAL REFERENCES

Carley, Rachel. *The Visual Dictionary of American Domestic Architecture.* New York: Henry Holt and Company, 1994.

Greene County Deed Books, Greene County Courthouse, Waynesburg, Pennsylvania.

McAlester, Virginia and Lee. *A Field Guide to American Houses.* Mount Vernon, New York: Consumers Union, 1984.

Portland Cement Company. *Designed for Concrete.* Chicago, Illinois: Portland Cement Company, 1936.  Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

Thralls, Ernest. *Circa 1930 Draft of a Biographical Sketch prepared for "Masonic Who's Who in the United States and Canada."* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

----------------. to Mrs. Stella M. Baker, Weatherford, Oklahoma 24 April 1937. Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

----------------. *Circa 1939 Plans, elevations, and Site Plan for the Thralls House,* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

----------------. *Various circa 1939 Advertisement for Building Material and Products.* Collection of Roy and Diane Brendel, Wayne Township, Greene County, Pennsylvania.

Van Trump, James D. "Spanish Villas: A Charming Legacy from the 1920s," Tribune-Review 13 March 1983.

NPS Form 10-900-a
(8-86)

OMB Approval No. 1024-0018

**United States Department of the Interior
National Park Service**

**National Register of Historic Places
Continuation Sheet**

*Thralls, Ernest, House
Greene County, Pennsylvania*

**Section Number   10        Page   1**

---

## *Verbal Boundary Description*

All that piece of ground situate in Wayne Township, Greene County, Pennsylvania, bounded and described as follows: Beginning at a point approximately 40 feet west of SR 218 in the northwest corner of the Ernest Thralls property; thence east 800 feet to a point approximately 20 feet north of TR 522; thence south 660 feet to a point along TR 522; thence west 402 feet to a point; thence northwest 500 feet to a point approximately 10 feet west of SR 218; thence west 150 feet to a point; thence north 190 feet to the place of the beginning. Containing nine acres more or less.

## *Boundary Justification*

This boundary includes the Thralls House and its historically associated outbuildings and immediate nine acres of ground which are connected to its architectural significance. The remaining ground is excluded from this nomination since it does not relate to the architectural development of the house and outbuildings.



Ernest Thralls
House
Wayne Township
Greene County
zone 17
Oak Forest Quad

1. 566980
   4400400

2. 566760
   4400440

3. 566840
   4400220

4. 567010
   4400240

Mapped, edited, and published by the Geological Survey

Control by USGS and USC&GS

Topography by photogrammetric methods from aerial
photographs taken 1958.    Field checked 1961

Polyconic projection.    1927 North American datum
10,000-foot grid based on Pennsylvania coordinate system,
south zone
1000-meter Universal Transverse Mercator grid ticks,
zone 17, shown in blue

Fine red dashed lines indicate selected fence and field lines where
generally visible on aerial photographs.    This information is unchecked

All wells shown are gas wells

Map photoinspected 1977
No major culture or drainage changes observed

BOUNDARY
OF
FARM AS
A
WHOLE

SMALLER POLYGON REFLECT
NF BOUNDARY - SEE SITE
PLAN

UTM GRID AND 1973 MAGNETIC NORTH
DECLINATION AT CENTER OF SHEET