## <u>EXHIBIT A</u>

## EXCERPTS OF DEPOSITION OF DIANE F. BRENDEL
## (FEBRUARY 8, 2006)

1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA
 2
   CONSOLIDATION COAL COMPANY,      )
 3                                  )
             Plaintiff,             )
 4                                  )
             vs.                    )
 5                                  )
   UNITED STATES DEPARTMENT OF      )
 6 THE INTERIOR, NATIONAL PARK      )    Civil Action
   SERVICE,                         )    No. 00-2120
 7                                  )
   and                              )
 8                                  )
   CAROL D. SCHULL, individually    )
 9 and in her capacity as the       )
   Keeper of the National Register  )
10 of Historic Places,              )
                                    )
11 and                              )
                                    )
12 ROY BRENDEL and DIANE BRENDEL,   )
                                    )
13           Defendants.            )


14


15                        - - - -


16        DEPOSITION OF:  DIANE F. BRENDEL


17                        - - - -


18
                    DATE:    February 8, 2006
19                           Wednesday, 9:30 a.m.


20
                    LOCATION:   Thorp Reed & Armstrong
21                              14th Floor
                                One Oxford Centre
22                              Pittsburgh, PA 15219


23        TAKEN BY:   Consolidation Coal Company


24
              REPORTED BY:   Keith G. Shreckengast, RPR
25                           Notary Public
                             AKF Reference No. KS92307
```

```
 1   Q.   What were those, please?  You're reading from

 2        what, the original or the supplement?

 3   A.   I don't know.  Should I start with the

 4        original?

 5   Q.   That might be better, yes.

 6   A.   The thing is some of these I don't have

 7        documents for, it was just somebody telling me

 8        something.

 9   Q.   That's what I'm asking you, are there any

10        paragraphs as to which you had no documents to

11        respond with; and if so, which one?

12             MR. HOOK:  Joe, I think you're asking

13        her to give you a legal conclusion.  In general

14        all these documents respond to your request.

15        And she's not required to tell you anything

16        specifically about whether a particular

17        document applies to a particular request.

18             MR. KATARINCIC:  She is required.  If

19        you want, I'll ask her to give me everything

20        you're producing in response to paragraph 1.

21             MR. HOOK:  And I'll tell her not to

22        respond.

23             MR. KATARINCIC:  You're serious?

24             MR. HOOK:  Yes.

25             MR. KATARINCIC:  Alright, I'll ask
```

```
 1      her.
 2   BY MR. KATARINCIC:
 3   Q.   What documents did you produce here today in
 4        response to paragraph 1, Exhibit A, of your
 5        notice?
 6             MR. HOOK:  Don't respond.
 7   Q.   Do you know, ma'am?
 8             MR. HOOK:  Don't respond to that
 9        question.
10   Q.   Do you know what documents you produced, that's
11        all, in response to paragraph 1?
12             MR. HOOK:  Don't respond to that
13        question.
14             MR. KATARINCIC:  On what basis?
15             MR. HOOK:  You're asking for mental
16        impressions and legal conclusions.  What
17        particular documents respond to paragraph 1 are
18        a result of my work product.  You're not going
19        to ask for that.
20             MR. KATARINCIC:  I will ask you the
21        same question for each and every paragraph of
22        Exhibit A to the deposition notice, which goes
23        to 21 paragraphs.
24             MR. HOOK:  Joe, just save your
25        breath, the same response to all of them.
```

14

```
 1                 MR. KATARINCIC:  Let's be courteous,
 2          Dave, please.  I will just tell you my
 3          judgment, that's a totally improper objection.
 4          You have no right to direct her so.  And she
 5          will most likely end up coming back here when
 6          we go to the Court.
 7                 MR. HOOK:  Fine.
 8   BY MR. KATARINCIC:
 9   Q.     Do you know whether any documents though picked
10          up and encompassed by Exhibit 1, Exhibit 1A
11          were held back and not produced?
12   A.     I have no idea.
13   Q.     You don't know?
14   A.     Huh-uh.
15   Q.     Are there any documents that you know as to
16          which attorney client privilege was asserted?
17   A.     I have no idea.
18   Q.     Did you have any discussions along those lines
19          with anybody?
20   A.     No.
21   Q.     Do you know if any documents were withheld on
22          the basis of, as Mr. Hook said, attorney client
23          privilege, or more specifically work product
24          privilege, which means documents of your lawyer
25          and things he prepared and helped you with and
```

```
 1       so forth?

 2   A.   I have no idea.

 3   Q.   You don't know.  Do you know who would know

 4        what was withheld because of privilege, either

 5        work product or attorney client?

 6   A.   Unless my lawyer knows.  I don't know.

 7   Q.   How about your husband, did he ever discuss

 8        that with you?

 9   A.   No, we don't think in terms like these.  And we

10        don't communicate in terms like these.  So I

11        really don't know.

12   Q.   You don't know whether or not any were withheld

13        because of privilege?

14   A.   Not that I know of.

15   Q.   Just answer my question, that's all.

16   A.   I'm trying.

17             MR. HOOK:  Joe, she has answered your

18        question.

19             MR. KATARINCIC:  I'm trying to put

20        her at ease, she's very apprehensive.

21             MR. HOOK:  You're not putting her at

22        ease, you're asking her the same question

23        twice.  If you keep it to the point, she'll be

24        much more at ease.

25             MR. KATARINCIC:  I'm very capable of
```

1       doing that.

2                    MR. HOOK:  We appreciate that.

3    BY MR. KATARINCIC:

4    Q.   Did you ever discuss with your husband -- he's

5         writing some notes here -- did you ever discuss

6         with him whether or not anything was withheld?

7    A.   No.

8    Q.   How did you and your husband go about

9         collecting all these documents that you're

10        producing here today?

11   A.   We went through file cabinets and folders and

12        boxes and picture albums and cupboards, just

13        looking for anything that pertained to whatever

14        you might have wanted.

15   Q.   And you're satisfied you produced everything

16        that you could locate?

17   A.   Yes.  We spent a long time doing it.

18   Q.   I appreciate your help on that, ma'am.

19                    MR. KATARINCIC:  Dave, how do you

20        want to identify these boxes?  You have what,

21        six, and then that one container.

22                    Would you mark an exhibit on each

23        box.

24                    MR. HOOK:  Mr. Brendel informs me

25        that each box will contain, if there's

```
 1   A.    If I can't --
 2              MR. HOOK:  You can answer in a
 3         general manner why you contacted the attorney,
 4         but you don't have to say what you said to the
 5         attorney.
 6              THE WITNESS:  I see.
 7   BY MR. KATARINCIC:
 8   Q.    Anything up to the point where you talked to
 9         Mr. Hook?  Why did you contact him?
10   A.    I wanted to find out what the ramifications of
11         all this was, and if there was anything he
12         could do to help us.
13   Q.    Did anybody contact you before you contacted
14         Mr. Hook about this to represent you in this
15         matter?
16   A.    No.
17   Q.    When did you take any action to have the
18         property in question put on the National
19         Register of Historical Structures with respect
20         to say '97 is when you got the letter, March,
21         when after that did you decide to do that?
22              MR. HOOK:  I'm going to object.
23         There's nothing that indicates that they did it
24         before or after at this point.
25              MR. KATARINCIC:  That's not a proper
```

```
 1          objection, Mr. Hook, it's a speaking objection.

 2          You're coaching the witness.  If I take you to

 3          the judge you'll be sanctioned.

 4                  MR. HOOK:  Take me to the judge.

 5                  MR. KATARINCIC:  You are going.  This

 6          is not Greene County.

 7                  MR. HOOK:  I know where we are, we're

 8          in your office here.  But Joe, you cannot ask a

 9          witness a misleading question like that.

10                  MR. KATARINCIC:  Repeat the question,

11          which he says is misleading.

12                          - - - -

13      (The record was read back by the Reporter.)

14                          - - - -

15  BY MR. KATARINCIC:

16  Q.    You have to answer that, ma'am.

17  A.    It's hard for me to answer it, because it

18          happened before that.  That's what I'm having

19          trouble answering.

20  Q.    When did it happen before you got the letter?

21  A.    I remember distinctly -- well, first of all,

22          ever since we had moved into the house and

23          people would come and tell us --

24  Q.    Ma'am, I apologize for interrupting.  When

25          before that --
```

```
 1                    MR. HOOK:  Mr. Katarincic, she's
 2          answering your question.  Don't interrupt her.
 3                    MR. KATARINCIC:  I'm not
 4          interrupting.  She goes into these --
 5                    MR. HOOK:  Yes, you are,
 6          Mr. Katarincic.  She's answering your question.
 7                    MR. KATARINCIC:  Don't point your
 8          finger at me.
 9                    MR. HOOK:  I'm pointing my finger
10          because I'd like to make a point with it.
11          Don't interrupt her.  If you do not conduct
12          yourself in a proper manner, we will simply
13          terminate the deposition.  While she's
14          speaking, you do not speak.  When she finishes,
15          you may speak.  I will do the same for you, you
16          do the same for me.  Is that okay,
17          Mr. Katarincic.
18                    MR. KATARINCIC:  Your admonitions are
19          juvenile.
20   BY MR. KATARINCIC:
21   Q.    Please answer my question.
22   A.    I just want to tell the whole story.
23   Q.    I just want to know when did you first decide
24          to --
25   A.    Then let me tell my story.
```

29

```
 1   Q.   Give me your whole big story, go ahead.

 2   A.   When we first moved in, we've had the people

 3        stopping and telling us about their

 4        grandfathers and all that.  Then we had

 5        tourists, people who would come just to look at

 6        the house and drive by.  So we started thinking

 7        we've got something really special here.  Then

 8        in 1995 I met a woman who came to my brother's

 9        shop at the Urban Flower Farm, and she knew my

10        sister-in-law very well.  And they started

11        telling me about how this woman was putting her

12        house on the National Historic Record.  And she

13        said to the woman my sister-in-law has a

14        beautiful house.  And the woman knew the house.

15        And she said to me you ought to think about

16        putting it on the National Historic Record.

17        And I talked to Roy about it.  And we said

18        well, heck, we don't even know what all is

19        involved.  Well, if we get the papers together,

20        so we started gathering papers in 1996.  Then

21        my daughter got married, everything was up in

22        the air for a year.  And it was 1997, and

23        that's when we decided to go ahead with our

24        plans to do it.

