Dbrendel.txt

1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF PENNSYLVANIA
 2
   CONSOLIDATION COAL COMPANY,    )
 3                                )
                 Plaintiff,       )
 4                                )
                 vs.              )
 5                                )
   UNITED STATES DEPARTMENT OF    )
 6 THE INTERIOR, NATIONAL PARK    )    Civil Action
   SERVICE,                       )    No. 00-2120
 7                                )
   and                            )
 8                                )
   CAROL D. SCHULL, individually  )
 9 and in her capacity as the     )
   Keeper of the National Register)
10 of Historic Places,            )
                                  )
11 and                            )
                                  )
12 ROY BRENDEL and DIANE BRENDEL, )
                                  )
13            Defendants.         )

14

15                    - - - -

16        DEPOSITION OF:  DIANE F. BRENDEL

17                    - - - -

18
              DATE:     February 8, 2006
19                      Wednesday, 9:30 a.m.

20
              LOCATION: Thorp Reed & Armstrong
21                      14th Floor
                        One Oxford Centre
22                      Pittsburgh, PA 15219

23        TAKEN BY:   Consolidation Coal Company

24
              REPORTED BY:  Keith G. Shreckengast, RPR
25                          Notary Public
                            AKF Reference No. KS92307
```

2

```
 1        DEPOSITION OF DIANE F. BRENDEL,
   a witness, called by the Plaintiff for examination,
 2 in accordance with the Federal Rules of Civil
   Procedure, taken by and before Keith G. Shreckengast,
 3 RPR, a Court Reporter and Notary Public in and for
   the Commonwealth of Pennsylvania, at the offices of
```

Page 1

EXHIBIT

10

Dbrendel.txt

```
 9        to ask questions about a Complaint that you
10        have superseded with an Amended Complaint.
11        It's not going to be relevant.
12 BY MR. KATARINCIC:
13 Q.    Go ahead, ma'am.  Have you ever seen 12 and
14        12A?
15 A.    This looks familiar, so I must have seen this
16        at some point.
17                MR. HOOK:  She's referring to 12.
18 Q.    You're referring to document No. 12?
19 A.    Yes.
20 Q.    Go to the other one, please, 12A.
21 A.    I'll tell you the truth, I've seen so many
22        different weird things that I don't understand,
23        that I could have seen this or not seen it and
24        I have no idea.
25 Q.    Did you speak to anybody in connection with
```

88