25   Q.   When did you first -- do you have any writing,
```

```
 1          first I kind of dismissed it.  But then I
 2          thought well, gee, why not.  There's a lot of
 3          historical places in Greene County.  It would
 4          be nice to be designated as a national historic
 5          treasure.  So I talked to my husband about it.
 6          We started doing a little bit of research with
 7          the Major's boxes of correspondence, and
 8          original drawings and maps, started putting
 9          things together.  And then I called this same
10          woman and said can you recommend somebody to
11          help us do this process.
12                    MR. HOOK:  Let's stop here a minute,
13          Joe.  While you're questioning Mrs. Brendel,
14          your associate, Lauren Rushak, is taking
15          materials from various boxes out of various
16          files and bringing them over to you outside of
17          the file.  I don't mind her getting the files
18          out, but I would request that she not remove
19          them from a file and bring them to you.  We're
20          eventually going to have a bunch of materials
21          and not know where they're going back to.
22                    MR. KATARINCIC:  I don't know what
23          the problem is.
24                    MR. HOOK:  The problem is I don't
25          want them mixed up.  Can we agree that that
```

```
1    A.    Exactly.

2    Q.    And that was after, though, you got the notice

3          from the coal company?

4    A.    Uh-huh.

5    Q.    To what extent did the decision of the coal

6          company to undermine your property have on your

7          deciding to retain an expert?

8    A.    I didn't see it as being related at all.

9    Q.    You did that completely independently?

10   A.    Exactly.

11   Q.    And you waited from '95 until '97 or '98 --

12   A.    As I say --

13   Q.    May I finish, please?  You waited from '95 to

14         '98 to make that inquiry of an expert?

15   A.    Yes.

16   Q.    And you're saying that the decision of Consol

17         to undermine your property had no bearing on

18         your --

19              MR. HOOK:  Asked and answered.  You

20         already asked her that.

21              MR. KATARINCIC:  I haven't even asked

22         the question yet.

23              MR. HOOK:  You asked the question.

24         You just asked it two minutes ago.  We can go

25         back through the record if you'd like.
```

44

```
 1        Register?
 2    A.   Yes, we had done all the research.
 3    Q.   So the answer is yes to my question?
 4    A.   Yes.
 5    Q.   Well, let me tell you, between March of '97
 6         when you received this letter, until
 7         Mr. Jenkins came to your structure, your house,
 8         and talked to you, did you write to Consol, or
 9         call Consol, say gentlemen, I'm thinking of
10         putting this house on the National Register,
11         you should not undermine here?
12    A.   No.
13    Q.   You did not alert them to the fact that you
14         were putting this on the National Register?
15    A.   No.
16    Q.   Did you tell Mr. Jenkins that?
17    A.   No.
18    Q.   And Mr. Jenkins was in in the spring, I believe
19         you said, of 2000?
20    A.   If I recall properly.
21    Q.   Pardon?
22    A.   If I'm recalling properly, yes.
23    Q.   That's your best recollection now?
24    A.   Yes.
25    Q.   Is there any reason why you didn't tell
```

1        Mr. Jenkins that we're thinking of putting this

2        property on the National Register, it should be

3        on the Register and you should not mine?

4              MR. HOOK:  Joe, I'm going to object.

5        When she met with Mr. Jenkins in 2000, it was

6        on the Registry.  So she couldn't logically

7        tell him she's thinking of putting the house on

8        the Registry at a meeting when it's --

9              MR. KATARINCIC:  Alright, my --

10             MR. HOOK:  Don't interrupt me.  --

11       when it's already on the Registry.  Would you

12       not interrupt me, please?  Can we agree to that

13       ground rule?

14             MR. KATARINCIC:  Please don't be so

15       foolish.  Say what you're going to say.

16             MR. HOOK:  Do not interrupt me.

17             MR. KATARINCIC:  I won't listen to

18       you.

19             MR. HOOK:  I don't care if you listen

20       to me or not, just don't interrupt me.  I want

21       my statements to be on the record without you

22       trying to talk over me.  That's common courtesy

23       in the legal practice, and I think you should

24       know about that by now.

25             MR. KATARINCIC:  Do you have anything

46

1       else to say?

2                    MR. HOOK:  No.

3                    MR. KATARINCIC:  Alright, sir.

4    BY MR. KATARINCIC:

5    Q.    I apologize for apparently mixing up the dates.

6          I didn't know that.  When was this house

7          actually officially put on the National

8          Register?

9    A.    In May of 1999.

10   Q.    When did you formally submit a request to have

11         this property put on the National Register?

12   A.    I don't recall the date.

13   Q.    Approximate, ma'am?

14   A.    I believe it was six months prior to that, I

15         believe, but I'm not sure.

16   Q.    You indicated May of '99 the house was

17         officially designated.  You think approximately

18         six months before May of '99 you sent a written

19         request to have it so designated?

20   A.    Yes.

21   Q.    Is that request here in the files, ma'am?

22   A.    It should be.

23   Q.    Who prepared that document?

24   A.    Clinton Piper.

25   Q.    Did he do that after the report was prepared by

49

```
 1          attempted to build homes that were reminiscent
 2          of the places to which they had vacationed.
 3    Q.    What do you understand this Spanish Revival
 4          architecture is?
 5    A.    It resembled original Spanish architecture
 6          which these people had seen in their travels.
 7          And they added their own little touches to it
 8          to make it a little more Americanized.
 9    Q.    I'm asking you not what they said, what do you
10          understand?
11    A.    That's my understanding of what it is.
12    Q.    Please, ma'am, what I would like -- not what
13          you mean of what other people said, what is
14          your understanding, please?
15                   MR. HOOK:  She just told you.
16                   MR. KATARINCIC:  No, she didn't.
17                   MR. HOOK:  She just told you what she
18          understood it to be.  Don't argue with her.
19          That's her answer, move on.
20    BY MR. KATARINCIC:
21    Q.    I want to ask you about this Spanish Revival.
22          What are the peculiar features of Spanish
23          Revival architecture?
24    A.    Patios.
25    Q.    Patios?
```

52

```
 1   A.   I had not the actual tree, but from the palm

 2        tree family, that looked exotic.

 3   Q.   So it's the plantings such as palm trees that

 4        are one of the factors in deciding that the

 5        veranda is of a Spanish Revival style?

 6   A.   Those are just my ideas.  I have not been

 7        schooled in this.

 8   Q.   I understand.  I asked you what was your

 9        understanding?

10   A.   Yes.

11   Q.   What is your answer to my question?

12   A.   I just got done answering your question.

13             MR. KATARINCIC:  Read it back,

14        please.

15                      - - - -

16        (The record was read back by the Reporter.)

17                      - - - -

18   A.   That's probably just my idea of what --

19   Q.   How about the intricate ironwork, I believe you

20        said, explain that, please.

21   A.   What do you want me to explain?

22   Q.   What is intricate about it?

23             MR. HOOK:  What is the relevance of

24        these questions, Mr. Katarincic?

25             MR. KATARINCIC:  I don't have to
```

1           explain it to you.

2                    MR. HOOK:  Then I'm going to instruct

3           her not to answer.  These are not eliciting

4           facts that are in any way relevant to this

5           case.  This house was put on the Historic

6           Register based on documents prepared by Clinton

7           Piper.  This person is not trying to justify

8           with her own background the listing of the

9           house on the Historic Register.  For you to

10          keep asking these inane questions, without any

11          hint at relevance, is simply unreasonable,

12          burdensome, and a total waste of her time.  So

13          move on.

14                   MR. KATARINCIC:  I'm not moving on.

15                   MR. HOOK:  Yes, you are.

16     BY MR. KATARINCIC:

17     Q.   Tell me what is the intricate ironwork that you

18          said is part of the decision or determination

19          that a structure is of Spanish Revival?

20                   MR. HOOK:  Don't answer.

21     Q.   But the idea that this was a Spanish Revival

22          structure was the basis for your going to have

23          it designated, was it not?

24                   MR. HOOK:  Don't answer.

25     Q.   What was your basis for having it designated?

```
 1                    MR. HOOK:  She told you why.  She's
 2           answered that question, Mr. Katarincic, if you
 3           would pay attention.  She answered it twice.
 4           She felt it was a historic structure.  She was
 5           advised it was a historic structure by
 6           Mrs. Williams.  And she hired somebody to
 7           determine whether it was.  And that's why it
 8           was placed, because Mr. Clinton Piper did his
 9           investigation.  You've been told all of this in
10           detail earlier.
11                    MR. KATARINCIC:  You understand
12           you're just coaching this witness?
13                    MR. HOOK:  No, I'm not coaching this
14           witness.  I'm repeating back to you her
15           testimony, which you apparently refuse to
16           acknowledge.
17                    MR. KATARINCIC:  You're coaching this
18           witness.  This is not permitted under the
19           Federal Rules.
20   BY MR. KATARINCIC:
21   Q.    Is there any intricate ironwork on your
22         structure?
23   A.    Yes.
24   Q.    And where is it located?
25   A.    There's an intricate iron railing around the
```

```
 1              kitchen porch.  There's an intricate iron
 2              railing around the side porch.  There's an iron
 3              railing around the back veranda.  There's an
 4              iron railing around the veranda by the bedroom.
 5              There's an iron gate actually inside the house
 6              leading from one room to another.  There is an
 7              actual cutout in the stairway with an iron gate
 8              through which you can see into the next
 9              hallway.
10    Q.        And what, aside from the number of ironwork or
11              iron railings, is there anything about your
12              characteristics that's peculiar to Spanish
13              Revival?
14    A.        I don't know.
15    Q.        So you're basically saying a large number of
16              them is indicative of Spanish Revival?
17    A.        I'm saying I don't know if it's indicative of a
18              Spanish Revival.  I leave that to the experts.
19    Q.        I know Mr. Hook suggested you should say that,
20              but is that your real answer?
21    A.        He's not suggested anything to me.  I'm trying
22              to tell you about my intricate iron, and you
23              keep asking me about it.  I don't know what
24              else to say about intricate iron.
25    Q.        That's fine.  If that's all you know, that's
```

1        fine.  Let's go to the -- you said columns.

2        Are there columns?

3    A.  Yes.

4    Q.  What was there about these columns that

5        supported or related to a Spanish Revival type

6        structure?

7    A.  Again --

8            MR. HOOK:  Mr. Katarincic, stop.  She

9        explained to you that columns to her

10       understanding are one of the elements of

11       Spanish Revival architecture.  You've just

12       asked her that question again.

13   Q.  Will you describe these columns to us, please?

14   A.  They're just columns.

15   Q.  How high, how large, what is peculiar about

16       them?

17   A.  They go from the patio, they hold up, actually

18       support one of the bedrooms.  And they go along

19       the entire porch.

20   Q.  These are concrete?

21   A.  Concrete.  No, not concrete.  They're concrete

22       and steel.

23   Q.  So they're hollow in the center?

24   A.  I don't know.

25   Q.  You can see the steel when you look at the

57

1     column?

2  A.    They're painted.  I don't know what they are.

3  Q.    You said they were steel.

4  A.    Well, I'm assuming they're steel.

5           MR. HOOK:  What's the relevance of

6     this?  You could go out there and look at this

7     house.  This is harassing this witness.  If you

8     don't want to ask her stuff that's relevant,

9     we're going to end this thing.

10          MR. KATARINCIC:  It's your decision

11    what to do.

12          MR. HOOK:  Move it along.

13          MR. KATARINCIC:  I'll move it as I

14    see appropriate.  If you want to hustle

15    business in Greene County, put a sign up, don't

16    do it in here.

17          MR. HOOK:  What kind of comment is

18    that, Mr. Katarincic?

19  BY MR. KATARINCIC:

20  Q.    Will you describe these columns to us as best

21    you can?

22  A.    They're white columns.  I know that they have a

23    cement base.  What the actual columns are made

24    of, I don't know.

25  Q.    How many of these columns are there?

62