```
 1        preparing information that was put into this
 2        document 12A, which is a Second Amended Answer,
 3        Counterclaim and Third Party Complaint?
 4 A.    I have no idea.
 5 Q.    No idea?
 6 A.    See, to you this is normal stuff, to me this
 7        is --
 8 Q.    What I asked you was did you meet with anybody
 9        to discuss facts that should or shouldn't be
10        placed into this document, that was all?
11 A.    I don't think so.  If I did see it, I don't
12        remember.
```

Dbrendel.txt
13          MR. KATARINCIC:  We're going to go
14     through this Complaint to verify your
15     understanding of certain facts.  So we'll take
16     a break for lunch.  I suggest you look at that,
17     so we can go more quickly.  We'll break for
18     about an hour.
19          MR. HOOK:  On behalf of Mr. Brendel,
20     there have been brought to this deposition, in
21     response to the request for documents at the
22     deposition seven boxes of documents from the
23     Brendels' responses.  We have asked that these
24     boxes not be delved into in our absence.  We're
25     just beginning to take a break for lunch.  Some

                                              89

1      of these boxes contain materials that are
2      unique, they're historical, they're one of a
3      kind, they're irreplaceable.  They are not
4      copied, nor are there copies made of them to
5      our knowledge.  We're very concerned that any
6      of these things would be misplaced, damaged, or
7      lost in our absence.  We have asked
8      Mr. Katarincic if he would agree not to delve
9      into these boxes in our absence, and it's my
10     understanding that he refuses to agree to that,
11     that he wants to go through these boxes while
12     we are not present.
13          MR. KATARINCIC:  These are now
14     exhibits, marked exhibits, pursuant to a
15     subpoena.  They're here.  I asked you a week
16     ago to produce these to avoid this very thing.
17     I have a right to go through exhibits, marked
                    Page 76

Dbrendel.txt

18    exhibits.

19         MR. HOOK:  Well, as a matter of fact

20    they've been marked, but they have not been

21    introduced into the record.  And they've not

22    been identified.  And again, we are requesting

23    that they not be disturbed in our absence.  And

24    I'm going to stack them up here in the corner,

25    and I would like them to be there when I get

                                             90

1    back.

2              - - - -

3         (Luncheon recess at 11:52 a.m.  At 1

4    p.m., the deposition was reconvened as

5    follows):

6              - - - -

7         MR. KATARINCIC:  Mr. Hook, I've gone

8    through the seven boxes you brought here this

9    morning.  The only four that seem to have

10   anything relevant are the four on the table.

11   The others are not, so --

12        MR. HOOK:  Can you tell us what

13   numbers those are?

14        MS. RUSHAK:  3, 4, 5 and 2.

15        MR. HOOK:  What we'll do is we'll

16   have those copied by a copy place and ask you

17   to reimburse the cost of copying.

18        MR. KATARINCIC:  Well, no, those are

19   in the custody now of the reporter.

20        MR. HOOK:  No, they're not.

21        MR. KATARINCIC:  Yes, they are.

Dbrendel.txt

22          MR. HOOK:  They're leaving with me.

23          MR. KATARINCIC:  And he will be asked

24   to copy them.

25          MR. HOOK:  No, I explained to you,

91

1    Mr. Katarincic, before I brought these up that

2    the ground rules were that I would bring them

3    up here.  I would let you examine them.  I

4    would take them back and copy them as you

5    requested.  That's what's going to happen here.

6          MR. KATARINCIC:  The only thing you

7    asked to take out of here were those, I don't

8    know, the very thin sheets of paper with

9    drawings on.  And that was all that's going to

10   be taken out of here.

11          MR. HOOK:  Mr. Katarincic, I'm taking

12   all of these boxes with me.  I brought them

13   here, and they're going to leave with me.

14          MR. KATARINCIC:  We'll call the Court

15   and see what they say.

16          MR. HOOK:  You better call right now,