```
 1    Q.    Are they Spanish Revival?
 2    A.    I don't know what they are.  I just know that
 3          they're part of the Register.
 4    Q.    So every building, I take it, on the land
 5          that's in question here is registered, is a
 6          historic landmark?
 7    A.    Yes.
 8    Q.    Can you tell me what there is about the pigpen
 9          that would make it part of the National
10          Register?
11    A.    I have no idea.
12    Q.    Do you know?
13                MR. HOOK:  She just said she has no
14          idea.
15    A.    I have no idea.
16    Q.    How about the horse barn?
17    A.    No idea.
18    Q.    Did you ask that they be put on?
19    A.    No, I did not.  But I do remember Mr. Piper
20          saying to me that the National Register tended
21          to put compounds on.  Like if it was a working
22          farm, and it was historical, the house was
23          historical, then all the buildings were put on.
24          That was my understanding at the time.  So I
25          never questioned it, and never thought about
```

67

```
 1   A.   No.

 2   Q.   Was the fact that the structure here and the

 3        land was to be undermined, was that something

 4        that was relayed to either the Pennsylvania or

 5        the Federal officials in connection with your

 6        application for designation?

 7   A.   One had nothing to do with the other.

 8   Q.   I didn't ask you that.  I asked you did you

 9        tell the Pennsylvania officials or the Federal

10        officials in connection with your application

11        for designation that the land was to be

12        undermined?

13   A.   I did not, no.

14   Q.   Do you know if they were told that?

15   A.   I have no idea.

16   Q.   You say it's unrelated?

17   A.   To me it's unrelated.

18   Q.   Did you examine the application made to the

19        Pennsylvania Historical Resource -- I'm sorry,

20        to the Pennsylvania Historical and Museum

21        Commission on the Bureau of Historical

22        Preservation as it was made for the structure?

23   A.   Did I look at the what?

24   Q.   The application to the Pennsylvania --

25   A.   Yes.
```

```
 1    Q.    Do you remember telling it, telling the

 2          Pennsylvania Commission, that this land was

 3          threatened by undermining?

 4                MR. HOOK:  She's already answered

 5          that, that she did not to her knowledge.

 6    Q.    Go ahead, ma'am.

 7                MR. HOOK:  That's her answer.  She

 8          doesn't have to answer it twice, Joe.

 9    Q.    Go ahead, ma'am.

10                MR. HOOK:  Don't answer.  You've

11          answered.

12    Q.    I'm asking you was the Pennsylvania Historical

13          Museum Commission advised in writing at the

14          time of the application for designation that

15          the property was threatened with undermining?

16    A.    I really don't remember.

17    Q.    Did you examine it before it was submitted?

18    A.    I'm sure that I did.

19    Q.    You previously mentioned a meeting with

20          Mr. Jenkins, if you recall that?

21    A.    Yes.

22    Q.    Now just to go back up a little bit, at that

23          time Mr. Jenkins discussed with you the fact

24          that Consol was going to undermine the

25          property?
```

1    Q.    So your answer is no?

2    A.    No.

3    Q.    You never talked to anybody about it?

4    A.    No.

5    Q.    Do you know if that view, in determining how

6          much should be paid to your client, somebody on

7          your behalf advanced, said look, it will cost

8          millions and millions to go around the Brendel

9          property, so we do want that money, rather than

10         you spending it going around that property, you

11         give us the money you save?

12              MR. HOOK:  Do that again.  That's the

13         worst question I ever heard.  Try to make it a

14         nice question that anybody could understand.

15              MR. KATARINCIC:  You must live in a

16         very pure world.

17   BY MR. KATARINCIC:

18   Q.    Do you remember whether anybody discussed on

19         your behalf how much it would cost to mine

20         around your property?

21   A.    No.

22   Q.    Never heard of that?

23   A.    No.

24   Q.    Did you ever hear of that discussed before

25         today?

76

```
 1   Q.   Concrete repointing, masonry repointing?

 2   A.   No.

 3   Q.   Painting?

 4   A.   Painting.

 5   Q.   Any other kind of repair to the chimneys or

 6        roof or anything?

 7   A.   Not that I can recall.

 8   Q.   So from '71 to end of '97, the only repair work

 9        that you recall are these gutters and

10        downspouts and periodic painting, that's all?

11   A.   Yes.

12   Q.   Do you have any record to show what repair work

13        was done on the Thrall House from the time you

14        purchased it in '71 until the end of '97?

15   A.   I don't think I still have any records like

16        that.

17   Q.   Well, the only work you had done, you say, is

18        gutter and downspouts and painting?

19   A.   That's all I can remember.

20   Q.   Do you have records on that?

21   A.   No, because that was years ago.

22   Q.   I don't mean to belabor the point, and I

23        apologize, but in 26 years this is the only

24        thing you recall having been done, gutters,

25        downspouts and painting in terms of maintenance
```

```
 1          or repair of the house?
 2                    MR. HOOK:  Roof.
 3                    MR. KATARINCIC:  That's your problem.
 4                    MR. HOOK:  She mentioned roof earlier
 5          on, and you left it out.  It's not a problem,
 6          you're being inaccurate.
 7                    MR. KATARINCIC:  Throw in the roof,
 8          too.  You may need some Xanax, Mr. Hook.
 9   A.     Roof, too.
10   BY MR. KATARINCIC:
11   Q.     Roof, downspouts and gutters, and painting in
12          that 26 year period is the only thing you
13          recall having done to the structure?
14   A.     We put in a new tub.
15   Q.     New bathtub, okay.  What architectural style
16          was that?
17   A.     I don't know what kind of architectural style.
18   Q.     Spanish Revival?
19                    MR. HOOK:  She just said she doesn't
20          know.
21   A.     I don't know what you would call it.
22   Q.     Anything else besides the bathtub?
23   A.     I can't think of anything else.
24   Q.     Was there any work done with the laundry room
25          in that house in that 26 year period?
```

88

```
 1          preparing information that was put into this
 2          document 12A, which is a Second Amended Answer,
 3          Counterclaim and Third Party Complaint?
 4   A.     I have no idea.
 5   Q.     No idea?
 6   A.     See, to you this is normal stuff, to me this
 7          is --
 8   Q.     What I asked you was did you meet with anybody
 9          to discuss facts that should or shouldn't be
10          placed into this document, that was all?
11   A.     I don't think so.  If I did see it, I don't
12          remember.
13                MR. KATARINCIC:  We're going to go
14          through this Complaint to verify your
15          understanding of certain facts.  So we'll take
16          a break for lunch.  I suggest you look at that,
17          so we can go more quickly.  We'll break for
18          about an hour.
19                MR. HOOK:  On behalf of Mr. Brendel,
20          there have been brought to this deposition, in
21          response to the request for documents at the
22          deposition seven boxes of documents from the
23          Brendels' responses.  We have asked that these
24          boxes not be delved into in our absence.  We're
25          just beginning to take a break for lunch.  Some
```

1       Joe.

2                   MR. KATARINCIC:  Do I understand

3       you're the custodian of these exhibits?

4                   THE REPORTER:  That's my

5       understanding.

6                   MR. KATARINCIC:  As the custodian,

7       you have no right to take them.

8                   MR. HOOK:  I gave you the ground

9       rules when I brought them up here.  I told you

10      exactly what was going to be done.  Now you're

11      trying to change that.

12                  MR. KATARINCIC:  One box you said.

13                  MR. HOOK:  No, I said everything that

14      we brought up was containing things that are

15      unique, personal to the Brendels, and could not

16      be duplicated.

17                  MR. KATARINCIC:  Can't be duplicated?

18      How are you going to duplicate them?

19                  MR. HOOK:  The originals cannot be

20      duplicated.  These are original photographs

21      from their family albums that cannot be

22      duplicated if they're lost.

23                  MR. KATARINCIC:  We'll call the

24      Court.

25   BY MR. KATARINCIC:

1    Q.    I was going through my notes here.  Did you

2          indicate to me that you did not contemplate

3          ever replacing the Thrall House, you didn't

4          want to build another house?

5    A.    No.

6    Q.    You didn't want to replace this at all?

7    A.    No.

8    Q.    That was never discussed?

9    A.    No.

10   Q.    I was looking, if I can find it hurriedly --

11         Did you see, Mr. Hook sent a letter on December

12         8, 2005 to the Pennsylvania Department of

13         District Mining Operations, Mr. Plassio?

14              MR. HOOK:  Don't answer it until he

15         shows you the letter.

16              MR. KATARINCIC:  I haven't asked a

17         question yet.

18   BY MR. KATARINCIC:

19   Q.    In here he says the following --

20              MR. HOOK:  Do you have a copy to show

21         her?

22              MR. KATARINCIC:  That's your letter.

23              MR. HOOK:  Show her the letter.

24              MR. KATARINCIC:  I will show her the

25         letter, if she wants to sit over here.  I'll

94

```
 1        give it to her when I'm done reading it.
 2   BY MR. KATARINCIC:
 3   Q.   This is on the bottom of page 3, page 3 of a
 4        letter of December 8, '05.  Last paragraph:  A
 5        further point should be made, there has been
 6        some discussion that the Brendels may replace
 7        the Ernest Thralls house and the Ernest Thralls
 8        tenant house rather than repair them.  Has
 9        there been such discussions?
10             MR. HOOK:  Show her the letter.
11        You've taken something out of context.  Show
12        her the entire document before you ask the
13        question.
14   Q.   Have you ever had such discussions?
15             MR. HOOK:  Don't answer the question
16        until he shows you the document.
17   Q.   Have you ever had such discussions?
18             MR. HOOK:  Don't answer the question
19        until he shows you the document.
20   Q.   Do I understand you say there have been no such
21        discussions?
22             MR. HOOK:  Don't answer the question
23        until you are show that document that he's
24        reading from.
25   Q.   Were there ever such discussions?
```

95

```
 1                   MR. HOOK:  Same instruction.
 2                   MR. KATARINCIC:  Will you note that
 3          to be reproduced immediately, that part of the
 4          transcript.
 5   BY MR. KATARINCIC:
 6   Q.     Forget the document, have you ever heard that
 7          somebody was representing on your behalf to the
 8          government of Pennsylvania that you were
 9          contemplating replacing this house?
10   A.     No.
11   Q.     You never authorized anybody to say that?
12   A.     No.
13   Q.     So if this is a false statement to the state,
14          you're not responsible for it?
15                   MR. HOOK:  Do not answer it.  He has
16          not shown you that document.  It's quite
17          outrageous for him to take a sentence out of
18          context and trying to ask you a question about
19          it.  Just don't answer it.
20   Q.     Are you aware whether anybody ever represented
21          to the state that you and your husband,
22          Mr. Brendel, were contemplating replacing the
23          entire Thrall House?
24   A.     No.
25   Q.     You would not have authorized anybody to say
```

97

```
 1   A.    No.