17   because they're going to be leaving when I

18   leave.

19          MR. KATARINCIC:  That's good.  We

20   have no way of knowing -- Then I'll identify

21   everything in those four boxes for the record.

22          MR. HOOK:  If you want to do that.

23          MR. KATARINCIC:  I'll ask the witness

24   questions about it, that's how I'll do it.

25          MR. HOOK:  Whatever you want to do,

Dbrendel.txt

1      Joe.

2                MR. KATARINCIC:  Do I understand

3      you're the custodian of these exhibits?

4                THE REPORTER:  That's my

5      understanding.

6                MR. KATARINCIC:  As the custodian,

7      you have no right to take them.

8                MR. HOOK:  I gave you the ground

9      rules when I brought them up here.  I told you

10     exactly what was going to be done.  Now you're

11     trying to change that.

12               MR. KATARINCIC:  One box you said.

13               MR. HOOK:  No, I said everything that

14     we brought up was containing things that are

15     unique, personal to the Brendels, and could not

16     be duplicated.

17               MR. KATARINCIC:  Can't be duplicated?

18     How are you going to duplicate them?

19               MR. HOOK:  The originals cannot be

20     duplicated.  These are original photographs

21     from their family albums that cannot be

22     duplicated if they're lost.

23               MR. KATARINCIC:  We'll call the

24     Court.

25 BY MR. KATARINCIC:

1 Q.    I was going through my notes here.  Did you

2       indicate to me that you did not contemplate

3       ever replacing the Thrall House, you didn't

Dbrendel.txt

4      want to build another house?

5 A.    No.

6 Q.    You didn't want to replace this at all?

7 A.    No.

8 Q.    That was never discussed?

9 A.    No.

10 Q.    I was looking, if I can find it hurriedly --

11      Did you see, Mr. Hook sent a letter on December

12      8, 2005 to the Pennsylvania Department of

13      District Mining Operations, Mr. Plassio?

14           MR. HOOK:  Don't answer it until he

15      shows you the letter.

16           MR. KATARINCIC:  I haven't asked a

17      question yet.

18 BY MR. KATARINCIC:

19 Q.    In here he says the following --

20           MR. HOOK:  Do you have a copy to show

21      her?

22           MR. KATARINCIC:  That's your letter.

23           MR. HOOK:  Show her the letter.

24           MR. KATARINCIC:  I will show her the

25      letter, if she wants to sit over here.  I'll

94

1      give it to her when I'm done reading it.

2 BY MR. KATARINCIC:

3 Q.    This is on the bottom of page 3, page 3 of a

4      letter of December 8, '05.  Last paragraph:  A

5      further point should be made, there has been

6      some discussion that the Brendels may replace

7      the Ernest Thralls house and the Ernest Thralls

8      tenant house rather than repair them.  Has

Dbrendel.txt

9      there been such discussions?

10             MR. HOOK:  Show her the letter.

11     You've taken something out of context.  Show

12     her the entire document before you ask the

13     question.

14 Q.   Have you ever had such discussions?

15             MR. HOOK:  Don't answer the question

16     until he shows you the document.

17 Q.   Have you ever had such discussions?

18             MR. HOOK:  Don't answer the question

19     until he shows you the document.

20 Q.   Do I understand you say there have been no such

21     discussions?

22             MR. HOOK:  Don't answer the question

23     until you are show that document that he's

24     reading from.

25 Q.   Were there ever such discussions?

                                                    95

1              MR. HOOK:  Same instruction.

2              MR. KATARINCIC:  Will you note that

3      to be reproduced immediately, that part of the

4      transcript.

5  BY MR. KATARINCIC:

6  Q.   Forget the document, have you ever heard that

7      somebody was representing on your behalf to the

8      government of Pennsylvania that you were

9      contemplating replacing this house?

10 A.   No.

11 Q.   You never authorized anybody to say that?

12 A.   No.

                     Page 81

Dbrendel.txt

13 Q.    So if this is a false statement to the state,

14       you're not responsible for it?