 2   Q.    Mr. Hook did?

 3   A.    It would be something I would assume.

 4   Q.    Well, when he was introduced to you, what were

 5         you told?

 6   A.    I was told this is a lawyer who is going to

 7         help us.

 8   Q.    And who told you that?

 9   A.    Mr. Hook.

10   Q.    Let's start going through this document, then,

11         please.  Go to page I believe it's 5.  There's

12         a paragraph number 31.  Do you see that?

13   A.    Yes.

14   Q.    It says there:  The plaintiff had actual notice

15         and commented and participated in the Thralls

16         historic property listing process.  Do you know

17         that the plaintiff, Consolidation Coal, had

18         knowledge of the listing process?

19   A.    I was told that.

20   Q.    By whom, ma'am?

21   A.    By Mr. Nixon, I believe.

22   Q.    Mr. Nixon.  Anybody else?

23   A.    I can't think of anyone else.

24   Q.    Did he tell you the basis for knowing that, how

25         he got to know it?
```

98

```
 1   A.   No.  I accepted his word.

 2   Q.   Sure, I understand.  You say and participated

 3        in the historic property listing process.  Do

 4        you know that's true?

 5   A.   I just know what I was told by my lawyer.

 6   Q.   Mr. Nixon?

 7   A.   Yes.

 8   Q.   So the averments of paragraph 31 concerning

 9        actual notice, commented and participated,

10        those statements, those facts you got from

11        Mr. Nixon?

12   A.   I do believe, yes.

13   Q.   Anybody else that you can think of?

14             MR. HOOK:  Joe, you're repeating

15        yourself.

16   Q.   Anybody else?

17             MR. HOOK:  Move it along.  You've

18        asked that question twice.

19             MR. KATARINCIC:  I didn't ask anybody

20        else.

21             MR. HOOK:  Yes, you did ask anybody

22        else.  Go back to where he asked did anybody

23        else tell you that.

24                      - - - -

25        (The record was read back by the Reporter.)
```

99

```
1                       - - - -
2                  MR. KATARINCIC:  There's your
3        question.
4                  MR. HOOK:  Don't ask it again.  I'm
5        not going to put up with this repeated picayune
6        question, question, question on the same thing.
7        Move it along.
8                  MR. KATARINCIC:  Would you repeat the
9        question to the witness?
10                 MR. HOOK:  She's not answering it
11       again.
12                 MR. KATARINCIC:  I'm just building a
13       record.
14                 MR. HOOK:  You're repeating the
15       record.
16                 MR. KATARINCIC:  To show the judge
17       your conduct.  Read the question, and indicate
18       in the record what question you repeated to
19       her.
20                 THE REPORTER:  "Question:  So the
21       averments of paragraph 31 concerning actual
22       notice, commented and participated, those
23       statements, those facts you got from Mr. Nixon?
24       Answer:  I do believe, yes.  Question:  Anybody
25       else that you can think of?"
```

100

```
 1                  MR. KATARINCIC:  She's not going to
 2          answer it?
 3                  MR. HOOK:  She's already answered it.
 4                  MR. KATARINCIC:  For that reason,
 5          she's not going to answer it?
 6                  MR. HOOK:  Why should she answer it
 7          twice?
 8                  MR. KATARINCIC:  Okay, now you've
 9          stated your position.  That's all I wanted on
10          the record.
11  BY MR. KATARINCIC:
12  Q.      Do you have any documents, any writings in your
13          possession, or have you ever seen any
14          documents, any kind of a writing that support
15          the allegations of paragraph 31, that
16          Consolidation Coal had actual notice and
17          commented and participated in the Thralls
18          historic property listing?
19  A.      No.
20  Q.      Has anyone shown you anything of that sort?
21  A.      No.
22  Q.      That would include Mr. Nixon?
23  A.      Yes.
24  Q.      Paragraph 39, page 6, your lawyers aver, quote,
25          paragraph 39, quote:  At all times relevant and
```

110

```
 1          Register, Consol would still be required to
 2          follow the plan, because the house remains
 3          eligible for a listing, he said.  Is that a
 4          false statement?
 5   A.     I have no idea.
 6   Q.     You understand that's his opinion of the coal
 7          company, isn't it?
 8                  MR. HOOK:  Same objection to the
 9          extent you're asking the witness to make a
10          legal conclusion, it's objected to.
11   Q.     Go ahead.
12   A.     I answered it, I have no idea.
13   Q.     So you don't know whether it's true or false?
14   A.     No, I don't.
15   Q.     But from your perspective this is an opinion of
16          the coal company?
17   A.     I'm assuming it is.
18   Q.     You don't know otherwise, do you?
19   A.     No.
20   Q.     Go to number 57.  Hoffman caused or allowed a
21          letter to be wrote to the editor of the
22          Post-Gazette regarding the Brendels and their
23          home, the historical Thralls House titled
24          Readers Should Know the Rest of the Story
25          Regarding the Brendel Property to be published
```

111

```
 1          with false and misleading statements in print,

 2          and on the whole worldwide web of the internet

 3          by the Post-Gazette.  He said that this case is

 4          about money.  Is that true, it's about money to

 5          repair your house?

 6   A.     I don't know if that's in context or not.

 7   Q.     Well, isn't that what you're basically

 8          contending here, your house should be repaired

 9          and you want damages in the form of money, or

10          the damage from the mining?

11   A.     As I recall that article, though, that is taken

12          out of context.

13   Q.     Well, I don't know what you mean by context,

14          but is this not your whole case, is being

15          adequately compensated for the damage?

16               MR. HOOK:  Objection, you're asking

17          her about this phrase, which says this case is

18          about money.  You're trying to take it out of

19          context and twist the characteristic of that

20          article.

21               MR. KATARINCIC:  Mr. Hook, I don't

22          know how long you've been at the Bar, but

23          everything you've done in that last statement

24          is contrary to the Federal Rules, to the spirit

25          and the written Federal Rules.
```

```
 1                    MR. HOOK:  I don't believe so,

 2          Mr. Katarincic.

 3                    MR. KATARINCIC:  Well, I do.

 4                    MR. HOOK:  When you twist a factual

 5          statement and take it out of context, that's

 6          improper questioning of a witness.

 7   BY MR. KATARINCIC:

 8   Q.    Then let me ask you, is it true --

 9                    MR. HOOK:  Perhaps you should show

10          her the article and let it be read in context.

11                    MR. KATARINCIC:  She has the

12          Complaint in front of her.

13                    MR. HOOK:  The article.

14                    MR. KATARINCIC:  It's your article,

15          you prepared the Complaint.

16                    MR. HOOK:  Don't try to take it out

17          of context.  I've seen Mrs. Rushak looking at

18          the article over there.

19   BY MR. KATARINCIC:

20   Q.    Is this statement true, this case is about

21          money?  If not, what else is it about?

22   A.    That sentence is taken out of context.  I know

23          this because I just recently reread that

24          article.  And Mr. Hoffman made it appear that

25          we were making this case a case for money,
```

116

```
 1        sixty-some thousand?

 2   A.   Roy and I have paid some of it.  And Mr. Hook

 3        has paid some of it.

 4   Q.   How much have you paid, you and Mr. Brendel?

 5   A.   We've paid about 18,000.

 6   Q.   Did you say a total of 60 originally?

 7   A.   Approximately.

 8   Q.   So Mr. Hook just paid 42,000; is that correct?

 9   A.   Uh-huh, yes.

10   Q.   So when you say $3 million, that's mostly cost

11        of repairing structures, and for these expert

12        costs?

13   A.   And for other incidentals.  For example at that

14        time we still had the wetlands that had to be

15        repaired, that we assumed would be a couple

16        hundred thousand dollars.  And we didn't know

17        of any other incidentals that might come up

18        along the way.  For example, the mold

19        mitigation that needs to be done, which is

20        close to another $50,000.

21   Q.   You're talking here about putting a price tag

22        on repairing the structure, not about clearing

23        up mold?