15              MR. HOOK:  Do not answer it.  He has

16       not shown you that document.  It's quite

17       outrageous for him to take a sentence out of

18       context and trying to ask you a question about

19       it.  Just don't answer it.

20 Q.    Are you aware whether anybody ever represented

21       to the state that you and your husband,

22       Mr. Brendel, were contemplating replacing the

23       entire Thrall House?

24 A.    No.

25 Q.    You would not have authorized anybody to say

                                                        96

1        that, would you?

2 A.     No.

3 Q.     Let's go back then.  Do you have what they call

4        the Second Answer, Counterclaim and Third Party

5        Complaint, I think it's Exhibit 12A if I'm not

6        mistaken?

7 A.     Yes.

8 Q.     Maybe I asked you this before lunch, if I did

9        I'm sorry, have you ever seen this document

10       before?

11 A.    Truthfully I can't remember.

12 Q.    You can't recall?

13 A.    I really can't.  I've looked at so many

14       documents over the years, that I really don't

15       remember.

16 Q.    This gentleman who signed the certificate of

17       service, Michael Nixon, who is he?

                         Page 82

Dbrendel.txt

18  A.    He is another one of our lawyers.

19  Q.    You met him?  Have you ever met him?

20  A.    Oh, yes.

21  Q.    And you've talked to him about this case?

22  A.    Yes.

23  Q.    How did you happen to find him?

24  A.    I don't know how he was found, frankly.

25  Q.    You didn't find him?

97

1   A.    No.

2   Q.    Mr. Hook did?

3   A.    It would be something I would assume.

4   Q.    Well, when he was introduced to you, what were

5         you told?

6   A.    I was told this is a lawyer who is going to

7         help us.

8   Q.    And who told you that?

9   A.    Mr. Hook.

10  Q.    Let's start going through this document, then,

11        please.  Go to page I believe it's 5.  There's

12        a paragraph number 31.  Do you see that?

13  A.    Yes.

14  Q.    It says there:  The plaintiff had actual notice

15        and commented and participated in the Thralls

16        historic property listing process.  Do you know

17        that the plaintiff, Consolidation Coal, had

18        knowledge of the listing process?

19  A.    I was told that.

20  Q.    By whom, ma'am?

21  A.    By Mr. Nixon, I believe.

Dbrendel.txt

22 Q.    Mr. Nixon.  Anybody else?

23 A.    I can't think of anyone else.

24 Q.    Did he tell you the basis for knowing that, how

25       he got to know it?

                                                          98

1 A.    No.  I accepted his word.

2 Q.    Sure, I understand.  You say and participated

3       in the historic property listing process.  Do

4       you know that's true?

5 A.    I just know what I was told by my lawyer.

6 Q.    Mr. Nixon?

7 A.    Yes.

8 Q.    So the averments of paragraph 31 concerning

9       actual notice, commented and participated,

10       those statements, those facts you got from

11       Mr. Nixon?

12 A.    I do believe, yes.

13 Q.    Anybody else that you can think of?

14            MR. HOOK:  Joe, you're repeating

15       yourself.

16 Q.    Anybody else?

17            MR. HOOK:  Move it along.  You've

18       asked that question twice.

19            MR. KATARINCIC:  I didn't ask anybody

20       else.

21            MR. HOOK:  Yes, you did ask anybody

22       else.  Go back to where he asked did anybody

23       else tell you that.

24                 - - - -

25       (The record was read back by the Reporter.)

                    Page 84

Dbrendel.txt

99

1                    - - - -
2              MR. KATARINCIC:  There's your
3    question.
4              MR. HOOK:  Don't ask it again.  I'm
5    not going to put up with this repeated picayune
6    question, question, question on the same thing.
7    Move it along.
8              MR. KATARINCIC:  Would you repeat the
9    question to the witness?
10             MR. HOOK:  She's not answering it
11   again.
12             MR. KATARINCIC:  I'm just building a
13   record.
14             MR. HOOK:  You're repeating the
15   record.
16             MR. KATARINCIC:  To show the judge