24   A.   You can't repair --

25                  MR. HOOK:  Objection.
```

119

```
 1                    MR. KATARINCIC:  I don't want to know
 2          your arrangements.
 3                    MR. HOOK:  Yes, you do.
 4                    MR. KATARINCIC:  Read the question.
 5          Don't mischaracterize it just to give
 6          legitimacy to your phony objection.  Read the
 7          question.
 8                             - - - -
 9          (The record was read back by the Reporter.)
10                             - - - -
11                    MR. HOOK:  That is not an appropriate
12          question.  She won't answer it.
13   Q.    Go ahead.
14                    MR. HOOK:  No, don't answer it.
15          Don't ask her again.
16                    MR. KATARINCIC:  I will ask again.  I
17          will ask anything I want to.
18                    MR. HOOK:  This is going to stop,
19          Joe.  We'll stop and walk out of here.
20                    MR. KATARINCIC:  Do whatever you
21          wish.  I remind you, you're not in Greene
22          County.
23                    MR. HOOK:  I know where I am, Joe.
24                    MR. KATARINCIC:  I'm doubtful about
25          that.
```

1    BY MR. KATARINCIC:

2    Q.    In the $3 million that is quoted here in the

3          newspaper, and which you say is the number,

4          within that you are including the legal fees to

5          be paid?

6                 MR. HOOK:  Asked and answered.  Do

7          not answer it again.

8    Q.    Is that true?

9                 MR. HOOK:  Asked and answered.  Do

10         not answer it again.

11   Q.    Did you tell Mr. Hoffman or anybody else that

12         the $3 million number included the legal fees

13         for Mr. Hook?

14   A.    No.

15   Q.    You kept that to yourself?

16   A.    It wasn't part of my experience at the time.

17   Q.    But it was included in your number?

18                MR. HOOK:  She's answered that

19         question.  Don't answer it again.

20   Q.    If it wasn't part of your experience at the

21         time, why did you come about including it?

22                MR. HOOK:  Move on, Mr. Katarincic.

23   Q.    Answer me, please.

24                MR. HOOK:  Don't answer it.

25                MR. KATARINCIC:  Your basis, sir?

1               MR. HOOK:  You're asking her about

2          her arrangement between herself and her

3          attorney.  You've asked these questions a dozen

4          times.  They're all improper.  Move on.

5               MR. KATARINCIC:  I don't want to know

6          about your arrangements.

7               MR. HOOK:  You just heard my

8          response.

9               MR. KATARINCIC:  I just asked her in

10         the $3 million number if she included the legal

11         fees you thought you'd have to pay Hook.

12              MR. HOOK:  She's answered that

13         question.  She's not answering it again.  Don't

14         ask it again.  If you ask it one more time,

15         we're out of here.

16    BY MR. KATARINCIC:

17    Q.   What all made up the $3 million?

18              MR. HOOK:  She's answered that.

19              MR. KATARINCIC:  No, she has not.

20              MR. HOOK:  Yes, she has.

21    BY MR. KATARINCIC:

22    Q.   Would you please answer, ma'am?

23              MR. HOOK:  Don't answer.

24    Q.   Break down the $3 million and what made it up.

25              MR. HOOK:  Don't answer.  She's

122

1         already broken it down to you.

2    Q.   Tell me how many dollars for this, how many

3         dollars for that, ma'am.

4              MR. HOOK:  She's already answered it.

5         Don't answer it again.

6              MR. KATARINCIC:  She's not answered

7         it.

8              MR. HOOK:  Yes, she has.

9    BY MR. KATARINCIC:

10   Q.   Break down the numbers that made up the

11        $3 million.

12             MR. HOOK:  She broke it down.  Don't

13        answer.

14   Q.   The only number I recall getting from you, if

15        I'm wrong, tell me, you said $1.8 million?

16             MR. HOOK:  Don't answer.  You gave

17        him a series of numbers, and you don't have to

18        go through them again.

19   Q.   You said 60,000.  That's how much you told me

20        made up the $3 million.

21             MR. HOOK:  Mr. Katarincic, I'm

22        running out of patience here.  She's not

23        answering these questions any further, period.

24        One more question in this area, we're out of

25        here.

```
 1                    MR. KATARINCIC:  It's irrelevant to
 2          me what your patience level is.
 3                    MR. HOOK:  I'm telling you this to
 4          see if you want us to continue with this
 5          deposition or you want us to leave at this
 6          point.
 7                    MR. KATARINCIC:  I want you to
 8          continue, and I have a right to ask the
 9          questions.
10                    MR. HOOK:  Not repetitively.  She's
11          finished on that subject matter.
12   BY MR. KATARINCIC:
13   Q.    I just want to know what made up the
14          $3 million.
15                    MR. HOOK:  We're done.  On the
16          record, I'd like somebody sent up to pick up
17          these boxes.
18                    MR. KATARINCIC:  There's nobody to be
19          sent up.  Those three boxes are in the custody
20          of the court, and you have no right to take
21          them.  Mr. Reporter, do you understand that?
22          Are you asking that they be kept in your
23          custody?
24                    THE REPORTER:  It's my understanding
25          I'm the custodian of the records.
```

124

1          MR. HOOK:  On the record, we had an

2     agreement when these were brought up here that

3     they would be made available for their

4     examination, we would return them to our

5     custody, we would make copies of what they

6     wanted to evaluate.  As we've stated before,

7     there are original, unique family documents

8     throughout all of these boxes.  They cannot be

9     replaced.  We set the ground rules, and

10    Mr. Katarincic has unilaterally attempted to

11    change those ground rules.  We are returning

12    these to my office.  They will be available

13    there for Mr. Katarincic to look at.

14          MR. KATARINCIC:  We'll see you here

15    tomorrow.  Mr. Brendel is to go tomorrow.  He's

16    scheduled for deposition.

17          MR. HOOK:  He's not coming back

18    tomorrow until we arrive at some appropriate

19    ground rules.

20          MR. KATARINCIC:  Ground rules on

21    what?

22          MR. HOOK:  Just this right here,

23    you're making us carry these out of here.

24          MR. KATARINCIC:  Leave them here

25    overnight.

125

```
 1              MR. HOOK:  I'm not going to leave
 2      here.
 3              MR. KATARINCIC:  You don't trust the
 4      reporter?
 5              MR. HOOK:  I told you beforehand they
 6      were not to be left here.  I told you that
 7      before they were brought up here.  You
 8      obviously have no comprehension of your word.
 9      And they are leaving, and they're not coming
10      back until we have some kind of agreement on
11      how they're to be handled.  The fact that
12      you're making us carry them out of here to me
13      reflects you in its entirety, Mr. Katarincic.
14              MR. KATARINCIC:  Because they're to
15      remain here.
16              MR. HOOK:  You know perfectly well
17      what the original discussion was.
18              MR. KATARINCIC:  Are they too heavy
19      for you to carry?
20              MR. HOOK:  Yes, exactly, I happen to
21      have a ruptured disc in my neck.
22              MR. KATARINCIC:  Well, then if it's
23      so bad, we'll get you somebody.
24              MR. HOOK:  I appreciate your
25      consideration.
```

126

```
 1                    MR. KATARINCIC:  We'll look for you
 2          tomorrow again.
 3                    MR. HOOK:  We won't be here,
 4          Mr. Katarincic.
 5                    MR. KATARINCIC:  We're moving for
 6          sanctions, including fees against you.
 7                    MR. HOOK:  Do whatever you want.
 8                    MR. KATARINCIC:  We will.
 9                    MR. HOOK:  Are you going to bring
10          somebody here for these documents or not?
11                    MR. KATARINCIC:  We'll send them down
12          to the street level.
13                    MR. HOOK:  We'll walk with them.
14                    MR. KATARINCIC:  Will those documents
15          be kept intact and nothing removed from the
16          boxes?
17                    MR. HOOK:  Of course.
18                    MR. KATARINCIC:  I don't know about
19          that.
20                    MR. HOOK:  You're beyond belief,
21          Mr. Katarincic.  You would suggest that we
22          wrote bring documents up here in a box and then
23          take them back and remove documents overnight.
24                    MR. KATARINCIC:  Nobody suggested
25          anything.
```

1              MR. HOOK:  You asked would they

2        remain intact, and I said yes, and you go well,

3        I don't know if I believe that.  That

4        suggestion is so infantile.

5              MR. KATARINCIC:  I didn't say that,

6        sir.

7              MR. HOOK:  He can read it back.  See

8        what he said.

9              MR. KATARINCIC:  I believe so.

10                   - - - -

11        (The record was read back by the Reporter.)

12                   - - - -

13              MR. HOOK:  You're insulting

14        intelligent people here, Mr. Katarincic.

15        You're unbelievable.

16              MR. KATARINCIC:  No one is insulting

17        anybody.  Your theatrics I'm sure are

18        appreciated in Greene County, but not beyond

19        that.  I think you're making a grave mistake by

20        leaving here.  Courts do not tolerate this

21        walking out of a deposition like this.

22              MR. HOOK:  Mr. Katarincic, you

23        refused to cease inquiring into the financial

24        arrangements between my client and myself,

25        after I requested you to cease probably ten

1       times.  That kind of conduct is on top of your

2       repeated refusal to simply ask a question and

3       get an answer and go on.  You just came to the

4       limits of what's appropriate here.  Until you

5       can agree on how to conduct yourself, your

6       attempt to hijack these records after they were

7       brought up here in good faith under a set of

8       ground rules, it's simply not possible to go

9       forward.

10              MR. KATARINCIC:  Nobody is hijacking

11      anything.  They're under the custody of the

12      reporter.  He has a fiduciary duty to the

13      Court, not to you or to me.  Let me make one

14      other point, only one time was a question asked

15      about arrangements, and you objected, and never

16      again was anything asked about the details of

17      her arrangement with you.  I did use the word

18      contingent once, you objected, and I never

19      asked it again.

20              MR. HOOK:  I think this record will

21      speak for itself that you repeatedly attempted

22      to delve into the arrangement for the legal

23      fees between my client and myself.

24              MR. KATARINCIC:  Mr. Shreckengast, on

25      the record, how do you propose to handle the

```
1          fact that these boxes, which are in your
2          custody, are being removed?  Are you going to
3          contact a lawyer for your reporting service?
4                    THE REPORTER:  I'll wait and see if
5          the parties resolve it, and if they don't, I'm
6          sure I'll be notified.
7                    MR. KATARINCIC:  We're going to
8          notify the Court that you let them go, I'll put
9          that in my motion, and you're going to say you
10         believe voluntarily.
11                   MR. HOOK:  Are you going to tell him
12         what to say?
13                   MR. KATARINCIC:  No, I'm saying are
14         you going to say you agreed to removing them?
15                   THE REPORTER:  I put my understanding
16         on the record.
17                         - - - -
18         (There was a discussion off the record.)
19                         - - - -
20                   MR. KATARINCIC:  There's one document
21         that's marked as an exhibit, one little piece
22         of paper.  The agreement of April 15, I'm
23         sorry, April 5, '98, between Roy Brendel and
24         Clinton Piper, one page, calling for the
25         payment of $300 in phase one and $300 in phase
```

130

1       two, actually $300 in each phase.  That

2       document is an exhibit, and Mr. Hook insists on

3       taking it from the custody of the reporter.

4               MR. HOOK:  This document is labeled

5       Original Letters National Register Nomination.

6       They are the Brendels' personal papers that are

7       part of the history of their efforts to get

8       this property placed on the Historic Register.

9       The ground rules established were that these

10      documents were to be identified as to which

11      ones they wanted copies made of, and we would

12      arrange to have copies made of them.  This

13      document could easily be copied and made an

14      exhibit.  There would be no significant change

15      in its --

16              MR. KATARINCIC:  Do you want me to

17      copy it now?

18              MR. HOOK:  I'm quite happy for you to

19      copy it.  You can copy everything in here.

20              MR. KATARINCIC:  The whole document?

21              MR. HOOK:  You can copy everything in

22      here.  I'll tell you what, have it copied in

23      its entirety.  There's certainly no objection

24      to any of the documents that you wish to retain

25      being copied, as I had earlier agreed with you.

131

```
 1              MR. KATARINCIC:  Then leave them

 2       here, I'll copy them overnight.

 3              MR. HOOK:  Mr. Katarincic, I'm not

 4       going to leave them here.

 5              MR. KATARINCIC:  Do it overnight, and

 6       when Mr. Brendel comes back tomorrow, they'll

 7       be here.