17   your conduct.  Read the question, and indicate
18   in the record what question you repeated to
19   her.
20             THE REPORTER:  "Question:  So the
21   averments of paragraph 31 concerning actual
22   notice, commented and participated, those
23   statements, those facts you got from Mr. Nixon?
24   Answer:  I do believe, yes.  Question:  Anybody
25   else that you can think of?"

100

1              MR. KATARINCIC:  She's not going to
2    answer it?
3              MR. HOOK:  She's already answered it.

Dbrendel.txt

4          MR. KATARINCIC:  For that reason,

5     she's not going to answer it?

6          MR. HOOK:  Why should she answer it

7     twice?

8          MR. KATARINCIC:  Okay, now you've

9     stated your position.  That's all I wanted on

10    the record.

11 BY MR. KATARINCIC:

12 Q.   Do you have any documents, any writings in your

13      possession, or have you ever seen any

14      documents, any kind of a writing that support

15      the allegations of paragraph 31, that

16      Consolidation Coal had actual notice and

17      commented and participated in the Thralls

18      historic property listing?

19 A.   No.

20 Q.   Has anyone shown you anything of that sort?

21 A.   No.

22 Q.   That would include Mr. Nixon?

23 A.   Yes.

24 Q.   Paragraph 39, page 6, your lawyers aver, quote,

25      paragraph 39, quote:  At all times relevant and

                                                      101

1       material herein, the historical property is the

2       Thralls House.  Do you see that?

3 A.    Uh-huh.

4 Q.    Now as I understand today, you're saying the

5       historical property is not only the house, but

6       the pigpen, the chicken coops and the garages

7       and so forth?

8 A.    Right.

                    Page 86

Dbrendel.txt

9 Q.    It's more than the Thralls House; is that
10      right?
11 A.   Yes, it is.
12 Q.   Do you know any reason why in the pleading
13      filed in Federal Court it was indicated that
14      the Thralls House was the historical property?
15 A.   I'm just assuming that by saying Thralls House
16      it was meant the whole compound.
17 Q.   Well, House is capital.
18 A.   Well, that's what it's called in the official
19      document, so I'm assuming that means all that's
20      involved in the Thralls House.
21 Q.   The dirt, too, the land, the real estate,
22      everything?
23 A.   Uh-huh.
24 Q.   It doesn't say the historical property is known
25      as the Thralls House, does it?

                                                    102

1 A.    No.
2 Q.    And you taught school how many years?
3 A.    This is not my area of expertise.  And in my
4       mind when it's called Thralls House and they're
5       both capitalized, to me that means the entire
6       compound of the Thralls House.
7 Q.    Do you have any writings to support that, that
8       that's what it means?
9 A.    No, I do not.
10 Q.   Go to paragraph 45, please.  It says there that
11      the Pennsylvania -- the PASHPO and the PHMC,
12      that would be the Pennsylvania Historical

                        Page 87

Dbrendel.txt

13     Museum Commission, I don't know what the first

14     one is, fully considered Consolidation Coal

15     Company's comments regarding the historic

16     Thralls House.  What's your facts to support

17     that statement?

18 A.   You would have to ask my lawyer.

19 Q.   You don't know?

20 A.   No.

21 Q.   Which lawyer would that be?

22 A.   I'm assuming it would be Mr. Nixon.

23 Q.   Did he discuss that with you?

24 A.   I believe he told me that, yes.

25 Q.   He told you that was the fact?

                                                    103

1 A.    Yes.

2 Q.    And you of course accepted what he told you?

3 A.    Yes, I did.

4 Q.    Do you know of any writings, documents, any

5       kind of a piece of paper that would support the

6       allegations of paragraph 45 that Consol -- that

7       the PHMC and the PASHPO considered Consol's

8       comments regarding the Thralls House?

9 A.    I do not know of any papers.

10 Q.   Did Mr. Nixon tell you that he had some proof

11      of those allegations in that paragraph?

12 A.   I believe at the time I assumed that he did.

13      Otherwise, he would not have --