 8              MR. HOOK:  I'm sorry, Mr. Katarincic,

 9       I simply don't trust you.  And your conduct

10       certainly justifies that.  Trying to hijack

11       these after they were brought up in good faith

12       to me is the height of improper legal practice.

13                      - - - -

14              (Thereupon, the deposition was

15       adjourned at 2 p.m.)

16                      - - - -

17

18

19

20

21

22

23

24

25
```

**EXHIBIT B**

**EXCERPTS OF DEPOSITION OF ROY BRENDEL**
**(FEBRUARY 9, 2006)**

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
            WESTERN DISTRICT OF PENNSYLVANIA
 2
CONSOLIDATION COAL COMPANY,    )
 3                             )
          Plaintiff,           )
 4                             )
          vs.                  )
 5                             )
UNITED STATES DEPARTMENT OF    )
 6 THE INTERIOR, NATIONAL PARK )    Civil Action
   SERVICE,                    )    No. 00-2120
 7                             )
   and                         )
 8                             )
CAROL D. SCHULL, individually  )
 9 and in her capacity as the  )
   Keeper of the National Register)
10 of Historic Places,         )
                               )
11 and                         )
                               )
12 ROY BRENDEL and DIANE BRENDEL, )
                               )
13        Defendants.          )


14


15                  - - - -


16          DEPOSITION OF:  ROY BRENDEL


17                  - - - -


18
                   DATE:    February 9, 2006
19                          Thursday, 9:30 a.m.


20
                LOCATION:   Thorp Reed & Armstrong
21                          14th Floor
                            One Oxford Centre
22                          Pittsburgh, PA 15219


23              TAKEN BY:   Consolidation Coal Company


24
             REPORTED BY:   Keith G. Shreckengast, RPR
25                          Notary Public
                            AKF Reference No. KS92308
```

4

```
 1    realizing the nature of his conduct yesterday
 2    should not be repeated.
 3              MR. HOOK:  I did call you,
 4    Mr. Katarincic, and left a message on your
 5    phone system asking you to return the call.
 6              MR. KATARINCIC:  Which I did.
 7              MR. HOOK:  You didn't return it to
 8    me.
 9              MR. KATARINCIC:  Well, you were busy
10    on the phone they said.
11              MR. HOOK:  I wasn't in my office in
12    the afternoon.
13              MR. KATARINCIC:  That's what they
14    said.  You did not leave a message that you
15    would not be here or that you would be here, no
16    message at all.  Of course when I saw your call
17    I thought that was a cover, and apparently I
18    was right.
19 BY MR. KATARINCIC:
20 Q.    What's your name, please?
21 A.    Roy Brendel.
22 Q.    Where do you live, sir?
23 A.    Spraggs.
24 Q.    What is your occupation?
25 A.    I'm retired.
```

 1      tends to go down.

 2 Q.    What value did you put on it, sir?

 3 A.    I can't remember exactly, but -- we had no

 4       idea, but it was a big acreage.

 5 Q.    You have no idea of the --

 6              MR. HOOK:  Don't interrupt him.

 7              MR. KATARINCIC:  I'm trying to help

 8       him move it along.

 9              MR. HOOK:  He doesn't need help,

10       Mr. Katarincic.

11              MR. KATARINCIC:  Please control

12       yourself.

13              MR. HOOK:  I want you to not

14       interrupt him.

15 BY MR. KATARINCIC:

16 Q.    Finish your answer, please.

17 A.    I think it was probably about 300,000, we

18       allowed for that.

19 Q.    300,000?

20 A.    Well, I'll tell you what, in foresight -- or in

21       hindsight, I think I was a little bit

22       conservative.  Because they did, DEP finally

23       ordered Consol to fill in that hayfield.  And

24       you should have seen the triaxle dump trucks

25       coming in there to fill that baby up.

34

1  Q.    What's the size of it, sir?

2  A.    18 x 36.  California play pool, that means the

3         depth was just below five feet.

4  Q.    What did you pay to build the pool?

5  A.    I think it was around twenty-some thousand.

6  Q.    Say 25, is that fair?

7  A.    Yes.

8  Q.    Anything else included in that 3 million?

9  A.    I had a basketball court.

10 Q.    How much do you have for that?

11 A.    Maybe a thousand dollars for the basketball

12        court.

13 Q.    What else, please?

14 A.    I have rock walls, and I'm sure the rock might

15        not have been damaged, but you've got to get a

16        laborer to get in there.  I put two years in

17        that wall.

18 Q.    Was there any damage to that wall, visible

19        damage?

20 A.    The one rock wall I'm thinking about, I don't

21        think there was any physical damage.  It was

22        kind of leaning down a little bit.  But at the

23        time I didn't know what was going to happen to

24        it.

25 Q.    So you put a number on that rock wall also?

1 A.    Yes.

2 Q.    How much, sir?

3 A.    Probably a thousand dollars, labor.

4 Q.    Anything else?

5 A.    My outside fences.

6 Q.    Barbed wire fences?

7 A.    Yes.

8 Q.    How many feet?

9 A.    133 acres.  I don't know how many feet that is.

10 Q.    All of the fence was affected by the mining?

11          MR. HOOK:  Hold it, excuse me, Joe,

12     you're misinterpreting his testimony there.

13     He's testifying about the proposal they put

14     together before the mining took place, not

15     after the mining.  That's what he's testifying

16     about, so don't say --

17          MR. KATARINCIC:  Now that you said

18     it, I understand what you're saying.  He did

19     not say that, but I presume you want him to say

20     that.

21 BY MR. KATARINCIC:

22 Q.    So why don't we say that's what you're saying?

23 A.    You asked me --

24          MR. HOOK:  Wait a minute.  We'll go

25     back in the testimony.  And you be quiet and

1    let me complete what I'm saying.  You're asking

2    him where he got this 3 million dollar number,

3    Mr. Katarincic.  That number was offered at a

4    meeting with Mr. Jenkins before the mining took

5    place.  That's the testimony of record.  If you

6    deny that, we'll go back through here in detail

7    and he can read it back to you.  Don't insult

8    me with inaccurate statements on the record.

9              MR. KATARINCIC:  All I asked you was

10   what made up the $3 million.

11             MR. HOOK:  Correct, and that was an

12   offer made before the mining.  Understood?

13 BY MR. KATARINCIC:

14 Q.   Do you hear what he wants you to say?

15             MR. HOOK:  No, do you understand,

16   Mr. Katarincic?  You apparently want to

17   misrepresent the record.  Do you understand

18   that now, or do we need to go back and

19   establish the record accurately?

20             MR. KATARINCIC:  Please keep your

21   voice down.

22             MR. HOOK:  Please answer my question.

23             MR. KATARINCIC:  You're acting very

24   unprofessional.

25             MR. HOOK:  No, I'm not, you are.  You

56

1  A.   No.

2  Q.   Is that building damaged?

3  A.   That building leans a little bit, but that

4       particular building is up off the floor.  I had

5       rebuilt that floor myself.  So it held up

6       pretty good.  There's some minor damage to the

7       bottom of it.

8  Q.   You rebuilt the floor since the mining?

9  A.   No, before, before the mining, exactly the way

10       the Major built it with raw cut lumber.

11  Q.   Anything else that was damaged by this mining

12       that you're making the claim for $3 million

13       for?

14  A.   I'm not making a claim for $3 million.

15             MR. HOOK:  Objection, that's

16       misrepresenting the record.  The $3 million was

17       offered prior to the mining at a negotiating

18       session.  That's what we've been talking about

19       for over an hour now.  At no time has he talked

20       about any estimate placed on the damages post

21       mining.

22  Q.   What number did you put on repairing the

23       storage shed at the time you put the $3 million

24       number together?

25  A.   I can't recall.

59

```
 1  A.    It says compensatory damages in excess of 1,800
 2        for the --
 3  Q.    $1,800,000?
 4  A.    For the damage to the Brendels' home, and in
 5        excess of $1,200,000 for the damage to the
 6        Brendels' other buildings and property, in a
 7        total sum to be determined at trial.
 8  Q.    Those two numbers, if you add them up, are $3
 9        million?
10  A.    Yes.
11  Q.    So would it be correct to say that in this
12        lawsuit you are claiming $3 million for damage
13        to the house, your home, and the other
14        buildings and property?
15              MR. HOOK:  No, that's not --
16        objection, that's just a misrepresentation of
17        the statement in the document.  I'm not going
18        to permit you to distort that.  It says quite
19        clearly the damages are in excess of
20        $1.8 million for damages to the house, and in
21        excess of 1.2 for the rest of the property.
22        And this is a total sum to be determined at
23        trial.  That's what it says, Mr. Katarincic,
24        not what you're trying to twist it to.
25              MR. KATARINCIC:  Mr. Hook, I really
```

60

1      feel sorry for you.

2 BY MR. KATARINCIC:

3 Q.    Let's go back to A.  The two numbers set forth

4       come to $3 million, do they not?

5 A.    Yes, they do.

6 Q.    And you and I previously, in enumerating what

7       went into the $3 million, included all of the

8       structures and so forth --

9              MR. HOOK:  Objection, Mr. Katarincic.

10      Again you are misconstruing.

11             MR. KATARINCIC:  I didn't finish my

12      question.

13             MR. HOOK:  Finish it, then I'll

14      object.

15             MR. KATARINCIC:  Please try to

16      contain yourself, Mr. Hook.

17             MR. HOOK:  It's very hard with your

18      type of conduct, Mr. Katarincic.

19             MR. KATARINCIC:  If you need another

20      break, I'll be happy to give it to you.

21 BY MR. KATARINCIC:

22 Q.    The amount of the $3 million which was given to

23      Mr. Jenkins and Mr. Kramer in Hook's office,

24      that covered what, all your damages including

25      the buildings and land and wheat and hay and so

1    forth?

2 A.    That was an estimate at that time.

3 Q.    Of all physical damage?

4 A.    Yes.

5 Q.    Now what do you understand the $3 million is

6        for here as set forth in paragraph 3 at page 16

7        of Exhibit 12 A?

8 A.    It says to be determined at trial.

9 Q.    What else does it say?  Are you saying that the

10       amount could be less $3 million; is that what

11       you intend to say here?

12              MR. HOOK:  Your Honor --

13 A.   It says in excess.

14 Q.   So you think it could be more than 3 million?

15 A.   I have to rely on my lawyer.

16              MR. HOOK:  I object to this line of

17       questioning.  The statement says what it says.

18       You don't need to ask this witness what it says

19       or what it might say.

20 Q.   Tell me what makes up the demand for 1.8

21       million and 1.2 million as set forth in

22       paragraph 3 on page 16.

23              MR. HOOK:  If you know.

24 Q.   And don't take that as a clue for an answer.

25       That's what he intends it to be.

1 A.    It says to be determined at trial.

2 Q.    But what do you understand constitutes --

3 A.    To be determined at trial.  That's exactly what

4       it is.