14 Q.   Did he tell you I have a filing with the

15      Commission, I have a piece of paper, I have a

16      letter that backs me up on this?

17 A.   I don't recall.

                       Page 88

Dbrendel.txt

18 Q.    Would you go to paragraph 55, please.  Would

19       you read that paragraph with the three

20       subparagraphs under it just to yourself?

21 A.    I did.

22 Q.    Have you finished it?

23 A.    Yes.

24 Q.    You say there that Mr. Hoffman made false

25       and/or misleading statements.  What are the

                                                    104

1        false or misleading statements that you are

2        aware of, yourself, that he made?

3 A.     Well, he says that the preservation law has

4        been abused.  And I do not believe that to be

5        correct.  That certainly is false and

6        misleading.  He says that our home flat-out

7        does not meet the criteria under the law.

8        Whereas it would appear that it does, since it

9        did make it onto the National Register.  As for

10       the third comment, it is what it is.

11 Q.    You think that's an untrue statement, the third

12       paragraph of 55?

13 A.    I don't know.

14 Q.    So you don't know whether it's true or not,

15       that he said that?

16 A.    I'm assuming he did say that.

17 Q.    What is your basis for the assumption?

18 A.    That he was quoted in the paper.

19 Q.    You're saying that these statements in some

20       sort are defamatory?

21 A.    Certainly the first two are.

                        Page 89

Dbrendel.txt

22 Q.    What is defamatory in number 1?

23 A.    That he's saying we have abused the

24        preservation law, which makes it appear that we

25        have done something illegal or unlawful to

                                                              105

1        abuse it.

2 Q.     And the second one?

3 A.     To say that our home and our property flat out

4        does not meet the criteria is certainly false,

5        because it obviously did meet the criteria or

6        it would not have been put on the Register.

7 Q.     You understand, I take it, that's his opinion,

8        that it doesn't meet the criteria?

9 A.     Right, which makes it appear that there's

10       something wrong with us that we would be

11       getting our house on the Register.

12 Q.    Do you know a basis for his opinion in

13       paragraph 2?

14 A.    The basis for his opinion is that he does not

15       want us to meet the criteria.

16 Q.    You know that, or are you surmising that?

17 A.    I would surmise that.

18 Q.    How about the opinion in the first paragraph of

19       Mr. Hoffman, you understand that's his opinion,

20       don't you, that the preservation laws have been

21       abused?

22 A.    That may be his opinion, but when he says

23       something like that, he abuses the opinion of

24       us.

25 Q.    So paragraphs 1 and 2 are opinions, but you say

                        Page 90

Dbrendel.txt

106

1    they're false?

2 A.    Exactly.

3 Q.    In number 3 he says the company was moving

4       ahead with its plans despite opposition.  Is

5       there anything false about that?

6 A.    No.

7 Q.    How about number 3, our mining and mitigation

8       plans have been reviewed and accepted by all

9       the agencies and we are proceeding, anything

10      false about that?

11 A.   I would assume that was true.

12 Q.   Go to the next paragraph, 56, 1, 2 and 3

13      subparts.  Let's read them.  I'll read them on

14      page 9, ma'am.  The National Register, it's in

15      brackets, listing was rushed through without

16      giving interested parties, including the coal

17      company, the opportunity to comment, Consol's

18      spokesman, Tom Hoffman, said Thursday.  You

19      realize that's his opinion?

20          MR. HOOK:  I'm going to object to the

21      extent you're asking the witness to make any

22      type of legal conclusion.

23          MR. KATARINCIC:  It's not a legal

24      conclusion, Mr. Hook.

25          MR. HOOK:  If you're asking her to

107

1    make a legal conclusion, I'm objecting.

2          MR. KATARINCIC:  Your objection is

3    noted.  Read my question back.

Page 91

Dbrendel.txt