5 Q.    When you use the word 1.8 here, that number,

6       what did you understand it to be?

7 A.    I don't know what you're talking about.

8 Q.    What is included in the 1.8 million?  When you

9       made a claim against Consol for 1.8 million and

10      1.2 million, tell me exactly what was included

11      within those numbers.

12 A.   Just what it says here, in excess.

13 Q.   Of?  What is it for?  What do they represent,

14      damage to what?

15 A.   This statement says compensatory damages in

16      excess of 1,800,000 for the damages to the

17      Brendels' home, and in excess of 1,200,000 for

18      the damage to the Brendels' other buildings and

19      property in a total sum to be determined at

20      trial.

21 Q.   What's the property you're referring to there

22      in that paragraph?  Do you know, sir?

23 A.   No, I don't follow you.

24 Q.   What is included in the word property as you

25      use it in paragraph 3 A?

1 A.    I don't know.  I don't know what you're talking

2        about.

3 Q.    You don't understand my question, or you don't

4        know what's included in the word?

5 A.    Yeah, I don't understand your question.

6 Q.    Well, you included the 1,800,000 damage to the

7        Brendels' home, and in excess of 1,200,000 for

8        damage to other buildings?

9 A.    Yes.

10              MR. HOOK:  That's not what it says,

11        it says other buildings and property.

12              MR. KATARINCIC:  I'm asking him what

13        property means.  Don't interrupt him.

14 BY MR. KATARINCIC:

15 Q.    You say other buildings and property.  What is

16        the property you're talking about?

17 A.    I would assume it meant my property.

18 Q.    What piece of your property?  Describe it in

19        detail.

20 A.    133 acres.

21 Q.    So it would be damage to the land itself?

22 A.    I don't know.

23 Q.    You don't know what it means?

24 A.    No, I don't know.

25 Q.    Okay, this is Roy Brendel Exhibit 13.

```
 1                    MR. HOOK:  Just for the record, what
 2          are we identifying as the earlier exhibits in
 3          Roy Brendel?
 4                    MR. KATARINCIC:  There was no other
 5          exhibits.  Those were for Mrs. Brendel's.  12
 6          and 12 A were the last ones in her depo.  This
 7          is the first exhibit since Mr. Roy Brendel has
 8          been deposed, but we're going to number it 13.
 9  BY MR. KATARINCIC:
10  Q.    Would you look at No. 13, please, and tell me
11          if you've ever seen that before.
12                    MR. HOOK:  It's about five till 12.
13          We're going to take a break for lunch now.
14                    MR. KATARINCIC:  Let's finish this
15          exhibit.
16                    MR. HOOK:  You can have him identify
17          it, then we'll go to lunch.
18                    MR. KATARINCIC:  I think we should go
19          a little longer.  We didn't start until 10:30.
20                    MR. HOOK:  We got here at 8:30.
21                    MR. KATARINCIC:  What I will ask you
22          about is any coaching or discussions you had
23          concerning Exhibit 13 during your lunch hour,
24          so be prepared for that, because it's unusual
25          to take a break at this point.
```

66

```
 1      the --

 2 A.   That's up to my lawyer.

 3 Q.   To the extent you're not satisfied?

 4 A.   That's up to my lawyer.

 5 Q.   Do you understand that if this order is

 6      complied with, that you will receive no money

 7      from Consol?

 8 A.   That's up to my lawyer.  I don't know anything

 9      about that.

10 Q.   Do you understand that?  Is that your

11      understanding?

12 A.   Is what my understanding?

13 Q.   That if this order is complied with fully, you

14      will receive no money from Consol in connection

15      with damage to the property?

16 A.   I don't know that.

17 Q.   You have not discussed that with anybody?

18 A.   No.

19 Q.   Now do you have any documents to show us

20      visually the extent of damage to your property?

21 A.   I brought you all the documents that you

22      requested.

23 Q.   Are they here today?

24 A.   They're in the car.

25 Q.   You have pictures or something?
```

67

1  A.    Yes, the same pictures, the pictures and tapes

2        that were here yesterday.

3  Q.    I understand that.  Do you have them so you can

4        go over them with me?

5  A.    We have to go get them.  They're in Mr. Hook's

6        car.  Should we go get them?

7              MR. HOOK:  We're not going to get

8        them, Mr. Katarincic.  I explained to you

9        yesterday, given the way you tried to handle

10       them yesterday, until we agree on a method for

11       addressing those documents, they're not going

12       to be brought into this office again.  They're

13       available for you to review at any time at my

14       office.

15 Q.    Let me ask you, what evidence do you have to

16       show visually the damage to this property?

17       Describe it in detail for me.

18 A.    I complied with everything that you asked for.

19 Q.    I'm asking you what documents do you have,

20       pictures, anything?

21 A.    It's all in that, in those boxes.

22 Q.    Sir, please tell me, what do you have in

23       writing, pictures?

24 A.    I can't remember all them.

25 Q.    Give me a general description of them.

68

1 A.    The items that you requested, they're in the

2       boxes.

3 Q.    But I mean as to reflecting the damage, what do

4       you have in those boxes?

5 A.    Just what you asked for.

6 Q.    And what is that, as you understand it?

7 A.    The documents that are in the boxes.

8 Q.    What documents are there in the boxes that

9       reflect the damage that the structures have

10      incurred as a result of mining?

11              MR. HOOK:  Are you asking him to

12      describe in general?

13              MR. KATARINCIC:  Just general, that's

14      what I said to him.

15              MR. HOOK:  Pictures, videotapes, et

16      cetera?

17              MR. KATARINCIC:  Obviously, that's

18      what I said to him.

19 BY MR. KATARINCIC:

20 Q.    General description of what you have.  Now that

21      he's made his observations, I think you'll have

22      an answer, but go ahead.

23 A.    I brought up the boxes, the boxes of tapes and

24      the boxes of pictures, and the boxes of

25      documents that you asked for.

69

1 Q.    Where are they?  They're in the car?

2              MR. HOOK:  He explained they're in my

3         car.  They'll be made available to you at my

4         office.

5              MR. KATARINCIC:  Your case is in

6         Pittsburgh.

7 BY MR. KATARINCIC:

8 Q.    Let me ask you, what are they, just generally

9         tell me.  What are these documents that support

10        and reflect the damage incurred to the

11        structures?

12 A.    They're in the boxes.

13 Q.    In the boxes.  Are they pictures, photographs?

14 A.    There are pictures.

15 Q.    There are photographs.  Do you have any idea of

16        approximately how many?  100?  You don't need

17        to be precise, just a rough number.

18 A.    There's got to be over 100.

19 Q.    Do some of those pictures show the condition of

20        the property before the mining took place?

21 A.    Yes.

22 Q.    And how many of those, roughly, pictures would

23        you have?

24 A.    I can't remember exactly how many.

25 Q.    You have pictures showing the condition of the

70

```
1       property following the completion of the
2       mining?
3  A.   They're all in the boxes.
4  Q.   But you do have such pictures?
5  A.   I have all the pictures that you asked me to
6       bring are there.
7  Q.   But I'm asking do you have, whether they're
8       here or not here, do you have in your
9       possession or control photographs showing the
10      damage after the mining was completed?
11 A.   I brought the boxes here yesterday.
12 Q.   Is your answer yes to my question?
13 A.   My answer is I brought the boxes here
14      yesterday.
15 Q.   I understand that, but do you have --
16             MR. HOOK:  He's answered it.
17             MR. KATARINCIC:  He hasn't answered.
18      He's just repeating what he was told to say.
19 BY MR. KATARINCIC:
20 Q.   You're under oath, you have to tell me, do you
21      have photographs anywhere?
22 A.   I complied and brought the things that you
23      asked for in the boxes.
24 Q.   That's fine, but do you have any photographs,
25      tell me yes or no, showing the condition after
```

71

1      the mining?

2  A.   I have all the photographs that you asked for

3      in that box.

4  Q.   And are there photographs showing the condition

5      of the structures after the mining?

6  A.   You can see the photographs yourself when you

7      open the box.

8  Q.   And there are videotapes you said, your lawyer

9      said?

10 A.   There are tapes.

11 Q.   And do they reflect the damage to the

12      structure?

13 A.   Those tapes were taken the whole time, since

14      the beginning of the mining.

15 Q.   But do they reflect damage to the structures?

16 A.   Yes, some of them.

17 Q.   How many of those tapes do you have that

18      reflect damage, half a dozen, a dozen?

19 A.   I'd say about 20.

20 Q.   And that would be videotapes showing the

21      structure both before and after the damage, or

22      just after the damage to the structures?

23 A.   There were pre-mining videos taken.

24 Q.   They're included in the videos you have?

25 A.   I think I included all the tapes.

72

1  Q.   So there were the tapes that you have, if they

2       include pre-mining conditions, you would have

3       taken them?

4  A.   Yes.

5  Q.   Are there any writings that you have here that

6       reflect the extent of the damage?

7  A.   I have just the stuff that's in the boxes.

8  Q.   Just in the boxes?

9  A.   That's it, all the documents you requested that

10      I had, I put in the boxes.

11 Q.   We yesterday identified with Mrs. Brendel

12      Exhibits 1 and 1A, the notices that were served

13      on her.  These are identical to those served on

14      you.  Would you look at those and tell me --

15      those items listed on Exhibit A, what's in the

16      boxes that are not here today?

17 A.   I packed those boxes.  I can't remember every

18      little thing that's in there.  I complied with

19      what you asked.  I put all the documents that I

20      had in the boxes.

21 Q.   Would you go to the exhibit, please.  Go to

22      paragraph 1.  As an example, we asked you in

23      paragraph 1 any documents which support your

24      claim in paragraph 8 in the Second Amended

25      Answer, Counterclaim and so forth.

1  A.    That's all lawyer stuff.

2  Q.    Did you go over in determining what documents

3        exist?

4              MR. HOOK:  You can't ask him what he

5        did with his attorneys.

6  Q.    I don't care what you did with your attorney.

7        All I want to know, when you got this notice,

8        did you search around your house or office or

9        wherever to see what you had within these

10       categories of Exhibit A?

11 A.    My lawyer has taken care of all of those type

12       things.  I've got enough to deal with.

13 Q.    Did you or did you not is all I'm asking?  If

14       your answer is no, tell me.  If your answer is

15       yes, tell me.  Did you search for these

16       documents?

17 A.    My answer is my lawyer is handling all that.

18 Q.    Did you furnish any documents to your lawyer in

19       response to Exhibit A?

20             MR. HOOK:  He's already answered that

21       he provided all of his documents in the boxes

22       that were brought up here.  That's the answer

23       to all these questions.