```
 4                    - - - -
 5      (The record was read back by the Reporter.)
 6                    - - - -
 7 A.   I realize that it is his opinion, but I also
 8      realize that it is his opinion as a
 9      spokesperson for Consolidation Coal Company,
10      not a personal opinion, but the opinion of the
11      company.
12 Q.   Let's go to number 2.  We think this is a case
13      someone decided at the last minute, to rush
14      through a listing so the owners would have
15      additional leverage in dealing with the coal
16      company, he said.  The leverage could come into
17      play for instance in negotiations regarding
18      damages caused by mining, he said.  You realize
19      that's his opinion, isn't it?
20 A.   Again, as a spokesperson for the company.
21 Q.   Well, I understand that, but this is his
22      opinion, you're saying as a spokesman?
23              MR. HOOK:  I'm making an objection as
24      to any request for her to make a legal
25      conclusion.
```

108

```
 1 Q.   Go ahead, ma'am.
 2 A.   I believe that was a very malicious thing to
 3      do.
 4 Q.   You mean to give his opinion?
 5 A.   To give his opinion and make it appear as if it
 6      were true as a company spokesperson.
 7 Q.   I understand that, but as a spokesman for
 8      Consol, as you say, he said it's decided at the
```

Page 92

Dbrendel.txt

9      last minute to push the listing?

10 A.   That's not his personal opinion, that's his

11      opinion as a spokesperson for the company.

12 Q.   For Consol, I understand.  And the rest of it,

13      the owners would have additional leverage in

14      dealing with the coal company, that also is an

15      opinion?

16              MR. HOOK:  Same objection to the

17      extent you're asking the witness to make a

18      legal conclusion.

19 Q.   You can answer.

20 A.   What was the question?

21              - - - -

22      (The record was read back by the Reporter.)

23              - - - -

24              MR. HOOK:  Same objection to the

25      extent you're asking the witness to make a

                                                        109

1       legal conclusion.  It's objected to.

2 Q.    Go ahead.

3 A.    Yes.

4 Q.    So it's your opinion that's an opinion?

5 A.    Yes.

6 Q.    I take it you would also say the same as to the

7       words the leverage could come into play for

8       instance in negotiations regarding damages

9       caused by mining, he said, you would also say

10      that's an opinion he gave, but is really the

11      opinion of the coal company?

12              MR. HOOK:  Same objection to the

Page 93

Dbrendel.txt

13    extent you're asking the witness to make a

14    legal conclusion.

15 Q.    Go ahead, ma'am.

16 A.    Yes.

17 Q.    Then the next one, 3, he says:  We are not

18       getting anything -- I'm sorry, we are not

19       getting out of anything by filing the lawsuit,

20       Hoffman said.  Do you know if that's true or

21       false?

22 A.    I have no idea.

23 Q.    Even if it is successful -- this is in

24       paragraph 3 of paragraph 56, quote:  Even if it

25       is successful in removing the house from the

                                                    110

1    Register, Consol would still be required to

2    follow the plan, because the house remains

3    eligible for a listing, he said.  Is that a

4    false statement?

5 A.    I have no idea.

6 Q.    You understand that's his opinion of the coal

7       company, isn't it?

8             MR. HOOK:  Same objection to the

9       extent you're asking the witness to make a

10      legal conclusion, it's objected to.

11 Q.   Go ahead.

12 A.   I answered it, I have no idea.

13 Q.   So you don't know whether it's true or false?

14 A.   No, I don't.

15 Q.   But from your perspective this is an opinion of

16      the coal company?

17 A.   I'm assuming it is.

                   Page 94

Dbrendel.txt

18 Q.    You don't know otherwise, do you?

19 A.    No.

20 Q.    Go to number 57.  Hoffman caused or allowed a

21       letter to be wrote to the editor of the

22       Post-Gazette regarding the Brendels and their

23       home, the historical Thralls House titled

24       Readers Should Know the Rest of the Story

25       Regarding the Brendel Property to be published

                                                        111

1        with false and misleading statements in print,

2        and on the whole worldwide web of the internet

3        by the Post-Gazette.  He said that this case is

4        about money.  Is that true, it's about money to

5        repair your house?

6 A.     I don't know if that's in context or not.

7 Q.     Well, isn't that what you're basically

8        contending here, your house should be repaired

9        and you want damages in the form of money, or

10       the damage from the mining?

11 A.    As I recall that article, though, that is taken

12       out of context.

13 Q.    Well, I don't know what you mean by context,

14       but is this not your whole case, is being

15       adequately compensated for the damage?

16              MR. HOOK:  Objection, you're asking

17       her about this phrase, which says this case is

18       about money.  You're trying to take it out of

19       context and twist the characteristic of that

20       article.

21              MR. KATARINCIC:  Mr. Hook, I don't

                        Page 95

Dbrendel.txt

22    know how long you've been at the Bar, but

23    everything you've done in that last statement

24    is contrary to the Federal Rules, to the spirit

25    and the written Federal Rules.

⬚                                                    112

1                MR. HOOK:  I don't believe so,

2    Mr. Katarincic.

3                MR. KATARINCIC:  Well, I do.

4                MR. HOOK:  When you twist a factual

5    statement and take it out of context, that's

6    improper questioning of a witness.

7 BY MR. KATARINCIC:

8 Q.   Then let me ask you, is it true --

9                MR. HOOK:  Perhaps you should show

10    her the article and let it be read in context.

11                MR. KATARINCIC:  She has the

12    Complaint in front of her.

13                MR. HOOK:  The article.

14                MR. KATARINCIC:  It's your article,

15    you prepared the Complaint.

16                MR. HOOK:  Don't try to take it out

17    of context.  I've seen Mrs. Rushak looking at

18    the article over there.

19 BY MR. KATARINCIC:

20 Q.   Is this statement true, this case is about

21    money?  If not, what else is it about?

22 A.   That sentence is taken out of context.  I know

23    this because I just recently reread that

24    article.  And Mr. Hoffman made it appear that

25    we were making this case a case for money,

Page 96