24             MR. KATARINCIC:  I have a right to

25       ask these questions.

1 BY MR. KATARINCIC:

2 Q.    Did you search for the documents in Exhibit A?

3 A.    My lawyer has all this stuff here.

4 Q.    Did you search around your office, your car,

5       wherever you keep the stuff?

6 A.    I complied with what I was asked to put all the

7       documents that you asked for, I put them in the

8       boxes.

9 Q.    So you did go to try to find them?

10 A.    All the things that I brought up were the

11       things that you asked for me that I have.

12 Q.    And you, yourself, made a search for them?

13 A.    The things that are in the boxes, I made a

14       search for them.

15 Q.    Did you search to see if you have other things

16       listed in Exhibit A which are not in the boxes?

17             MR. HOOK:  I object, he just said he

18       brought everything he had and put them in the

19       boxes.

20 Q.    Do you have anything in those boxes which are

21       not here?  In connection with paragraph 5 of

22       the exhibit, documents supporting the claim in

23       paragraph 55 that Thomas Hoffman made or caused

24       to be published false and misleading

25       statements, is there anything in those boxes

1      concerning that?

2 A.    I put everything in the boxes that was on the

3       paper that you guys submitted.

4 Q.    So your answer is yes as to number 5?

5 A.    My answer is all the documents I have I put in

6       the box.

7 Q.    But in that box are there any documents

8       relating to paragraph 5 of Exhibit A?

9 A.    I put everything in the box.

10              MR. HOOK:  You don't have to answer

11      that question.

12 Q.   Tell me, are there documents there in response

13      to paragraph 5 of Exhibit A?  That is a

14      question you have to answer.

15              MR. HOOK:  Objection, he doesn't have

16      to answer that question.

17 A.   I answered it.

18 Q.   Specifically is there anything in those boxes

19      supporting and responding to paragraph 5 of

20      Exhibit A?

21              MR. HOOK:  Don't answer the question.

22              MR. KATARINCIC:  I take it if I asked

23      about every one of those numbers under Exhibit

24      A, I'd get the same answer, he doesn't have to

25      answer?

```
 1                 MR. HOOK:  Correct.
 2 BY MR. KATARINCIC:
 3 Q.    Do you know whether, in those boxes that are
 4       not here today, there are documents encompassed
 5       by paragraphs 1, 2, 21 of Exhibit A to the
 6       notice of deposition?
 7 A.    I put everything in that box that I had that
 8       was asked of me.
 9 Q.    I understand.
10 A.    I put all my documents in those boxes.
11 Q.    I want to know whether you found any, as an
12       example --
13 A.    When you go through the boxes, you can
14       determine whether they apply or not.  I gave
15       all the documents I was asked to give.  And my
16       lawyer handles all the ones that pertain to
17       lawyer stuff.
18 Q.    As an example, paragraph 13 of Exhibit A, to
19       the extent not produced in response to our
20       request, any documents supporting, reflecting,
21       relating to or referring to the alleged mine
22       subsidence damages that plaintiff claims Consol
23       Mining caused or for which plaintiffs are
24       claiming damages seeking reimbursement from
25       Consol in this action.  Were there any
```

77

1      documents concerning that?

2 A.   That's lawyer stuff to me.

3 Q.   Were there any comments, though, in that box

4      concerning that paragraph?

5 A.   All the things that were asked of me, any

6      documents that I had, I put in the box.

7 Q.   I understand that.

8           MR. HOOK:  I'm going to object.

9      You're asking him to make some kind of legal

10     conclusion as to whether one particular

11     document applies to paragraph 14 or not.  He's

12     not qualified and not required to make those

13     kind of legal conclusions.  So I'm going to

14     tell him not to answer that type of question.

15          MR. KATARINCIC:  You understand, I

16     didn't ask him whether it applies to paragraph

17     13, I asked him does he have any documents as

18     identified in paragraph 13, there's a

19     difference.

20          MR. HOOK:  You're saying he's got to

21     categorize the documents as to whether or not

22     they apply to paragraph 13.  He's not going to

23     do that.  He's not some kind of legal expert.

24          MR. KATARINCIC:  I'm not going to

25     quarrel with you.

```
 1              MR. HOOK:  He's not going to answer
 2         those questions.
 3              MR. KATARINCIC:  You're reshading the
 4         argument in a way favorable to you.
 5  BY MR. KATARINCIC:
 6  Q.   All I'm saying is in those boxes are there any
 7         documents that come within the purview of
 8         what's described here in paragraph 13, which is
 9         mine subsidence?
10              MR. HOOK:  He's not going to answer
11         it.
12  Q.   Those documents are in Mr. Hook's car, you say,
13         down in the building here?  Is that what you
14         said?
15  A.   Yes.
16  Q.   Parked in the building here where this
17         deposition is going on?
18  A.   Yeah, where he parked his car.
19  Q.   But I mean they're in town here?
20  A.   Yes.
21              MR. KATARINCIC:  Many of my questions
22         that I have set forth here pertain to
23         documents.  So I've been basically prohibited
24         from taking this deposition because of that
25         conduct.
```

79

```
 1              MR. HOOK:  For the record, I'd like
 2         to state that the conduct that has caused the
 3         documents not to be here is Mr. Katarincic's
 4         conduct yesterday, where he attempted to
 5         improperly hijack those documents and keep them
 6         here in his office, contrary to the original
 7         agreement of them being brought up here.  Until
 8         such time as Mr. Katarincic can agree to an
 9         appropriate method to handle the documents,
10         they will remain in my custody, at my office,
11         where he is welcome to come and examine them at
12         his convenience, upon making appropriate
13         arrangements.
14 BY MR. KATARINCIC:
15 Q.    But right as you sit here today, you have no
16        documents in this room in response to this
17        notice of deposition, do you?
18 A.    I put the documents, as was asked for, I
19        brought them yesterday.
20 Q.    Are they in the room here today?
21 A.    I'm not going to answer that question.
22 Q.    You have to answer me.  Are they here?  You
23        have no choice what you do or don't want to
24        answer, sir.  It's a fact, are those documents
25        here right now in this room?
```

80

1  A.    I brought them yesterday.

2  Q.    Sir, are they here now, please?

3  A.    They're in the boxes.

4  Q.    Are the boxes here?

5  A.    I'm not going to answer that question.

6            MR. KATARINCIC:  It seems to me, I've

7        never tried before, but this is a perfect

8        opportunity for contempt proceedings against

9        this witness.  His last several questions

10       reflected to me he's obstreperous, doesn't want

11       to cooperate.  And is apparently, for some

12       reason, refusing to give evidence to me.  I'm

13       going to terminate this, but I'm going to do

14       two things; first move for sanctions, and

15       second, move to have you held in contempt.  And

16       I mean it.  We'll leave it at that.

17            This deposition will be terminated in

18       light of the conduct of the witness, his

19       refusal to answer questions.  Thank you very

20       much.

21            MR. HOOK:  The record is not closed

22       yet.

23            MR. KATARINCIC:  The record is going

24       to continue open.

25            MR. HOOK:  Let the record show that

1   as I indicated yesterday to Mr. Katarincic on

2   the record, that those documents would be

3   removed until such time as he agreed to an

4   appropriate method for the handling of them.

5   He has not agreed as of this date.  He

6   apparently does not want to agree.  The

7   documents are available for him at our office,

8   and will remain available to him at our office

9   until such time as he agrees to an appropriate

10  methodology to handle these documents, which

11  are unique, irreplaceable, family documents.

12  That have historical value, which have family

13  value, which the Brendels do not want to have

14  leave their custody without appropriate

15  safeguards.

16          I will further add that yesterday

17  when we specifically asked Mr. Katarincic not

18  to delve into these boxes outside of our

19  presence, he immediately proceeded to go

20  through the boxes at lunch hour when we were

21  out of the room, in direct contravention to our

22  request.  He then further attempted to force

23  the documents to remain here in this building,

24  in his offices, in spite of our earlier request

25  that he identify what documents he would like

82

1    to have copied and we would appropriately have

2    them copied.

3         That kind of conduct shows complete

4    lack of consideration for the value of these

5    documents to the Brendels, and I believe

6    justifies our concerns about bringing them and

7    making them available.  We would be willing to

8    bring them to this room today, except for the

9    fact that yesterday we were confronted with the

10   possibility of not being able to remove the

11   documents from the room.  So accordingly, we

12   feel that until such time as appropriate

13   arrangements are made, I will have to stand on

14   this position.

15        MR. KATARINCIC:  Much of what

16   Mr. Hook said is false.  We did delve into the

17   documents.  I told him I was going to delve

18   into the documents.  The documents were in the

19   custody of the reporter, as has been true

20   throughout these proceedings.  Mr. Hook thinks

21   he's the dominant force here.  Why he thinks

22   that, I think I know.  I have offered to have

23   them sent out to a commercial production

24   company of the highest quality.  He refuses to

25   do that.  Somebody is going to have to copy

83

1     these things, whether I designate them or who.

2     I told him my people right across the street

3     are ready to take these on, and they'll be done

4     within the day.  He's refused to do that.  I

5     can't help the guy.  I'm entitled to have those

6     here.  He does not set the ground rules.  We

7     will move to have him compelled to bring those

8     here, to have both of these witnesses brought

9     back, and move for sanctions and contempt.  And

10    that I'm serious about.

11          You can make all the speeches you

12    want about me stealing documents as you did

13    yesterday, make all the speeches you want about

14    embargo.  It's utterly meaningless to me,

15    because none of it has any merit.

16          MR. HOOK:  Mr. Katarincic has never

17    offered to have them copied at any place.  The

18    specific discussion was that they would be

19    identified, and I would arrange to have them

20    copied, and provided to him at his expense.

21    And he refused to agree to that.

22          MR. KATARINCIC:  The record will

23    speak for itself.  That point was covered

24    yesterday.  As of this morning when I pointed

25    out the falseness of his statements, he said

84

1    nothing.

2              MR. HOOK:  I'm saying it now.  And if

3    Mr. Katarincic wants to review the record, he's

4    certainly welcome to.  As far as Mr. Brendel

5    being uncooperative, Mr. Katarincic simply

6    seems to want to ask him about questions that

7    he is not required to answer in terms of trying

8    to categorize whether a particular document

9    falls into a particular category of questions.

10             MR. KATARINCIC:  That's a false

11   statement, I did not ask him that.  You'll have

12   a chance to expound to the court very shortly

13   on that Mr. Hook.  I don't mean a court in

14   Greene County, I mean a Federal Court.

15             MR. HOOK:  We're done.

16             MR. KATARINCIC:  See you again.

17                  - - - -

18             (Thereupon, the deposition was

19   concluded at 1:22 p.m.)

20                  - - - -

21

22

23

24

25